UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee <br> of BD REALTY TRUST, <br>         Plaintiff <br><br> v. <br><br> THE TOWN OF WAREHAM acting by <br> and through the BOARD OF <br> SELECTMEN OF THE TOWN OF <br> WAREHAM, and the BOARD OF <br> SELECTMEN OF THE TOWN OF <br> WAREHAM, <br>         Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S MOTION IN LIMINE FOR LEGAL RULING THAT A NONPROFIT RECREATIONAL BEACH CLUB IS AN ALLOWED USE WITHIN THE R-30 ZONING DISTRICT UNDER THE WAREHAM ZONING BYLAW

Now comes the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), and moves this Honorable Court for a ruling, as a matter of law, that a nonprofit recreational beach club, with clubhouse structure and attendant parking area, would constitute an allowed use as of right under the Wareham Zoning Bylaw on the premises located at 200 Swifts Beach Road in Wareham, Massachusetts ("the Premises), on the date the Premises were taken by eminent domain. The issue is one of law and is appropriate in advance of trial so that the Plaintiff can determine whether this use can be offered as the lawful highest and best use for purposes of determining the fair market value of the Premises.

## STIPULATED AND UNDISPUTED FACTS

The Town of Wareham took the Premises by Order of Taking recorded at the Plymouth County Registry of Deeds on December 31, 2003.  See Pre-Trial Mem. at p.2, ¶ 2.  The Premises are comprised of a parcel of land consisting of 5.35 acres of waterfront property with beach frontage on Buzzards Bay. See Pre-Trial Mem. at p. 2, ¶ 4.  As of the date of taking, the Premises were designated by the Town of Wareham Zoning Bylaw as being located in the "Residential R-30 District".  See Pre-Trial Mem. at p. 2, ¶ 7.  The Town of Wareham Zoning Bylaws, as revised through April 28, 2003, were in effect on the date of taking.  See Pre-Trial Mem. at p.3, ¶ 19. See also Pre-Trial Mem. at p. 3, ¶ 19 and Agreed Exhibit 9 (cited portions of the Bylaw are attached hereto as **Exhibit 1**).

## ARGUMENT

I.      Scope Of Nonprofit Beach Club On The Premises

Through its experts, the Trust has determined that the highest and best use of the Premises on the date of taking would be as a nonprofit recreational beach club; an "as of right" use under the Wareham Zoning Bylaw within the R-30 zone.[1]  The beach club would be operated by a corporation organized under M.G.L. c. 180, at which a defined and limited membership could enjoy swimming, sunbathing, kayaking, boating, picnicking and other recreational pursuits, but from which the general public is excluded, which does not offer "temporary memberships", and which does not pay dividends to its members, officers or directors.  The beach club would include a clubhouse facility with lockers, changing rooms and other similar amenities. Additionally, there would be a parking area for the beach club members.

II.      The Determination of an Allowed Use Is a Question of Law.

---

[1] The Town disputes that a nonprofit recreational beach club would be an allowed use within the R-30 zone.

The meaning of a term or phrase contained within a zoning by-law is a question of law to be determined by the court.  See Seekonk Collision Serv., Inc. v. Bd. of Selectmen of Seekonk, 4 Mass. App. Ct. 701, 704 (1976) (citation omitted) (interpreting the term "automobile service station" as a "question of law [by the] court [citation omitted] 'according to common and approved usage' [citation omitted] and in the context in which it is employed." [citation omitted]).

In the instant case, the Trust proposes that the highest and best use of the Premises on the Date of Taking is a nonprofit beach club, and intends to introduce evidence at trial in this regard. As discussed herein, although a "nonprofit beach club" is not specifically listed as an allowed use within the zoning district for the Premises, "nonprofit recreational purposes" are an allowed use within the R-30 zone.  Thus, prior to trial, this Court must determine whether, as a matter of law, the "nonprofit beach club" envisioned by the Trust constitutes a "nonprofit recreational purpose" as that term is commonly used and within the context in which it is employed under the zoning bylaw.

The inquiry at issue here is purely a legal one and distinct from the factual inquiry that would be required if the use required favorable zoning relief or the grant of use permits.  See e.g. McLaughlin v. Board of Selectmen of Amherst, 38 Mass. App. Ct. 162, 170-172 (1995)(valuation theory as a residential subdivision required evidence that it was reasonably probable that plaintiff could have obtained waivers of planning board subdivision regulations and special permit from the zoning appeals board); Salem County Club, Inc. v. Peabody Redevelopment Authority, 21 Mass. App. Ct. 433, 435 (1986)(and cases cited therein)(whether favorable action by public authorities should be taken into account is a matter for demonstration through evidence).  Where the use is dependent on zoning relief or use permits, "the exercise the

trier of fact must go through is to appraise whether a favorable change in circumstances is reasonably probable, rather that merely possible, and to calculate what an informed, reasonably astute buyer would pay for the probability factor." In the instant case, however, the proposed use suggested by the Trust is an allowed use which would not require any permits or approvals from the Town. Thus, the only inquiry that this Court is being asked to make at this juncture is whether, as a matter of law, the nonprofit beach club falls within the meaning of a "nonprofit recreational purpose" as that term is used within the Wareham Zoning Bylaw.

      III.    <u>A Nonprofit Beach Club Is Permitted As Of Right Under The Wareham Zoning Bylaw</u>.

      A.    <u>Wareham Zoning Bylaws</u>

In the R-30 zoning district, the Wareham Zoning Bylaws permit the following uses as of right:

> Allowed Uses:
> **In Residential R-30 District buildings, structures and premises may be used for** one-family detached residential purposes, for two family detached and multiple family residential purposes only as provided in Section III, RESIDENTIAL CLUSTER DEVELOPMENT, and for uses customarily necessary thereto, for municipal, religious, educational, **non-profit recreational purposes**, any agricultural use, except piggeries and fur farms, and for the following commercial purposes but no others:
> (1) The display and sale at a roadside stand of products the major portion of which are raised on the farms or produced in the homes of the Town.
> (2) The use of a room or rooms in a dwelling or accessory building for a customary home occupation including the taking of boarders or lodgers, or the practice of a profession or trade conducted by a resident of the premises, provided there is no external evidence of any business other than permitted signs.

Wareham Zoning Bylaws at p. 5 (emphasis added). The Wareham Zoning Bylaws do not define "nonprofit recreational purpose", nor its component terms, "nonprofit" and "recreational purpose". <u>See</u> Wareham Zoning Bylaws at p. 45-52. <u>See also</u> Expert Report of Michael S.

Giaimo, Esq.[2] dated March 29, 2006 (hereinafter, "Giaimo Report") at p. 8 (attached hereto as **Exhibit 2**).  The Wareham Zoning Bylaw does not appear to contain any other use category within which a "beach club" might better fit.  See Giaimo Report, p. 8.  The Bylaw includes a definition for the term "membership club,"[3] but this term is not referenced in the use provisions of any district, and appears to be used only one time in the Wareham Zoning Bylaw in any context.[4]  See Giaimo Report, p. 8-9 and nn.3-4.

There are a limited number of cases that have interpreted the Wareham Zoning Bylaw.  In S. Volpe & Co. v. Wareham Board of Appeals, 4 Mass. App. Ct. 357 (1976), the Massachusetts Appeals Court, assumed that the phrase "non-profit recreational purpose" in the Wareham Zoning Bylaw would allow a non-profit golf course to be constructed, even though a for-profit golf course would require a special permit in the district in question.  See Giaimo Rep., p. 8, n.2. See also Tsagronis v. Wareham Board of Appeals, 415 Mass. 329, 334 (1993) (Abrams, J. dissenting) (assuming that the phrase "non-profit religious, educational and recreational purpose" in the Wareham Zoning Bylaw would allow use as "a campground for Boy Scouts, Girl Scouts, poor children, the Salvation Army or for many other activities.").  S. Volpe & Co. and Tsagronis appear to be the only reported cases in which the language of the Wareham Zoning Bylaw in question is addressed.

Because the phrase "nonprofit recreational purpose" is not defined by the Bylaw itself, it requires interpretation.  "In the absence of an express definition, the meaning of a word or phrase used in a local zoning enactment is a question of law, [citation omitted] and is to be determined

---

[2] Attorney Michael S. Giaimo, Esq., was retained by the Trust to render an expert zoning opinion and report pursuant to Fed. R. Civ. P. 26(a)(2), which has already been disclosed to Defendants.
[3] "a social, sports or fraternal association or organization which is used exclusively by members and their guests and is not conducted as a gainful business." Article IX.
[4] That is within Article IX, as an example of what the term "dwelling" does not include.

by the ordinary principles of statutory construction.    Specific provisions of a zoning enactment

are to be read in the context of the law as a whole, giving the language its common and approved

meaning 'without regard to … (the court's) own conceptions of expediency.'" <u>Framingham</u>

<u>Clinic, Inc. v. Zoning Bd. of Appeals of Framingham</u>, 382 Mass. 283, 290 (1981) (citations

omitted).   The court should "'derive the words' usual and accepted meanings from sources

presumably known to the (by-law's) enactors, such as their use in other legal contexts and

dictionary definitions.'"   <u>Id.</u>   The Wareham Zoning Bylaw, Article IX, provides that words not

defined in the Zoning Bylaw or in the State Building Code or the Wareham Subdivision

Regulations shall have the meaning given in "Webster's Unabridged Dictionary, Third Edition."

<u>See</u> Giaimo Report, p. 8.[5] Generally, the meanings of words used, but not defined in a zoning

bylaw, are determined according to the "common and approved usages of the language." <u>Jackson</u>

<u>v. Building Inspector of Brockton</u>, 351 Mass. 472, 475 (1966).   <u>See</u> <u>also</u> Giaimo Report, p. 8.

     1.      <u>"Recreational Purpose"</u>

Webster's Third New International Dictionary defines "recreational" as "of or relating to

recreation."   <u>See</u> Giaimo Rep., p. 9.   It defines the term "recreation" in turn, as "the act of

recreating or the state of being recreated:   refreshment of the strength and spirits after toil:

diversion, play . . . a means of getting diversion or entertainment."   <u>See</u> Giaimo Rep., p. 9. To

similar effect, the Massachusetts Appeals Court has stated that

> 'Recreation' in its most natural signification means 'refreshment of strength and spirits
> after work; . . . a means of refreshment or diversion.'. . . This would include not only . . .
> active pursuits (playing baseball and the like) . . . but also passive pursuits, such as
> watching baseball, strolling in the park to see animals, flowers, the landscape
> architecture, or other sights, picnicking, and so forth.

---

[5] In his analysis of whether a nonprofit beach club would be an allowed use under the Zoning Bylaw, Bobrowski
failed to acknowledge this reference to directive for statutory construction that is expressly provided within the
Zoning Bylaw itself.

