UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee<br>of BD REALTY TRUST,<br>         Plaintiff<br><br>v.<br><br>THE TOWN OF WAREHAM acting by<br>and through the BOARD OF<br>SELECTMEN OF THE TOWN OF<br>WAREHAM, and the BOARD OF<br>SELECTMEN OF THE TOWN OF<br>WAREHAM,<br>         Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S MOTION IN LIMINE TO BAR OR LIMIT ROBERT DAYLOR'S TRIAL TESTIMONY REGARDING WETLANDS ON THE PREMISES

Now comes the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), and moves this Honorable Court to bar or limit the trial testimony of Defendants' expert, Robert F. Daylor, regarding wetlands existing on the premises. For reasons, the Trust states as follows.

## RELEVANT FACTUAL/PROCEDURAL BACKGROUND

On or about June 29, 2006, the Defendants submitted to the Trust the expert report of Robert F. Daylor in the form of "Affidavit of Robert F. Daylor, P.E., P.L.S." ("Daylor Report"). Robert F. Daylor ("Daylor") is the Chief Executive Officer of Daylor Consulting Group, Inc. See Depo. Trans at 5.[1] Daylor's educational background includes a Bachelor's degree in Civil Engineering, and a Master's degree in Civil Engineering with an emphasis on Environmental Engineering. See p. 8 of Trans.

---

[1] "Depo. Trans." refers to portions of the transcript of the deposition of Robert Daylor taken on September 27, 2006 which is attached hereto as **Exhibit 1**.

According to the nine (9) page Daylor Report, Daylor was retained by the Town to "assess the site's physical conditions and review environmental regulations and previous permitting applicable to the site to assist the Town's appraiser in the determination of the 'highest and best use' as of the date of taking in 2003." In addition to the Daylor Report, the Defendants also submitted a thirty-one (31) page document entitled "Site Analysis" ("Site Analysis"), prepared by Daylor Consulting Group, Inc., together with supporting exhibits. The Daylor Report and Site Analysis were submitted to the Trust as one bound document, hereinafter referred to as the Daylor Report. See **Exhibit 2** attached hereto (containing cited portions of Daylor Report).

I.    <u>Daylor's Expert Report and Anticipated Testimony Lacks a Proper Basis for the Expression of His Opinions and Therefore Should Be Excluded at Trial</u>.

Both the Trust and the Town each retained wetlands experts to assist in the determination of what wetland resource areas likely existed at the Premises on the Date of Taking. In fact, perhaps the primary factual determination that must be made by the jury in this case is the nature and extent of various wetland resource areas existing on the Premises on the Date of Taking. The disposition of this wetlands issue will, as a preliminary matter, help determine the physical uses that could have occurred at the time of the taking in 2003, which will in turn play a factor as to the highest and best use of the Premises for valuation purposes. As set forth below, the purpose of this motion is to exclude or otherwise limit the trial testimony of the Town's wetlands expert, Robert Daylor.

A.    <u>Legal Standard for Admitting Expert Testimony</u>.

An expert may provide opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid.

702.  The trial judge is assigned the "gate-keeping" function of assuring that only reliable expert

testimony is admitted into evidence.  Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S.

579, 593-595 (1993); Kumho Tire Co., v. Carmichael, 119 S.Ct. 1167, 1169 (1999);

Commonwealth v. Lanigan, 419 Mass. 15 (1994).  To exercise this function, the trial court must

examine specific factors, such as testing, peer review, error rates, and "acceptability" in the

relevant scientific community, some or all of which might prove helpful in determining the

reliability of a particular scientific "theory or technique."  Kumho Tire, 119 S. Ct. at 1169 (citing

the four factors in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. at 593-594).[2]

While scientific testimony need not be known to a certainty, Daubert does require that

assertions be derived from "scientific knowledge." "Scientific" means proper grounding in the

methods and procedures of science, or the "scientific method." "Knowledge" is more than

subjective belief or unsupported speculation, but "applies to any body of known facts or to any

body of ideas from such facts or accepted as truths on good grounds." Daubert, 509 U.S. at

589-90.  "[U]nsupported speculation" and "subjective belief" are not sufficient to be admissible

expert evidence.  Daubert, 509 U.S. at 600.[3]

"[C]onclusions and methodology are not entirely distinct from one another.  Trained

experts commonly extrapolate from existing data.  But nothing in either Daubert or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

---

[2] "Daubert is not a mechanical or exhaustive test.  In some cases, the Daubert factors may have no bearing at all. [citation omitted] It is also open to a court to fashion new criteria relevant to the facts and circumstances of a particular case."  Smith v. General Elec. Co., 2004 WL 870832 *1, *3 n.10 (D. Mass. 2004).

[3] Rule 703 of the Federal Rules of Evidence further provides that:
    The facts or data in the particular case upon which an expert bases an opinion or inference may be those
    perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by
    experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be
    admissible in evidence in order for the opinion or inference to be admitted. . . .
Fed. R. Civ. P. 703 (emphasis added).  If the basis of an expert's opinion extends beyond facts or data reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, then the facts and data must be admissible.  Ferrara & DiMercurio v. St. Paul Mercury Ins. Co., 240 F.3d 1, 9 (2001).

data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Daylor's opinion testimony is precisely the sort of conclusory science that Daubert and its progeny were intended to exclude.  As discussed herein, Daylor's anticipated opinion testimony should be excluded under the principles of Daubert because his underlying methodology is not scientifically valid.  Moreover, the testimony of Daylor, the Town's purported wetlands expert, should be excluded altogether because the facts relied upon by Daylor are not of a type reasonably relied upon by wetlands experts when forming opinions, and therefore because the facts are inadmissible hearsay, Daylor's opinion is likewise inadmissible pursuant to Fed. R. Evid. 703.  Alternatively, at minimum, Daylor's testimony should be restricted at trial to very narrow areas of testimony which do not require him to have had personal on-site observations of the Premises to support his opinions.

    B.    Daylor's Opinion Testimony is Conclusory and Not Supported by Disclosed or Adequate Analysis or Methodology.

As indicated above, one of the very first and central question to be decided by the jury is the existence and location of wetland resource areas on the site as of the date of taking. Beginning on page 6 of his Affidavit, Daylor offers a series of naked opinions unadorned by factual or scientific analysis on that very topic.  Daylor opines that:

- As of the date of taking numerous (9 identified) regulated wetland resource areas existed at the site (but without any indication of size or location).

- The highest and best use on the date of taking was for construction of one modest duplex home constructed on piles above base flood elevation and in accord with state and federal building requirements in the area of an existing concrete pad.

- Plaintiff's proposed uses of the site as a Chapter 40B residential condominium project or as a beach club use cannot be constructed on the site due to the existence of wetland resource areas and applicable state and federal wetland regulations as of the date of taking.

- The proposed construction of the Chapter 40B residential condominium project would result in adverse impacts to the wetland resources at the site by filling (increased erosion) and alteration (changing form of) of coastal beach for parking use, alteration of coastal dune for driveway and parking uses and the filling and alteration (destruction) of 6,700 ± sf of saltmarsh for building, parking and landscaping uses and alteration of 12,800 ± sf of bordering vegetated wetland (wet meadow).

- The proposed construction of the beach club use would result in adverse impacts to the wetland resources at the site by filling and alteration of coastal beach for parking use, alteration of coastal dune for driveway and parking uses and the filling and alteration of 5,900 ± sf of saltmarsh for parking uses and alteration of 12,000 ± sf of bordering vegetated wetland (wet meadow).