Catanzarite v. Springfield, 32 Mass. App. Ct. 967 (1992).  See also Giaimo Rep., p. 9.  In this

light, there can be little doubt that swimming in the ocean, kayaking, and sunbathing on a beach

would be considered "recreational purposes" within the ordinary meaning of that term.  See

Goldmuntz v. Town of Chilmark, 38 Mass. App. Ct. 696 (1995) (interpreting conservation

restriction allowing "passive recreational uses" to include boating and swimming in a pond);

Ivons-Nispel, Inc. v. Lowe, 347 Mass. 760, 762 (1964) (using the term "summer recreational

purposes" in referring to "bathing, sun bathing, picnicking and all recreational activities for

which beach property is seasonally used").  See also Giaimo Rep., p. 9.

      2.     "Non-Profit"

    Webster's Third New International Dictionary defines "non-profit" in relevant part as

"not conducted or maintained for the purpose of making a profit. . . not based on the profit

motive."  See Giaimo Rep., p. 10.  In Kiss v. Board of Appeals of Longmeadow, 371 Mass. 147,

155-56 (1976), the Massachusetts Supreme Judicial Court addressed the question whether two

tennis clubs qualified for special permits under a use provision allowing "a club not conducted

for profit."  See Giaimo Rep., p. 10.   In the absence of a definition under the local zoning by-

law, the Court held that the clubs in question—which were operated as corporations under G.L.

c. 180, which lease their space and facilities from the owners of the land, where the owners

received no profit "on any count from the operation of the clubs other than the payment of rent

under the leases," where the "membership in the clubs will be strictly controlled and limited to

bona fide members" and "the public at large will not be allowed to use the clubs," and "no

members, officers or directors of the club will receive any dividends from either club's

operation"—qualified as a club "not conducted for profit" within the meaning of the zoning

provision. See Kiss, 371 Mass. at 155-56. See also Giaimo Rep., p. 10.

The Court in Kiss contrasted the case of Carpenter v. Zoning Board of Appeals of Framingham, 352 Mass. 54 (1967).  See Giaimo Rep., p. 10.  The plaintiff in that case operated a swimming pool, locker room and attendant facilities in a single family residential zone in which commercial uses were prohibited.  See Giaimo Rep., p. 10.  Even though the facility was owned by a nonprofit corporation organized under G. L. c. 180 "to encourage athletic and recreational activities of all kinds, and to acquire and develop facilities designed to promote the same" the court rejected the argument that the facility qualified as a "club" under the zoning provision.  See Giaimo Rep., p. 10.  Instead, the fact that anyone could come in off the street and pay for a "temporary membership," that there was no limitation on the membership, that the property of the "club" is not owned by the members but by the original investors, and that the members do not have effective means of participating in management indicated its prohibited commercial nature.  See Giaimo Rep., p. 10-11.  Likewise, because it was commercial in nature, it did not qualify as an allowed "recreational building and ground" and instead was more akin to a "commercial amusement place," which was allowed only in certain non-residential zones.[6]  See Giaimo Rep., p. 11.

3.     "Non-Profit Recreational Beach Club" Use

Based on the foregoing, a beach area operated by a corporation organized under G.L. c. 180, at which a defined and limited membership can enjoy swimming, sunbathing, kayaking and other recreational pursuits, but from which the general public is excluded, which does not offer "temporary memberships," and which does not pay dividends to its members, officers or directors, would, at the time of the taking, have constituted a  "non-profit recreational purpose"

---

[6] Wareham, likewise, provides for "places of amusement or assembly" in the Wareham Village District.

allowed by right at the Premises under the Wareham Zoning Bylaw, subject to the further issues considered in Sections II.A.3.a-c below. See Giaimo Rep., p. 11.[7]

The Town's reliance on Leominster Materials Corp. v. Bd. of Appeals of Leominster, 42 Mass. App. Ct. 458, 460 (1997) (cited in the Supplemental Affidavit of Mark Bobrowski), is misplaced and has no application to the provision of the Wareham Zoning Bylaw at issue. The holding in Leominster Materials is very narrow. In that case, the sole issue was whether an unlisted use fell within the meaning of one of three allowed uses specifically delineated in the bylaw. The specific uses allowed in the zone were the removal of "sand, loam and gravel". The applicant argued that the removal of "rock" also fell within the purview of these three allowed uses. The Massachusetts Appeals Court disagreed and held that the exclusion of "rock" from the list of earth products that could be removed was deliberate, and therefore could not be considered to fall within the items specifically listed. The Appeals Court further held that the "express

---

[7] In his faulty interpretation of the Zoning Bylaw, the Town's zoning expert (Bobrowski) offers nothing more than a red herring. Bobrowski suggests that a "nonprofit beach club" is not allowed within the R-30 zone because it is not expressly delineated within the text of the Bylaw. His argument misses the point because "nonprofit recreational purposes" are allowed within the zone, but because this phrase is not defined, an additional step must be taken to reach the conclusion that a nonprofit beach club is, in fact, an allowed use. In fact Bobrowski acknowledges this rule of statutory construction in his self-authored book entitled HANDBOOK OF MASSACHUSETTS LAND USE AND PLANNING LAW (2d ed. 2002):

> Zoning ordinances and by-laws are generally written by laypersons. As an unfortunate result, ordinances and by-laws are rife with undefined terms, inconsistencies and ambiguities. . . .
>
> …
>
> As a general rule, '[t]he zon[ing] ordinance must be construed reasonably with regard both to the objects sought to be obtained and to the general structure of the ordinance as a whole.' Resolution of the matter is a 'question of law, and is to be determined by the ordinary principles of statutory construction.'…
>
> Many decisions turn on the meaning of a specific, undefined word or phrase in an ordinance or by-law. [footnoting to Framingham Clinic v. Zoning Bd. of Appeals of Framingham, 382 Mass. 283 (1981)] In such cases, '[o]ther legal contexts and dictionary definitions are helpful.' If the words to be interpreted are everyday in nature, they 'should be interpreted in accordance with common usage, without artificial enlargement or contraction, and free from the court's 'own conceptions of expediency.''

HANDBOOK OF MASSACHUSETTS LAND USE AND PLANNING LAW (2d ed. 2002) at 87-89 (emphasis added). This is the very analysis that the Trust's zoning expert (Giaimo) undertook—and which the Town's zoning expert did not, arguably because it would have yielded an unfavorable analysis for the Town.

mention of one matter excludes by implication other similar matters not mentioned." 42 Mass. App. Ct. at 461.

In this case, the phrase "nonprofit recreational purpose" cannot be interpreted in the same manner as the provision in <u>Leominster Materials</u> because it is not an explicit delineation of identifiable uses. Instead, "nonprofit recreational purpose" is a broad category of uses which is un*defined* by the Bylaw; it is not merely one of several *expressed* uses among a list of explicit uses (such as the earth removal activities in <u>Leominster Materials</u>). Indeed, using the Town's analysis, only a "nonprofit recreational purpose" could be allowed within the zone, but clearly these words do not, on their face, refer to any specific use that can be generally recognized or understood. Thus, "nonprofit recreational purpose" can only be interpreted to encompass a wide range of uses that must meet certain criteria (*i.e.* that they are operated as a nonprofit and that their underlying scope is recreational in nature) in order to be allowed within the R-30 zone. <u>See</u>, <u>e.g.</u>, <u>S. Volpe & Co.</u>, 4 Mass. App. Ct. at 358 (assuming a nonprofit golf course to fall within the realm of "nonprofit recreational purpose"). In this case, a nonprofit recreational beach club, as described *supra*, squarely falls within this broad category of uses.

a.    <u>Accessory Parking Use</u>

The practical ability to conduct a beach club use at the Premises presumably depends on the ability to maintain associated parking.[8] <u>See</u> Giaimo Rep., p. 11. The use of a portion of the Premises for parking accessory to a nonprofit recreational use at the Premises would be allowed by right (subject possibly to review of a landscaping plan under Article X of the Zoning By-law in connection with any associated building permit). <u>See</u> Giaimo Rep., p. 11.

Parking is not specifically addressed as a use in the Wareham Zoning Bylaw, and the use provisions of the Residential R-30 District do not address accessory use in connection with non-

---

[8] The Wareham Zoning Bylaw addresses Parking in Article VI.

residential uses allowed in that district.  See Giaimo Rep., p. 11.  However, the Zoning Bylaw

impliedly recognizes accessory uses by defining the term "use, accessory" as:

> "a use incidental and subordinate to the principal use of a structure
> or lot, or a use, not the principal use, which is located on the same
> lot as the principal structure.  Accessory use by area shall be
> interpreted not to exceed 40 percent of the area to total use [sic] of
> the structure and/or lot on which it is located."[9]

Wareham Zoning Bylaw, Article IX (p. 51).  See Giaimo Rep., p. 11-12.  This language appears

intended to limit the amount of a lot that can be devoted to an accessory use to 40 percent of the

total lot area.  See Giaimo Rep., p. 12.

Article VI of the Zoning Bylaw contains a chart showing the required number of parking

spaces for various uses.  See Giaimo Rep., p. 12.  This chart does not specify a parking

requirement for non-profit recreational use.  See Giaimo Rep., p. 12.  It indicates that the

Building Inspector shall determine the required number of parking spaces for any use not listed

in a category contained in the chart of parking space requirements.  See Giaimo Rep., p. 12.

Presumably in doing so, the building inspector would look to the requirements set forth in the

chart for an analogous use such as that of a Marina or Yacht Club, which requires one space for

every two boat slips, or *commercial* outdoor recreation, which requires one space per four

persons capacity.  See Giaimo Rep., p. 12.  By analogy to the parking ratio required under the

Bylaw for marina parking, assuming that there could be two family memberships for each

parking space, the number of parking spaces that can be lawfully laid out on the Premises would

support twice the number of family memberships at the Premises.  See Giaimo Rep., p. 12.[10]

b.    Permanent Clubhouse Structure

---

[9] See Pratt v. Building Inspector, 330 Mass. 344, 346 (1953) (although zoning ordinance does not specifically
address accessory uses, it must be interpreted in a reasonable manner).
[10] Despite having ample opportunity to do so, the Town's zoning expert did not offer any direct or rebuttal testimony
in this regard, and thus the Trust's interpretation of the amount of parking required for a nonprofit beach club use is
undisputed.

The practical ability to conduct a beach club use at the Premises also presumably depends on the availability of amenities for members. <u>See</u> Supplement to Expert Report of Michael S. Giaimo, Esq. ("Giaimo Supp. Rep."), p. 1-2 (attached hereto as **Exhibit 3**). Permanent structures such as a comfort station, locker facilities, or a small snack bar might be logically associated with a nonprofit beach club use and would be permitted under the base zoning applicable to the Premises, subject to an overall limitation that accessory structures not exceed 40 percent of the total lot area. <u>See</u> Giaimo Supp. Rep., p. 1-2.

      c.    <u>Additional Amenity Structures Accessory to Non-Profit Recreational Beach Club Use</u>

The beach club use envisioned by the Trust also includes some accessory amenity structures for use by the members and guests of the non-profit beach club. These accessory structures would be permissible under the Zoning Bylaw. <u>See</u> Giaimo Rep., p. 12-13. Structures that might logically be associated with a beach club use include kayak and bicycle racks and picnic tables. <u>See</u> Giaimo Rep., p. 12-13. As a matter of the base zoning, such accessory uses would appear to be allowed subject to the overall limitation that accessory uses cannot exceed 40 percent of the total lot area. <u>See</u> Giaimo Rep., p. 13.