Of course, to be able to opine, as Daylor does, about how much of a particular resource area would be altered or disturbed by a hypothetical project as of the date of taking, Daylor must also have knowledge of or a properly supported opinion about the location of these resource areas on the site as of the date of taking. Yet, nowhere in Daylor's Affidavit does he offer an opinion about the location and extent of wetland resource areas on the site. The answer to where these resource areas are purportedly located is found, instead, in the attached Site Analysis Report prepared by his staff. The Daylor staff indicates that based upon their field evaluations occurring over 4 days in June, 2006, they believe that "the coastal wetland resource area boundaries previously established by the October 18, 2000 ORAD (Order of Resource Area Delineation issued by the Wareham Conservation Commission) for the site, represent the type and extent of wetland resource areas on the property as of the date of taking." [4]

The problem with the Site Analysis Report is that it never explains <u>why</u> or <u>how</u> a plan prepared by a former owner of the property in 2000 based upon field observations from 1999

---

[4] The Daylor representation of where these resource areas are located appears on Attachment 23 to the Site Analysis Report entitled "Daylor Exhibit A 2003 Wetland Resource Area Delineations."

accurately reflects the resource areas in existence as of December 31, 2003 as viewed from June, 2006. The remainder of the Site Analysis Report deals almost exclusively with the nature of the site as of June, 2006, but never explains the reasoning or methodology for why the 2000 ORAD plan was accurate in the first place or why the plan was still accurate despite the passage of over three years time. The "[t]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993). In this case, the reasoning or methodology underlying both Daylor's testimony and even the staff report is simply unknown and "there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). The underlying basis for Daylor's conclusions are nothing more than the *ipse dixit* of the experts or even the experts' employees.

At least three additional factors raise serious questions about the reasoning and methodology underlying the Daylor's Report. First, though Daylor opines that the ORAD Plan accurately depicted the resource areas on the site as of December 31, 2003 and had not changed in over three years, Daylor's own existing conditions plan two and a half years later, in June, 2006 showed, in their opinion, extensive changes in the location of resource areas on the site. Second, while insisting that the ORAD Plan accurately depicts the resource areas on the site as of the date of taking, Daylor in his deposition acknowledged that the plan did not accurately show the location and extent of salt marsh on the site:

> Q [Attorney Angley]: … Are there any aspects of this [ORAD Plan] that you think are incorrect?

> A [Daylor]: Yes.
> Q [Attorney Angley]:  And what aspects of this ORAD Plan would you consider to be
> incorrect in some fashion or other?
> A [Daylor]: … I do not believe that the salt marsh area is as extensive as shown on the
> Glick Plan …

Daylor Depo Trans. p. 56.  Finally, it is abundantly clear that Daylor bases his opinion on the

location of resource areas at the site as of the date of taking not on his own independent

assessment of the physical nature and characteristics of the property, but on his interpretation of

the legal effect of the Massachusetts DEP Wetlands regulations to the effect that the ORAD Plan

legally binds the applicant to the plan regardless of what might have actually have existed on the

site.

> Q [Attorney Angley]:  How did you determine the resource areas that existed on the site
> as of the date of taking which would be December 31, 2003?
> A [Daylor]: This – plan reflects the –the ORAD Plan, the Glick Plan, which is also before
> us right at this point and the Superceding Order of Conditions reference to that
> plan…Therefore the resource areas are as shown on that plan.
> Q [Attorney Angley]: And that's suggesting to me that you believe that the …resource
> area delineations are kind of established as a legal proposition?  Is that right?
> A [Daylor]: Yes.  They –they do.  My expertise doesn't include offering legal opinions,
> but, you know, I think that I do understand your question.
> Q [Attorney Angley]:  Yes.
> A [Daylor]:…It is my interpretation of the …regulations …and what entitlements they
> had on the date of the taking… It, if you will, it is the legal opinion of what was in force
> at the time.
> Q [Attorney Angley]:  And so, is that, so I take it then that that's …independent of what
> might actually have physically existed on the site?
> A [Daylor]: It is—it's not completely independent.

Daylor Depo Trans. p. 50-54.  As Daylor himself concedes, his expertise does not involve

offering legal opinions.  His reliance on his own legal interpretation of the wetlands regulations

as the basis for a determination of the location of resource areas as of the date of taking is

completely outside and beyond his expertise and is not a proper foundation for his opinion

testimony.

C.    Portions of Daylor's Expert Report Are Not Based on Personal Knowledge About the Premises and Therefore Testimony Related to These Portions Should be Excluded At Trial.

Daylor's Report was completed on June 29, 2006.  Daylor was deposed on September 27, 2006.  During his deposition, Daylor testified that he did not visit the premises located at 200 Swifts Beach Road, Wareham, Massachusetts ("the Premises"), until six days before the deposition, on September 21, 2006.  See pp. 29-30 of Trans.  This means that Daylor did not visit the Premises until almost three (3) months after he rendered his written opinion of the site's physical conditions and the environmental regulations applicable to the site as of the date of taking in 2003.  Furthermore, Daylor also revealed that the Site Analysis report (and implicitly the data collected in preparation thereof) was not prepared by Daylor himself, but rather Sterling Wall ("Wall"), project manager for Daylor Consulting Group, Inc.  See pp. 33-34 of Trans.[5] Thus, the underlying basis for most of Daylor's opinion testimony is inadmissible hearsay.

There are several examples of how Daylor's failure to undertake personal, on-site observations and his reliance on the observations of others undermine the validity of Daylor's opinion and render it inadmissible at trial.  For example, although the Site Analysis indicates that a soil evaluation analysis was performed, Daylor did not personally perform the soil evaluation analysis at the Premises.  See p. 30 of Trans.  Instead, Daylor examined soil samples from the Premises which were brought to his office by Daylor Consulting Group, Inc. staff members working under Daylor's direction.  See p. 30 of Trans.  Yet, as Daylor testified during his deposition, this is not the proper methodology for undertaking a soil evaluation:

> Q [Attorney Angley]:  … What is the soil evaluator, what does that work involve, in order to make an evaluation of soil types?
> A [Daylor]:  . . . the evaluations are made in the field based on observations you make in test holes.

---

[5] According to Daylor's deposition testimony, Wall is a coastal geologist.  See p. 34 of Trans.

So, generally, test pits are excavated.  You look at the color and characteristic of the soil.
And you also look at the setting of that.  What is the nature of the land forms and what
does that tell you about the probability of the soil?
So, it's an observation of the soil characteristics, the level of the groundwater, and any
appearance of the maximum highest groundwater by the structure of the soils or soil color
changes, technically speaking.
But, it is a – it is an examination that is performed in the field.

Daylor Depo Trans. p. 27 (emphasis added).  Not only did Daylor fail to personally observe the

soil testing in the field—which, based on his own testimony, is how the evaluation should be

done—but there is also no indication within Daylor's Report or the Site Analysis as to where the

soil samples were obtained from the Premises other than along unidentified north/south and

east/west transects.  See Site Analysis at 25.  Given that the Premises are more than five (5) acres

in area, knowledge of the location of the eight (8) soil test holes is critical in order to determine

whether they are an appropriate indicator as to whether any wetland resource areas were present

on the Premises in 2003 and to what extent, if any, such areas impact the various development

scenarios proposed by the parties.

In addition to Daylor's failure to personally observe the site during the soil evaluations,

his testimony rests on portions of the Site Analysis which can only be described as hearsay and

conclusions that do not have any identifiable basis and which remain unexplained as to their

connection to Daylor's conclusion that the Premises contained salt marsh that would have barred

development on the date of taking.  See, e.g., Site Analysis at 23 ("This area has been saltmarsh

in the past.") and 25 ("where the historic saltmarsh has been filled, there is saltmarsh vegetation

that is regrowing on the surface of the fill soils, changing what was once a sand parking area

back to vegetated saltmarsh wetland that will meet the state and federal definitions of

saltmarsh/wetland.")[6] (emphasis added).   These reliances on the Site Analysis for rendering an

_____
[6] In order to classify certain portions of the Premises as "historic saltmarsh", Daylor must rely on soil samples taken
2.1 to 3.1 feet below the surface.  This is not a sound methodology for determining the status of the Premises on the

opinion appear to lack the scientific validity of sound methodology for a purported wetlands expert.