## <u>CONCLUSION</u>

Based on the foregoing, this Court should allow the Trust's motion in limine and hold that a nonprofit recreational beach club, with clubhouse structure, parking area and accessory amenity structures, is a "nonprofit recreational purpose" as a matter of law, and therefore is an allowed use within the R-30 zone which can be considered as the highest and best use of the premises at trial.

                          Plaintiff,
                          BARBARA DEIGHTON HAUPT, Trustee
                          of BD REALTY TRUST,

Date:   3/6/2007

By her attorneys,
 /s/ Kristen M. Ploetz_____
Jeffrey T. Angley, Esq.
B.B.O. #543958
Kristen M. Ploetz, Esq.
B.B.O. #654549
Phillips & Angley
One Bowdoin Square
Boston, MA 02114

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 6th day of March, 2007.

_____/S/ Kristen M. Ploetz_____
Kristen M. Ploetz, Esq.

L:\Ditn002\Motions in limine\mot.legal.ruling.beachclub.JTA.final.doc

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee )
of BD REALTY TRUST,                            )
              Plaintiff                            )
                                    )
v.                                                          )
                                      )
THE TOWN OF WAREHAM acting by         )
and through the BOARD OF                      )
SELECTMEN OF THE TOWN OF             )
WAREHAM, and the BOARD OF               )
SELECTMEN OF THE TOWN OF             )
WAREHAM,                                           )
              Defendants                       )

## EXPERT REPORT OF MICHAEL S. GIAIMO, ESQ.

### I.   Witness

Michael S. Giaimo, Esq.
Robinson & Cole LLP
25th Floor
One Boston Place
Boston, MA  02108

### II.   Introduction

This report and the opinions expressed herein are being submitted by Michael S. Giaimo,

Esq. on behalf of Barbara Deighton Haupt, Trustee of BD Realty Trust, Plaintiff in the above-

referenced matter.  This report is being submitted in accordance with Fed. R. Civ. P. 26(a)(2).

### III.   Witness Qualifications

#### A.   General Background[1]

I am a partner in the law firm Robinson & Cole, LLP.   My practice is focused primarily

on zoning and other land use and environmental law.   I represent a variety of business,

---

[1] A copy of my *curriculum vitae* is attached hereto as **Exhibit A**.

individual, institutional and public clients.    I provide them with advice concerning permitting

and regulatory requirements associated with the use and development of property, and represent

them during the permitting process and in related litigation.    I have practiced at Robinson &

Cole since 1997 and have been a partner there since 2000.

I previously practiced with the law firm Rackemann, Sawyer and Brewster in Boston

from 1989 through 1997, where I likewise focused on zoning and other land use and

environmental permitting.   Before entering private practice, I clerked for Justice Francis

O'Connor of the Massachusetts Supreme Judicial Court during 1988-89.  I was admitted to the

Massachusetts bar in 1988.

I have served as the Chair of the Zoning Board of Appeals in Sherborn, Massachusetts

since June, 2005.  I previously served as a member of the Sherborn Planning Board from 1993

through 1999, and Chaired that Board from 1996 through 1998.  I have a Masters Degree in City

Planning from MIT, in addition to a J.D. degree with honors from Harvard Law School.  I have

lectured on zoning and related land use legal topics at various programs sponsored by

Massachusetts Continuing Legal Education and by other continuing professional education

organizations.

B.    List of Publications Authored by Witness Within Last Ten (10)Years

"Chapter 8: Steering Your Way Through Local Zoning Requirements" in *Massachusetts Basic Practice Manual* Massachusetts Continuing Legal Education, 2000, Supp. 2001, 2002 and forthcoming 2006.

Book Review: "Take it on Faith" *Planning & Environmental Law* September, 2005

"Chapter 1: "Historical Development of Massachusetts Zoning Law" in *Massachusetts Zoning Manual* Massachusetts Continuing Legal Education, 1999 and Supp. 2002 and 2005.

"Chapter 7: "Zoning Freezes" in *Massachusetts Zoning Manual* Massachusetts Continuing Legal Education, 1999 and Supp. 2002 and 2005.

"Chapter 8: "Special Permits" in *Massachusetts Zoning Manual* Massachusetts Continuing Legal Education, 1999 and Supp. 2002 and 2005.

"A Promising New Mechanism for Creating More Housing and Encouraging Mixed Use Development in Massachusetts" *Real Estate Finance* April, 2005 (with Brian W. Blaesser and Matthew J. Lawlor).

Commentary: "Releasing the Choke Hold on Growth" *Planning & Environmental Law* October, 2004 (with Brian W. Blaesser).

"Challenging Improper Land Use Decision-Making Under the Equal Protection Clause" XV *Fordham Environmental Law Review* 335, Spring, 2004.

"Ill Will and Class of One: Equal Protection Claims after the Olech Decision" *Land Use Law & Zoning Digest*, February, 2003.

"Vol. 3, Environmental Law and Transportation" in *Selected Studies in Transportation Law* Transportation Research Board, 2003 (with Brian W. Blaesser and Daniel R. Mandelker).

"Church v. State" *Planning* April, 2003.

Book Review: "Introduction to Zoning, 2d Edition" *Journal of the American Planning Association (JAPA)*, Autumn, 2002.

"The Land Court's Durand Case and the Doctrine of Contract Zoning in Massachusetts: A Promise Not Forgotten" *The Conveyancer* Summer, 2002 (with Janet Stearns).

"Preston v. Zoning Board of Appeals of Hull and the Zoning Doctrine of Merger: A Reminder from the Appeals Court" *The Conveyancer* Summer, 2001.

C.     Compensation to be Paid to Witness for Study and Testimony

My hourly rate is billed at $340.00 an hour. Through the period ending February 28,

2006, I have billed BD Realty Trust a total of $8,952.79 for services rendered.

D.     Listing of Other Cases in Which Witness Has Testified as an Expert at Trial or by Deposition Within Last Four (4) Years

None in the past four years.

IV.    **Statement of Opinions**

A.    Summary of Opinions

It is my opinion that under the provisions of the Wareham Zoning By-law in effect when the Town of Wareham took the Premises that are the subject of this matter, those Premises could have been lawfully used as a beach club that is organized and operated as a *bona fide* non-profit entity, including accessory parking for up to 125 cars substantially as shown on the "Conceptual Beach Club Plan" prepared by McKenzie Engineering Group, Inc., dated March 28, 2006 ("Beach Club Plan"), and outdoor furnishings such as picnic tables, bicycles racks, kayak racks, and temporary sanitary facilities.  It is also my opinion, with reference to the provisions of the Wareham Zoning By-law in effect when the Town of Wareham took the Premises that are the subject of this matter, and to the provisions of Massachusetts General Laws Chapter 40B and the regulations of the Massachusetts Housing Appeals Committee, that  the Premises could lawfully have been used for a condominium development having a 25% affordable housing component under a comprehensive permit issued by the Wareham Zoning Board of Appeals pursuant to Massachusetts General Laws Chapter 40B, such as the 40-unit condominium development shown on the "Conceptual Comprehensive Permit Plan" dated March 28, 2006, prepared by McKenzie Engineering Group, Inc. ("Condominium Proposal Plan").  The Wareham Zoning Board of Appeals would have had the burden of demonstrating that the denial of an application for such a permit or the imposition of conditions that would render the development uneconomic was justified by local planning concerns that outweighed the regional need for housing.

B.    Complete Statement of Opinions Giving Basis and Reasons

1.    Background as to Why I Was Retained

I was retained in August, 2005 by the law firm Phillips & Angley on behalf of the

Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), with respect to

questions of zoning interpretation relating to the intended development and use of a 5.35 acre

waterfront parcel of land located off of Swifts Beach Road in Wareham, Massachusetts ("the

Premises"), and to render an opinion and act as an expert witness in connection with that subject.

I was retained to provide an opinion concerning whether the Premises could have been used for a

beach club under the applicable provisions of the Town of Wareham Zoning By-law ("Zoning

By-law") at the time the Town of Wareham took it by eminent domain in December 2003.  I

have subsequently been asked to more broadly evaluate other potential uses for the Premises

under the Zoning By-law, and in particular to evaluate a potential use involving a 40 unit

condominium project with 92 parking spaces.  My report will also provide the basis for

determining the highest and best use of the Premises from a zoning perspective.

The scope of the services I was retained to provide included the following:

- site inspection of the Premises;

- review of applicable law concerning the zoning of the Premises;

- review of plans, photographs, and other documentation regarding the Premises;

- render a written report of opinions regarding my findings; and

- testify at pre-trial proceedings and at trial.

2.    Data and Information Which Form the Basis of My Opinions

In forming my opinion, I have reviewed copies of the following documents and

considered the following additional information concerning the Premises:

5

- Zoning By-laws, Town of Wareham, Massachusetts, Revised Thru April 28, 2003;

- Town of Wareham Massachusetts Zoning Map, revised through February 1, 1999;

- Meeting Housing Needs in Wareham ("Town Housing Plan");

- FIRM Flood Insurance Rate Map, Panel 7 of 17 Community Panel Number 255223 0007D, revised July 15, 1992;

- "Existing Conditions" Plan prepared by McKenzie Engineering Group, Inc. now dated March 28, 2006;

- Land Court Subdivision Plan 12124D, Sheet 1, dated June 30, 1938. ("1938 Land Court Plan");

- "Conceptual Comprehensive Permit Plan" dated March 28, 2006, prepared by McKenzie Engineering Group, Inc. ("Condominium Proposal Plan");

- "Conceptual Beach Club Plan" prepared by McKenzie Engineering Group, Inc., dated March 28, 2006 ("Beach Club Plan");

- Historic aerial photographs of the Premises in the possession of Plaintiff's counsel.

See **Exhibit B** attached hereto.

I also reviewed the historic versions of the Zoning Bylaws contained in the files of the Wareham Town Clerk. I inspected the Premises on September 8, 2005. Plaintiff's counsel informed me of, and I considered, the following additional facts: at one historic point in time, the property contained several beachfront cottages. Those cottages were subsequently removed or destroyed. From at least the early 1950's, and continually on a seasonal basis through the time of the taking, the Subject Property was in use during summer months as a fee-based parking lot for beachgoers, who used the beachfront recreationally. For a period of time, there were buildings on the property containing a snack bar and restrooms (shown on the historic photographs); however those buildings were destroyed by a hurricane in 1954 and were not rebuilt.