Furthermore, Daylor testified that he was not the individual who flagged the Premises for the purpose of establishing the delineation of wetlands on the site. See Depo. Trans. at 133. Instead, the wetlands flagging was conducted by another Daylor Consulting Group employee, Richard Albano. Thus, unlike the Trust's own wetlands expert, Lenore White, Daylor does not have personal knowledge as to whether the wetlands delineations shown on the concept plans prepared by Daylor Consulting, Inc. are correct, yet he attempts to offer opinion testimony as to the meaning of such data which was compiled in the field by someone else. In short, Daylor's opinions are not based upon facts or stated methodologies, but on the opinions of others who have not been offered up or qualified as expert witnesses.

It is obvious that field observations in this case are essential because to some degree, they are subjective; this is evidenced by the differing opinions as to what wetland resource areas exist on the Premises even today. Furthermore, given that both Daylor and White agree that at least some portions of earlier ORAD Plan is incorrect (although they disagree as to the scope of those errors), it is clear that there can be errors in site plans and/or delineations. This is why it is essential that the person testifying as to the meaning of the delineations shown on a particular plan have at least some personal knowledge about the wetlands delineations that form the basis thereof, as well as to be able to properly refute or support any plans prepared by someone else.

---

date of taking because that would not have been an accurate representation of what existed at the surface. Indeed, the only methodology for evaluating whether something is classified as coastal "saltmarsh" depends on two mutually inclusive factors: the location in relation to the highest high tide line and the presence of plants that are well adapted to or prefer living in saline soils. See 310 CMR 10.32. Thus, digging down beyond a few feet of fill which has existed on the Premises for many years to reach what may have been saltmarsh in the distant past, is not the proper method for determining what existed approximately three years ago at the surface. In sum, the principles relied upon by Daylor to equate the state of the Premises in 2003 with any purported historic saltmarsh are not reliable and therefore not admissible.

Additionally, Daylor testified that he did not prepare the Site Analysis, and that it was instead prepared by Mr. Wall, one of his employees.  See Depo. Trans. at 33-34.  Thus, Daylor neither visited the site to personally assess the physical layout, conditions and soil samples, nor did he use data collected by others to prepare the Site Analysis.  The fact that Wall—who had firsthand experience observing the site—wrote the Site Analysis instead of Daylor confirms that on-site, personal observations are mandatory and standard protocol in the ability to render opinions such as those that Daylor now seeks to express.  Moreover, there is a lack of disclosure about the nature and extent of the testing done by Wall (and Daylor's other employees) or the results of that testing, and therefore it is impossible to assess the principles and methodologies of the testing that was undertaken, much less how Daylor analyzed the results of that testing.

Any testimony offered by Daylor which first requires personal observations and on-site evaluations at the Premises must be barred at trial because, as he testified, he did not make the requisite personal observations in advance of rendering his opinion.  That is, Daylor's opinions are not based upon sufficient facts or data, nor are they the product of reliable principles and methods that would meet the Daubert threshold for wetlands determinations.  See Fed. R. Evid. 702 and 703.  Indeed, personal observations of the wetland resource areas presently existing on the Premises—and the ability to explain the relationship between these present conditions and what may have existed in 2003—are central to the primary factual dispute in the case: the nature and extent of wetland resource areas on the site as of the Date of Taking.  Daylor has not demonstrated any knowledge of the site characteristics that would qualify him to opine about the wetland resource areas now or formerly existing on the Premises.  It is not enough that an expert proffers his qualifications, his conclusions and his assurances of their reliability.  Likewise, the

numerous assertions and conclusions within the Site Analysis are not only not Daylor's own, but he only goes on to ratify or explain them with mere *ipse dixit*.

In sum, there is not a sufficient foundation for the admissibility of Daylor's expert testimony, and there is too great of an analytical gap between the data gathered by Daylor's employees and the opinion offered by Daylor.  See General Elec. Co. v. Joiner, 522 U.S. at 146.

Based on the foregoing, the testimony that must be barred due to the lack of foundational support and Daylor's failure to personally observe the Premises prior to rendering the opinion, includes the following:

- any determination of the location of any purported wetland resource area(s) now or previously existing at the site;

- any testimony of the state or condition of the Premises before September 21, 2006 which forms the basis of the opinions, conclusions or data set forth in the Site Analysis within the Daylor report including testimony of the location and extent of wetland resource areas on the site as of the date of taking;

- testimony that Plaintiff's proposed uses of the site as a Chapter 40B residential condominium project or as a beach club use cannot be constructed on the site due to the existence of wetland resource areas;

- any opinion that the physical location of resource areas in existence on the site as of the date of taking is established by the ORAD Plan or derivatives of that plan;

- Daylor's conclusion (as set forth at page 6 of the Daylor Report) that because the Premises has remained a closed beach since the Date of Taking, this is a "recognition" that the Premises contains resource areas;

- Daylor's purported observations about the limits of the use of the Premises (as set forth at page 6 of the Daylor Report);

- Daylor's conclusion that portions of the Premises contain historic saltmarsh and/or that such historic areas are purportedly returning to saltmarsh at present time; and

- any testimony that relies on the on-site soil evaluations conducted by Wall and/or other Daylor employees.

## CONCLUSION

Based on the foregoing, this Court should allow the Trust's motion in limine and bar Daylor's testimony at trial as set forth above, or, alternatively, limit Daylor's testimony to those opinions about the condition of the Premises which do not first require the need for personal on-site observations.

<div style="margin-left: 50%;">

Plaintiff,
BARBARA DEIGHTON HAUPT, Trustee
of BD REALTY TRUST,
By her attorneys,

</div>

Date: 3/6/2007

<div style="margin-left: 50%;">

____/s/ Kristen M. Ploetz_____
Jeffrey T. Angley, Esq.
B.B.O. #543958
Kristen M. Ploetz, Esq.
B.B.O. #654549
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
(617) 367-8787

</div>

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 6th day of March, 2007.

<div style="margin-left: 40%;">

_____/S/ Kristen M. Ploetz_____
Kristen M. Ploetz, Esq.

</div>

L:\Ditn002\Motions in limine\mot.limit.testimony.daylor.JTA.doc

**EXHIBIT 1**

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Barbara Deighton Haupt v. The Town of Wareham

Transcript of the Testimony of:

# Robert F. Daylor

# September 27, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

ORIGINAL

Janet M. Hills   20831

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

5

| 1 | Q | And what is your occupation? |
|---|---|---|
| 2 | A | I am the CEO of Daylor Consulting Group and the |
| 3 | | managing partner of Vanasse and Daylor in Fort |
| 4 | | Meyers, Florida. |
| 5 | Q | Now, what is the primary work that Daylor |
| 6 | | Consulting Group, Inc. does? |
| 7 | A | We do primarily land development-related work. |
| 8 | | We -- we do site acquisition studies for |
| 9 | | institutions, corporations, working with their |
| 10 | | facilities. |
| 11 | | So, we look at land, advise clients on |
| 12 | | the development potential of their property and |
| 13 | | then, carry them through the permitting |
| 14 | | process. |
| 15 | | We also do more traditional civil |
| 16 | | engineering site design work, water and sewer |
| 17 | | systems, that type of work. |
| 18 | | And we do a fair amount of public |
| 19 | | planning work, city and regional planning, |
| 20 | | affordable housing plans, that kind of master |
| 21 | | planning work. |
| 22 | Q | Is the planning work that you do, with respect |
| 23 | | to municipal entities, is that on behalf of the |
| 24 | | entity?  Or is that for -- for developers who |