6

3.    Analysis and Conclusions

Based on my review of the above-noted documents and information and my knowledge of and research concerning the Massachusetts law pertaining to zoning, I have formed an opinion as to whether a beach club use is permitted on the Premises under the applicable provisions of the Wareham Zoning By-law in effect at the time of the taking, and as to the permissibility of other potential uses of the Premises as a matter of zoning law.

a.    Background Information Concerning Applicable Zoning:

According to the Wareham Town Clerk's office, the Town of Wareham first adopted zoning on November 19, 1951, in the form of the so-called "1952 Zoning By-law." In rendering my opinion, I have relied upon the version of the Wareham Zoning By-law that was in effect on December 31, 2003, and any reference in this report to the Wareham Zoning By-law or to the "By-law" is to that version, unless otherwise specified. The Premises are located in the Residential R-30 Zoning District, as depicted on the Town of Wareham Massachusetts Zoning Map in effect at the time of the taking on December 31, 2003. The Premises are also located within the Flood Plain District, which is an overlay district, by virtue of its location within a VE district on the Flood Insurance Rate Maps for the Town of Wareham. It does not appear that the Premises are located within any other overlay district.

Lot area, frontage and setback requirements for the Residential R-30 District are set forth in Table 4 of Article IV of the Wareham Zoning Bylaw. Non-residential uses and single family residential uses require a lot having at least 30,000 square feet and 150 feet of continuous frontage on a public or private street or way. The Premises satisfy those minimum requirements.

7

    b.    <u>Opinion as to Use of Subject Property for Non-Profit Beach Club with Accessory Parking</u>

The use of the Premises for a beach club that is organized and operated as a *bona fide* non-profit entity would have been allowed by right under the Wareham Zoning By-law at the time of the Taking. The size of the beach club would be limited by the size of the associated parking area that would be feasible under the provisions of the By-law pertaining to the design of parking areas and the limitation on the size of accessory uses.

Buildings, structures and premises may be used for a "non-profit recreational purpose" by right in the Residential R-30 District under the Wareham Zoning By-law. However the By-law defines neither the term "non-profit recreational purpose," nor its component terms "non-profit" and "recreational purposes." This provision therefore requires interpretation. The Wareham Zoning Bylaw, Article IX, provides that words not defined in the Zoning Bylaw or in the State Building Code or the Wareham Subdivision Regulations shall have the meaning given in "Webster's Unabridged Dictionary, Third Edition." Generally, the meanings of words used but not defined in a zoning bylaw are determined according to the "common and approved usages of the language." *Jackson v. Building Inspector of Brockton*, 351 Mass. 472, 475 (1966).[2] The Wareham Zoning Bylaw appears not to contain any other use category within which a "beach club" might better fit. The By-law includes a definition for the term "membership club,"[3] But

---

[2] In *S. Volpe & Co. v. Wareham Board of Appeals,* 4 Mass. App. Ct. 357 (Mass App. Ct. 1976), the Appeals Court, assumed that the phrase "non-profit recreational purpose" in the Wareham Zoning By-law would allow a non-profit golf course to be constructed, even though a for-profit golf course would require a special permit in the district in question. *See also, Tsagronis v. Wareham Board of Appeals* 415 Mass. 329, 341 (1993) (Abrams, J. dissenting) (assuming that the phrase "non-profit religious, educational and recreational purpose" in the Wareham Zoning Bylaw would allow use as "a campground for Boy Scouts, Girl Scouts, poor children, the Salvation Army or for many other activities.") These appear to be the only reported cases in which the language of the Wareham Zoning Bylaw in question is addressed.

[3] "a social, sports or fraternal association or organization which is used exclusively by members and their guests and is not conducted as a gainful business." Article IX.

this term is not referenced in the use provisions of any district, and appears to be used only one time in the Wareham Zoning By-law in any context.[4]

*Recreational Purpose*

Webster's Third New International Dictionary defines "recreational" as "of or relating to recreation." It defines the term "recreation" in turn, as "the act of recreating or the state of being recreated: refreshment of the strength and spirits after toil: diversion, play . . . a means of getting diversion or entertainment." To similar effect, the Massachusetts Appeals Court has stated that "'Recreation' in its most natural signification means 'refreshment of strength and spirits after work; . . . a means of refreshment or diversion.'. . . This would include not only . . . active pursuits (playing baseball and the like) . . . but also passive pursuits, such as watching baseball, strolling in the park to see animals, flowers, the landscape architecture, or other sights, picnicking, and so forth." *Catanzarite v. Springfield*, 32 Mass. App. Ct. 967 (Mass. App. Ct. 1992). In this light, there can be little doubt that swimming in the ocean, kayaking, and sunbathing on a beach would be considered "recreational purposes" within the ordinary meaning of that term. *See Goldmuntz v. Town of Chilmark*, 38 Mass. App. Ct. 696 (Mass. App. Ct. 1995). (Interpreting conservation restriction allowing "passive recreational uses" to include boating and swimming in a pond); *Ivons-Nispel, Inc. v. Lowe*, 347 Mass. 760, 762 (1964) (Using the term "summer recreational purposes" in referring to "bathing, sun bathing, picnicking and all recreational activities for which beach property is seasonally used").

---

[4] That is within Article IX, as an example of what the term "dwelling" does not include.

*Non-Profit*

Webster's Third New International Dictionary defines "non-profit" in relevant part as "not conducted or maintained for the purpose of making a profit. . . not based on the profit motive." In *Kiss v. Board of Appeals of Longmeadow,* 371 Mass. 147, 155-56 (1976), the Supreme Judicial Court addressed the question whether two tennis clubs qualified for special permits under a use provision allowing "a club not conducted for profit." In the absence of a definition under the local zoning by-law, the Court held that the clubs in question, which were operated as corporations under G.L. c. 180, which lease their space and facilities from the owners of the land, where the owners received no profit "on any count from the operation of the clubs other than the payment of rent under the leases," where the "membership in the clubs will be strictly controlled and limited to bona fide members" and "the public at large will not be allowed to use the clubs," and "no members, officers or directors of the club will receive any dividends from either club's operation" qualified as a club "not conducted for profit" within the meaning of the zoning provision.

The Court in *Kiss* contrasted the case of *Carpenter v. Zoning Board of Appeals of Framingham*, 352 Mass. 54 (1967). The plaintiff in that case operated a swimming pool, locker room and attendant facilities in a single family residential zone in which commercial uses were prohibited. Even though the facility was owned by a nonprofit corporation organized under G. L. c. 180 "to encourage athletic and recreational activities of all kinds, and to acquire and develop facilities designed to promote the same" the court rejected the argument that the facility qualified as a "club" under the zoning provision. Instead, the fact that anyone could come in off the street and pay for a "temporary membership," that there was no limitation on the membership, that the property of the "club" is not owned by the members but by the original

investors, and that the members do not have effective means of participating in management indicated its prohibited commercial nature. Likewise, because it was commercial in nature, it did not qualify as an allowed "recreational building and ground" and instead was more akin to a "commercial amusement place," which was allowed only in certain non-residential zones.[5]

*Non-Profit Beach Club Use*

Based on these cases, it is my opinion that a beach area operated by a corporation organized under G.L. c. 180, at which a defined and limited membership can enjoy swimming, sunbathing, kayaking and other recreational pursuits, but from which the general public is excluded, which does not offer "temporary memberships," and which does not pay dividends to its members, officers or directors, would, at the time of the Taking, have constituted a "non-profit recreational use" allowed by right at the Subject Property under the Wareham Zoning By-law, subject to the further issues considered below.

*Accessory Parking Use*

The practical ability to conduct such a use at the Subject Property presumably depends on the ability to maintain associated parking.[6] It is my opinion that the use of a portion of the Premises for parking accessory to a non-profit recreational use at the Premises would be allowed by right (subject possibly to review of a landscaping plan under Article X of the Zoning By-law in connection with any associated building permit).

Parking is not specifically addressed as a use in the Zoning By-law, and the use provisions of the Residential R-30 District do not address accessory use in connection with non-residential uses allowed in that district. However the Zoning By-law impliedly recognizes accessory uses by defining the term "use, accessory" as:

---

[5] Wareham, likewise, provides for "places of amusement or assembly" in the Wareham Village District.
[6] The Wareham Zoning Bylaw addresses Parking in Article VI.

> "a use incidental and subordinate to the principal use of a structure or lot, or a use, not the principal use, which is located on the same lot as the principal structure.  Accessory use by area shall be interpreted not to exceed 40 percent of the area to total use [sic] of the structure and/or lot on which it is located."[7]

This language appears intended to limit the amount of a lot that can be devoted to an accessory use to 40 percent of the total lot area.

Article VI of the Zoning By-law contains a chart showing the required number of parking spaces for various uses.  This chart does not specify a parking requirement for non-profit recreational use.  It indicates that the Building Inspector shall determine the required number of parking spaces for any use not listed in a category contained in the chart of parking space requirements.  Presumably in doing so, the building inspector would look to the requirements set forth in the chart for an analogous use such as that of a Marina or Yacht Club, which requires one space for every two boat slips, or *commercial* outdoor recreation, which requires one space per four persons capacity.  The Plan titled "Conceptual Beach Club Plan" ("Beach Club Plan") prepared by McKenzie Engineering Group, Inc., dated March 28, 2006, shows a design for a parking area with 125 parking spaces at the Premises.  By analogy to the parking ratio required under the By-law for marina parking, assuming that there could be two family memberships for each parking space, the 125 parking spaces shown on the Beach Plan would support a membership of 250 families at the Premises.

*Structures Accessory to Non-Profit Beach Club Use*

I have also formed an opinion as to whether accessory structures for use by the members and guests of a non-profit beach club would be permissible under the Zoning By-law.  Structures that might logically be associated with such a use include a comfort station, kayak and bicycle

---

[7] See *Pratt v. Building Inspector* 330 Mass. 344, 346 (1953) (although zoning ordinance does not specifically address accessory uses, it must be interpreted in a reasonable manner).

racks, locker facilities, picnic facilities, or a small snack bar.   As a matter of the base zoning, such accessory uses would appear to be allowed subject to the overall limitation that accessory uses cannot exceed 40 percent of the total lot area.

However because the Premises are located within a FEMA VE Zone, I also consider the effect of the Flood Plain District Regulations (Section VII.M of the Zoning By-law) on the ability to undertake new construction or development at the Premises.  In this regard, the Zoning By-law appears to be internally inconsistent.  Section VII.M(b)1.(B) provides in part that "no development or redevelopment shall be permitted within a FEMA V-Zone . . . or . .. equivalent. . .." with certain exceptions for redevelopment or repair of structures that have been damaged or destroyed.   However Section VII.M(b)3. provides that no new development shall be permitted in the VE Zone "unless it is demonstrated that the cumulative effect of the proposed development when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point within the Town."   The latter provision clearly contemplates that at least some new development can take place in the VE Zone.

In my opinion, it would not be reasonable to consider the seasonal placement of structures that are not affixed permanently to the ground to be "development" implicating these Floodplain District Regulations.  For that reason, I consider it likely that as a zoning matter, the non-profit beach club could include outdoor furnishings such as picnic tables, bicycles racks, kayak racks, and temporary sanitary facilities.

c.    Opinion as to Construction of a Condominium Development

I have reviewed a plan entitled "Conceptual Comprehensive Permit Plan" dated March 28, 2006, prepared by McKenzie Engineering Group, Inc. ("Condominium Proposal Plan").  The

Condominium Proposal Plan shows the footprint of a proposed condominium development consisting of two buildings, one having 10 dwelling units ("Building A") and one having 30 dwelling units ("Building B") for a total of 40 dwelling units, with parking at grade for up to 92 vehicles. In my opinion, the Wareham Zoning By-laws would not allow the construction at the Premises of the development shown on the Condominium Proposal Plan without variances from use requirements of the Zoning By-law pertaining to the construction of apartments in a R-30 District and pertaining to new construction in a FEMA VE-Zone. Given the standards for the granting of variances under Massachusetts General Laws Chapter 40A, section 10, it is not likely that such variances would be issued for the project shown on the Condominium Proposal Plan, or that if issued they would be sustained in the face of an appeal.