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

8

```
 1              with -- after high school.

 2      A       I went to Northeastern University.  I have a

 3              Bachelor of Science in Civil Engineering and I

 4              also have a -- in 1961 and in 1968, I have a

 5              Masters in Civil Engineering, with an emphasis

 6              on Environmental Engineering.

 7                      And I was -- in the academic years,

 8              '76, '77, I was awarded a postgraduate Loeb

 9              fellowship at Harvard University.

10      Q       And that fellowship allowed you to do what?

11      A       It's a -- if you have -- it's one of the three

12              standing postgraduates fellowships.

13                      The Neiman Fellow's in journalism, the

14              Loeb is in environmental studies and the

15              Kennedy Fellow's in government.

16                      And all of those fellows have officer

17              status for a year.

18      Q       I'm sorry.  What?

19      A       They have officer status at the university for

20              a year.  So, we -- at that status, we can take

21              any course we want.

22                      We can take any course at affiliated

23              institutions and the Loeb Fellows have an

24              obligation to teach.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

27

```
 1              those courses, do you use that yourself on a
 2              day-to-day basis?
 3      A       I would say not on a "day-to-day basis," but, I
 4              still -- I still get to look at in lot of holes
 5              and some dirt once a while.
 6      Q       Because, that would -- what is the soil
 7              evaluator, what does that work involve, in
 8              order to make an evaluation of soil types?
 9      A       It -- the evaluations are made in the field
10              based on the observations you make in test
11              holes.
12                      So, generally, test pits are excavated.
13              You look at the color and characteristic of the
14              soil.  And you also look at the setting of
15              that.  What is the nature of the land forms and
16              what does that tell you about the probability
17              of the soil?
18                      So, it's an observation of the soil
19              characteristics, the level of the groundwater,
20              and any appearance of the maximum highest
21              groundwater by the structure of the soils or
22              soil color changes, technically speaking.
23                      But, it is a -- it is an examination
24              that is performed in the field.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

29

| 1 | | best use alternative did not require the |
| 2 | | property. |
| 3 | Q | On this list that we are both looking at, Page |
| 4 | | 3 of your affidavit, which is the beginning of |
| 5 | | your report, what other matters on this list |
| 6 | | involved eminent domain proceeding? |
| 7 | A | All of these are (indicating). |
| 8 | Q | All of them are eminent domain? |
| 9 | A | Yes. |
| 10 | Q | So, with respect to the second item, January |
| 11 | | 2006 SDB Corporation case, what were the |
| 12 | | wetlands issues involved in that case, if any? |
| 13 | A | In that case, they were along the Neponset |
| 14 | | River and I think, they were -- the wetlands |
| 15 | | issues were -- were less at issue in there. |
| 16 | | Most of the site had access from a |
| 17 | | public way, but they did border the Neponset |
| 18 | | River. |
| 19 | Q | Now, with respect to the Swifts Beach property, |
| 20 | | which is the subject of this case, did you |
| 21 | | personally go out and view this property? |
| 22 | A | Yes, I did. |
| 23 | Q | And approximately when did you go and look at |
| 24 | | this property? |

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

30

| | | |
|---|---|---|
| 1 | A | I -- I viewed this property on the 21st of |
| 2 | | September. |
| 3 | Q | Of what -- what year? |
| 4 | A | This year. |
| 5 | Q | So, this has been just about -- |
| 6 | A | Last week. |
| 7 | Q | Six days ago. |
| 8 | | Is that the first time that you |
| 9 | | personally have viewed the site? |
| 10 | A | Yes. |
| 11 | Q | Did you -- so, of course, that was after you |
| 12 | | had issued your report? |
| 13 | A | Yes. |
| 14 | Q | I think I know the answer to the next question, |
| 15 | | but I'll ask you anyway. |
| 16 | | So, did you perform a soil evaluation |
| 17 | | analysis at this site? |
| 18 | A | I did not personally. |
| 19 | Q | You're aware that there was some soil testing |
| 20 | | that was done at the site? |
| 21 | A | Yes.  That work was done under my direction by |
| 22 | | staff members. |
| 23 | Q | Did you actually examine any of the soil?  Was |
| 24 | | any soil brought back to your offices?  Did you |

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

33

```
 1              And there is a technical write up and

 2         so, those samples are all -- I actually saw

 3         them again yesterday.  So, they're still

 4         sitting in a -- in a box under someone's desk.

 5    Q    Now, you had -- before you, you have your

 6         report -- in the first nine pages is an

 7         affidavit which you've signed?

 8    A    Yes, sir.

 9    Q    And then, there is a -- there is a statement at

10         the end of your affidavit that says, "The

11         attached Site Analysis Report has been prepared

12         by Daylor staff under my direction to document

13         the foundation for my opinions and to support

14         the Town in its defense in the pending

15         litigation."

16              So, is it -- am I correct in saying

17         that, the first nine pages of this report, you

18         wrote this first nine pages?

19    A    I did.

20    Q    And then how about the balance of, that is, the

21         reference made to the "attached Site Analysis

22         Report"?  Who prepared that Site Analysis

23         Report?

24    A    The project manager is Sterling Wall, W-A-L-L.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

34

```
 1              And it was drafted largely by him as the

 2              principal investigator.

 3    Q         And now, Sterling Wall, how long has he been an

 4              employee of Daylor Consulting?

 5    A         A very long time.  I would say 12, 13 years.

 6    Q         And did -- do you know, did Mr. Wall go out and

 7              take a look at the site?

 8    A         Oh, on several occasions.

 9    Q         Was there anybody else at Daylor Consulting,

10              besides Mr. Wall, who, to your knowledge, went

11              out to the site?

12    A         Yes.

13    Q         What other person?

14    A         Richard Albano, A-L-B-A-N-O, went to the site.

15              He is a wetlands scientist and a habitat

16              specialist.

17                   Sterling's background is actually --

18              he's a coastal geologist.

19    Q         Does Daylor Consulting have a web site that has

20              the outline of who the different employees are

21              in the company?

22    A         We do.  And both of those individuals, I

23              believe, are posted on there and we have sample

24              projects.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

50

```
 1              the ORAD Plan.

 2                    I believe this was the -- do you

 3              understand, am I correct, that the -- this

 4              Glick Plan, that we are looking at here, is

 5              the -- a plan that was the plan approved

 6              pursuant to the Order of Resource Area

 7              Delineation by the Wareham Conservation

 8              Commission in October of 2000?

 9     A        Yes.  That is my understanding.

10                    MR. BLAKE:  And is it dated May

11              4, 2000?

12                    MR. ANGLEY:  Well, it's amended

13              through June 19, 2000.

14     Q        (By Mr. Angley)  So, could you explain to me --

15              I'm sorry.

16                    So, let's go back.  This is Exhibit

17              Number 22 and I believe it's also referred to

18              in your report as Daylor Exhibit A?

19     A        Yes, sir.  It is.

20     Q        2003 resource area delineation.

21                    How did you determine the resource

22              areas that existed on the site as of the date

23              of taking which would be December 31, 2003?

24     A        This -- plan reflects the -- the ORAD Plan, the
```

51

```
 1          Glick Plan, which is also before us right at
 2          this point and the Superseding Order of
 3          Conditions' reference to that plan.
 4               And it shows the resources as defined
 5          in that order, that is, the Order of Resource
 6          Determination that was issued in October of
 7          2000.
 8               And at the -- that same resource
 9          determination was used in the applicant's
10          Notice of Intent Plans, the so-called Vautrinot
11          Plans of 2001.  And the same resource
12          determination that was -- is part of -- cited
13          in DEP's Superseding Order of Conditions in
14          August of 2003.
15               Therefore, the resource areas are as
16          shown on that -- those plans, except that the
17          difference in our plan is that we also show and
18          have labeled it in a blue line on the plan, the
19          highest predictable high tide.  We have shown
20          this sort of higher high tide Corps of
21          Engineers' jurisdiction.
22               But for that distinction, the
23          determinations are the same.
24    Q     So then it's, I take it, part of your -- the
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

52

```
1              request, part of the services that you were

2              asked to render was to make your own

3              determination about what resource areas existed

4              at the site at the date of taking?