However, the development shown on the Condominium Proposal Plan could be approved with a comprehensive permit under Massachusetts General Laws Chapter 40B, if it were proposed by a public agency or limited dividend or nonprofit organization, and at least 25 percent of the units were reserved for sale or rent to households with incomes at or below 80% of median. Under Chapter 40B, the Zoning Board of Appeals would be authorized to approve the development in order to help meet the need for affordable housing in Wareham. Chapter 40B authorizes the Zoning Board of Appeals to grant waivers from provisions of the Zoning By-law and other local laws and regulations as a way to facilitate the development of affordable housing. Chapter 40B can be used to compel the Zoning Board of Appeals to grant such waivers in order to authorize projects that will increase the stock of affordable housing in Wareham.

The Massachusetts Housing Appeals Committee ("HAC") is charged with deciding administrative appeals by developers from local decisions denying or conditioning the approval of a comprehensive permit application under Chapter 40B. With respect to a project under

14

Chapter 40B in a community where less than ten percent of municipality's total housing units are subsidized low and moderate income housing units, there is a regulatory presumption that a substantial housing need in the community outweighs local concerns for the enforcement of zoning and other requirements that would prevent the proposed development or cause conditions to be imposed that render the building or operation of the development uneconomic. *See* 760 CMR 31.07(1)(e); *Board of Appeals of Hanover v. H.A.C.*, 363 Mass. 339, 367 (1973). According to its Housing Plan, Wareham has not achieved the ten percent threshold that would entitle it to overcome this presumption.

Under the HAC regulations, if a town or city that has not met the ten percent threshold attempts to rebut the presumption that a substantial regional housing need outweighs local planning concerns, the proportion of the city or town's population that consists of low income persons will be used in determining the relative weight to be given the regional housing need. *See* 760 CMR 31.07(1)(e). The Housing Plan also documents that 2,131 people out of a 2000 population of 20,335 in Wareham were below the poverty level for income, that 443 families consisting of 5.4 percent of all Wareham households in 2000 were families living below the poverty level, and that 7.2 percent of the households were families paying more than 35 percent of their income for rent.

In deciding an application for a comprehensive permit to develop a condominium project having an affordable housing component on the Premises, the Wareham Zoning Board of Appeals would have to approve the proposal without any conditions that would render the development uneconomic, unless it could identify valid planning objectives for imposing a condition or denying the project that outweigh the regional need for low and moderate income housing. *Board of Appeals of Hanover* at 367; G.L. c. 40B §20.    In rendering its decision on a

comprehensive permit application that requests waivers from provisions of the Zoning By-law and other local laws and regulations, the Zoning Board of Appeals would be able to impose only those local requirements and other conditions that are "consistent with local needs" because they are required in order to protect the health or safety of the occupants of the proposed housing or of the residents of the town or the environment, or to promote better site and building design in relation to the surroundings, or to preserve open space, and that are reasonable in view of the regional need for housing. G.L. c. 40B §20; 760 CMR 31.07(2)(b); 760 CMR 31.07(3).

In my view it would be very difficult for the Zoning Board of Appeals to sustain its burden of demonstrating a local concern for the health and safety of the occupants of the Premises that would warrant applying the Flood Plain District provisions of the Zoning By-law to prevent the Condominium Proposal Plan from going forward under a comprehensive permit. In drawing this conclusion, I assume that the Condominium Proposal Plan could be designed and constructed in accordance with the applicable provisions of the Massachusetts Wetlands Protection Act, building code standards and any other federal or state standards applicable to construction in the FEMA VE-Zone, as a way of mitigating the degree of risk to health and safety. My understanding is that those regulatory schemes, all of which have health and safety objectives, do not preclude building for residential and other purposes in the VE-Zone, provided that there is conformity to design, construction, and performance standards. These non-local requirements are not subject to waiver under Chapter 40B and would apply to the development shown on the Condominium Proposal Plan. For example, the buildings would have to be constructed on pilings to a height above the flood elevation shown on the FEMA Map (as the Condominium Proposal Plan indicates that they will be).

A showing of conformity to applicable federal and state standards with regard to construction in a VE-Zone would place the burden on the Zoning Board of Appeals to demonstrate that, notwithstanding compliance with state and federal regulatory standards, it would "imperil" the health and safety of occupants or town residents not to apply the Flood Plain provisions of the Zoning By-law to prevent development at the Premises. See 760 C.M.R. 31.06(2), 31.07(2)(b).

This would be a very difficult burden to sustain because those zoning provisions do not on their face demonstrate a strong local concern with preventing people from living in the Velocity Zone. For one thing, although Section VII M.(b)1.(B) of the Zoning By-law can be read to prohibit development or redevelopment (other than redevelopment or repair) within a VE-Zone, Section VII M. (b) 3 indicates that "new construction or other land development" is allowed in the VE- Zone if, along with all other "existing and anticipated development," it will not cause a rise in the base flood elevation of "more than one foot at any point in the Town." Moreover, much of the VE- Zone in the immediate vicinity of the Premises and elsewhere in Wareham is already occupied by residential dwellings, and even Section VII.M.(b)1.(B) would apparently allow the reconstruction of such dwellings if they were destroyed. This suggests that any local health and safety interest in preventing the development and residential occupancy of such areas altogether is less than compelling.

The ability of the Condominium Proposal Plan to receive approval pursuant to the Wetlands Protection Act, would likewise serve to undercut the argument that the natural environment would be "endangered" by that proposal. Such an approval would make it very difficult for the Zoning Board of Appeals to sustain an environmental impact rationale based on

17

proximity to wetland resource areas, in defense of an attempt to deny the Project or impose conditions that would make it uneconomic. 760 C.M.R. §31.07(2)(b).

The Zoning Board of Appeals would have to show that the design of the site and proposed housing is "seriously deficient" in order to justify the denial of the Condominium Proposal Plan on this basis. 760 CMR 31.07(2)(b). In my opinion it is not likely that it would be able to do so, and more likely that it would be able to address design concerns through appropriate conditions. With respect to site design considerations, I note that although the property is at present vacant, it is not undisturbed, and the parcel was historically developed with a number of structures, as depicted on the 1938 Land Court Plan. The footprint of Building A and the adjacent parking area as shown on the Condominium Proposal Plan, encompass a concrete pad that historical photographic evidence indicates was the site of a building. Indeed, the Condominium Proposal Plan shows that both of the proposed buildings and almost all of the parking spaces are proposed within the area of the existing gravel parking area and the existing concrete pad on the Premises. (Four parking spaces to the south of Building A appear to be located outside the existing gravel parking area.) The two buildings are shown separated by a distance of approximately 150 feet and the total building footprint is 15,000 square feet and only 6.4 percent of the total area of the Premises as calculated by McKenzie Engineering. The locations shown on the Condominium Proposal Plan for Building A and Building B appear to satisfy the 10 foot front and 20 foot side and rear setback requirements applicable to the Residential R-30 District in which the Premises are located.

The number of parking spaces proposed would exceed the requirements of the Zoning By-law, which call for two spaces for each dwelling unit of two or more bedrooms in an apartment building. The parking layout makes use of the pre-existing parking area and appears

18

to have a reasonable configuration and to meet the Zoning By-law requirements for the size of spaces and aisles. Other than the footprint, building design is not depicted on the Condominium Proposal Plan, and the Zoning Board of Appeals would be allowed to impose reasonable conditions pertaining to landscaping and other design matters as long as they did not render the project uneconomic.

Any attempt by the Zoning Board of Appeals to deny the Condominium Proposal Plan based on an asserted critical need for open space in the community would be undercut by the facts that the area of the Premises where the construction would take place is a previously disturbed parking lot, that the beach portion of the Premises will not be disturbed by the Condominium Proposal Plan, and that there is an existing public beach adjacent to the Premises to the east. Therefore, local concern for open space is also not a basis that is likely to support a lawful denial of a Chapter 40B Comprehensive Permit for the Condominium Proposal Plan.

In sum, it is my opinion, with reference to the provisions of the Wareham Zoning By-law in effect in December, 2003 when the Town of Wareham took the Premises, and to the provisions of Massachusetts General Laws Chapter 40B and the regulations of the Massachusetts Housing Appeals Committee, that the Premises could lawfully have been used for a condominium development having a 25% affordable housing component under a comprehensive permit issued by the Wareham Zoning Board of Appeals pursuant to Massachusetts General Laws Chapter 40B, such as the 40-unit condominium development shown on the "Conceptual Comprehensive Permit Plan" dated March 28, 2006, prepared by McKenzie Engineering Group, Inc. ("Condominium Proposal Plan"). The Wareham Zoning Board of Appeals would have had the burden of demonstrating that the denial of an application for such a permit or the imposition

19

of conditions that would render the development uneconomic was justified by local planning concerns that outweighed the regional need for housing.

C.    Exhibits to be Used as a Summary of or Support for the Opinions

The exhibits which have been used in support of my opinions are attached hereto as **Exhibit B**.

Signed and submitted this _____29th_____ day of March, 2006.

Michael S. Giaimo, Esq.
Robinson & Cole LLP
Boston, Massachusetts

L:\LITG\Ditu002\Michael Giaimo Reports\Michael.Giaimo.Report.Final.03.29.06.doc

**EXHIBIT 2**

# ZONING BYLAWS



Town of

# WAREHAM

## Massachusetts

**Revised Thru April 28, 2003**

A TRUE COPY
ATTEST
*Mary Ann Silva*
TOWN CLERK

## RESIDENTIAL R-43 DISTRICT

### Allowed Uses:

In the Residential R-43 District buildings, structures and premises may be used for one-family detached residential purposes, any lawful religious, educational or non-profit recreational purpose, any agricultural use except piggeries or fur farms, for the office of a professional person located in the dwelling in which he resides.

### Special Permit Uses:

The following additional uses are allowed provided that they are not injurious, noxious, or offensive and only if authorized by the Board of Appeals subject to appropriate conditions where such are deemed necessary to protect the neighborhood and the Town:

1. Golf course or tennis club.
2. Nursing home, intermediate care center, day care center.
3. Structures for public utility corporations, not including repair stations or outside storage of supplies.
4. Cemetery.

## RESIDENTIAL R-30 DISTRICT

### Allowed Uses:

In Residential R-30 District buildings, structures and premises may be used for one-family detached residential purposes, for two family detached and multiple family residential purposes only as provided in Section III, RESIDENTIAL CLUSTER DEVELOPMENT, and for uses customarily necessary thereto, for municipal, religious, educational, non-profit recreational purposes, any agricultural use, except piggeries and fur farms, and for the following commercial purposes but no others:

(1) The display and sale at a roadside stand of products the major portion of which are raised on the farms or produced in the homes of the Town.
(2) The use of a room or rooms in a dwelling or accessory building for a customary home occupation including the taking of boarders or lodgers, or the practice of a profession or trade conducted by a resident of the premises, provided there is no external evidence of any business other than permitted signs.