5    A         Yes.

6    Q         Is that correct?

7                   And so, I take it then, that the

8              delineation that you've show on your Daylor

9              Exhibit A Plan, is really the resource area

10             delineation that was established by the ORAD,

11             except, as you say, for this highest

12             predictable tide line that you've added?

13   A         Yes, sir, that's correct.

14   Q         So, is this like a legal position?  Or does

15             this purport to show actually, physically what

16             existed on the site as of the date of taking?

17                   MR. BLAKE:  Can you clarify

18             that?

19                   MR. ANGLEY:  Yes.

20                   MR. BLAKE:  Legally?

21   Q         (By Mr. Angley)  Well, I mean, because you told

22             me in the last answer that, you've referred to

23             these orders and the Vautrinot Plan and the

24             SOC.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

53

```
 1                    And that's suggesting to me that you

 2          believe that the delineation -- area of

 3          resource -- the resource area delineations are

 4          kind of established as a legal proposition?  Is

 5          that right?

 6     A    Yes.  They -- they do.

 7                    My expertise doesn't include offering

 8          legal opinions, but, you know, I think I do

 9          understand your question.

10     Q    Yes.

11     A    It is my interpretation of the -- you know,

12          looking at the regulations and what -- what

13          entitlements they had on the date of the

14          taking, it is -- it is driven by the orders and

15          the regulations.  It, if you will, it is the

16          legal opinion of what was in force at the time.

17                    It is -- this is -- this is -- this is,

18          on the date of the taking, DEP had made a

19          determination and the Wareham Conservation

20          Commission extension of that superseding order,

21          had made this determination on the date of the

22          taking.

23     Q    And so, is that, so, I take it then that

24          that's -- like that's independent of what might
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

54

```
 1                 have actually have physically existed on the

 2                 site?

 3     A           It is -- it's not completely independent.

 4                        But, we also offered an opinion

 5                 about -- different from this, about what we

 6                 think the conditions were in 2003.

 7     Q           So, now -- and where does that opinion show up?

 8                 Is that one of your other attachments?

 9     A           Yes.  And in our -- we have -- if you look at

10                 Exhibits -- our Daylor Exhibit B and C, --

11     Q           Well, here are B and C.  I don't know which one

12                 it is that you wanted to look at.

13                        Perhaps, I've gotten these out of the

14                 order that you wanted to look at.

15     A           Exhibit B is the -- this is our interpretation

16                 of the Plaintiff's resource delineation in

17                 2006.  So, this is shown on -- on the McKenzie

18                 Plans, the E-1, E-2 and 3, that is, the concept

19                 plans.

20                        And our -- our plan C is -- Exhibit B

21                 is what is -- what is before us from the

22                 Plaintiff's position of the resource areas.

23                 And our Exhibit C is our determination of the

24                 resources as they exist today.
```

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

56

| | | |
|---|---|---|
| 1 | | there aspects of this plan that -- and this is |
| 2 | | the Glick Plan, the ORAD Plan, that seem |
| 3 | | incorrect?  Are there any aspects of this that |
| 4 | | you think are incorrect? |
| 5 | A | Yes. |
| 6 | Q | And what aspects of this ORAD Plan would you |
| 7 | | consider to be incorrect in some fashion or |
| 8 | | other? |
| 9 | A | From my review of photographs and GIS mapping |
| 10 | | and my observations in the field and, I don't |
| 11 | | believe the salt marsh area is as extensive as |
| 12 | | shown on the Glick Plan. |
| 13 | | So, I think -- I think there is no |
| 14 | | question there -- there's no question in my |
| 15 | | mind that, before the date of the taking, and |
| 16 | | after the date of the taking, and most likely |
| 17 | | on the date of the taking, that within the area |
| 18 | | they identified as salt marsh, there were salt |
| 19 | | marsh plants and they're evident today.  And |
| 20 | | they're evident in the Plaintiff's own |
| 21 | | photographs. |
| 22 | | But, I don't believe the entire area |
| 23 | | was covered with salt marsh vegetation. |
| 24 | | Also, I believe the coastal dune areas |

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

133