### Special Permit Uses:

The following additional uses are allowed provided that they are not injurious, noxious, or offensive and only if authorized by the Board of Appeals subject to appropriate conditions where such are deemed necessary to protect the neighborhood and the Town:

1. Greenhouse, nursery, cidermill, ice house, or temporary sawmill.
2. Golf course, riding stable, boys or girls camp.
3. Gravel, loam, sand or stone removal.
4. Veterinary hospital.
5. Nursing home, intermediate care center, day care center.
6. Neighborhood grocery store.
7. Structures for public utility corporation, not including repair stations or outside storage of supplies.
8. Public service or other passenger stations.
9. Cemetery.
10. Aviation field.

## MULTIPLE-RESIDENTIAL MR-30 DISTRICT

### Allowed Uses:

In Multiple-Residential MR-30 District buildings, structures and premises may be used for any lawful residential, municipal, religious, non-profit educational, non-profit recreational purpose, any agricultural use, except piggeries and fur farms, and for uses customarily necessary thereto, and for the following commercial purposes but no others:

(1) The display and sale at a roadside stand of products the major portion of which are raised on the farms or produced in the homes of the Town.

A.  Building Signs.
The top edge of building signs shall be not higher than the roof ridge of the building, or the highest point of the roof if no ridgepole, and no higher than the top edge of a flat roof. Buildings signs are allowed up to 10% of the aggregate square footage of the front wall area. The square footage allowed includes a single sign, or a series of signs representing individual businesses or any combination thereof. Such signs may be placed on any wall, but in no case shall the total of all building signs exceed 10% of the front wall square footage, nor shall any wall have signage exceeding 10% of the front wall square footage. These signs may be any of the following: wall, projecting and awning. No such sign shall exceed the outline of the face of the building or roofline from which it is viewed. A building sign shall be against the wall of the building projecting no more than 12 inches from the building surface.

B.  Free Standing Signs.
One (1) freestanding sign is permitted on each lot, provided that it does not contain more than (100) square feet in signboard area, does not exceed fifteen (15) feet in height and is not located closer than five (5) feet to any lot line or block a line of sight for pedestrians and traffic. The top edge of any such free-standing sign shall be not higher than fifteen (15) feet vertical measure above the average level of the ground between the supports of each sign.

C.  No sign shall have signboard area (or display area if no signboard) exceeding the dimensions allowed, and included in any such area measurements is any space between display elements.

D.  Illuminated Signs.
Illuminated signs are permitted, subject to the following conditions:
A.  No sign shall be Intermittently illuminated. Traveling lights, animated or flashing lights or exposed neon-type signs shall not be permitted.
B.  Signs may be illuminated only in the following manner:
a.  Externally illuminated, or
b.  Illumination with a wall mounted backlit lettered sign.

E.  Contractors and developers.
For each construction or development project, there may be issued a temporary permit for one (1) free-standing sign not to exceed thirty-two (32) square feet in signboard area, setting forth facts and names, pertinent to the subject. Such signs shall be removed forth with when the project completed.

F.  Sale or rent.
Sale or rent signs for a lot or business are allowed.

G.  Directory Signs.
Signs of no greater than eight (8) square feet directing traffic flow, entrances to buildings, parking areas and exits, and the like may be allowed by the Building Inspector.

H.  Waiver or Modification.
The Planning Board may waive or modify any of the standards or requirements hereunder by Site Plan Review - Special Permit, provided it finds that it is impractical to meet the standards and regulations and that such modifications are appropriate by reason of the proposed uses, or that such waiver or modifica- tions are justified upon demonstration that the proposed design is of high standards and that any depar- tures from the regulations and requirements will not violate the intent of the Zoning Bylaw.

# ARTICLE VI
# Parking Regulations

## Flexibility in Administration

The inflexible application of parking standards to determine the number of parking spaces required for a particular use may result in a development either with inadequate parking spaces or parking spaces in excess of needs. Therefore, deviations from normally accepted standards may be permitted if such deviations will reduce traffic congestion or parking violations on streets or adjacent unauthorized land and present no increased traffic hazard to pedestrian or vehicular movement.

## Number of Parking Spaces Required:

The number of parking spaces required for development is shown in the chart below:

### PARKING SPACES REQUIRED

| Use Category | Parking Spaces Required Per Dwelling Unit |
|---|---|
| 1. Cluster | 2 per dwelling unit |
| 2. Duplex | 2 per dwelling unit |
| 3. Multi-Family/Apartments | |
| a. 1 bedroom | 1.5 per dwelling unit |
| b. 2 or more bedrooms | 2 per dwelling unit |
| c. elderly | 1 per dwelling unit |
| d. guest | .2 per dwelling unit |
| 4. Motel or Hotel | 1 per unit |
| 5. Guest House | 1 per unit plus 2 for residence |
| 6. Nursing Home, Hospital | 1 per bed for hospital |
| | 1 per 4 beds, nursing home |
| 7. Bank | 1 space per 200 ft(2) GFA |
| 8. Professional Office | 1 per employee |
| | *minimum 5 spaces |
| 9. Personal Services | 1 per 150 ft(2) GFA |
| 10. Retail Trade < 1,000 | 1 per 200 ft(2) GFA ft(2) GFA |
| 11. Retail Trade > 1,000 | 1 per 300 ft(2) GFA ft(2) GFA |
| 12. Convenience Store | 1 space per 150 ft(2) GFA |
| 13. Restaurant, Theater, or Commercial Indoor Recreation | 1 per 5 seats |
| 14. Restaurant w/o Seating | 6 spaces |
| 15. Bowling Alley | 3 per lane |
| 16. Motor Vehicle Repair | 2 per lift or bay |
| 17. Manufacturing uses and _ Industrial Non manufacturing Uses | 1 per 1.5 on largest shift plus 1 per vehicle stored on premises |
| 18a. Marina and/or Yacht Club: | .5 per slip |
| 18b. W/indoor facilities add: | 1 per 6 persons capacity |
| 19. Commercial Outdoor Recreation | 1 per 4 persons capacity |
| 20. Business, professional and administrative offices | 1 space per 250 SF GFA |
| 21. Research and development laboratories | 1 space per 300 SF GFA |
| 22. Health Club | .75 spaces per occupant as calculated under the Massachusetts state Building Code for maximum occupancy |
| 23. Day Care Center | One space per employee at maximum capacity, plus a drop-off or parking area capable of receiving 25% of the capacity of the day care center as determined by the Office for Children (OFC) |

GFA = Gross Leasable Floor Area

The number of parking spaces required for any use not listed in a category above shall be determined by the Building Inspector.

Relief from the above parking space requirements may be granted subject to a Special Permit by the Zoning Board of Appeals, in accordance with Chapter 40A, as amended, of Mass. General Laws.

Wareham Zoning Bylaws – April 28, 2003
© FOXMOORE PUBLISHING – Format & Layout

# ARTICLE IX
## Definitions

For the purpose of this by-law certain terms and words shall have the following meanings. Words used in the present tense include the future, the singular number includes the plural, the plural the singular, the word "used" or "occupied", include the words "designed", "arranged", "intended" or "offered", to be used or occupied, the words "building", "structure", "lot", "land", or "premises" shall be constructed as though followed by the words "or any portion thereof", and the word "shall" is always mandatory and not merely directory. Terms and words not defined herein but defined in the State Building Code or Subdivision Regulations shall have the meanings given therein unless a contrary intention clearly appears. Words not defined in either place shall have the meaning given in Webster's Unabridged Dictionary, Third Edition.

**ABANDONMENT:**

The visible or otherwise apparent intention of an owner to the characteristic equipment or furnishings; or the replacement of non conforming use or building by a conforming use of building.

**ADULT CABARET:**

Any establishment which provides live entertainment for its patrons, which includes the display of nudity, as that term is defined in M.G.L. Chapter 272, Section 31. *(Added 10/23/97)*

**ADULT MOTION PICTURE THEATER:**

An enclosed building used for presenting material distinguished by an emphasis on matter depicting, describing, or relating to sexual conduct or sexual excitement as defined in M.G.L. Chapter 272, Section 31. (Added 10/23/97)

**ADULT USE:**

An adult store, adult motion picture theater, adult cabaret, or similar establishment. *(Added 10/23/97)*

**ADULT STORE:**

An establishment which has more than 10 percent of its gross floor area or a substantial/significant portion of its stock in trade, books, magazines, photographs, videos, computer software, computer discs, and other matter which are distinguished or characterized by their emphasis depicting, describing, or relating to sexual conduct or sexual excitement as defined in M.G.L. Chapter 272, Section 31. *(Added 10/23/97)*

**ALTERATION:**

Any construction, reconstruction or other action resulting in a change in the structural parts of height, number of stories or exits, size, use, or location of a building to other structure.

**ANIMAL KENNEL:**

Harboring and/or care of more than three dogs three months.

**ANTENNA TOWER:**

A self supporting structure tapering from base to top and without anchor guy wires that support a platform and or structure for the purposes of wireless communications. An auxiliary building housing electronics and communications equipment is permitted as part of this use. *(Added 10/23/97)*

**APARTMENT HOUSE - APARTMENT DWELLING:**

A dwelling containing five or more separate family dwelling units, each unit containing a minimum of 650 square feet of liveable floor space, exclusive of closets and bathrooms.

**ACCESSORY APARTMENT:**

An accessory apartment is a second dwelling unit located within or attached to a structure originally designed, constructed and occupied as a detached single-family dwelling unit in a manner that maintains the appearance of the structure as a detached single-family home.

**AUXILIARY COMMUNICATIONS BUILDING:**

An unmanned, self-contained structure housing electric and communication equipment, which shall not be more than 600 square feet in area, not more than 12 feet in height. *(Added 10/23/97)*

**BASEMENT:**

A portion of a building partly below grade which has more than one-half of its height, measured from finished floor to finished ceiling above the average finished grade of the ground adjoining the building. A basement is not considered a story unless its ceiling is six feet or more above the average finished grade.

## BED AND BREAKFAST:

A small, owner-operated business with 1 to 10 guest rooms where the owner or manager lives on the premises. Breakfast is the only meal served to overnight guests. Parking for each room should be provided on-site or in close proximity to the establishment.

## BUILDING:

A combination of any materials, whether portable or fixed, having a roof, and enclosed within exterior walls or firewalls; built to form a structure for the shelter of persons, animal or property. For the purpose of this definition, "roof" shall include any awning or any similar covering, whether or not permanent in nature.

## BUILDING ACCESSORY:

A detached building, the use of which is customarily incidental and subordinate to that of the principal building, and which is located on the same lot as that occupied by the principal building.

## BUILDING AREA:

The aggregate of the maximum horizontal plane area of all buildings on a lot measured to their outer wells, including cornices, eaves, porches, enclosed porches, enclosed stairs, decks, bay windows and balconies.