```
 1    Q    Request Number 62, the -- the request was,
 2          "Admit or deny that delineation flagging
 3          referenced in the Daylor Report was not
 4          performed by a certified wetlands scientist."
 5               And that was "Admitted."
 6               Who did the wetlands delineation
 7          flagging at your office?
 8    A    When I went through this, I didn't answer this
 9          question.  But, I went through this and how was
10          it we -- this is a -- the reason it was
11          admitted is that -- is that there isn't --
12          there isn't a term called "certified wetlands
13          scientist."
14               That's the reason.  Rich Albano is a --
15          is a professional wetlands scientist and holds
16          certifications.
17               It's a technical response.  A technical
18          response.
19               But, it was -- it was done by a very
20          qualified person.
21    Q    And as I say, if I go on your website, I'll
22          find his resume?
23    A    Yeah.  He has a Master's degree in Biology, 20
24          years experience, a very good guy.
```

**EXHIBIT 2**



## AFFIDAVIT OF ROBERT F. DAYLOR, P.E., P.L.S.

### I.   Witness

Robert F. Daylor, P.E., P.L.S., CEO
Daylor Consulting Group, Inc.
Ten Forbes Road
Braintree, MA 02184

### II.   Introduction

The opinions expressed and information provided are submitted by Robert F. Daylor, P.E., P.L.S., CEO of the Daylor Consulting Group, Inc, on behalf of the defendants, Town of Wareham acting by and through the Board of Selectmen of the Town of Wareham and the Board of Selectmen of the Town of Wareham.

### III.   Witness Qualifications

#### A.   Background

Robert F. Daylor, is a licensed professional engineer and professional land surveyor and the CEO and founder of the Daylor Consulting Group, Inc. of 10 Forbes Road, Braintree, MA.  Mr. Daylor is the Managing Partner of Vanasse & Daylor LLP with principal offices in Fort Myers, FL.   In the Commonwealth of Massachusetts he holds professional registrations in civil engineering and land surveying and as a certified soils evaluator.  Mr. Daylor has 40 years professional experience including the planning, design and construction of public works and land development projects including many (more than 100) single-family residential projects.

Mr. Daylor holds a Bachelor of Science in Civil Engineering ("BSCE") degree and Master of Science in Civil Engineering ("MSCE") with a concentration on environmental issues from Northeastern University, Boston, MA, and was awarded a Loeb Fellowship in Advanced Environmental Studies by Harvard University.  He also has extensive continuing education credits in the fields of environmental studies and community planning, including studies at Harvard, MIT and the University of Pennsylvania.  He has also completed accredited management and marketing training by professional organizations.

Mr. Daylor is a frequent lecturer or seminar participant regarding land development issues and environmental regulations.  These include lectures at the Harvard Graduate School of Design, MIT Department of City and Regional Planning, Massachusetts Association of Land Surveyors and Civil Engineers, Association of Consulting Engineering Companies, Urban Land

1

Institute, National Association of Industrial and Office Properties, Society for the Marketing of Professional Services, the Massachusetts Association of Conservation Commissions (MACC), the Massachusetts Bar Association, Massachusetts Continuing Legal Education and the Appraisal Institute.

He has been qualified and has testified as an expert witness in numerous environmental and land development cases, many involving hydrology and wetland issues, in the Massachusetts Superior Court, the Massachusetts Land Court, the Appellate Tax Board, the Housing Appeals Committee and the U.S. District Court for the District of Massachusetts. He has appeared as an expert witness over 25 times in eminent domain cases, construction damages cases and permit appeals. He has appeared as an expert over 50 times in administrative trials or adjudicatory hearings, including many before the Massachusetts Department of Environmental Protection ("DEP").

Mr. Daylor is familiar with the MA Wetlands Protection Act, MGL c. 131, § 40 and its regulations at 310 CMR 10.00. He served on the Blue Ribbon Task Force which led to major regulatory changes in 1983 and 1986. He has been a speaker and lecturer at the MACC's annual meeting many times and has participated in other Conservation Commission training sessions. He has continuing pro bono participation in DEP advisory committees on Title V, the Rivers Protection Act, and revisions to Chapter 91.

By virtue of his professional occupation and licensing, he is required to be, and is, thoroughly familiar with the Massachusetts statutes and regulations applicable to the protection of environmental resource areas such as lakes, rivers, streams and wetlands of all types, including but not limited the Massachusetts Wetlands Protection Act, M.G.L. c. 131, § 40, and its implementing regulations as well as the Federal Clean Water Act Section 404-Wetlands regulations. He is also familiar with the Town of Wareham's Zoning Bylaws and Regulations and the Wareham (local) Wetlands Protective Bylaw.

Robert F. Daylor's professional resume is attached as Exhibit 1.

**B. Compensation to be Paid to Witness for Study and Testimony**

Mr. Daylor has been retained by the Town of Wareham, MA based on a proposal for services dated June 5, 2006. Fees for Basic Services will be billed on a Time and Materials basis and compensation has been estimated to be $33,700.00 (labor) for project services, not including expert witness testimony at trial.

Mr. Daylor's billing rate for expert testimony in court is $300.00 per hour.

2

C. **Listing of Other Cases in Which the Witness has Testified as an Expert at**
   **Trial or Deposition Within the Preceding Four (4) Years**

| DATE | PLAINTIFF VS. DEFENDANT | CASE |
|---|---|---|
| May 2006 | Plaintiff | Brox Industries vs. Commonwealth of Massachusetts Department of Highways, Middlesex Superior Court No. 01-4154LI 6.6$\pm$ acre taking from 63.2$\pm$ acre parcel, Route 3 and Kendall Road, Tyngsborough, MA |
| January 2006 | Plaintiff | S.D.B. Corporation vs. Commonwealth of Massachusetts (Metropolitan District Commission), Suffolk Superior Court C.A. No. 99-5604, Hilltop Street, Neponset River, Dorchester, MA |
| September 2005 | Plaintiff | Joseph Pasquarello, Trustee of C & J Realty Trust vs. Commonwealth of Massachusetts, Suffolk Superior Court C.A. No. 01-3395, Hilltop Street, Neponset River, Dorchester, MA (2.4 acres) |
| August 2005 | Defendant | Amtrak v. 40 Harvard Street Trust, Westwood, MA United States District Court, District of Massachusetts 03CIV (Settled) |
| December 2004 | Plaintiff | Farrell's Dock & Terminal Company v. Massachusetts Bay Transportation Authority, Sleeper Street, 36,529 s.f. property (former Victoria Station), Boston, Massachusetts (Settled at Mediation) |
| November 2004 | Plaintiff | Compaq Computer Corporation, Successor in Interest to Digital Equipment Corporation vs. Metropolitan District Commission, Route 140/Route 70, Boylston, West Boylston, MA, 102 of 400 acres taken |
| September 2004 | Defendant | Village Homes & Williams Brothers vs. Commonwealth of Massachusetts (MHD), Plymouth Superior Court No. 01-1438B, Brooks Street, Carver, MA (30 of 38 acres taken) |
| August 2004 | Defendant | David E. Dicarlo and Helen Dicarlo Reale, Trustees of the Winter Elysium Trust vs.Town of Wrentham, 200 acres, Bennett Street, Wrentham, MA |
| February 2003 | Plaintiff | Whittier Place Condominium Trust v. Commonwealth of Massachusetts Highway Department Suffolk Superior Court, C.A. NO. 99-5607B, Martha Road, Charles Street, Boston (5 acres) Case settled |
| January 2003 | Defendant | Boston & Maine v. Commonwealth of Massachusetts (MHD-CAT) – Suffolk #99-3982, North Point, Cambridge, Case settled |

PLEASE NOTE: There are several pending cases of both Plaintiff and Defendant work related to highway takings for Route 44, Route 146 and Route 20 improvements and a Plaintiff Representation in a MWRA taking case. There have been Answers to Interrogatories exchanged in all of these matters.

3

## D.  List of Publications

| | |
|---|---|
| June 13, 2006 | MA Continuing Legal Education<br>"Environmental Planning/Reports and How to Read Them as Part of Closing Documents in a Real Estate Sale" |
| May 2-3, 2006 | Zweig White Land Development Conference<br>"Green Site Design" |
| October 19, 2004 | Lorman Education Services<br>"Current Trends in Stormwater Management" |
| July 30, 2003 | MA Continuing Legal Education<br>"Permits for Projects In and Near Wetlands and Water" |
| July 31, 1998 | MA Continuing Legal Education<br>"Eminent Domain in Massachusetts: The Role of the Expert/Land Use Professionals" |
| May 20, 1998 | Environmental Management and Technology Expo<br>"Everyday Ethics" |
| March 7, 1998 | Massachusetts Association of Conservation Commissions<br>"How to Review Drainage Calculations – Hands On" |
| December 3, 1997 | The Cambridge Institute<br>"Land Use and Development" |
| November 13, 1997 | Mass ALFA Annual Conference<br>"All the Good Sites are Gone" |
| October 12, 1995 | Boston Bar Association<br>"Title 5: Practical Approaches to Problems in Transactions and Property Management – Engineering Perspectives" |
| October 6, 1995 | Suffolk University Law School Advanced Legal Studies<br>"Practical Applications of the New Title 5 Regulations" |

The above is a partial list of papers presented at conferences.  Mr. Daylor is a frequent participant in panel discussions and guest lecturer.