## BUILDING ATTACHED:

A building having any portion of one or more walls in common with adjoining building.

## BUILDING COVERAGE:

The building area expressed as a percentage of the total lot area.

## BUILDING DETACHED:

A building having open spaces on all sides.

## BUILDING LINE:

The line, parallel to the street line, which passes through the point of the principal building nearest to the front lot line.

## BUILDING PRINCIPAL:

A building in which is conducted the principal use of the lot on which it is located.

## CAMP GROUND, FAMILY TYPE:

Any place of camp character as the term is commonly understood, used wholly or in part for recreational camping or group activity purposes or for accommodations for overnight or longer periods and which accommodated for profit or under philanthropic or charitable auspices three or more families or camping grounds. The family type camp ground may accommodate tents, mobile camping units, expandable trailer camping units, and such other devices as may be developed and marketed for the camping trade. The camp ground may be so arranged that individual plots or sites properly allocated, designated and furnished, are available for such groups for their convenience during their temporary occupation. The plots or sites may or may not be equipped with auxiliary tents, tent platforms, tables and fireplaces. The camp ground may contain temporary or permanent buildings for common usages and may be operated as an overnight camp, a resident camp, or a picnic area. The term family type camp ground does not include a children's day camp, recreational camp for children, or a Mobile Home Park.

## CELLAR:

A portion of a building, partly or entirely below grade, which has more than one-half of its height measured from finished floor to finished ceiling, below the average established finished grade of the ground adjoining the building. A cellar is not deemed a story.

## CLUSTER DEVELOPMENT:

A division of land into lots for use as residential building sites where said lots are arranged into one or more groups having area and yard measurements less than the minimum required in the Table of Dimensional and Density Regulations. These clusters of groups shall be separated from adjacent property and other groups of lots by intervening "common land". The number of lots over the entire tract of land shall not exceed the number of lots permitted under normal application of the area regulations of the zone in which the tract of land is located.

## COMMERCIAL ACCOMMODATION:

A building or complex of buildings, or suites of room with sleeping and sanitary facilities but no kitchen facilities; and which may have kitchen facilities only in connection with a common dining room and related function rooms. Rooms may have either a common or individual entrance. Included in this definition are inn, motel, hotel, motor inn, and tourist court. Excluded from this definition are apartment house, boarding house, lodging house or rooming house. *(Article 4/25/84)*

### CONDOMINIUM:

An arrangement of dwelling units that may or may not be located in one building but which are located within one parcel of land comprised of a common estate and individual unit estates. For the purpose of this by-law, a "Condominium" and "Town House" shall be designed and treated in the same manner as an "Apartment" or "Multi-Family Dwelling" depending upon the number of units and shall be subject to the same zoning restrictions as said apartment or multi-family dwelling. *(Article #17, 4/25/84)*

### CONVERSION:

The changing or alteration of a seasonal dwelling unit so to permit its use on a year-round basis. *(April 27, 1981)*

### DAY CARE CENTER:

A child care arrangement that provides day care on a regular basis for more than four hours per day for more than five children of preschool age.

### DISTRICT:

A zoning district as established by this By-law.

### DRIVE-IN ESTABLISHMENT:

A business establishment wherein patrons are usually served while seated in parked vehicles in the same lot. The term "drive-in includes drive-in eating establishments where the food is purchased from a building on the lot, but is consumed in the vehicles; drive-in service stations, gasoline stations, or the like. Drive-in movies are excluded from this definition.

### DRIVEWAY:

An open space, located on a lot, which is not more than 24 feet in width for access to a garage, or off-street parking or loading space.

### DWELLING:

A privately or publicly owned, permanently fixed structure containing a dwelling unit or dwelling units. The terms "one-family", "two-family", or "multi-family" dwelling shall not include hotel, lodging house, hospital, membership club, trailer, mobile home or dormitory.

### DWELLING, ONE FAMILY:

A detached building containing one dwelling unit, also referred to as a "single-family dwelling".

### DWELLING, TWO FAMILY:

A building containing two dwelling units constructed on a single lot.

### DWELLING UNITS:

One or more living or sleeping rooms arranged for the use of one or more individuals living as a single housekeeping unit with cooking, living, sanitary, and sleeping facilities.

### ESSENTIAL SERVICES:

Services provided by public utility or governmental agencies through erection, construction, alteration or maintenance of underground or overhead gas, electrical, steam or water transmission and distribution systems; and collection, communication, supply or disposal systems. Facilities necessary for the provision of essential services include poles, wires, mains, drains, sewers, pipes, conduits, cables, fire alarm boxes, traffic signals, and other similar equipment and accessories in connection therewith. Specifically excluded from this definition are buildings necessary for the furnishing of adequate service by such public utility or governmental agencies for the public health, safety or general welfare.

### EXCEPTION:

The use of a structure or lot or any action upon a premises which may be permitted under this by-law only upon application to and the approval of the Board of Appeals.

### FAMILY:

An individual or two or more persons related by blood or marriage living together as a single housekeeping unit and including necessary domestic help such as nurses or servants and further including not more than three lodgers or roomers taken for hire. A group of individuals not related by blood or marriage, but living together as a single housekeeping unit may constitute a family. For purposes of controlling residential density each such group of five individuals shall constitute a single family.

### FLOOD LINE:

The limits of flooding from a particular body of water caused by lunar tides, a storm, or other natural phenomena whose frequency of occurrence is once in twenty years as determined and certified by a registered professional engineer qualified in drainage.

## FLOODWAY:

The area subject to periodic flooding, the limits of which are determined by the flood line.

## FLOOR AREA, GROSS:

The sum of areas of the several floors of a building measured from the exterior faces of the walls. It does not include cellars, unenclosed porches or attics not used for human occupancy or any floor space in accessory buildings or in the main building intended and designed for accessory heating and ventilating equipment.

## FLOOR AREA RATIO:

The ratio of the gross floor area to the total lot area.

## HEIGHT:

The vertical distance from the average finished grade of the adjacent ground to the top of the structure of the highest roof beams of a flat roof, or the mean level of the highest gable or slope of a hip, pitch or sloped roof.

## HOME OCCUPATION:

An accessory use which customarily is carried on entirely within a dwelling unit, and is incidental and subordinate to the dwelling use and which shall not occupy more than 25 percent or 400 square feet, which-ever is less, of the dwelling units used.

## HOSPITAL:

A facility where the sick or injured are given medical and surgical care.

## HOTEL-MOTEL:

See COMMERCIAL ACCOMMODATION.

## INTERMEDIATE CARE HOME:

A facility providing accommodations and needed medical care and supervision at a lower level than a nursing home. Intermediate Care Home shall have the same meaning as Convalescent Home.

## JUNK:

Any worn out castoff or discarded articles or materials which are ready for destruction or disposal or has been collected or stored for salvage or conversion to some use. Any article or material which, unaltered or un-changed or without further reconditioning, can be used for its original purpose as readily as when new, shall not be considered junk.

## INCIDENTAL USE:

Is a use of a building or premises customarily pertaining thereto and located on the same lot with the building or premises to which it pertains.

## LOADING SPACE:

Any off-street space at least twelve (12) feet in width, fifty (50) feet in length and with a vertical clearance of at least fourteen (14) feet, having an area of not less than thirteen hundred (1,300) square feet which includes access and maneuvering space used exclusively for loading and unloading of goods and materials from one vehicle.

The dimensions of the loading space may be reduced by the Administrative Officer to not less than three hundred (300) square feet which includes access and maneuvering space, when it is clearly evident that service vehicles utilizing said space will not require the area listed above.

## LODGING UNIT:

One or more rooms for the use by one or more individuals not living as a singular housekeeping unit and not having cooking facilities. A "Lodging Unit" shall include rooms in boarding houses, tourist houses, or rooming houses.

## LOT:

An area or parcel of land or any part thereof, not including water area, in common ownership, designated on a plan duly filed by its owner or owners as a separate lot and recorded in the Plymouth County Registry of Deeds.

## LOT, CORNER:

A lot at the point of intersection of and abutting on two or more intersecting streets, the interior angle of intersection of the street lot lines, or in case of a curved street, extended lot lines, being not more than 135 degrees.

## LOT COVERAGE:

The maximum percent of lot area allowed to be covered by buildings, parking areas and driveways (regardless of surface) and all impervious surface.

**LOT DEPTH:**

> The mean horizontal distance between the front lot line and the rear lot line.

**LOT FRONTAGE:**

> That portion of a lot fronting upon a street or way, public or private, measured continuously along the street sideline between side lot lines, or in the case of corner lots, the distance between one side lot line and the midpoint of the corner arc length. *(Amended 4/28/87)*

**LOT LINE, FRONT:**

> The property line dividing a lot for a street (right-of-way). On a corner lot the owner shall designate one street line as the front lot line.

**LOT LINE, REAR:**

> The lot line opposite from the front lot line.

**LOT LINE, SIDE:**

> Any lot line not a front or rear lot line.

**LOT NONCONFORMING:**

> A lot lawfully existing at the effective date of this by-law or any subsequent amendment thereto which is not in accordance with all provisions of this by-law.

**LOT, THROUGH:**

> AN interior lot, the front and rear lot lines of which abut streets, or a corner lot, two opposite lines of which abut streets.

**LOT WIDTH:**

> The horizontal distance between the side lot lines as measured parallel to the street line at the minimum front yard depth required by this by-law at the building line and at all points between.

**ONE-FAMILY HOUSE:**

> Is a detached dwelling intended and designed to be occupied by a single family.

**MANUFACTURED HOME:**

> A structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. For floodplain management purposes, the term "manufactured home" also includes park trailers, travel trailers, and other similar vehicles placed on a site for greater than 180 consecutive days. *(Amended 4/28/87)*

**MARINA:**

> Premises used for wharves, docking, boat liveries, boat yards, yacht clubs, sale of boats and other marine equipment but not including the processing or sale of fish. Indoor marina facilities shall include restaurants, social clubs, and other membership organizations, whether including or not including the serving of alcoholic beverages.

**MEMBERSHIP CLUB:**

> A social, sports or fraternal association or organization which is used exclusively by members and their guests and is not conducted as a gainful business.

**MOBILE HOME:**

> The words "mobile home" shall mean a dwelling unit built on a chassis and containing complete electrical, plumbing and sanitary facilities, and designed to be installed on a temporary or permanent foundation for permanent living quarters.

**MOBILE HOME PARK:**

> A parcel of land upon which two or more mobile homes or house trailers are parked or intended to be parked for living purposes.

**MULTIPLE FAMILY DWELLING:**

> A dwelling containing at least three but no more than four separate dwelling units.
> *(Article #86; April 28, 1986)*

**NURSING HOME:**

> A facility maintained for the purpose of providing skilled long-term nursing care and medical supervision at a lower level than a hospital.

**OPEN SPACE:**

The space on a lot unoccupied by buildings, unobstructed to the sky by man-made objects other than walks, swimming pools, and terraced areas, not devoted to streets, driveways, or off-street parking or loading spaces and expressed as a percentage of total lot area.