## IV.  Statement of Opinions

The Town of Wareham, MA, is the owner of a 5.35-acre waterfront property (the "site") bordering the tidal portion of the Wareham River in the Swifts Beach section of Wareham, MA.  In June 2006, the Town engaged Daylor Consulting Group, Inc (Daylor) to assess the site's physical conditions and review environmental regulations and previous permitting applicable to the site to assist the Town's appraiser in the determination of the "highest and best use" as of the date of the taking in 2003.  The site in question is identified on the Town of Wareham's Assessor's Map, Plat 50B as comprised of Lots B-1, E and an unnumbered lot with a street address of 200 Swifts Beach Road, Wareham.

It is my understanding that on December 31st, 2003, the Town recorded an Order of Taking in the Plymouth County Registry of Deeds related to the subject property ("the taking").  On August 23, 2005, BD Realty Trust filed a Complaint and Jury Claim in United States District Court, District of Massachusetts.  This matter is identified as:

> Barbara Deighton Haupt, Trustee, BD Realty Trust v. Town of Wareham et al. U.S. District Court for the District of Massachusetts, Civil Action No.: 05-11745RWZ.

The action filed by the Plaintiff alleges at Count 1 that the taking by Eminent Domain was made in bad faith and was a taking to prevent BD Realty Trust from constructing a two-family residence on the property for the benefit of local abutters, including one or more Selectmen and their families. It is my further understanding that the action filed alleges at Count 2 that there should be an assessment of damages because the Trust was deprived of its land and property which it alleges were of great value based on the highest and best uses of the site.

Based on my evaluation and review I have determined that:

1.  With regard to Count 1, there was no bad faith taking.

First, the environmental conditions on the site that would limit development of this property in 2003 existed before the taking, were generally known and shown on plans, maps and charts showing the area that includes the site dating back to 1893 (See Attachments 1-6, 8-11 and 15-21).

In addition, the document record shows that the prior owner of the property (Glick Realty Corp.) initiated the wetland permitting process to secure a formal determination of the type, location and extent of wetland resources on the site by filing an Abbreviated Notice of Resource Area Delineation (ANRAD) with a plan dated May 4, 2004 (See 2000 ANRAD Plan-

5

Attachment 10). This process was ongoing when the plaintiff purchased the site in August 2000. On October 18, 2000, the Wareham Conservation Commission issued its determination (an Order of Resource Area Delineation-ORAD) identifying the wetland resources on the site.

The formal delineation of these resource areas was subsequently incorporated by the plaintiff's engineer as part of a Notice of Intent permit filing and shown on permitting plans (See 2001 Vautrinot Plan of Land - Attachment 11). The Plaintiff used this determination in applications both before the Wareham Conservation Commission and DEP which issued a Superseding Order of Conditions citing the Plaintiff's own determination of wetland resources.

Second, from my observations, I have determined that the property is actually in use and serving a proper public purpose as a municipal beach and open space. The site is bounded on the west and east by other public beaches and the taking provided an open-space link between these abutting public beach areas creating approximately 2,400-linear feet of continuous beach area for public use. I have observed active use of these beach areas, including the site, by the public. The fact that the access to the site is closed to vehicles and that the Town no longer is parking cars on the property is a recognition of the Wareham Conservation Commission's October 18, 2000 wetland resources determination (ORAD) and the MA DEP's Superseding Order of Conditions (SSOC dated August 12, 2003) requiring that the degraded saltmarsh areas (former parking lot) be fenced off and allowed to re-vegetate naturally.

2. With regard to Count #2, I have determined that the use of the site is very limited because of the presence of protected natural resources. It is my opinion that as of the date of the taking the following wetland resource areas regulated under the local Wetlands Protective Bylaw, the MA Wetlands Protection Act and the Clean Water Act Section 404-Wetlands existed at the site:
- coastal beach;
- coastal dune
- barrier beach
- salt marsh
- bordering vegetated wetland (wet meadow)
- land under the ocean
- land subject to coastal storm flowage
- coastal wetland (federal)
- inland wetland (federal)

However, even with the above-listed protected resources, it is my professional opinion that: (1.) The highest and best use on the date of the taking would have been for the construction of one, modest-sized duplex home constructed on piles elevated above the base flood elevation in accordance with the state building code for construction in flood hazard areas and FEMA requirements,

6

and (2.) That the home would have had to have been located in the area of a former concrete slab, including removal of that slab and re-vegetation of the area beneath the elevated building as a low dune with very limited permeable driveway access.

Plaintiff's Concepts

The action filed alleges that there should be an assessment of damages because the Trust was deprived of its land and property which were of great value. The following are my professional opinions based upon my reviews of the Plaintiff's highest and best use concepts.

This allegation is based on the presentation of two alternatives that plaintiff's current engineer developed for site use. The two development alternatives identified by the plaintiff for use of the site were:

- Two large elevated buildings providing a total of 40 residential condominium units, driveways and parking for 90-vehicles under the provisions of Chapter 40B (Concept 1); and

- Driveways and parking for 120-vehicles as part of a beach club use (Concept 2).

The Plaintiff bases these alternatives on a new delineation of wetland resources performed in her behalf by consultants in 2006. This new delineation reduces the protected wetland areas on site and is in conflict with the Plaintiff's own wetland delineation in force at the actual time of the taking. Just prior to the taking in 2003 the Plaintiff pursued and obtained the above referenced Superceding Order of Conditions from DEP using the more extensive wetland delineation which had been approved by the Wareham Conservation Commission and MA DEP.

To my knowledge, no regulatory agency has ruled on the Plaintiff's 2006 delineation. We performed an extensive current delineation ourselves including soil examinations and do not agree with the Plaintiff's new delineation. We find the wetlands resource areas slightly more extensive than those shown on the Plaintiff's own resource area determination at the time of the taking. This follows logically because of the lack of use as a parking area has allowed the wetlands to revegetate just as cited in the findings of the 2003 DEP Superceding Order of Conditions. It is illogical that the Plaintiff's 2006 delineation could now be claimed by her to be more accurate than the Plaintiff's own delineation at the time of the taking.

However, it is my professional opinion that neither the Chapter 40B residential condominium use nor the beach club use proposed by the Plaintiff can be constructed at this site. Further, such uses in my opinion are speculative and cannot meet the "reasonably probable" standard for their design, regulatory approval and construction. As listed above significant

7

wetland resource areas exist at this site and applicable state and federal wetland regulations so limit the area available for development at the site, as of the date of the taking, that it precludes the concept developments offered as their highest and best use opinion. The two development alternatives propose the filling and alteration of saltmarsh and bordering vegetated wetland (wet meadow) resource areas and the applicable wetland regulatory performance standards 310 CMR 10.32 and 310 CMR 10.55 are: (1.) A project shall not destroy any portion of a saltmarsh and shall not have an adverse effect on the productivity of a salt marsh, and (2.) Any proposed work in a Bordering Vegetated Wetland (wet meadow) shall not destroy or otherwise impair any portion of said area.

### Concept 1 - Chapter 40 B Residential Condominium Project

The Plaintiff has proposed the construction of two (2) elevated buildings providing a total of 40 residential condominium units, driveways and parking for 90-vehicles under the provisions of Chapter 40B (See Concept 1 –Report Attachment 13) as an example of a potential highest and best use of the site. Plaintiff further alleges that there should be an assessment of damages because the Trust was deprived of its land and property which were of great value based on such a residential use alternative.

I have evaluated the proposed Chapter 40B residential condominium use proposed by the plaintiff and I believe that this project cannot be constructed at this site. Chapter 40B allows the Zoning Board of Appeals after certain findings to lay aside, in the issuance of a Comprehensive Permit, <u>local</u> zoning, and limited other <u>local</u> by-laws in order to provide affordable housing. There is no authority to set aside or override State or Federal regulations. The Plaintiff's concept plans would require violation of the State and Federal wetland regulations. The concept shows alteration of protected resources known to the Plaintiff and used by her in regulatory procedures. These very resources are subject to the Wareham Conservation Commission and MA DEP Orders forbidding such alterations. The Plaintiff was a party to these proceedings.