**OVERNIGHT CABIN:**

An overnight cabin is any cabin, trailer or any building, tent, or structure, housecar or automobile trailer used for or adaptable to use for living quarters.

**OWNER:**

The duly authorized agent, attorney, purchaser, devisee, trustee, lessee or any person having vested or equitable interest in the sue, structure or lot in question.

**PARKING SPACE:**

An off-street space at least 10 feet in width and 20 feet in length having an area of not less than 200 square feet, plus 100 square feet of access and maneuvering space, whether inside or outside a structure for exclusive use as a parking stall for one motor vehicle.

**PLANNING DEVELOPMENT:**

A development involving the construction of two or more principal buildings on the same lot for any permitted use.

**SEASONAL DWELLING UNIT:**

A dwelling unit that cannot be occupied on a year-round basis without alteration(s) being made requiring a permit from the Building Department. *(April 27, 1981)*

**SIGN:**

Any structure or device either temporary or permanent, used as, or which is in the nature of an advertisement, announcement, or direction, or is designed to attract the eye by any means. The following shall not be considered signs within the context of this by-law:

(a) flags and insignia of any government except in connection with commercial promotion;
(b) legal notices or informational signs erected or required by government bodies;
(c) temporary signs erected for a charitable or religious cause;
(d) temporary signs inside display windows, covering of more than 20% of window area;
(e) standard gasoline pumps bearing the name, type, and price of gasoline either upon the pump surface or an attached area not exceeding 1.5 square feet. *(October 15, 1984)*

**SIGN BUSINESS:**

A sign used to direct attention to a service, product sold or other activity performed on the same premises upon which the sign is located.

**SIGN, DIRECTIONAL:**

A sign guiding or directing traffic, not exceeding (3) square feet.

**SIGN, GENERAL ADVERTISING:**

Any sign advertising products or services other than products or services available on the lot on which the sign is located, or any sign which is not located within 200 feet of the building or other structure at which the products or services advertised thereon are available.

**SIGN, IDENTIFICATION:**

A sign used simply to identify the name, address, and title of an individual family or firm occupying the premises upon which the sign is located.

**SIGN, ROOF:**

A sign erected on or affixed to the roof of a building.

**SIGN, STANDING:**

A sign erected on or affixed to the land including any exterior sign not attached to a building.

**SIGN, SURFACE AREA OF:**

For a sign, either free-standing or attached, the area shall be considered to include all lettering, wording, and accompanying designs and symbols, together with the background, whether open or closed, on which they are displayed, but not including any supporting framework and bracing which are incidental to the display itself. For a sign consisting of individual letters, designs, and symbols attached to or painted on a surface, building, wall or window, the area shall be considered to be that of the smallest quadrangle which encompasses all of the letters, designs and symbols. One side only of a flat, back to back sign shall be counted.

**SIGN, TEMPORARY:**

A sign erected or placed for a period not to exceed thirty (30) days for the purpose of notifying availability of a new service, product, or facility. Such sign shall not exceed 12 square feet.

**SIGN, WALL:**

A sign affixed to the exterior wall of a building and extending not more than 15 inches therefrom.

**STORY:**

That part of a building comprised between a floor and the floor next above. If a mezzanine floor area exceeds one-third of the area of the floor immediately below, it shall be deemed to be a story. A basement shall be classified as a story when its ceiling is six or more feet above the average finished grade.

**STORY, HALF:**

A story under a gable, hipped or gambrel roof, the floor area of which does not exceed two-thirds of the floor immediately below when measured where the vertical distance between the floor and ceiling is four (4) feet or more.

**STREET:**

A way which is dedicated or devoted to public use by legal mapping or by any other lawful procedure. A street includes all public ways, a way which the Town Clerk certified is maintained and used as public way, a way shown on a plan approved and endorsed in accordance with the "Subdivision Rules and Regulations" of Wareham, Massachusetts, and a way having in the opinion of the Planning Board sufficient width, suitable grades and adequate construction to provide for needs of vehicular traffic thereon or served thereby, and for the installation of municipal services to serve such land and the buildings to be erected thereon.

**STRUCTURE:**

A combination of materials assembled at a fixed location to give support or shelter, such as building, bridge, trestle, tower, framework, retaining wall, tank, tunnel, tent, stadium, reviewing stand, platform, bin, fence, sign, flagpole or the like.

**STRUCTURE, NONCONFORMING:**

A structure lawfully existing at the effective date of this by-law, or any subsequent amendment thereto, which does not conform to one or more provisions of this by-law.

**UPLAND:**

All land not defined herein as wetland.

**USE:**

The purpose for which a structure or lot is arranged, designed, or intended to be used, occupied or maintained.

**USE, ACCESSORY:**

A use incidental and subordinate to the principal use of a structure or lot, or a sue, not the principal use, which is located on the same lot as the principal structure. Accessory use by area shall be interpreted not to exceed 40 percent of the area to total use of the structure and/or lot on which it is located.

**USE, NONCONFORMING:**

A use lawfully existing at the time of this by-law, or any subsequent amendment thereto, which does not conform to one or more provisions of this by-law. Non-conformity may be either of use or dimension.

**USE, PRINCIPAL:**

The main or primary purpose for which a structure or lot is designed, arranged, or intended or for which it may be used, occupied, or maintained under this by-law. Any other use within the main structure or the use of any other structure or land on the same lot and incidental or supplementary to the principal use and permitted under this by-law shall be considered an accessory use.

**USE, SUBSTANTIALLY DIFFERENT:**

A use which by reason of its normal operation would cause readily observable differences in patronage, service, appearance, noise, employment or similar characteristics from the use to which it is being compared.

**VARIANCE:**

Such departure from the terms of this by-law as the Board, upon appeal in specific cases, is empowered to authorize.

**WETLAND:**

Any bank, freshwater wetland, coastal wetland, beach, dune, flat, marsh, meadow, or swamp bordering on the ocean or on any estuary, creek, river, stream, pond, or lake or from land under said waters or land subject to tidal action. The meaning of words used in this definition of a wetland shall be as defined in M.G.L. Chapter 131, Section 40 and in 310 C.M.R. 10.00, Wetland Protection.

**YARD:**

A portion of a lot, upon which the principal building is situated, unobstructed artificially from the ground to the sky, and unoccupied except by fences, walls, poles, paving, and other customary yard accessories, and having at least two sides open to lot lines.

**YARD, FRONT:**

A yard extending for the full width of the lot between the front line of the nearest building wall and the front lot line.

**YARD, REAR:**

A yard; unoccupied except by an accessory structure or accessory use as herein permitted, extending for the full width of the lot between the rear line of the building wall and the rear lot line.

**YARD, SIDE:**

Yard extending for the full length of a building between the nearest building wall and the side lot line.

**YEAR-ROUND DWELLING:**

Any dwelling which is suitable for human occupancy on a permanent, year-round basis and meets the requirements of the Massachusetts State Building Code and State Health Code for a dwelling.

# ARTICLE X
# Landscaping

## A - Purpose:

The purpose of this Article is to protect the health, safety, morals and welfare of the public by ensuring that there are properly vegetated and maintained landscaped buffers between potentially incompatible land uses in order to minimize and mitigate the potential impacts of noise, fighting, stormwater runoff and air pollution. These regulations will also serve to enhance and preserve the rural and visual character of Wareham by promoting high quality development projects. Minimum standards are established for the installation and maintenance of vegetative and standard Landscaping.

## B - Applicability:

This Article applies to all new non-residential and multi-family residential projects of over 6 units. Expansions of any non-residential or multi-family residential project which exceed ten (10) percent of the existing gross floor area or one thousand (1,000) square feet, whichever is less, shall comply with these regulations. Projects which are fully permitted as of the effective date of this Ordinance shall be exempt.

## C - Plan Submittal Requirements:

A landscape plan shall be submitted for all projects delineated in Section B Applicability, in conjunction with any other submittal required for a special permit, site plan review or building permit.

1. For new projects or expansions exceeding five thousand (5,000) square feet of non-residential development or more than three (3) multi-family dwelling units, the landscape plan shall be prepared by a registered landscape architect, whose seal shall appear on the plan.
2. A landscape plan shall be deemed complete when it contains the following:
   a. A description of the site;
   b. Proposed project and parking site plan;
   c. Location, general type, and quality of existing vegetation, including trees;
   d. Existing vegetation to be preserved;
   e. Mitigation measures employed for protecting existing vegetation during construction and a sediment and erosion control plan;
   f. Locations and labels for all proposed plants;

52

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee )
of BD REALTY TRUST, )
          Plaintiff )
      )
      )
v. )
      )
THE TOWN OF WAREHAM acting by )
and through the BOARD OF )
SELECTMEN OF THE TOWN OF )
WAREHAM, and the BOARD OF )
SELECTMEN OF THE TOWN OF )
WAREHAM, )
          Defendants )

## SUPPLEMENT TO EXPERT REPORT OF MICHAEL S. GIAIMO, ESQ.

The purpose of this statement is to supplement Section IV of my Expert Report dated

March 29, 2006, as filed with the court, to further address the issue of structures accessory to a

non-profit beach club use at the Premises that are the subject of this matter.   In that Expert

Report I state the opinion that it would not be unreasonable to consider the seasonal placement of

structures that are not affixed permanently to the ground such as picnic tables, bicycles racks,

kayak racks, and temporary sanitary facilities to be "development" implicating the Town of

Wareham Zoning By-law's Floodplain District Regulations (Wareham Zoning By-law §VII-M)

and therefore that it is likely that these structures would be permitted as part of a non-profit

beachclub at the Premises.

In that opinion I also note that permanent structures such as a comfort station, locker facilities or

a small snack bar might also be logically associated with a non-profit beach club use and would

be permitted under the base zoning applicable to the Premises subject to an overall limitation that

897222.1

accessory structures not exceed 40 percent of the total lot area. However because I interpreted the Zoning By-Law Floodplain District Regulations to be internally inconsistent with respect to whether new development is permitted within the FEMA VE-Zone, I refrained from reaching a conclusion as to whether such permanent structures could be included as part of a non-profit beach club use at the Premises.

I have subsequently been made aware of a number of instances since the date that the operative version of Section VII.M(b)1 of the Zoning By-law became effective, in which the Town of Wareham has reportedly issued building permits for the construction of new dwellings or additions to existing dwellings within the VE Zone. Based on that information, it appears that the Town of Wareham has not interpreted the Floodplain District Regulations to prevent the development of all new structures in the VE Zone. Where a Zoning By-law appears ambiguous or internally inconsistent, but it is in practice applied in a consistent way by the local officials charged with its interpretation, that provides considerable support for interpreting it that way in other instances. Based on this information, I consider it likely that as a zoning matter, such permanent structures as a comfort station, locker facility or snack bar could be constructed at the Premises as part of a non-profit beach club use, subject to the limitation on the size of accessory structures and all other applicable dimensional requirements.

Submitted under the pains and penalties of perjury this 6th day of September, 2006.

Michael S. Giaimo, Esq.
Robinson & Cole LLP
Boston, Massachusetts

2