This proposed construction would result in adverse impacts to the wetland resources at the site; the filling (increasing erosion) and alteration (changing the form of) of coastal beach for parking use, alteration of coastal dune for driveway and parking uses and the filling and alteration (destruction) of 6,700+-sf of saltmarsh for building, parking and landscaping uses. This construction would also alter an additional 12,800+-sf of bordering vegetated wetland (wet meadow) subject to the MA Wetlands Protection Act. Further, there is federal Army Corps of Engineer's jurisdiction under the Clean Water Act Section 404-Wetlands (regulations at 33 CFR 322-Permits for Discharges of Dredged or Fill Material into the Waters of the United States). Thus, the proposed filling and alterations are not allowed under the MA Wetland Protection Act Regulations and the proposed filling of saltmarsh and wet meadow is also not allowed under the federal Clean Water Act- Section 404

Wetland Regulations. The 40B concept plan does not meet the critical criterion for highest and best use that it be "legally permissible".

### Concept 2 - Beach Club

The Plaintiff has proposed the construction of driveways and parking for 120-vehicles as part of a beach club use (See Concept 2 –Report Attachment 14) as an alternative example of a potential highest and best use of the site. Plaintiff further alleges that there should be an assessment of damages because the Trust was deprived of its land and property which were of great value based on such a beach club use alternative.

I have evaluated the proposed Beach Club use proposed by the Plaintiff and I believe that this project cannot be constructed at this site. This proposed construction would also result in adverse impacts similar to her first concept; the filling and alteration of coastal beach for parking use, coastal dune for driveway and parking uses and 5,900+-sf of saltmarsh for parking uses. This construction would also alter an additional 12,000+-sf of bordering vegetated wetland (wet meadow) subject to the MA Wetlands Protection Act and federal Corps jurisdiction under the Clean Water Act Section 404-Wetlands jurisdiction; activities not allowed under the MA Wetland Protection Act Regulations and not allowed under the federal Clean Water Act- Section 404 Wetland Regulations. No alteration of State and Federally protected salt marsh is allowed under applicable regulations. Only a few "limited projects" are allowed to alter more than 5,000 sq. ft. of bordering vegetated (fresh) wetlands with replacement mitigation. Parking lots are not one of the listed limited projects. Again, this concept cannot meet the "legally permissible" standard for highest and best use as it clearly violates applicable wetland regulations in force on the date of the taking.

The attached Site Analysis Report has been prepared by Daylor staff under my direction to document the foundation for my opinions and to support the Town in its defense in the pending litigation.

Submitted under the pains and penalties of perjury this 30th day of June, 2006

Robert F. Daylor, P.E., P.L.S., CEO
Daylor Consulting Group, Inc.

9

**Daylor
Consulting
Group
Inc.**

Engineers
Surveyors
Scientists
Planners
Landscape Architects

# Site Analysis



## BD REALTY TRUST VS. TOWN OF WAREHAM ET AL
### 200 SWIFTS ROAD
### WAREHAM, MASSACHUSETTS

Submitted to:

Board of Selectmen
Town of Wareham
54 Marion Roadp
Wareham, MA 02571

Submitted by:

Daylor Consulting Group, Inc.
Ten Forbes Road
Braintree, MA 02184

**Ten Forbes Road
Braintree/MA 02184**
Tel     781.849.7070
Fax     781.849.0096
Web     www.daylor.com

**June 29, 2006**                    Job # 1.2627.00

**Coastal Dune-**defined at 310 CMR 10.28, means any natural hill, mound or ridge of sediment landward of a coastal beach deposited by wind action or storm overwash. Coastal dune also means sediment deposited by artificial means and serving the purpose of storm damage prevention or flood control.

Construction on a Coastal Dune is generally not allowable because the work cannot be conditioned in a manner that protects the resource and the public interests, especially those interests related to prevention of storm damage and pollution. Any project on a dune is presumed to be significant to storm damage prevention and flood control. The coastal dune at this site is a high hazard coastal flood zone with a 100-year flood elevation of 20-ft. However, beach homes previously existed on this dune and the existence of a 40-ft x 65-ft concrete pad is the remaining part of a concession stand that served the beach-going public prior to Hurricane Bob in October 1991. The coastal dune portion of the site has been altered in the past by storm overwash (1938 & 1991).

### Barrier Beach

That portion of the site that is composed of coastal beach and coastal dune where there is saltmarsh located behind and to the north can be defined as a Barrier Beach system. However, this barrier has not been previously mapped by the MA Office of Coastal Zone Management as a barrier beach unit.

**Barrier Beach** - as defined at 310 CMR 10.29, means, a narrow, low-lying strip of land generally consisting of coastal beaches and coastal dunes extending roughly parallel to the trend of the coast. It is separated from the mainland by a narrow body of fresh or brackish water or a marsh system. A barrier beach may be joined to the mainland at one or both ends."

Approximately 2.5-acres of the 5.35-acre site is considered to be barrier beach.

### Saltmarsh

Approximately 10,000-sf (0.23-acres) of the site landward of the tidal channel, beach and dune is saltmarsh wetland. Daylor has determined that 1. This area has been saltmarsh in the past, 2. Continues to be identifiable as saltmarh based on the presence of coastal wetland plant species located in a several low elevation portions of the site and 3. Based on the tidal flooding characteristics of the site. The Wetlands Regulations define Saltmarsh at 310 CMR 10.32, as a coastal wetland that:

1. extends landward up to the highest high tide line, that is, the highest spring tide of the year. A salt marsh may contain tidal creeks, ditches and pools. Spring Tide means the tide of the greatest amplitude during the approximately 14-day tidal cycle. It occurs at or near the time when the gravitational forces of the sun and the moon are in phase (new and full moons); and

(a) Borders on creeks. The types of freshwater wetlands are wet meadows, marshes... Bordering vegetated wetlands are areas where the soils are saturated and/or inundated such that they support a predominance of wetland indicator plants.

In addition, the preamble section for coastal dune at 310 CMR 10.28 recognizes that wet meadows may occur in interdunal areas, such as this area at the site. Since this wet meadow is also subject to flooding during the Highest Predictable Tide of the year, the subject wetland meets the Corps definition of wetland and federal Section 404-Wetlands jurisdiction extends to the landward edges of this wetland boundary.

## 3.6    Significance of the Saltmarsh Wetland

Daylor has further evaluated the presences of saltmarsh at this site by 1. Performing historic research of available information for the Swifts Beach Area including the site, 2. Performing a test hole investigation to determine the sediment horizons at the site and 3. Observing Spring High Tide flooding at the site on June 23, 2006 (elevation 4-NGVD at 7:19 PM).

An examination of the historic plans, maps and charts reviewed in this matter, Attachments 1-7, 9-11 and 15-22, all generally indicate the presence of coastal wetland at the site. Many of these attachments specifically note that saltmarsh has been a resource area present at the site since 1927. To confirm the 79 years of observation that salt marsh exists on this site, on June 16, 2006 Daylor performed a series of soil borings along one east-west transect line and one north-south transect line. The results of these soil borings were to define a historic saltmarsh surface between 2.1 and 3-ft under the present fill material on the site and to define saltmarsh at the present surface on the eastern and central portions of the site. Thus, we have concluded that the area delineated as saltmarsh on the Glick (200) and Vautrinot (2001) plans was historically saltmarsh.

In addition, our personal observations (June 16 and 23) are that portions of the historic saltmarsh area have been filled by clean sandy fill and that despite the filling, the filled area continues to be flooded and the saltmarsh continues to be definable as saltmarsh wetland resource area. Furthermore, where the historic saltmarsh has been filled, there is saltmarsh vegetation that is regrowing on the surface of the fill soils, changing what was once a sand parking area back to vegetated saltmarsh wetland that will meet the state and federal definitions of saltmarsh/wetland. Daylor's Exhibit A shows the extent of the area that should be defined as saltmarsh at the time of the taking in 2003. 

There is a two part state Regulatory Definition of Salt Marsh at 310 CMR 10.32 which is a coastal wetland that:

1. extends landward up to the highest high tide line, that is, the highest spring tide of the year. A salt marsh may contain tidal creeks, ditches and pools. Spring Tide means the tide of the greatest amplitude during the approximately 14-day tidal cycle. It occurs at or near the time when the gravitational forces of the sun and the moon are in phase (new and full moons); and

2. is characterized by plants that are well adapted to or prefer living in, saline soils. The dominant plants within salt marshes are salt meadow cord grass (*Spartina patens*) and/or salt marsh cord grass (*Spartina alterniflora*).