UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee of
BD REALTY TRUST,

        Plaintiff

v.

TOWN OF WAREHAM acting by and
through the BOARD OF SELECTMEN OF
THE TOWN OF WAREHAM, and the
BOARD OF SELECTMEN OF THE TOWN
OF WAREHAM,

        Defendants

DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE ANY AND ALL
EVIDENCE AND TESTIMONY OF
PLAINTIFF'S PROPOSED USE OF
THE PROPERTY AS A BEACH CLUB
AND ANY ALLEGED COMPARABLE
BEACH CLUB PROPERTIES RELIED
UPON BY THE PLAINTIFF

Now come the defendants in the above captioned matter and hereby move this

Court to exclude any and all evidence of plaintiff's proposed use of the subject property

as a non-profit beach club and any of the alleged comparable sales of beach clubs relied

upon by the plaintiff's expert appraiser. For reasons therefor, the defendants state that the

plaintiff's appraiser has so completely failed to 1) establish that there is a market for a

non-profit beach club; and 2) establish reasonable comparable properties in his analysis

of the value of a non-profit beach club, that any valuation regarding a non-profit beach

club is as a matter of law unreliable and should be excluded. For further reasons therefor,

the defendants state as follows.

I.    <u>INTRODUCTION</u>

This is an eminent domain case arising out of the defendants taking of plaintiff's

beach front property in the Town of Wareham. Plaintiff has brought this action pursuant

to M.G.L. c. 79, claiming that the pro tanto awarded by the Town did not justly

1

compensate her for the value of the taken property. As a result, plaintiff has engaged an expert appraiser who has opined that the highest and best use of the property would have been as a 250 membership non-profit beach club with an estimated value of $3,125,000.00.

II.    Relevant Facts

In reaching a valuation for the non-profit beach club, plaintiff's appraiser used the so-called sales comparison approach to valuation. The sales comparison approach relies on a comparative analysis of sales of similar properties. See Plaintiff's Appraiser's Supplemental Expert Report p. 20 (hereinafter Supp. Report at p.__. a copy of which is attached hereto as Exhibit A.). Obviously, the more data or recent sales of similar properties available for comparison the better and more accurate the indicated value will be. Id.

In this matter, neither plaintiff nor plaintiff's appraiser was unable to locate any sales of beach clubs to use in a comparison analysis. See Deposition Plaintiff at pp. 49-51 (a copy of which is attached hereto as Exhibit B)(stating "[t]here was nothing exactly comparable"). Indeed, when questioned during a deposition, plaintiff's appraiser admitted that "it turned out there were virtually no sales of beach club properties available." Deposition of Steven Elliot at p. 54 (hereinafter Elliot Depo. at p.____ a copy of which is attached hereto as Exhibit C). Additionally, after further examination at his deposition, plaintiff's appraiser admitted that there was no comparable information to use in analyzing the developability of the subject property as a non-profit beach club. Exhibit C, Elliot Depo. at p. 58.

2

Notwithstanding this lack of a market for non-profit beach clubs, plaintiff proposes that the development of the Property would be undertaken as follows. Plaintiff is not a non-profit but rather intends to sell the Property to a developer who will build the beach club and attempt to sell each of the 250 units to individual owners who will in turn, incorporate themselves as a non-profit beach club. See Exhibit C, Elliot Depo. at pp. 81-85.

In spite of the lack of comparable properties and the tenuous nature of the proposed development of the project as a non-profit beach club, plaintiff's appraiser attempted to arrive at a value by comparing sales of individual units in a for-profit beach club and extrapolating a value from this meager sales data. Plaintiff's appraiser was only able to locate three sales of units in a for-profit beach club that he deemed comparable; the Bowerman's Beach Club in Falmouth, Massachusetts.[1] See Exhibit A Supp. Report at d (iii). The Bowerman's Beach Club is a 157 unit club, run for-profit, which offers its members the use of a one story club house and one parking space for each unit. Id. Based on a very meager sales history of units conveyed by the beach club, plaintiff's appraiser opined that a non-profit beach club at the subject property would be able to command $15,000/unit with each proposed unit assigned a ½ parking space. Id.

III.   ARGUMENT

In this matter plaintiff's basis for contending that the Property could be used as a non-profit beach club is based on a two step analysis: 1) that there is a market for non-profit beach clubs; and 2) that the property could be sold to a developer who would risk investing in the Property and expending the necessary funds to develop a beach club and

---

[1] Despite plaintiff's appraiser's opinion that this is a comparable property, plaintiff has admitted that it is not. See Exhibit B, Plaintiff's Depo. p. 51

then sell 250 individual units to members who would then incorporate and run the club as a non-profit. Plaintiff has failed to produce any evidence that either step in the analysis is anything more than rank speculation. Additionally, based on the unsubstantiated and wholly speculative nature of plaintiff's appraiser's comparable property analysis with respect to the proposed non-profit beach club, this Court should exercise its gate keeper function and exclude any and all evidence of plaintiff's appraiser's so-called comparable sales analysis. See Bailey v. United States, 325 F.2d 571, 572 (1st Cir. 1963)(stating [w]hether transactions involving other lands are . . . sufficiently similar property are . . . addressed to the sound discretion of the trial court"); see also Algonquin Gas Transmission Co. v. 60 Acres of Land, 855 F. Supp. 449 (1994); United States v. Nickerson, 2 F.2d 502 (1st Cir. 1924).

"No two pieces of property are exactly alike, and much must be left to the discretion of the presiding judge, who, in the first instance, is to determine whether there is such general similarity between the land sold and the land taken that the selling price of the former will furnish a fair criterion of the market value of the latter. In other works, [she] is to decide whether the evidence of the sale of such land will aid and assist the jury properly to fix the value of the land in controversy; or whether, upon the whole, the land sold was not shown to be sufficiently similar to the land in question and, therefore, the introduction of evidence of the actual sale of such land would tent only to mislead and confuse the jury." Iris v. Town of Hingham, 303 Mass. 401, 408-409 (1939); see also Valley Paper Company v. Holyoke Housing Authority, 346 Mass. 561, 569 (1963). In those cases where the Court finds that the comparable sales proffered by an expert are so vastly different that each sale has "lost its probative weight as evidence . . . the jury

4

should not be permitted to surmise or speculate as to the [alleged similarities]." <u>Haufler</u> v. <u>Commonwealth</u>, 372 Mass. 527, 533 (1977).

In this matter, there is no evidence that there is a market for a non-profit beach club and the comparable sales analysis relied upon by plaintiff is so dissimilar to such propose use, that this Court should exclude any and all evidence relating to the value of plaintiff's propose non-profit beach club. Both the plaintiff and plaintiff's appraiser have admitted that with respect to sales data for the sale of any beach clubs either for-profit or non-profit, "it turned out there were virtually no sales of beach club properties available," and "[t]here was nothing exactly comparable." <u>Exhibit B</u>, Depo. of Plaintiff at p 49 and <u>Exhibit C</u>, Depo. Elliot at p. 54. However, notwithstanding these telling admissions, plaintiff continues to claim that a value can be determined for a theoretical non-profit beach club.

The speculative nature of plaintiff's proposal is further highlighted by the process in which plaintiff proposes to develop the club. Plaintiff does not, and cannot, propose, based on market data, that there is a market for the sale of the property to a non-profit for development as a beach club. Instead plaintiff's proposal would require that a developer speculate on the chance that after expending considerable resources on the property and developing a beach club, that it could then find 250 people that would be willing to pay $15,000.00/unit and then incorporate as a non-profit to run the beach club.[2]

It becomes clear after reviewing plaintiff's proposed plan for developing the property as a non-profit beach club that the value of the proposed beach club use is

---

[2] Whether a non-profit beach club is allowed under the Town's zoning by-laws is questionable. Assuming, arguendo, that a non-profit beach club is allowed, under plaintiff's current proposal, it is difficult to understand how a developer would be able to obtain the necessary permits without first being incorporated as a non-profit.

contingent upon finding a developer that would be willing to speculate and develop the property and then contingent upon finding 250 buyers that would be willing to incorporate as a non-profit beach club; whereas, in the sale of the so-called comparable units, there were no such contingencies. Even without the necessity of this tenuous chain of events, the plaintiff is unable to identify any non-profit beach clubs, hence amplifying the significant speculative nature of plaintiff's proposal.

Thus, without at least some sales data from the sale of properties to developers who are willing to risk building a non-profit beach club or sales data from the sale of a non-profit beach club or evidence that a market even exists for a non-profit beach club, it is wholly speculative to place a value on this Property for use as a non-profit beach club. Additionally, because plaintiff's so-called comparables in this matter are not non-profit clubs developed with multiple contingencies, they are so dissimilar to the proposed highest and best use that the introduction of the sales price of these comparables would only tend to mislead and confuse the jury. Accordingly, this Court should exclude all testimony and evidence regarding the use of the property for a non-profit beach club. Iris v. Town of Hingham, 303 Mass. 401, 408-409 (1939).

Defendants,
By their attorneys,

Richard Bowen (BBO# 552814)
Jeffrey T. Blake (BBO# 655773)
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA 02110-1109
(617) 556-0007

307961/3100/0224

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11745RWZ

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee of BD Realty Trust, | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| THE TOWN OF WAREHAM acting by And through the BOARD OF SELECTMEN OF THE TOWN OF WAREHAM, and the BOARD OF SELECTMEN OF THE TOWN OF WAREHAM, | ) |
| Defendants | ) |

## SUPPLEMENTAL EXPERT REPORT OF STEVEN G. ELLIOTT, SRA, MRA REAL ESTATE APPRAISER

I.    **Witness**

Steven G. Elliott, SRA, MRA
Elliott, Gottschalk & Associates
78 Thomas Street
Ashland, MA 01721

II.    **Introduction**

This supplemental report and opinions expressed herein are submitted by Steven G. Elliott of Elliott, Gottschalk & Associates, on behalf of the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust, in the above referenced matter.

This supplemental report is submitted in accordance with Fed. R. Civ. P. 26(a)(2) and 26(e), and is a supplement to the Expert Report of Steven G. Elliott, SRA,MRA Real Estate

**EXH. A**

Appraiser dated March 31, 2006 ("Original Report"). The basis for submitting this supplement report is the recently available information contained in the Supplement to Expert Report of Michael S. Giaimo, Esq. dated September 6, 2006 ("Supplemental Giaimo Report"), the Defendant Town of Wareham's Response to Plaintiff's Request for Admissions, and the Expert Report of Richard Dennis, all of which have been made available to and reviewed by me, indicating that a structure can be built on the Premises (as described herein) in accordance with the Wareham Zoning By-Law Floodplain District regulations. Based on this information, it has been necessary for me to assess the impact of a beach club building as an additional amenity of the proposed beach club use to determine whether such an amenity would alter the valuation of the beach club use. In my opinion, such an amenity does alter my valuation. As a result, I have revised my opinion as to the highest and best uses of the Premises as of the date of taking.

All exhibits referenced herein have been previously submitted with the Original Report, with the exception of the McKenzie Engineering C-3 plan attached hereto.

III.     **Witness Qualifications**

   A.     General Background

   **EDUCATION:**     Providence College, Providence, RI,
   Graduated 1974, *magna cum laude*, with a B.S. in Business
   Management
   Babson College, Wellesley, MA
   Graduated 1977, with Distinction MBA Program

   Postgraduation coursework includes: a number of appraisal and
   banking courses have been completed, including the 101, 201 and
   202. Courses offered by the Society of Real Estate Appraisers.
   The R-2 Workshop and several chapter seminars, including
   Multiple Regression Analysis and the Valuation of Leases have
   also been attended. Courses I and II of the Mortgage Banker's
   Association of America, Mortgage Banker's school have been
   attended and completed with the highest passing grade possible.

   **EXPERIENCE:**     On July 1, 1974, began work as Appraisal Trainee, under tutelage
   of John D. Hewitt, MAI, SRPA, at the Boston Five Cents Savings
   Bank. Promoted to staff appraiser in 1975 and Assistant Appraisal
   Officer in 1977.

   In February 1980, resigned from the bank to form a partnership
   known as Elliott, Gottschalk and Associates, Real Estate
   Appraising and Consulting. In September 1980, received the SRA
   designation from SREA. In 1981, was named an Eastern Mass.
   Chapter #51 Director of SREA for a 3 year term. In 1984, received
   the MRA designation from the Mass. Board of Real Estate
   Appraisers. In 1984 began instructing courses for both the SREA
   and MBREA. In 1989-90 served as Vice President and
   Admissions Chairman for Eastern Mass. Chapter #51.

   From 1999-2001 served as Education Chairman for MBREA.
   President of MBREA in 2004. Nationally approved instructor for
   Appraisal Institute Courses Basic Appraisal Principles, Basic
   Appraisal Procedures, Residential Market Analysis and Highest
   and Best Use and 410, 420/430. Appraisal Foundation Certified
   USPAP Instructor.

   In the 30+ years of appraising, over 18,000 appraisals, including

residential, commercial and industrial properties have been
completed for over 500 clients, including lenders, attorneys,
municipalities and individuals. Is also qualified as an expert
witness in various courts in Massachusetts, Connecticut and
Vermont.

**LICENSES**    Massachusetts Certified General Real Estate Appraiser License
#295

B.    <u>List of Publications Authored by Witness Within Last Ten (10) Years</u>

Articles appearing in the *New England Real Estate Journal* as follows:

May 14, 2004, *Most Important Principle is the Principle of Change*

- June 11, 2004, *The Changing Face of the Appraisal Profession: A few Important Issues*

- September 10, 2004, *All Indicators Pointing to Stability for the Beginning of 2005*

- October 29, 2004, *Looking Forward to This year's Appraisers' Expo*

- February 11, 2005, *If Rates Remain Low, the RE Market Should Still Percolate*

- June 10, 2005, *HR 1295; Appraisers Should Contact Legislators in Support*

C.    <u>Compensation to be Paid to Witness for Analysis and Testimony</u>

I am being compensated for my services on an hourly basis. My hourly rate is billed at

$175.00 per hour. To date, I have billed BD Realty Trust for approximately $3,000 for services

rendered to date. In addition, BD Realty Trust has also paid a $2,000 retainer (which is exclusive

of the services billed to date).

D.    <u>Listing of Other Cases in Which Witness Has Testified as an Expert or by
Deposition Within the Last Four (4) Years.</u>

Cordaville Rd., River St., Southville Rd.
Southborough, MA
ROUSSEAU v MBTA

February 2005

Gates St., Framingham
TOWN OF FRAMINGHAM v MA TURNPIKE AUTHORITY
February 2005

48 N St., South Boston
DONOVAN v CARROLL
June 2005

45 Putting Drive, Westwood, MA and 95 Longwood Drive,
Grantham, NH
NICHOLAS v NICHOLAS
December 2004

1186 Worcester Rd., Framingham
DHARA INC v TOWN OF FRAMINGHAM
September 2004

6 Mary Helen Way, Rockport
COOK v COOK
February 2004

59 Fountain St., Framingham
BANCROFT FOUNTAIN REALTY LLC v TOWN OF FRAMINGHAM
November 2003

720 Stevens St., Marlborough
FLYNN v FLYNN
October 2003

25 Forty-five West Street, Beverly
FRIEDMAN v FRIEDMAN
September 2003

29 Rice Road, Wayland
MAGLIONE v TOWN OF WAYLAND
September 2003

179 Sidney Street, Cambridge
SORKOW v GROSSMAN
August 2003

48 Maugus Avenue, Wellesley
O'CONNOR v O'CONNOR
February 2003

303 Grove St., Westwood
HENNESSEY v SARKIS
2001

IV.    **Statement of Opinions**

A.    Summary of Opinions

As a result of my inspection of the subject site, investigation, review of site and proposed

development plans provided by others and analysis, it is my opinion that the Premises can be

developed as a forty (40) unit residential condominium project developed pursuant to M.G.L. c.

40B. My opinion as to the value of the Premises with the 40B project is $3,000,000.00.

It is also my opinion that an alternative development scenario exists for the Premises

which yields a measure of value similar but higher in value than the 40B project. As described in

my Original Report, the alternative development concept for the Premises would be as a non-

profit, recreational beach club with 250 available memberships valued at $15,000.00 per

membership. At the time I rendered my Original Report it was my understanding that a

clubhouse facility might not be lawfully constructed to support the beach club use. Taking into

account all appropriate discounts and deductions as discussed herein, my opinion as to the value

of the Premises with the beach club use without an amenities structure is $2,812,500.00, rounded

to $2,800,000.00.

However, in light of the information presently available to me as described in Section II

above, it is my opinion that the beach club use described, if lawfully enhanced with a permanent

two-story structure ("clubhouse") that contains amenities such as individual storage lockers,

6

changing facilities, bathrooms, showers, food storage and seating areas, increases the value of memberships by 20%, or $18,000.00 per membership. Taking into account all appropriate discounts and deductions as discussed herein, my opinion as to the value of the Premises with the beach club use with a clubhouse is $3,125,000.

Thus, as described herein, the highest and best use of the Premises as of the date of taking would be a 250 membership non-profit, recreational beach club with clubhouse facility.

B.    Complete Statement of Opinions and Basis and Reasons Therefor

1.    Background as to Why I Was Retained

In August 2005, I was retained by the law firm of Phillips & Angley on behalf of the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), to determine the value of the highest and best use of a 5.35 acre waterfront parcel of land located off of Swifts Beach Road in Wareham, Massachusetts ("the Premises"), and to render a report in accordance therewith. I was retained to provide a report expressing my opinions as to value of the highest and best use of the Premises at the time the Town of Wareham took it by eminent domain in December 2003.

Specifically, the scope of the services I was retained to provide included the following:

1.    review existing background information about the Premises;

2.    conduct a site inspection of the Premises;

3.    render a written report of opinions regarding my findings; and

4.    testify at trial.

2.    Data and Information Which Form the Basis of My Opinions

Upon being retained, I reviewed several documents in order to obtain background information about the Premises prior to my conducting a visual site inspection. Specifically, I reviewed the following documents:

- "Plan Accompanying Abbreviated Notice of Resource Area Delineation on Land in Wareham, MA prepared for Glick Realty Corporation", drawn by Thompson Surveying & Engineering, Inc., dated May 4, 2000 and revised through June 19, 2000 ("ANRAD Plan");

- "Plan of Land in Wareham, Mass. Prepared for BD Realty Trust", drawn by Vautrinot Land Surveying, Inc., dated May 7, 2001 and revised through March 28, 2003 ("Vautrinot Plan");

- Deed conveying title to the Premises to BD Realty Trust, See **Exhibit A** attached hereto;

- Order of Taking recorded by the Town of Wareham on December 31, 2003;

- Various historical photographs of the Premises, including an aerial photograph from the 1950s;

- Land Court Subdivision Plan 12124D, Sheet 1, dated June 30, 1938, See **Exhibit B** attached hereto ("1938 Land Court Plan");

- Superceding Order of Conditions issued by the Department of Environmental Protection for the Premises in Case No. SE 76-1380; and

- Architectural rendering of Wankinko Beach Club dated September 21, 2003, See **Exhibit C** attached hereto.

After reviewing the foregoing documents, Mr. Wayne Valliere and I conducted a site visit of the Premises on March 4, 2005. Subsequent to our site visit, additional research was also undertaken as described herein.

3.    Analysis and Conclusions

8

Based on my review of the above-noted materials and my site visit, I have formed an opinion as to the value of the highest and best uses of the Premises on or about December 31, 2003, the date that the taking occurred.

a.    <u>Introduction</u>

As stated above, on March 4, 2005, Wayne Valliere and I inspected the property known as Swift's Beach Road, Wareham, Plymouth County, Massachusetts, for the purpose of estimating the market value of the property as of December 31, 2003, which was the date of the taking of the land by the Town of Wareham.  The property has been appraised according to USPAP principles.  The marketing time is estimated to be less than one year, therefore, no estimate of Fair Value is necessary.  The date of valuation is the date of the taking.  The following is a Summary Appraisal Report, whereby the Departure Rule has not been invoked. We certify that we have personally inspected the property, that we have no present, future or contemplated interest in the property and that our compensation is not based on any stated or preconceived value.  As a result of our inspection, investigation and analysis, we are of the opinion that the highest and best uses of the Premises is as follows:  a 250-membership non-profit recreational beach club with clubhouse facility which would have a value of **$3,125,000.00**.  An alternative use, of slightly lower value, would be a residential condominium project under Mass. Gen. L. c. 40B, which has a market value of **$3,000,000.00**. The following report includes the assumptions, investigation and analysis necessary to arrive at the final estimate of value.

b.    <u>The Appraisal Process</u>

i.    <u>Scope of Appraisal Process</u>

In order to perform a complete appraisal process, the information and data collected and considered includes the following:

- identify and inspect the Premises;

- review the Expert Report of Lenore White, Wetlands Scientist, dated March 29, 2006, and the analysis and opinions set forth therein as to the wetland resource areas on the Premises;

- review the zoning regulations;

- review the Expert Report of Michael S. Giaimo, Esq., dated March 29, 2006, and the analysis and opinions set forth therein as to the zoning regulations applicable to the Premises;

- review the Expert Report of Bradley C. McKenzie, P.E., Civil Engineer, dated March 29, 2006, and the analysis and opinions set forth therein as to the permissible uses of the Premises;

- review the Supplement to Expert Report of Michael S. Giaimo, Esq. dated September 6, 2006, and the analysis and opinions set forth therein as to the zoning regulations applicable to the Premises;

- review the Expert Report of Richard J. Dennis, Sr., MAI, SRA, MRA dated June 29, 2006, and the analysis and opinions set forth therein;

- review of plan entitled "Alternative No. 2 Conceptual Beach "Clubhouse" Building" (drawing C-3), prepared by McKenzie Engineering Group, Inc.;

- review the Defendant Town of Wareham's Responses to Plaintiff's Request for Admissions;

- applicable information regarding the subject, area, general area and all relevant comparable data;

- current market conditions and trends affecting Premises;

- highest and best use analysis and opinion as to the highest and best use of the property;

- appropriate informational sources including municipal offices, Deed Registries, cost,

rental and sales data publications, as well as parties related to transactions considered to be applicable to the development of a value estimate; and

- the three approaches to value to the extent they are applicable, fully develop those approaches that are applicable and explain and justify the exclusion of any approaches.

The extent of the scope is based on what is typical for the property under appraisement as judged by users of appraisal services and the actions of other competent appraisers performing the same assignment.

    ii.    <u>Appraisal Development and Reporting Process</u>

This is a Complete Summary Appraisal Report, which is intended to comply with the reporting requirements set forth under Standard Rule 2 of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it represents the discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of the value.[1] To develop the opinion of value, the appraiser performed a complete appraisal process, as defined by the Uniform Standards of Professional Appraisal Practice. This means that no departures from Standard 1 were invoked.

The appraiser is not responsible for the unauthorized use of this report.

    iii.    <u>Definition of Value and Interest Appraised</u>

According to the text Real Estate Appraisal Terminology, published by the Appraisal

---

1 This report is not a Complete Self Contained Report under USPAP as this Report is premised, in part, on the Expert Reports of Lenore White of Wetland Strategies, Inc,. Michael Giaimo Esq. of Robinson & Cole, LLP and Bradley McKenzie of McKenzie Engineering Group, Inc., Supplement to Expert Report of Michael Giaimo, Esq., and Supplement to Expert Report of Lenore White of Wetland Strategies, Inc., Supplement to Expert Report of Bradley McKenzie of McKenzie Engineering and McKenzie Engineering C-3 drawings/plans titled "Alternative No. 2 Conceptual Beach "Clubhouse" Building" which are not attached to nor made part of this Report (except C-3 drawing). Nevertheless, each of those reports is a fundamental foundation for the opinions of value expressed herein, especially as to the physical possibility, legal permissibility, and financial feasibility of the uses so valued. This Report does contain the complete data, reasoning and analyses for the determination of highest, best and most profitable uses of the property and the market values expressed in this Report.

Institute, the applicable terms are defined as follows:

*Market Value*

The most probable price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    buyer and seller are typically motivated;

2.    both parties are well informed or well advised, and each acting in what he considers his own best interest;

3.    a reasonable time is allowed for exposure in the open market;

4.    payment is made in cash or its equivalent;

5.    financing, if any, is on terms generally available in the community at the specified date and typical for the property in its locale; and

6.    the price represents a normal consideration for the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or credits incurred in the transaction.

*Fee Simple Interest*

An absolute fee; a fee without limitations to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, police power, taxation and escheat.  An inheritable estate.

     c.    <u>Description of the Premises and Town of Wareham</u>

     i.    <u>Site Description - Summary</u>

The subject property consists of a 5.35 acre parcel of land located at the corner of Swift's Beach Road, Wankinco Avenue and Atwood Avenue, in Wareham, Plymouth County, Massachusetts. The land is identified by the town on Map 50B, Block 2, Parcel B1 of the Wareham Assessors Maps. Record title information is found in the Plymouth Registry of Deeds, Plymouth, Massachusetts, Book 18845, Page 224.

    ii.    <u>Site Description – Full</u>

The subject site is located at 200 Swifts Beach Road, Wareham.  The lot has 233,046 square feet, or 5.35 acres of land.  There is 305 feet of linear road frontage on Swifts Beach Road running north and south. The property then runs east by northeast for several courses along Wankinco Avenue and an unnamed Way, 108.52' x 37.72' x 239.24' x 74.36' x 38.91'. The property then turns southeast along an existing drainage ditch for 466' +/- to the Wareham River.  The property line then turns west and runs along the coastline to a lot of land now or formerly owned by George Papageorge and the Town of Wareham, turning north for 170', turning west for 100', and turning south for 172' back to the Wareham River where it turns west and follows the coast back to Swifts Beach Road.

The site is mostly level and sandy with beach grass growing in places. Other sections are devoid of any plantings or vegetation.  Subsequent to my site inspection in March 2005, current resources areas under the Wetlands Protection Act have been delineated by Wetland Strategies, Inc. (WSI) and depicted on a plan entitled "Existing Conditions Plan", dated March 28, 2006, drawn by McKenzie Engineering Group, Inc. WSI has also rendered an opinion of the scope of the resource areas existing on the Premises as of the date of taking and the capacity of the site to

sustain the uses valued in this Report from an environmental permitting perspective. The site has an existing concrete pad in the northeast area. There is a utility pole near the pad with what appears to be water faucets. This area used to have some form of building on it and this pole and the water faucets were seemingly part of that building. The subject is located within a FEMA flood zone, which according to the surveyor, is Firm Community Panel 255223 0007D, Zone VE. This is common and typical for the area and surrounding newly constructed homes are elevated on concrete platforms.

There is an existing right of way serving the lots owned by the Town of Wareham and now or formerly owned by George Papageorge. This right of way acts as a driveway for both of these properties as well as the upper northwest area of the subject. The Premises historically has been used as a parking lot during the summer months for beach goers. The parking area appears to consist of hard packed sand with no growing vegetation.

iii.     History of the Premises

The current property owner is the Town of Wareham, which acquired the property via a taking on December 31, 2003. Prior to the taking, the property was owned by Barbara Deighton Haupt, Trustee of BD Realty Trust under Declaration of Trust dated September 9, 1997and recorded with the Plymouth County Registry of Deeds, Book 15487, Page 245. The property was acquired from Swift's Beach Trust, Philip Shwachman, Trustee on August 31, 2000, with consideration shown of $225,000. The deed reference is Book 18845, Page 224 in the Plymouth County Registry of Deeds. The taking by the Town was for a reported $450,000.

iv.     Area Analysis

The Town of Wareham is located in southeastern Massachusetts in the southeastern section of Plymouth County. During the decade 1990 to 2000 the population of Wareham increased by 1,103, or 5%.

**Census analysis 1990 to 2003:**

| 1990 | 2000 | 2003 |
|------|------|------|
| 19,232 | 20,335 | 21,090 |

The federal census is taken on even years. 2003 analysis is estimated.

Wareham is one of 27 incorporated communities located within the southeastern area of Plymouth County. Wareham has a land area of 36.68 square miles and a population of 20,335 per the 2000 census giving it a density of 554.39 people per square mile. It is bordered by the Towns of Middleborough, Carver, and Plymouth to the north, the Towns of Plymouth and Bourne to the East, the Town of Marion to the south, and the Towns of Rochester and Marion to the west. Wareham is approximately 20 miles east of New Bedford, 50 miles south of Boston, and 122 miles from New York City. Principle highways serving the town are Interstate Route 95 and 495. Local state highways include route 6, 25 and 28.

Public utilities are provided by NStar Electric and Gas Company, Inc., a privately owned corporation regulated by the Commonwealth of Massachusetts. The Town of Wareham provides sewer and water to the town from ground water sources. Rates for electric and gas services appear higher than average.

There are various routes of access both to and from the town of Wareham. While there is no passenger rail in the town itself, bus service to neighboring cities and towns are available. The MBTA is available in the neighboring city of Lakeville. Local roads and highways are considered

good, meeting the requirements of modern transportation. Commuter rail service is provided by the MBTA in adjacent Lakeville and long distance passenger service on AMTRAK is available in Boston.

Wareham has over 54 miles of coastline enhanced by beaches, estuaries, rivers, and ponds. From its beginnings Wareham was a mix of agricultural and industrial economies. Wareham has diversified into an industrial, commercial, and residential area with ample human and natural resources to support the growth. Current commercial growth continues on Route 6 and in the Industrial Park off of Interstate 195.

Wareham was originally a manufacturing town but also dabbled in shipbuilding and whaling. The town's swamplands were rich with iron ore, and manufacturing cut nails began in 1822 at the site of today's Tremont Nail Company, the oldest cut nail factory still in operation.

At the same time Wareham was establishing itself as a major grower of cranberries. Long before they were cultivated, cranberries grew wild in the area and were used as a food source, for medicinal purposes and as dyes. Since 1864, cranberry bogs have been commercially cultivated in Wareham.

Wareham's rural sections branch out from the town's center. The section known as Onset boasts vacation homes, shops, restaurants and beaches, all within walking distance of each other; there are also sailboats and fishing charters on its bay. In the summer the center of Onset offers outdoor concerts and events, and there are also tennis courts, a public park and golf nearby. Onset is a thriving summer retreat for both local residents and those from across the U.S. and has become more popular as visitors find they can enjoy the same beauty and cool waters as Onset's

more crowded neighbor, Cape Cod.

Wareham is growing commercially. One of the largest recent projects in Wareham is construction of a 56,000-square-foot Shaw's supermarket.   The only other full-service grocery stores operating between New Bedford and Cape Cod are in Fairhaven along Route 6 and on Cranberry Highway in East Wareham.   Additional commercial development is also proposed on 75 acres in West Wareham located just south of Route 28 and west of Interstate 195. The complex could comprise 30 to 40 retail stores and as many as four restaurants. In keeping with the aesthetics of Wareham, models of the plaza attempt to create a village environment, with sidewalks lined with park benches and trees.

Open space continues to be important to residents. The Wareham Fire District was recently awarded a state grant for $160,500 to help purchase and preserve 29 acres of undeveloped land off Charge Pond Road.

A popular pastime is watching the Wareham Gatemen, a local team of the Cape Cod Baseball League, at Spillane Field. Also popular is golf and tennis at the Bay Pointe Country Club or fishing on Blackmore Pond. Wareham also boasts several beaches and playgrounds.

Wareham remains one of the most affordable south shore communities in home prices, second only to New Bedford. Most recently, the Wareham Community & Economic Development Authority hopes to convert vacant, second-story units in Wareham center or Onset Village to affordable housing. The number of affordable apartments in town would increase under a program that provides funding for property owners to renovate structures for conversion to rental units.

v.    <u>Market Area Analysis</u>

The subject neighborhood is bordered to the north and west by Route 6, to the east by the

Wareham River, and to the south by Buzzards Bay.  Buzzards Bay is a warm water bay with

maximum water temperatures during the summer of 71 .  The shoreline is mostly smooth with

sand and gravel beaches.  There are a number of elongated bays and inlets.  In 1998 Buzzards

Bay was designated an Estuary of National Significance.  The Bay is 28 miles long and averages

8 miles in width with an average depth of 36 feet and an area of approximately 228 square miles.

The Swifts Beach area was originally developed as a summer camp area in the late 1800s.

Small cottages were built and used for summer homes in close proximity to beach recreation. In

the 1960s the cottages started to undergo renovation and were made year round homes. To keep

up with the influx of year round residents the Town of Wareham ran water and sewer lines to the

area. The area continued to grow to become a year round neighborhood that saw new building in

the 1970s through to the present. Today the neighborhood is 95% developed with primarily

single family homes. Styles vary from the very small modest cottage to the larger more refined

modern contemporaries. Neighborhood services include school buses provided by the Town for

all schools. Shopping is located 1.5 miles northeast in downtown Wareham and 3.5 miles

northeast on Route 6 in East Wareham. Local fire and police services are available within 1.5

miles from the subject neighborhood. Public transportation is 1.5 miles north on Route 6.

vi.    <u>Zoning Data</u>

The Premises are located in a residential district R-30 that requires 30,000 square feet of

land with 150' of frontage for single family and 45,000 square feet and 200' frontage for duplex

structures/uses. Front, side and rear setbacks are 20', 10' and 5' and the maximum height is 35'. The Premises has 305 feet of frontage on the road as well as 233,046 square feet of land area, which conforms to current zoning. The Premises has approximately 660 feet of beach frontage.

d.    Valuation of Highest and Best Use of the Premises

i.    Highest and Best Use

From the text of Real Estate Appraisal Terminology, published by the Appraisal Institute, the definition of Highest and Best Use is as follows:

> That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal. Alternatively, that use from among reasonable, probable, legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.[2]

Given the above definition, the appraiser has considered the property in terms of its location, zoning, land use and improvements, if any. In addition, the area, neighborhood and local market have also been considered. The highest and best use analysis calls for valuing the property as though the land were vacant and also with the property improved if that is the case.

ii.    Valuation Process

In estimating the value of the subject property, the appraiser has considered the three approaches to value to the extent they are applicable. The style, type, age and availability of data will determine which approaches to value can be applied in a given situation.

The value estimate, by the **cost approach**, relies on separate value estimates for the land

---

2 An alternative consistent definition is found in the Real Estate Appraisal 4th Edition, of the Appraisal Institute of Chicago Illinois: "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility and maximum productivity."

19

and improvements. The land is valued as though it were vacant and the improvements are valued on the basis of the reproduction cost new. If the improvements are aged, then depreciation must be calculated and subtracted from the cost new of the improvements. Once the depreciated cost new has been calculated, it is then added to the land value estimate in order to arrive at an indicated value for the subject by the cost approach.

The **sales comparison approach** relies on a comparative analysis of sales of similar properties. The more similar the property is to the subject, the more valuable the property is as an indicator of value. Differences between the sale and the subject property are adjusted out so that an indication of value can be generated. Usually, the more data available, the better the indicated value is by this approach.

The **income approach** involves an analysis of a property's ability to generate income. The ability of the property to generate future income requires the appraiser to analyze the present worth of the property's future income stream. The income of the property is defined as the gross potential income a property can generate, less the expenses which are typical for a property of this type. The remaining net income before debt service is capitalized at an overall rate in order to arrive at an indicated value by this approach.

The final step in arriving at a final indication of value is to reconcile whatever approaches have been applied on the basis of the weight or strength each approach commands in the marketplace. This reconciliation does not mean a simple averaging of the approaches; it means a careful analysis of the strengths and weaknesses of each approach in view of the other approaches available.

In arriving at a final value estimate, the appraiser has applied the sales comparison approach to value. No weight has been placed on the income approach to value, given the site is non-income producing. No weight has been placed on the cost approach due to the fact there are no improvements on the site.

iii.    <u>Value of Opinion of Highest and Best Use of Premises.</u>

At the time of taking, the property was used as a commercial pay-to-park beach open to the public during the summer season, which seasonal use dates back to the 1950's by report and supported by photographic and physical evidence at the site. The Trustee, Ms. Haupt had begun the design and development of a private beach club concept known as the Wankinko Beach Club and this appraiser has reviewed the architectural renderings prepared for that future planned use. Also, at the time of taking, the Trustee, Ms. Haupt, had obtained a permit from the Massachusetts Department of Environmental Protection to locate a 6000 square foot two story duplex building on the site, though the Town of Wareham had appealed the permit to an adjudicatory hearing at the DEP. When first retained, we were asked to value the property as <u>a duplex lot</u> and then to value the duplex use with an adjoining beach club use. As time progressed, different alternatives were proposed in terms of allowable uses to the site that would maximize its value in the marketplace and would better account for the legally permissible and physically possible prospects for the property. After many meetings and discussions it was determined that from among all of the various potential uses, there were two uses that appeared to be both allowable and capable of generating the highest return. The first use was a forty (40) unit residential condominium project developed as a 40B project. The second use was a 250-membership non-

profit, recreational beach club without a clubhouse facility. These are the two uses valued in the Original Report and are again described herein.

In light of recent information set forth in the Supplement to Expert Report of Michael S. Giaimo, Esq., the Expert Report of Richard J. Dennis, Sr. and the Town of Wareham's Responses to Plaintiff's Request for Admissions, it is now indicated that the Non-Profit Beach Club can be supported and enhanced in terms of appeal with the construction of a clubhouse facility on the Premises. The facility, based on the McKenzie Engineering drawing, is assumed to be a two story, 3,600 square foot facility with individual storage lockers, changing facilities, bathrooms, showers, food storage and seating areas.

The value of the land was substantially increased by the prospect of its development as a 40B project or as a private membership beach club. In particular, the environmental, zoning, civil engineering and land use professionals retained by the Trust analyzed these specific development proposals and how those proposals could be permitted and implemented. These proposals illustrate and support the enhanced value of the property based upon its development potential. According to two plans provided by McKenzie Engineering Group, which are dated March 28, 2006, the site has the capability of supporting a non-profit beach club with 125 parking spaces, or a two-building, 40 unit condominium complex, which would be allowed under Chapter 40B. The plan shows a 30 unit building and a 10 unit building. Based on the location of the property, its visibility, zoning and allowable uses, it is my opinion that the highest and best use of the Premises, as vacant, would be a 250-membership nonprofit recreational beach club with clubhouse facility.

*Sales Comparison Approach*

The underlying premise for the approach is the principle of substitution. The principle states that a willing buyer will substitute a like property at a lower price, providing there is similar utility and no unnecessary time delays in acquisition of said substitute. The method needed in applying this approach is for a study of the market to be conducted in order to locate sales of comparable properties. The sales must be verified and be on an arm's length transactional basis in order for them to be considered in the analysis. Once the sales have been located and verified, they are adjusted for any differences and then, specific units of comparison can be generated, i.e. price per square foot, price per acre, price per lot, etc.

*Beach Club Development*

Part of the reasoning and rationale for the beach club use is provided in a marketing study provided by Clarke Communication Group. See **Exhibit E** attached hereto. The Wankinco Beach Club Association Market Plan indicates a strong demand for a beach club facility in Wareham, given its location north of the Cape Cod Canal and the fact that users would not be committed to having to go over the canal onto the Cape, which is becoming saturated, on a capacity basis according to the study. Located on Buzzards Bay and sharing the Bay with Cape communities such as Bourne and Falmouth, a beach club on Swifts Beach would offer the attractions of a private beachfront property on warm water bay and Cape Cod beaches without the crowding and demands of Cape Cod.

The appraisers have studied the market for sales of condominium units or shares held in a beach club membership. The number of membership-only beach clubs in the area are limited.

During our initial research of the beach club market, Ms. Haupt indicated that she was aware of the following beach clubs in the area which might be used for comparability:

- Bowerman's Beach Club in Falmouth, Massachusetts

- Baker's Beach Club in Westport, Massachusetts

- Atlantic Avenue Beach Club in Westport, Massachusetts

- C K Beach Club, Inc. in Westport, Massachusetts

- Bonnet Shores Beach Club in Saunderstown, Rhode Island

Upon our review of the foregoing beach clubs, the Bowerman's Beach Club in Falmouth was the only comparable beach club to the one proposed for the Premises. The reason that Bowerman's Beach Club is the only beach club that is viable as a comparable is that of those considered, Bowerman's Beach Club had the only transfers of record.

Bowerman's Beach Club Condominium is located on Chapoquoit Road in West Falmouth on a peninsula that has Buzzards Bay on the west and West Falmouth Harbor on the east. It is on a long, slightly traveled dead end road with water frontage on Buzzards Bay. It consists of 8.23 acres, set within rolling sand dunes that affords very good privacy for the members, and boardwalks that allow members to walk through the dunes to the private beach area. There is one building which is one story in height which contains a total of 157 units that are numbered 1 through 157. The foundation is pine boards on cement block pilings. Exterior walls are of plywood covered with wood shingles. The roof is slightly pitched and covered with rolled asphalt. One parking space is assigned per unit. Across the road from the beach club is West Falmouth Harbor, a protected cove for boating, bathing, and fishing from the shore line.

Recent sales of condominium shares in the Bowerman's Beach Club are as follows:

**_Recent Sales of Condominium Units from the_**
**_Bowerman's Beach Club in Falmouth, Massachusetts_**

Location of Bowerman's Beach Club Condominium property:
140 Chapoquoit Road, Falmouth

| Condominium Unit No. | Date of Sale | Purchase Price |
|---|---|---|
| 125 | August 16, 2002 | $20,000.00 |
| 105 | October 9, 2002 | $22,000.00 |
| 55 | December 10, 2003 | $25,000.00 |

<u>See</u> **Exhibit F** – Deeds of reference to sales.

The Original Report set forth a valuation of a beach club without a clubhouse facility as follows. Based on the site plan and zoning opinions, the Trust's Premises can support 125 parking spaces. Each parking space can support two ownership units resulting in a total of 250 ownerships. The site plans indicate that the other site amenities would include but not be limited to a comfort station, portable toilets, picnic tables and kayak/canoe racks. Based on the sales of comparable beach club condominium units at Bowerman's Beach in Falmouth, the value of the Premises as a non-profit beach club is based on a per ownership value of $15,000. To arrive at the "per membership" value for the Premises, the three (3) sales considered from the Bowerman's Beach Club were adjusted downward in accordance with the following features pertinent to the Bowerman's Beach Club:

- larger land area;

- superior location; and

- deeded changing rooms and bath facilities for members.

With three sales for the Bowerman's Beach Club ranging from $20,000 to $25,000, after adjusting for the above three items, a value estimated at $15,000 per beach club membership at the Swifts Beach Premises has been developed for a beach club use without a clubhouse facility.

When $15,000 is multiplied by the 250 ownership entities, the gross potential sellout is $3,750,000. As stated, this is the gross potential, or retail sellout value. From retail sellout value, appropriate deductions must be made in order to develop the market value of the property. The standard deductions include marketing, carrying costs, overhead and profit. Based on my experience with several apartment projects that were acquired for redevelopment as condominiums, the average discounts taken are as follows:

- 2%-4% for marketing;

- 2%-4% for overhead; and

- 2%-4% for carrying costs.

Based on these ranges, an average of 10% was applied to the subject.

The last and largest item is entrepreneurial profit. Depending on the size and scope of a project, along with the expected project length, my experience with profit is in the 10% to 20% range. More difficult projects with long absorption periods are at the high end of the range and easier projects with rapid absorption are at the low end of the range. For the subject, the middle of the range was selected, or 15% based upon the strong demand for beachfront property and due to the large number of memberships (250) absorption rates would be lengthy (estimated at one and a

half to two and a half years). The total discount applied to the subject as a non-profit beach club without clubhouse facility is 25%. When this percentage is applied to the retail, sellout value of $3,750,000, the market value for the subject is $2,812,500, rounded to $2,800,000.

However, with the advent of the information regarding the allowance of a beach club facility that would provide similar amenities to the Bowerman Beach Club, the appraiser's opinion of value for the subject (as set forth above and in the Original Report) has been amended and increased by 20% to reflect the facility. The revised membership value is now $18,000. When $18,000 is multiplied by the 250 ownership entities, the gross potential sellout increases from $3,750,000 to $4,500,000. Again, as was originally done, expenses must be deducted from the retail sellout value in order to arrive as an 'as-is' value. The additional consideration is the cost of the beach club facility. Assuming modest quality of construction, a cost of $50.00 per square foot has been assigned to the 3,600 square foot facility for a construction cost of $180,000.00. This type of facility is comparable to the facility at the Bowerman Beach Club. Site costs, including footings pilings, piers and utility connections have been estimated at $70,000, which is a lower figure than that used in the valuation of the property as a two family facility due to its smaller size. The combined cost new for the facility and site improvements is $250,000. In order to arrive at the 'as-is' value, this figure must be deducted from the retail sellout figure along with the previously discussed figures for marketing, overhead, carrying costs and profit. In the original value estimate of the beach club use as set forth above and in the Original Report, a total of 25% was deducted from the retail sellout figure. This same figure has been adopted for the beach club with a club house facility. Based on the above, the following

breakdown has been developed for the subject assuming the construction of the beach club facility:

| | | |
|---|---|---|
| Retail Sellout Value – 250 memberships x $18,000 - | | $4,500,000 |

Less:

| | | |
|---|---|---|
| Cost of Clubhouse - | $ 250,000 | |
| Profit, Marketing, etc. expenses (25%) | $1,125,000 | |
| Total Expenses | $1,375,000 | $1,375,000 |
| Net, 'As-Is' Value | | $3,125,000 |

On the basis of the above, the inclusion of a beach club facility increases the original value estimate as a 250 membership private beach club by a gross amount of $750,000. After appropriate deductions for the cost of the facility, marketing, overhead, carrying costs and profit, the 'as-is' value is $3,125,000

*40B Project Development*

The appraisers have studied the market for sales of land sales that were acquired with approvals in place for condominium complexes. A number of sales throughout eastern and southern Massachusetts were identified and analyzed. From those, the sales discussed below were selected as being most comparable based on location, size and development potential. Once the sales were located, they were compared to the Premises on the basis of the number of potential condominium units.

In order to apply this approach, a study of the market is conducted in order to locate sales of comparable properties. As stated above, the sales must be verified and be on an arm's length transactional basis in order for them to be considered in the analysis. Once the sales have been located and verified, they are adjusted for any differences and then, specific units of comparison can be generated, i.e. price per acre, price per square foot, price per front foot, etc.

The appraiser has studied the market for comparable "adult housing" and/or condominium projects. From the study, the following have been selected as most comparable:

| ADDRESS | SALE DATE | SALE PRICE | PRICE/UNIT |
|---|---|---|---|
| 1. 37 Misty Meadows Lane, Chatham | $ 750,000 | 01/13/04 | $107,142 |
| 2. 13 Beach Road East Orleans | $ 910,000 | 08/16/04 | $101,111 |
| 3. 161 Route 28 West Harwich | $1,200,000 | 05/13/05 | $ 92,307 |
| 4. 26 Mt. Vickery Rd., Southborough | $1,600,000 | 01/29/02 | $ 40,000 |
| | $3,000,000 | 01/29/02 | $ 75,000 |
| 5. Off Olive Street Ashland | $1,350,000 | 11/09/01 | $ 24,545 |
| | $4,510,000 | 11/09/01 | $ 82,000 |

See **Exhibit D** attached hereto -- Deeds of reference to sales.

The above five sales are sales of land for planned residential communities or condominium projects on an unapproved or approved basis.

Following is a description of the sales and circumstances surrounding each sale.

1. This is a 1.59 acre parcel of land that was purchased pre-approval. The buyer obtained permits to construct seven, 2 bedroom condominiums that are being market in the $700,000 range. The deed reference is Book 18122, Page 322.

2. This is a 1.86 acre parcel of land that was improved by the 16 unit Sea Breeze Motel and a three bedroom raised ranch style dwelling. This is an interior lot that the developer demolished the motel, received approvals for eight, 2 bedroom condominiums and retained the existing dwelling as a ninth unit. This unit was sold and the new units are being marketed for $650,000 to $725,000 with two currently on the market for $699,900 and $739,000. The deed reference is Book 18940, Page 265.

3. This is the site of a 26 unit motel known as the West Harwich Motor Lodge. The 30+ year old facility is sited on .60 acres of Herring River waterfront, which access Nantucket Sound. The facility was demolished and the buyer replaced the wooden riverfront bulkhead. Approvals were granted for 13, 2 bedroom condominiums with marketing starting at $424,900 per unit. Completion is expected in early to mid 2006 and there are currently four units under agreement. The deed reference is Land Court Certificate 176688.

4. This is the sale of an adult community. The project is known as Vickery Hills and consists of a 17.57 acre parcel of land that was approved for 40 units. Pre-construction prices started at $439,000 and there were four models available. Michael and Alice Gulbankian sold the property to Vickery Hills LLC. The intervening transfer to John Sullivan was on an unapproved basis at $40,000 per unit. The transfer on an approved basis was $75,000 per unit with Norwood Co-Operative Bank providing a $3,750,000 mortgage. The transfer is recorded in Book 25863, Page 110. This is a superior project in terms of location, just off Route 85, approximately six miles from the subject.

5. This is a sale of an adult, 55+ condominium community known as Leah Estates. The above sales indicate the price paid for raw, unapproved acreage and an approved but unimproved site. The complex was approved for 55, detached dwellings of four model types. Units are of one and two story design and range from 1,700 to 2,100 square feet. Pricing started at $359,900 to $409,900. The parcel contains 20.6 acres and has a clubhouse facility as part of the amenity package. This is a desirable location near the Ashland Reservoir, which provides a number of recreational facilities. The first transfer was from Sabina Milman to Landmarc Development Group II, with a simultaneous transfer to JCJ Inc. The second transfer involved a $1,700,000 mortgage from Bay State Federal Savings and Loan.

    The above sales require adjustments for date of sale, location, size and whether or not the

sale was on an approved or unapproved basis. Based on the above, the following adjustment grid

has been developed:


**SALE $/UNIT     SALE DATE     LOCATION  WATERFRONT     ADJ P/UT**

| | | | | |
|---|---|---|---|---|
| 1. $107,142 | 0- | -20% | 15% | $101,785 |
| 2. $101,111 | -04% | -10% | 10% | $97,067 |
| 3. $ 92,307 | -08% | 0% | 05% | $ 89,168 |
| 4. $ 75,000 | 12% | -15% | 25% | $ 92,400 |
| 5. $ 82,000 | 13% | -10% | 25% | $106,559 |

The appraiser has studied this adjusted price per unit range of $89,168 to $106,559. Sales 1 and 2 are most comparable in terms of date of sale. Sales 3-5 require a substantial adjustment for date of sale. After considering the above range, the estimated value of the subject by the sales comparison approach is $100,000 per approved unimproved unit. When the indicated value of $100,000 per unit is multiplied by the Premises' proposed 30 market units, the indicated value is $3,000,000.

The adjusted range of sales on a price per condominium unit and price per ownership basis was analyzed and from the range, a price per unit and price per ownership were developed. These values were multiplied by the subject site's number of condominium units that can be developed as well as the number of ownerships that can be sold. The second step as a 40B condominium project is to make appropriate deductions for the fact that the project requires 25% of the total number of units to be affordable. The value per unit developed for the condominiums is $100,000. However, given that 25%, or 10, of the 40 units must be affordable units, no value has been assigned to the affordable units. This is due to the fact that a developer makes little or no profit on the units and would not pay any additional monies to acquire the non-revenue generating units. This fact is born out by a recent appraisal completed on a project in

Westborough, Massachusetts. Since the sale has not been consummated exact specifics cannot be disclosed. However, having personally analyzed three separate offers to purchase, none of the offers included any monies for the affordable units that are part of the permitting process by the town. As a result of the elimination of the 10 affordable units, the value of $100,000 per unit is based on the 30 market units, which results in the indicated value of $3,000,000.

. vi.    Reconciliation and Final Value Estimate

The appraiser has developed an indication of value by the sales comparison approach to value. The indicated value developed is as follows:

Cost Approach:                          N/A

Income Approach:                        N/A

Sales Comparison Approach:

*Beach Club Development - $3,125,000.00*

*40B Condominium Project - $3,000,000.00*

Since the only approach applicable is the sales comparison approach, the value of the highest and best use of the Premises, as of the date of valuation, December 31, 2003, would be a 250 membership non-profit recreational beach club with clubhouse facility of

**Three Million One Hundred Twenty-Five Thousand ($3,125,000.00) Dollars**

D.    Exhibits to be Used as a Summary of or Support for the Opinions

A copy of the plan entitled "Alternative No. 2 Conceptual Beach "Clubhouse" Building" (drawing C-3), prepared by McKenzie Engineering Group, Inc. is attached hereto as Exhibit 1. The other exhibits which have been used in support of my opinions were attached to my Original

Sep 20 06 12:21p    Steven Elliott            617 314 6320            p.1

Report as **Exhibits A through F.**


Signed and submitted this ___20th___ day of September, 2006.

Steven G. Elliott, SRA, MRA

L:\LITG\Ditn002\STEVEN ELLIOTT REPORTS\SElliott.supp.report.09.20.06.doc

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on _September 20, 2006_
_____

and electronic mail

33

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA No. 05-11745RWZ

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
BARBARA DEIGHTON HAUPT, Trustee    )
of BD REALTY TRUST                 )
       Plaintiff,               )
                                   )
    vs.                            )
TOWN OF WAREHAM acting by and      )
through the BOARD OF SELECTMEN OF  )
THE TOWN OF WAREHAM, and the       )
BOARD OF SELECTMEN OF THE TOWN OF  )
WAREHAM,                           )
      Defendant.                  )
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          The deposition of Barbara Haupt,
a witness called on behalf of the Plaintiff,
provisions of Rule 30 of the Massachusetts Rules of
Civil Procedure, before Carmen Branson, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Kopelman and Paige, P.C., 101 Arch Street, Boston, MA
02110 on Wednesday, August 30, 2006, commencing at
11:10 a.m.

APPEARANCES:
JEFFREY T. ANGLEY, P.C., ESQ.
Phillips @ Angley
One Bowdoin Square
Boston, MA  02114
(For the Plaintiff)

RICHARD BOWEN, ESQ.
KOPELMAN AND PAIGE, P.C.
101 Arch Street
Boston, MA  02110
(For the Defendant)

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

*Hearing - Conference - Proceedings*

EXH. B

1                        I N D E X

2    Deposition of:        Direct  Cross  Redirect  Recross

3    Barbara Deighton Haupt        3

4

5                          EXHIBITS

6    No.            Description                    Page

7    1        Complaint                              3

8    2        Quitclaim Deed                         3

9    3        Photocopy of BD Realty Trust

10            DVD cover                              3

11   4        Rendering of Wankinco Beach Club       3

12   5        Rendering of Dwelling (2pps)           3

13   6        Letter (3-14-02)                       3

14   7        Letter from Plaintiff (6-23-02)        3

15   8        Plaintiffs Letter to Editor (2002)     3

16   9        Letter (8-16-02)                       3

17   10       Letter (8-23-03)                       3

18   11       Letter (12-04-03)                      3

19   12       Aerial view                           47

20   13       Aerial view                           47

21

22

23

*LEAVITT REPORTING, INC.*

1                  P R O C E E D I N G S

2          (Exhibits 1 through 11 were pre-marked for

3     identification.)

4                  S T I P U L A T I O N S

5              It is stipulated by and between counsel

6     for the respective parties that the deposition

7     transcript is to be read and signed by the deponent,

8     waive notary; and that the sealing and filing thereof

9     are waived; and that all objections, except as to

10    form, and motions to strike are reserved to the time

11    of trial.

12              BARBARA DEIGHTON HAUPT, Sworn

13    DIRECT EXAMINATION.

14       Q.   (By Ms. Haupt)  Good morning, Ms. Haupt.

15       A.   Good morning.

16       Q.   Thank you for coming in.  I am sorry it was

17    such an ordeal getting in.  I am going to ask you a

18    series of questions about the case involving the

19    property in Wareham.  If at any point you don't

20    understand the question or I am mumbling or if you

21    have any problem at all, let me know, and I will put

22    it in differently.  If you are tired, if you want to

23    take a walk, whatever you like, just let me know.

1  While it is technically an adversarial process, I

2  want to make it a comfortable one.

3       A.  I appreciate that.

4       Q.  Starting off, I am going to ask you a few

5  questions about yourself.  If you were an expert

6  witness you'd probably slip a resume across the table

7  to me.

8            Can you tell me where you were born?

9       A.  Brockton, Massachusetts at home.

10      Q.  At home.  That's a rare claim these days.

11  Since your birth in Brockton, where have you lived

12  and when?

13      A.  That's a good question.  I have moved 52

14  times.  Some were just little moves.  Mostly I lived

15  in Brockton until I graduated high school.  Then I

16  lived in Providence for a couple of years.  I went to

17  college there.  Then I lived in Germany a year and a

18  half.  And where did I go from there?  Came back to

19  Brockton and then lived in Dorchester for a couple of

20  years.  That was a college experience too.  Then I

21  moved to Marshfield.  Then from Marshfield for

22  Duxbury, I lived there for quite awhile.  Moved

23  briefly to Kingston.  Then I went to Florida in 1978.

1    And I lived mostly around Venice, Sarasota area in

2    Florida.

3        Q.   West coast?

4        A.   Yes.

5        Q.   Would you tell me about your education?

6        A.   Yes.  I graduated from Brockton High School

7    and then I went to Brown University for close to two

8    years.  And then I took courses at that point.  I had

9    a child and I took courses in Boston MIT and a

10   special student at Harvard.  And professional courses

11   for real estate mostly.  When I went to Florida, I

12   took some casual courses but mostly life experience.

13       Q.   What were the real estate courses that you

14   took?

15       A.   Title examination, mostly courses to qualify

16   for my license here in Massachusetts and in Florida.

17       Q.   Which license is that?

18       A.   Broker's license.

19       Q.   Do you currently have a broker's license in

20   Massachusetts?

21       A.   I do.

22       Q.   And still in Florida as well?

23       A.   Yes.  Yes.

1    Q.  Do you use the licenses actively?

2    A.  Not really.  I don't do retail business.  I

3    just keep them.

4    Q.  Well they are hard to get if you lose them.

5    A.  It is.  I have had my license since I have

6    been 25.  So it is twenty years in Massachusetts.

7         MR. ANGLEY:  If you could speak up a

8    little bit.  I am sitting right next to you and I

9    can't catch the tail end of the sentences.

10        (Pause.)

11   Q.  Are you currently employed?

12   A.  No.

13   Q.  Would you consider yourself retired?

14   A.  Well, I don't know how to answer that.

15        MR. ANGLEY:  Do the best you can.  Give

16   the most accurate answer you can give.

17   A.  I guess so.  I don't maintain an office,

18   mostly my own account.  Do some investing, help my

19   husband.  I am busy every day.  Well this lawsuit has

20   been quite a burden.

21   Q.  What sorts of investing do you do?

22   A.  Real estate on a small scale.

23   Q.  When you were employed, maybe I will put it

1    that way, what were you doing?

2        A.  I was always self-employed.  I was

3    independent except for a brief time in Florida where

4    I had to qualify for my license.  I put in an

5    apprenticeship there.  But mainly land brokerage and

6    development.

7        Q.  And have you owned other properties?

8        A.  Oh yes.  Yes.

9        Q.  On a residential basis or as an investment?

10       A.  Well not recently, and much land.  Buying

11   little condos and that type of thing on a small

12   scale.

13                   (A discussion was held off the

14   record.)

15       Q.  Ms. Haupt, I am going to show you a document

16   that has been marked as Exhibit 1 and just ask if you

17   can identify these?

18       A.  Yes.  That's the Complaint that we filed

19   initially.

20       Q.  And it shows that you are the trustee of

21   BD Realty Trust, right?

22       A.  Yes.

23       Q.  Can you tell me a little bit about the

1  Trust.  Well start with when was it formed?

2       A.  I think it was 1998.  I am not exact about

3  1998.

4       Q.  Do you recall the manner in which it was

5  formed?

6       A.  I don't understand manner.

7       Q.  Well was there a recording at the Registry

8  of Deeds?

9       A.  Oh yes.  Plymouth Registry of Deeds, yes.

10      Q.  Who are the beneficiaries?

11      A.  I am the beneficiary and my children, four

12  children.

13      Q.  Are there other trustees?

14      A.  No.

15           MR. BOWEN:  Jeff, would it be possible

16  to get a copy of the Trust.

17           MR. ANGLEY:  Of course.

18           MR. BOWEN:  Thank you.

19           MR. ANGLEY:  We didn't produce that?

20           MR. BOWEN:  I haven't seen it.

21           MR. ANGLEY:  I am sorry.

22           MR. BOWEN:  It is quite all right.

23           MR. ANGLEY:  Do you want the schedule

*LEAVITT REPORTING, INC.*

1    of beneficiaries too.

2             MR. BOWEN:  I guess what I would ask

3    just a copy of any of the related trust documents so

4    we have a full picture of what the Trust is and

5    stuff.

6        Q.  Well as somebody holding a real estate

7    license and an investor, you probably have formidable

8    record-keeping skills?

9        A.  I don't know. I do the best.  I have always

10   done all my own work.

11       Q.  Let me ask you this.  Have you ever been

12   involved in any other eminent domain litigation?

13       A.  No.

14       Q.  Have you ever had a piece of property taken

15   from you by eminent domain?

16       A.  No.

17       Q.  Have you or the Trust ever owned land in

18   Rochester, Massachusetts?

19       A.  No.

20       Q.  Has anybody connected with the family owned

21   property in Rochester, Massachusetts, if you know?

22       A.  Many years ago, I really can't recall, but I

23   believe I was involved with some property in

1  Rochester a long time ago.

2      Q.  Do you know what sort of property it was?

3      A.  It was acreage.

4      Q.  Do you still own it today?

5      A.  No.  No.

6      Q.  Do you recall how you disposed of it?

7      A.  I don't remember.  I was having a baby at

8  the time, so I didn't keep good track of what was

9  going on.  I know we had street lots that we sold.

10     Q.  Basically approval not required type lots?

11     A.  It was acreage that was not developable.  I

12  can't remember how that went.

13     Q.  Let me show you a document marked as

14  Exhibit 2.

15     A.  Yes, that's the deed.

16     Q.  And when did you buy the property that's the

17  subject of this litigation?

18     A.  August 31, 2000.

19     Q.  And what was the consideration paid for the

20  property?

21     A.  It is hard to say.  I think the

22  consideration on the deed was 225.

23     Q.  Was there any other consideration not

1    expressed in the deed?

2        A.    I am trying to recall.  I think there was

3    four thousand dollar extension fee that went to the

4    owner.  Just regular expenses, closing expenses.

5        Q.    Were there any permitting or legal expenses

6    I mean other than the usual sort of thing that you

7    recall being part of the consideration?

8                MR. ANGLEY:  I am sorry.  That she

9    would have paid to Schwachman or have assumed?

10       Q.    Or have assumed.

11       A.    I think there was --  I can't remember now.

12   Somewhere between 15 hundred, two thousand that went

13   to the engineers.

14       Q.    And that was because of the permitting that

15   was ongoing when you acquired the property?

16       A.    Right.  Right.

17       Q.    When did you first learn that the property

18   was for sale?

19       A.    Let me think.  I think it was sometime in

20   the early summer.

21       Q.    Of 2001?

22       A.    2000.

23       Q.    Oh 2000, pardon me.

1           And do you recall how you became aware

2    that it was for sale?

3           A.    There was an old sign on the property.    An

4    owner's sign which is bait for somebody like me.    It

5    looked pretty rusted, like it had been there for

6    awhile.

7           Q.    Do you know how long it had been on the

8    market before you purchased it?

9           A.    The owner had said it had been on the market

10    for quite awhile.    And I don't know the exact date.

11    But he said at least eight years. I don't think it

12    had had a lot of exposure.    He had a little sign

13    there.

14           Q.    So the purchase and sale dealings that were

15    done were without benefit of a seller's broker?

16           A.    Right.

17           Q.    Do you recall when you first contacted the

18    seller?

19           A.    The day after I saw the sign.

20           Q.    And what did you do?

21           A.    We discussed price, of course, and what was

22    there and so forth.

23           Q.    What did he ask for a selling price?

1          A.   At that time he was asking three hundred.

2          Q.   I assume you had negotiations with him

3     because you bought it for less than three hundred?

4          A.   Right.

5          Q.   Was it done in writing or over the

6     telephone?

7          A.   We discussed it and then he sent me a form.

8          Q.   Do you recall when he sent you the form?

9          A.   No.  No.  I don't remember exactly.  It

10    seemed so long ago.  Six years.

11         Q.   Do you still have a copy of that form?

12         A.   I probably do somewhere.  Probably not here.

13         Q.   Were there any other exchange of

14    correspondence between you and he regarding the sale

15    and your purchasing the property?

16         A.   Oh yes.  I can't remember.  Not that much.

17    Not that much.  He wanted to get rid of it.

18         Q.   Can you recall maybe how many pieces of

19    correspondences there would have been?

20         A.   Not that much.  Mostly just telephone

21    conversations and stuff like that.

22         Q.   Do you keep logs of telephone conversations

23    and that sort of thing?

1       A.   No.

2       Q.   Was there a Purchase and Sale Agreement that

3   was put together?

4       A.   Yes, there was.

5       Q.   Do you recall whether there were any

6   contingencies in the Purchase and Sale document?

7       A.   Well the plan was just being completed and

8   there was a contingency on that.

9       Q.   Was it the Glick plan?

10      A.   Yes.

11      Q.   Do you recall what the subject was, the

12  contingency was?

13      A.   Subject to us qualifying.

14      Q.   Do you recall any other contingencies?

15      A.   Clear title.

16      Q.   Did the seller -- as far as you know had the

17  seller ever listed it with a broker?

18      A.   I am not aware of that.

19      Q.   Did he have any prospectus that he sent you

20  when you called him and expressed an interest in the

21  property?

22      A.   No.  No.

23           MR. BOWEN:  I think I would like to get

1    copies of all the correspondences that went back and

2    forth.

3            MR. ANGLEY:  Could I clarify.  You had

4    asked her a question, had he sent you anything.  He

5    sent a form.  What do you mean by form.  Are you

6    talking about Offer to Purchase.  Just so if you are

7    asking me for documents, I need to know.

8        Q.  Of course.  Do you remember what the form

9    was?

10       A.  You know, I really can't remember.  It was

11   just a simple Purchase and Sale Contract, yes.

12       Q.  Do you remember when because I know you are

13   a broker.  When we see these things we always see the

14   standard form which was what I assumed when you

15   mentioned form.  Did you end up using his form or

16   more of a sort of standard realtor's Purchase and

17   Sale Agreement form?

18       A.  It was abbreviated, one page simple form.

19           MR. BOWEN:  I guess I would like to get

20   a copy of that.  And a copy of any correspondences

21   that went back between Ms. Haupt and the seller.

22           MR. ANGLEY:  Regarding the purchase?

23           MR. BOWEN:  Regarding the purchase.

1      Q.   And, Ms. Haupt, there were also documents

2  generated in connection with the closing, were there

3  not?

4      A.   Yes.

5           (A discussion was held off the

6  record.)

7      Q.   Do you recall what documents were generated

8  in connection with the closing?

9      A.   The closing statement, a very simple one

10  page closing statement.

11      Q.   And how did you finance the purchase?

12      A.   Cash.

13      Q.   Did you get an appraisal of the property

14  before you bought it?

15      A.   No.

16      Q.   Well no lender, so you wouldn't have to.

17  Did you get a letter of opinion from any appraiser?

18      A.   No.

19      Q.   Is it fair to say that you were relying on

20  your real estate expertise to?

21      A.   Oh yes.

22           MR. ANGLEY:   I was going to object to

23  the form of the question.

1          MR. BOWEN:  I didn't even finish the

2    question.

3          MR. ANGLEY:  You can ask her of her

4    judgement, but in her expert opinion, I don't know

5    whether you are offering her as an expert.  You took

6    that in the funicular sense.

7          MR. BOWEN:  It was in the funicular

8    sense.

9          MR. ANGLEY:  In the experience or

10   judgment.

11         MR. BOWEN:  So with that clarification

12   on the record we will go forward.   I would like to

13   get a copy of any documents that were generated in

14   connection with the closing.

15      Q.  When you contacted the seller, what was your

16   first offer for the property?

17      A.  That was it.  First.

18      Q.  First and only?

19      A.  Yes.

20      Q.  Take it or leave it?

21      A.  Yes.

22      Q.  And how did you communicate that offer?

23      A.  Pardon me.

1     Q.  How did you let him know that this is what

2 you were willing to pay and take it or leave it?

3     A.  I just made the offer.

4          MR. ANGLEY:  He's asking how is it that

5 you made it.

6     Q.  Orally, did you do it by telephone, or put

7 something in writing?

8     A.  Oh telephone.

9     Q.  Did you ever follow up with anything in

10 writing?

11     A.  Just the contract.

12     Q.  Did you take any steps to verify the

13 description of the property that was presented to you

14 by the seller?

15     A.  Yes.  I got a copy of the plan, the Land

16 Court plan.

17     Q.  Would this be the Glick plan?

18          MR. ANGLEY:  No, the Land Court.

19     Q.  Did you do anything else?

20     A.  I checked the zoning and so forth at the

21 Town Hall.

22     Q.  Did you visit any other departments in Town

23 Hall?

1          A.   Not really.

2          Q.   Did you talk with any engineers or persons

3     like that?

4          A.   I am trying to think if I did or not.   I

5     did.   I believe I talked to Al Vautrinot.

6          Q.   Do you recall when you spoke to someone at

7     Vautrinot Engineering?

8          A.   Not really.   It was between the offer and

9     the closing.

10          Q.   Had you used Vautrinot services in the past?

11          A.   Yes.   The quite distant past when I lived in

12     Massachusetts.

13          Q.   How many times had you used Vautrinot

14     before?

15          A.   I can't remember.

16          Q.   Did Vautrinot charge you for the

17     consultation?

18          A.   No.

19          Q.   And by the consultation, I mean when you

20     were doing your due diligence about the property, he

21     didn't charge you?

22          A.   No.

23          Q.   Do you recall what representations the

1    seller made to you about permits or approvals that

2    were needed for the property?

3        A.    I don't understand the question.

4        Q.    Did Mr. Schwachman say anything about

5    permits or approvals that you might need to be able

6    to use the property?

7        A.    He didn't represent anything like that.

8        Q.    He just said here's the property, take it.

9        A.    Yes.

10       Q.    And pay my engineer bill in the bargain?

11       A.    Right.    Right.

12       Q.    Beyond that, did he have anything to say

13   about the property?

14       A.    Well just the parking lot.  He had the

15   parking lot leased.  We discussed that.  How long he

16   had used the parking lot and so forth.  That was I

17   was interested in that part.

18       Q.    Were you doing like an income approach to

19   evaluation when you were calculating what the

20   property was worth?

21       A.    Not at that time, no.

22       Q.    Did you have any particular ideas about what

23   you wanted to do with the property when you bought

1    it?

2         A.   Oh yes.

3         Q.   What did you have in mind?

4         A.   The plan finally generated was what I wanted

5    was a two unit residential structure.  And the

6    parking lot could be used for extra income.

7    Eventually do something with it.  I didn't have clear

8    clear plans then about it.

9         Q.   Between the time that you bought the

10   property and the time that the town took it by

11   eminent domain within those two boundaries, at what

12   point did you come up with a clear idea about what

13   you would like to do with the property?

14        A.   I don't know what the date was.  As far as

15   the residential structure.

16              MR. ANGLEY:  He's asking you about

17   anything.

18        A.   Oh anything.  It sort of evolved over about

19   two year's time.  And mainly I wanted to qualify to

20   go for the permitting for the residence and then I

21   went on from there.  Actually it was in early 2003

22   that I commissioned an architect to do a conceptual

23   plan of the whole property.

1          MR. ANGLEY:  You need to explain what

2   that is about.

3     A.   That was a conceptual plan showing,

4   illustrating the location of the residents and the

5   work the DEP was requiring renourishment plan.  Part

6   of the property and they had required me to lay out

7   the parking lot as such, the parking lot as it was

8   used and it was beautiful.

9     Q.   I am going to show you a document that's

10  marked as Exhibit 3.

11          Are you familiar, do you know what's

12  depicted in Exhibit 3?

13    A.   Oh yes.

14    Q.   And what is it?

15    A.   Four parts as I recall.  First part.

16          MR. ANGLEY:  I'm sorry.  If you could

17  speak up and with all due respect, if you could just

18  be clear about what you are talking about.

19    A.   As I recall.

20    Q.   Well it is a video, correct, or DVD?

21    A.   DVD.  Yes.  The first part was I called the

22  home movie session.  My older son, we did a video of

23  all the property in the neighborhood and it was

1    actually, it was the third anniversary of the

2    purchase of the land.  I had my grandchildren there.

3    And it was a beautiful day.  August 31, 2003.

4          And the second part I am trying to think

5    what came first was the town meeting when the Wareham

6    Town Meeting met, Special Town Meeting, where they

7    had an article to acquire my land.  I don't remember

8    what the date of that was.  October, I think.

9    Sometime in October of 2003.

10          And the third part was the Selectmen's

11    meeting where they voted to take it by eminent

12    domain, I think that was sometime in November.  I

13    might not have these dates exactly right, but I am

14    just drifting through it.

15          And the fourth part when they voted

16    from the Community Preservation Funds to pay for it.

17    So that's four segments.

18    Q.  It is first part of the video, had you ever

19    I think your phrase was, home movie, had you ever

20    done a home movie of one of your properties before?

21    A.  I never had anything like this before.

22    Q.  Whose idea was it to make the home movie?

23    A.  My son and I just wanted to do it.  My

1    children are the beneficiaries, so they just wanted

2    to see the way it was.  Like a before and after.

3    Because we anticipated building the structure.  So we

4    kind of got carried away with the beautiful day.

5        Q.  Do you recall what the tide level was when

6    you took the video?

7        A.  It really wasn't important.  There really

8    isn't a big tide variation in May.  You know I never

9    thought about it.  I know it was windy.  There were

10   sail boats out there.

11       Q.  I would like to show you another document

12   which is marked as Exhibit 4.  Could you tell me what

13   is depicted in Exhibit 4?

14       A.  This is a conceptual plan of the land as I

15   envisioned developing it.

16       Q.  And who prepared it?

17       A.  Timothy Washburn.

18       Q.  And who is Mr. Washburn?

19       A.  He's an architect.  He lives in Onset part

20   of Wareham.

21       Q.  And what made you decide to use his

22   services?

23       A.  I just run into him at dinner one night,

1    started telling him what I had in mind, and he was

2    waiting for his wife to get off duty from her nursing

3    thing.  I am trying to think of the dates.  I just

4    wanted someone who could do this.  I was surprised to

5    find someone local that got a feeling for it.  I was

6    impressed about how much time he spent.  He counted

7    every rock on the beach, measured everything out.

8    Just did a good job.  I was very impressed.  He

9    actually had a portfolio thing that he had showed me.

10   He was a good man.  He had done commercial work in

11   Boston and so forth.  He was sort of between jobs.

12        Q.   Do you remember when you met him?

13        A.   Pardon me.

14        Q.   Do you remember when you met him?

15        A.   It had to be in the summertime.  He was

16   walking the land.  See, this was generated September,

17   I don't remember exactly.  June or July.

18             MR. ANGLEY:  I'm sorry of what year

19   though.

20        A.   This is 2003.

21        Q.   Did he charge you for his services?

22        A.   Yes, he did.

23        Q.   Do you recollect what the amount was?

1      A.   It was somewhere around two thousand
2  dollars.
3      Q.   Did you have a contract with him?
4      A.   I may have.  I think I may have.
5      Q.   And prior to entering into a contract with
6  him, was there any exchange of correspondences and
7  proposal letters of engagement, that sort of thing?
8      A.   I don't recall if we did or not.
9      Q.   So you think the first document that you
10  might have received or have created was the contract
11  with him?
12      A.   Probably, yes.  It is hard for me to
13  remember.  I had so much going on.
14          MR. BOWEN:  Well, Jeff, I would like to
15  get a copy of that.
16      Q.   And if Barbara's memory becomes clearer one
17  way or another, I know it is a while back.
18      A.   Again most of my records are in Florida.  So
19  it will be quite a while before I can get it.
20      Q.   Did, if you know, was Mr. Washburn working
21  off any engineering documents when he prepared this
22  rendering shown in Exhibit 4?
23      A.   I believe he had a copy of the Vautrinot

1    plan.  Or one of them.  There were so many that were

2    generated.

3        Q.  Who would have provided them, the documents

4    that he used in connection with in preparing this

5    rendering?

6        A.  I gave him the Vautrinot plan.

7        Q.  Do you recollect if you gave him anything

8    else?

9        A.  Like what?

10            MR. ANGLEY:  If he knew, he would have

11    asked.  To the best of your recollection if you gave

12    him any documents other than the Vautrinot plan that

13    is to Mr. Washburn.

14        A.  I don't remember giving him anything else.

15        Q.  Was there a, if you remember, was there a

16    plan that proposed subdividing the property between a

17    residential and parking lot use?

18        A.  No plan at that time.

19        Q.  As far as you can tell, does Exhibit 4 show

20    any line of demarkation between the marking area and

21    the residential structure.  Here is a colored one.

22        A.  It was a natural demarkation along the way

23    there.

1        Q.  Are there any other renderings of the

2   proposed Beach Club other than the one shown in

3   Exhibit 4?

4        A.  Not that I am aware of.

5             MR. ANGLEY:  We do have a larger

6   version of it.  I can tell you that.

7        Q.  But --

8             MR. ANGLEY:  It's the same thing.  It

9   is blown up.  It is considerably larger.  18 by 24

10  something like that.

11       A.  That was original.  It was reduced for

12  practicality.

13       Q.  Have you commissioned anyone else to do

14  renderings of proposed beach club?

15       A.  I never did.

16       Q.  Has anyone else to your knowledge done so?

17       A.  Our experts.  I can't remember.

18       Q.  Let's take a look.  It is actually two

19  documents.  They have been pre-marked as Exhibit 5.

20  5A and B. I would ask you to look at what has been

21  marked as Exhibits 5A and 5B.  And can you tell me

22  what is depicted in these exhibits?

23       A.  My dream house.

1    Q.   Nice Florida style tin roof on it, I see.

2    A.   Copper. He made it green.   Patina.

3    Q.   It is very much a Florida style house?

4         MR. ANGLEY:   He asked you a question.

5    I think you have to complete the answer.   He asked

6    you what it shows and your answer was your dream

7    house.

8    Q.   That's a good answer.

9    A.   Well the front elevation, of course, it

10   faced the water and the height is somewhat, what

11   should I say, the design of the piles and so forth is

12   so that it was just a big box sitting up there.   And

13   the porches, of course, are wonderful.   It is

14   approximately fifty feet wide.   That is quite a bit

15   of frontage for view.   What else can I say.   It is

16   beautiful.

17   Q.   Now were these prepared by Mr. Washburn as

18   well?

19   A.   Yes.

20   Q.   And do you recall when you asked

21   Mr. Washburn to prepare these renderings about?

22   A.   About the same time he was doing the

23   landscape plan.

1      Q.  Would it have been part of the same contract

2  for services, or was it under a different contract?

3      A.  I really don't remember.  It may have been

4  separate.

5      Q.  But you think one way or another there would

6  have been a contract that covered this?

7      A.  I believe so.  Yes.  Because that's a long

8  time ago.

9      Q.  Did you send him a letter asking him to do

10  it?

11      A.  No.  It was just a call on the phone and get

12  together on the beach.

13      Q.  And I know you mentioned a figure of two

14  thousand dollars when I was asking about the beach

15  club renderings.  Do you know whether that two

16  thousand dollars covered this rendering?

17      A.  I think there was an extra charge.

18      Q.  Do you recall what that might have been?

19      A.  It wasn't a lot of money.

20      Q.  Apart from the renderings in 5A and 5B, did

21  Mr. Washburn prepare any blueprints?

22      A.  I think there was a casual floor plan.  I

23  never got to that point. At some point the town

1    appealed the permit.  I didn't want to spend fifty

2    thousand dollars on detailed prints.

3        Q.  So the work that Mr. Washburn did for you

4    wouldn't have included something, for example, that

5    you would have taken to the building inspector for a

6    building permit?

7        A.  No.  No.  It was before that.

8        Q.  Do you recall how many times you met with

9    Mr. Washburn in connection with the preparation of

10   the rendering shown in Exhibit 4?

11       A.  No.  I don't remember.  You know we met on

12   the land at least twice.

13       Q.  And do you recall how many times you met

14   with Mr. Washburn in connection with the rendering

15   shown in exhibits 5A and 5B?

16       A.  I don't remember.

17       Q.  Somewhere in the pleadings there was a

18   reference to the possibility of doing a Chapter 40B

19   development.  Do you recall that?

20       A.  I recall.

21           MR. ANGLEY:  Objection.  You mean in

22   the Complaint.

23       Q.  No, in the --

1          MR. ANGLEY:  In the expert report.

2          MR. BOWEN:  No.  It is not in the

3   Complaint.

4      A.  That was the expert's opinion.  I had

5   nothing to do with that.

6      Q.  Was that something you ever intended to

7   pursue?

8      A.  No.  This is what I wanted to do.  The

9   experts came up with that.  It is their opinion.

10     Q.  Have you ever hired anybody to do a study of

11  a 40B development of that property?

12     A.  No.  No.

13     Q.  Have you ever seen a document that shows a

14  plan or rendering of a 40B development for this

15  property?

16     A.  From the expert.

17     Q.  Do you recall what it was that you saw?

18     A.  Just two buildings.  One parking lot area

19  and one in the upland area.

20          (A discussion was held off the record.)

21     Q.  I would like to show you a document that has

22  been marked as Exhibit 6.  Do you recall seeing this

23  document before?

1     A.  Yes.

2     Q.  And could you tell me what it is?

3     A.  It's a letter from Susan Bernstein

4  representing the so-called Swift's beach neighbors.

5  S-W-I-F-T apostrophe S.

6     Q.  And in it they proposed to buy the property

7  for two hundred and fifty thousand dollars?

8     A.  Sort of.

9     Q.  Well can you tell me what you remember about

10  this particular offer?

11     A.  What I remember about it?

12     Q.  Sure.

13     A.  It was an insult.

14     Q.  So I take it that you rejected it?

15     A.  I never responded.

16     Q.  Well that heads off my next question.

17          Let's take a look at what has been

18  marked as Exhibit 7.  And once you have had a chance

19  to read it, let me know, please.

20          (A recess was taken.)

21     Q.  Ms. Haupt, could you tell me what the

22  exhibits evidence please?

23     A.  It is a letter that I wrote to the neighbors

1    in reaction to some of their circulating flyers and

2    so forth as a response.

3        Q.   Does the document accurately reflect your

4    intended use of the property?

5        A.   At that time, at that time it did.

6        Q.   At what point did your plans change?

7        A.   Right after this.  We couldn't, nobody

8    responded.  We were welcoming people to come and talk

9    about this.  And they never did.

10        Q.   Let's take a look at the next exhibit which

11    is marked as number 8.  And after you have had a

12    chance to read it, please tell me what it is.

13              (Pause.)

14        A.   It was follow-up released to the newspaper.

15    A Letter to the Editor.

16        Q.   And does it accurately reflect or did it

17    accurately reflect your plans for the property at the

18    time the letter was published?

19        A.   Yes.  At that time it did.

20        Q.   Let's take a look at Exhibit 9.  And when

21    you are done reading it, let me know.

22              (Pause.)

23        Q.   At the time you wrote this letter to

*LEAVITT REPORTING, INC.*

1    Mr. Hartman, did it accurately reflect your plans for

2    the property?

3        A.   Yes.  At that time, yes.

4        Q.   Looking over on Page 2, the second sentence,

5    it says these areas are delineated as bordering

6    vegetated wetlands and river front protected area and

7    coastal.

8        A.   Right.

9        Q.   What information did you use to support your

10   conclusion?

11       A.   That was the plan that went into DEP.

12       Q.   Other than the plan that went into the DEP,

13   was there any other document that you relied upon?

14       A.   I don't think so.  I can't remember.

15       Q.   And dropping down to the second to the last

16   sentence.  It reads, "There is a question whether

17   recreational use of the beach would be consistent

18   with conservation purposes."  What did you mean by

19   that statement?

20       A.   The neighbors were trying to, they were

21   saying it was public access.  With no beginning and

22   no end.  So we felt we didn't want to do that until

23   our plan was approved, do anything.

1        Q.   Let's take a look at Exhibit 10?

2              MR. ANGLEY:   Can we go off the record

3    for a second.

4              (A recess).

5              MR. ANGLEY:   So, Ms. Haupt, you have

6    been asked a question just before we took our break

7    with respect to Exhibit 9 and in particular, counsel

8    had asked you with respect to a reference the second

9    to last sentence in your letter in Exhibit 9.  The

10   sentence there is a question whether recreational use

11   of the beach would be consistent with the

12   conservation purposes.

13              And after the break, do you have a better

14   recollection of what that was a reference to?

15        A.   Yes.  I didn't -- yes.  I can explain it if

16   you can show me the plan.

17              MR. ANGLEY:   How about Exhibit 4.

18        A.   Yes.  What the situation was is the Town of

19   Wareham owned half of this white area that was

20   donated for conservation purposes only to the Town of

21   Wareham.  And what there was on the old deeds, there

22   was a private way coming down this way to access this

23   lot and this lot was owned by a private party.  No

1    houses on it.  This is all dunes here.  And a lot of

2    poison ivy and then the beach.

3              But these people, of course, these lots

4    had access down the road and down the beach this way.

5    But the neighbors and the second year I owned it,

6    there was a private parking lot up here they wanted

7    to access the beach and just come down this.  This is

8    more convenient this way.

9        Q.  So they wanted to be able to cut through

10   Kinko Avenue through your property?

11       A.  Mostly these people right here and the

12   people using that parking lot there to come here and

13   go here. (Indicating.)  But with the dunes and poison

14   ivy and everything, they kept trespassing and as you

15   can tell, there was a lot of the strife going.  So in

16   that sense, we got the police chief to try and

17   negotiate between me and the town.  Well you saw the

18   letter.

19              And my logic was to go this way and walk

20   over the dunes and so forth was not for conservation

21   purposes.  This land was given to the town for

22   conservation purposes.  And plus, you know, as I said

23   there was a lot of controversy because they would

1    just come over here and basically trespassing.

2             MR. ANGLEY:    Thank you.

3        A.    That's what that was.    The sense of this

4    letter was I was trying to address the town to

5    resolve the issue before there was a real problem of

6    any sort.

7        Q.    Looking at Exhibit 10.    Can you tell me what

8    this letter is?

9        A.    Yes.    As I recall, one of the conditions of

10    the DEP permit was to get clearance from the Army

11    Corps of Engineers regarding to groins.

12        Q.    Stone wall stick out into a water?

13        A.    Yes.    So I proceeded to do that.    And seven

14    months later I get a letter, this letter.    I sent

15    them, I think it was a form or whatever.    A letter

16    just asking a clearance regarding their groins.

17        Q.    Well the letter from the Army Corps

18    characterizes it as this letter as being a response

19    to an application.    Do you recall filing an

20    application document?

21        A.    I guess that's what it was, yes.

22        Q.    Would you still have a copy of your

23    correspondence with the Army Corps of Engineers?

1       A.  Possibly.  I tried to keep everything but as

2   I say it is probably sitting in Florida.

3               MR. ANGLEY:  We will look, yes.

4               MR. BOWEN:  Thank you.

5       Q.  I am going to show you a document that has

6   been marked as Exhibit 11.

7               Can you tell me what Exhibit 11 is

8   please?

9       A.  It was a Trust response to the Selectmen's

10  offer to purchase it for 450 thousand dollars.

11      Q.  Is this an accurate copy of what was sent to

12  the town?

13      A.  As I recall, yes.

14      Q.  In the first paragraph of the letter, there

15  is a sentence that reads as follows.  "We have

16  retained Cath J. Craft, III, Esq., with the firm of

17  Coleman and Sons an appraisal group in Waltham,

18  Massachusetts, to conduct a professional appraisal of

19  the property."

20              How did you come to be familiar with

21  Coleman and Sons?

22      A.  I don't remember.  My associate actually had

23  had some experience with them on another property.

1       Q.   Who's your associate?

2       A.   Robert Deighton, my ex-husband.

3       Q.   And who contacted Coleman?

4       A.   Actually he did.  As I recall it was prior

5    to the town meeting vote.  After the DEP permit came

6    in.

7       Q.   Is Mr. Deighton still one of the trustees of

8    the Trust?

9       A.   He was never a trustee.

10      Q.   Is he a beneficiary?

11      A.   No.  No.

12      Q.   Did you send any correspondence to the

13   Coleman Company?

14      A.   I don't remember.

15      Q.   Did Coleman and Sons send any correspondence

16   to you?

17      A.   No.  Actually they never really did anything

18   substantial because they were busy and then after the

19   taking, I found Jeff.  And he took care of the

20   appraisal.

21      Q.   Did you pay Coleman and Sons any money?

22      A.   I don't remember.  I think there was a

23   deposit.

1      Q.   A retainer perhaps?

2      A.   A retainer type of thing.

3      Q.   Was that retainer refunded to you?

4      A.   No.

5      Q.   Do you recollect the amount of the retainer?

6      A.   I can't remember what it was.  Three

7   thousand.  Something in that range.

8      Q.   Do you know how the retainer was delivered

9   to Coleman and Sons?  By hand, by mail?

10     A.   I can't remember.  I don't know.  Probably

11  by mail.

12     Q.   And at the time of the payment of the

13  retainer, do you recall signing a letter of

14  engagement with Coleman and Sons.

15     A.   There was something.  You can imagine I was

16  in kind of a state here.  I believe there was a

17  letter of intent along those lines with the retainer.

18     Q.   Did Coleman and Sons give you any letters or

19  correspondences or documents relating to the

20  property?

21     A.   No.

22     Q.   Did they deliver any product at all for the

23  money you paid them?

1      A.   No.   I asked but I didn't get.

2      Q.   As part of the discovery process, we were

3  given these photographs.   Have you ever seen them

4  before?

5      A.   Yes.

6      Q.   What do they depict and when?

7      A.   Well it's the beach.

8          MR. ANGLEY:   Could we refer to the

9  numbers on them.

10     Q.   We are talking about documents that are

11 stamped 384 and 385 as part of the mandatory initial

12 disclosure response.

13              What do we have here and when do you

14 think it was taken?

15     A.   In the '60s.

16          MR. ANGLEY:   I'm sorry which ones.

17     A.   Both.   Actually they are both part of the

18 same very large aerial, and estimated to be in the

19 '60s because of the models and the cars.   And the

20 former owner, not Schwachman, two people before him.

21 The man who ran the beach facility the snack bar and

22 restroom and the cars.   The photograph cut off here.

23     Q.   For what it is worth, I was trying to figure

1    out how old it was by the models of the cars.

2         A.    It is like all '60s Cadillac there.

3         Q.    Now I want to show you another photograph

4    that has the number 393 from the disclosures.  Could

5    you tell me if you know what that depicts?

6         A.    Yes.  This is an aerial view of the

7    property.  A little corner is cut off here.  And this

8    was flown Labor Day, 2005, by the local aerial guy.

9    So this is the land.

10        Q.    Now when I watched your video, one of the

11   things that you commented on were some of the

12   surrounding structures and how they had been raised

13   up.  And looking at the document that is marked 393,

14   maybe, gosh, maybe you could just circle the

15   buildings that were raised up as shown in your video?

16        A.    Do you want me to mark this?

17        Q.    Yes.

18        A.    (The witness complies.)  I am not sure about

19   this one.  Because that was destroyed in the '91

20   hurricane.  It is hard to tell from the aerial I saw.

21   It is raised up a little bit.  I don't think that

22   this house was actually built.  It was under

23   construction.  But it has since been built.  It is

1    raised up.  That's all on this particular photograph.

2                MR. ANGLEY:  I am sorry.  You are

3    saying that as shown in the photograph it has not

4    been raised up.  But subsequently been raised up.

5        A.  I think this one was under construction when

6    I was doing the video.  The video was taken 2003.

7    This is 2005.

8                MR. ANGLEY:  So let the record reflect

9    the building, the large building at the middle, top,

10   large building, two cars parked in front of the

11   house.

12       Q.  Let's just go back and perhaps compare it to

13   the older photographs.

14                MR. ANGLEY:  Would you like to use a

15   1977.  It is a different date, I believe.  The 1977,

16   is that helpful to you.  We can mark the back where

17   you want.

18                MR. BOWEN:  I am just trying to find

19   which ones were damaged in '91.

20       A.  These three houses.

21       Q.  The ones you circled on Page 393 are raised

22   up because of the '91 storm?

23       A.  This has been raised up but it looks like

1    they took the same house and they put it on piles.

2        Q.   Do you know when that was raised up?

3        A.   I believe they had a blanket permit to go

4    ahead if they built after two years after the

5    hurricane.  I believe these all were done '91 to '93.

6        Q.   This one here?

7        A.   Most likely.

8        Q.   Would you mind circling that, please.  Is

9    that the same thing?

10       A.   Yes.  That's the house of one of the

11   Selectmen.

12               MR. ANGLEY:  The same thing.

13               This is the little pizzeria place.

14       A.   That's where he had his own private parking

15   lot.  See these are his cars here.  Get ready for the

16   big Labor Day.  This is the father-in-law.  This is

17   uncle.  This is his cousin.  This is an uncle and

18   this is a close family friend.

19       Q.   Anything else on 393 that you could tell was

20   raised up because of the '91 storm?

21       A.   Not in this photograph.

22       Q.   Okay.

23       A.   But this is destroyed.  Now there is a

1    raised house there.  Right here.

2        Q.  Tell you what.  On page 384, why don't you

3    see -- this maybe inappropriate.  Draw an X through

4    the one that is destroyed?

5              MR. ANGLEY:  Maybe just underline it.

6    In front of the -- Xs seem harsh.

7              MR. BOWEN:  Why don't I see if we can

8    get a yellow marker.

9        A.   It shows up.  I have done that.

10             MR. BOWEN:  We have got yellow.

11             MR. ANGLEY:  It shows up.

12             MR. BOWEN:  Well I guess it does.

13       A.   And they rebuilt.  Well you can't see here.

14   Some of the aerials it show.   They rebuilt on the

15   corner.  This is where I was going to put my house

16   here.

17       Q.  Why don't you draw a circle --  we are

18   looking at Page 384.  I am asking you to mark with a

19   circle the site of a building that was destroyed in

20   '91, is that correct?

21       A.  Right.

22       Q.  And then has been rebuilt?

23       A.  Right here.

1    Q.   When it was rebuilt, was it put up on

2    pylons?

3    A.   Oh yes.  13 feet.

4    Q.   And then you said it would be a twin to your

5    proposal.  Why don't you mark with an X where your

6    proposed building would have been?

7    A.   (The witness complied.) Okay.

8    Q.   Thanks.

9    A.   This isn't quite the prospectus because they

10   took an aerial.  So this area looks smaller to me

11   anyway.

12   Q.   And I guess we will mark these 12 and 13.

13        (Aerial view marked Exhibit No. 12 for

14   identification.)

15        (Aerial view marked Exhibit No. 13 for

16   identification.)

17   Q.   Exhibit 13 will be page 393.

18        Let's pull out Exhibit 1.  Over on

19   Page 10 of the Complaint.  Right at the very top of

20   the page.  You will see the tail end of Paragraph 45

21   of the Complaint and I will just read it off.  "The

22   Trust has been offered a sum of money as compensation

23   for the taking of it's land.  A property which is

1    grossly unfair and totally inadequate and which does

2    not account for the highest and best use of the

3    premises which at a minimum exceeds 2 million, 6

4    hundred thousand and up to 4 million, 7 hundred

5    thousand."

6              Did you develop that range of damages?

7       A.   What do you mean develop?

8       Q.   Who came up the range 2.6 million to 4.7

9    million dollars?

10      A.   How did we come up with that?  That was my

11   opinion of the range of value.  Actually I went more

12   the high side because I would have been the developer

13   and the low side was perhaps somebody else's version.

14      Q.   Do you know who that somebody else might

15   have been?

16      A.   No.  I developed the range because at that

17   point, we didn't have a full appraisal.

18      Q.   When you came up with this range, what

19   method of evaluation did you use to develop these

20   figures?

21      A.   My plan for the property.

22      Q.   Which plan?

23      A.   The landscape plan, the building the home

1    and having a beach club eventually.

2        Q.   And that would have been what has been

3    depicted in Exhibit 4?

4        A.   Right.

5        Q.   And did you use a comparable sales approach

6    to evaluation when you came up with this range?

7        A.   I could find no comps.

8        Q.   Did you use an income approach to evaluate?

9        A.   Not really.  I researched other beach clubs

10   between Rhode Island and the Cape and so forth.

11   There was nothing exactly comparable.  But what I was

12   calculating was a demand.  They all had waiting lists

13   and so forth.  So it was my own version of what I

14   could expect.

15       Q.   Do you recall which beach clubs you

16   considered and just ones whether or not you

17   ultimately found them comparable or not, which ones

18   did you actually look at?

19       A.   I can't remember the name of it.  There was

20   one in Rhode Island which is a big one.  It is twelve

21   hundred units.

22       Q.   Which community is it in, do you know?

23       A.   It is down by Narragansett.  One was Bowers.

1    I can't remember the name of it.  It is in the

2    Narragansett area.

3        Q.   And did you ultimately consider that

4    property to be comparable to what you were doing?

5        A.   In some ways it was because it was a for

6    sale.  They sold units over the years.  It has been

7    in business for a long time.  The problem is there

8    aren't many sales.  Because people just don't sell.

9    Once they get it, they keep it in the family.  So it

10   just confirmed my idea.

11       Q.   When you said they sold units, what did the

12   unit consist of?

13       A.   It varied from having a place to park, a

14   little locker, and they had some units that involved

15   a little beach house.

16       Q.   Cabana sort of thing?

17       A.   It was beyond that.  But they couldn't spend

18   the night, but they could go there for the day and

19   live in this place.  And those went for a lot of

20   money.  But the basic units at that time were going

21   about 45 thousand, I think.  But it had a pool.  It

22   had amenities.  So that's what I used, just what I

23   saw.

1      Q.   What other beach clubs did you look at?

2      A.   There is one in Falmouth.  Again I don't

3   remember the name of it.  There is another one next

4   to Horse Neck Beach.  That was just an annual.

5   People paying annual fees.  They couldn't own it.

6   And they did have lockers, but they were doubled or

7   tripled up.  The two or three people had used the

8   same little deal.  But they had a waiting list.

9      Q.   Did you think that the Horse Neck and

10  Falmouth ones were comparable to what you wanted to

11  do?

12     A.   Not really.  There really wasn't anything

13  exactly comparable because they aren't making anymore

14  water front.

15     Q.   Well global warming, you never know.

16     A.   Well this actually, this shore line hadn't

17  changed because we had to research for the DEP permit

18  where the high water mark was.  In 60 years what I

19  saw anyway.  I am not an expert.  I just concluded

20  that it really is not going anywhere.

21     Q.   Has the property changed much over the years

22  since you opened it?

23     A.   No.  Can you see from the pictures.  It is

1    pretty much the same.

2            MR. ANGLEY:  You are referring to the

3    time she observed it or since she doesn't own it any

4    longer.

5        Q.  Well during the time she owned it for

6    starters.

7        A.  No.

8        Q.  And has it changed since the town took it?

9        A.  I haven't seen any changes.

10       Q.  Getting back to the question of beach clubs.

11   Other than the ones you already described, are there

12   any others that you considered?

13       A.  I couldn't find any locally.  I am familiar

14   with Florida.  And I talked to a woman who did golf

15   courses and so forth.

16       Q.  Down in Florida or up here?

17       A.  Mostly Florida.  And I just didn't get to

18   that point because I got stopped at the pass, you

19   know.  So I wasn't able to do that.  But we have our

20   experts now, maybe we could do more.

21       Q.  When you came up with this range and you

22   were looking at these beach clubs, did you do any

23   cost of development analysis?

1      A.   I did.

2      Q.   Did you commit anything to writing?

3      A.   It was a casual list like I do.  And most if

4  I could find that.

5      Q.   If you can find it, I would like a copy of

6  it.

7           When you were doing your development cost

8  analysis, did you talk to any engineers?

9      A.   I didn't have to do any engineering, just

10  leave it the way it is.  New fencing would be

11  necessary.  Very very minimal, legal was a big

12  expense.  Cost of the comfort station.  That was it.

13      Q.   Did you talk to any contractors about these

14  costs?

15      A.   I took a guesstimate for the fencing from

16  some other small job I had done.  Multiplied it times

17  20 or whatever it was.  Anyway so that's that.

18      Q.   Did you use any other methodology to come up

19  with this range that you have got here in

20  Paragraph 45 of the Complaint, anything you haven't

21  told me about?

22      A.   Not really.  I just figured how many units I

23  could use.  And what I felt the market would bear and

1    the time range.

2        Q.   How did you do your market demand analysis?

3        A.   Common sense.  The waiting lists here,

4    nobody selling here, and just my instincts, just like

5    a subdivision.  You know, land subdivision but no

6    roads.  Just leave the land the way it was.

7        Q.   Do you have an opinion as to the best use of

8    the property?

9        A.   Just what the experts are telling me.

10       Q.   But you as an individual, do you have an

11   opinion?

12       A.   Me?  What I would do with it?

13       Q.   Yes.

14       A.   Is what I had shown on that plan.  But that

15   was speculative.

16            MR. BOWEN:  Well, I think I am done

17   except for this.  Normally, I would say just let's

18   end the deposition.  But I would like to suspend the

19   deposition for two reasons.  First is Kristen sent us

20   over a letter about Count 1 and.

21            MR. ANGLEY:  You want to wait for the

22   complaint.

23            MR. BOWEN:  Right.  And the other thing

1    is there might be a few documents that could come in

2    relating to some of the questions that I have asked

3    Barbara, and while I really don't expect to drag you

4    back in here, I owe it to my client to at least leave

5    the door ajar slightly in case there is a startling

6    revelation in those documents.

7                So with that I would like to suspend the

8    deposition.

9                MR. ANGLEY:  Well, generally speaking I

10   think you should ask the questions that you have when

11   we are here.  I presume it would be very little.

12   What I could agree with, if you want to limit any

13   additional questions that you have asked to the

14   extent we can produce it.  That might be the easiest

15   solution.

16               MR. BOWEN:  That is fair.  It is not

17   for me to get another bite of the apple.

18               MR. ANGLEY:  The only thing I would

19   indicate is Ms. Haupt does live in Florida.  She is

20   in Connecticut.  They have a summer home in

21   Connecticut.  When do you go back to Florida?

22               THE WITNESS:  I don't know.  We go back

23   in October.

1              MR. BOWEN:  We will work with the

2    schedule.

3              (The deposition concluded at 12:45 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    WITNESS CERTIFICATE

2

3      I, Barbara Deighton Haupt, the within named

4 deponent have read the transcript of my deposition

5 taken on August 30, 2006, and have listed any

6 corrections to my testimony on an attached errata

7 sheet.

8

9

10                     Signed under the pains and

11                     penalties of perjury:

12

13

14                     _____

15                     Barbara Deighton Haupt

16

17

18                     _____

19                     DATE

20

21

22

23

C E R T I F I C A T E

STATE OF MASSACHUSETTS    )
                          )          ss.
COUNTY OF NORFOLK         )

         I, CARMEN W. BRANSON, a Shorthand Reporter and Notary Public in and for the County of Norfolk and State of Massachusetts, do hereby certify that:

         That the witness in the foregoing deposition was present at the time and place therein state;

         That the said proceeding was taken before me as a Notary Public at the said time and place and was taken down in machine shorthand writing by me;

         That I am a Court Reporter and Notary Public of the State of Massachusetts, that the said proceeding was thereafter under my direction transcribed into computer-assisted transcription, and that the foregoing transcript constitutes a full, true, and correct report of the proceedings which then and there took place;

         IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my official seal this 5th day of September, 2006.

                       CARMEN W. BRANSON
My Commission expires March 6, 2009

   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

*LEAVITT REPORTING, INC.*

## WITNESS SIGNATURE/SIGNING INSTRUCTIONS

The original signature page and errata sheet for the Deposition of Barbara Haupt taken on August 30, 2006, was sent to Richard Bowen, Esq., Kopelman and Paige, P.C., 101 Arch Street, Boston, MA 02110. When the witness has completed reading and have signed the signature page, copies should be forwarded to all parties, and the original should be sent to Jeffrey T. Angley, Esq., Phillips & Angley, One Bowdoin Square, Boston, MA 02110 to whom copies of the transcripts were delivered.

LEAVITT REPORTING, INC.
1207 COMMERCIAL STREET, REAR
WEYMOUTH, MA 02188
(81)335-6791

Miniscript and Word Index

BARBARA DEIGHTON HAUPT, Trustee
Of BD Realty Trust

VS.

THE TOWN OF WAREHAM acting by and
Through the BOARD OF SELECTMEN FOR THE TOWN OF WAREHAM
and the BOARD OF SELECTMEN OF THE TOWN OF WAREHAM

Deposition of:
Steven Elliott

October 11, 2006

Leavitt Reporting, Inc.
1207 Commercial Street, Rear,
Weymouth, MA  02189
781-335-6791

EXH. C

**49**

1    don't recall.  If it is 20 or 25.  That's another
2    five or six thousand.  20 percent would be five
3    thousand.  25 percent would be a little more.
4    Essentially you are down ten thousand dollars.
5        Q.  That gets us to the 15 thousand dollars?
6        A.  Correct.
7        Q.  Using the other end of your range.  Beach
8    Club structure, you had said 10 to 15 percent.  What
9    would be the 15 percent be.  I suppose that would be
10   3750.
11          And then you said 30 percent for
12   location.  That would be?
13       A.  As I said I don't remember the exact
14   percentages.  I am recalling these off the top of my
15   head.  But, sure, 75 hundred dollars would be 30.
16   And 3750.
17       Q.  So what's the total of that?
18       A.  I don't know.  15 thousand.  Which would get
19   you down to ten thousand I think or something.  But
20   again I don't recall the exact percentages.  They
21   could have been 5 to 15 percent.  I don't remember.
22   I am simply approximating from memory.
23       Q.  On Page 7.  You talked about, I will read,

**50**

1    "Specifically the scope of services I was retained to
2    provide included the following."
3        A.  Where are we.
4        Q.  Page 7.  Down at the bottom?
5          MR. ANGLEY:  This is the Supplemental
6    Report.
7        Q.  Yes.
8        Q.  Under one?
9        Q.  Yes.
10       A.  Okay.
11       Q.  You say you, "Reviewed existing background
12   information about the premises."
13          Do you recollect what information that
14   was?
15       A.  Where are we now.  I'm sorry.  One.
16   Number 1.  Specifically, I was still up in this
17   paragraph up here? "Review existing background
18   information on the premises."  I think plans, aerial
19   photos, deeds, information, just regarding the
20   history of the property up until the taking.
21       Q.  Anything else that you can recall?
22       A.  I don't believe so.
23       Q.  On Page 8.  Towards the bottom.  There is a

**51**

1    reference to a Mr. Wayne Valliere?
2        A.  Yes.
3        Q.  And who is Mr. Valliere?
4        A.  He was the fellow I referred to.  The other
5    appraiser.  He lives in Plymouth.
6        Q.  What is his connection to you?
7        A.  I met Wayne through the Massachusetts Board
8    of Real Estate Appraisers.  He served on the
9    Education Committee with me for a couple of years.
10   So I just know of him through the Mass Board.  He
11   actually, I believe received the original phone call
12   from you folks.
13       Q.  Is he employed by you?
14       A.  Oh no.  No.  No.  He's another independent
15   fee appraiser.
16       Q.  And in your report you referenced the
17   compensation that you were paid.  I believe that's in
18   section C on Page 4.
19       A.  Correct.
20       Q.  Does that compensation cover whatever fees
21   Mr. Valliere has been paid?
22       A.  It had as of the time, yes.  We split the
23   retainer.  Then we billed for the other three

**52**

1    thousand dollars.  When we received that check we
2    received another thousand dollars and I retained two
3    thousand out of the three.
4        Q.  How many hours has Mr. Valliere put in on
5    this assignment?
6        A.  I think you would have to ask him.  I don't
7    know.  We inspected the site together.  He researched
8    the comparables for the various parts of the
9    assignment.  I then went down and we discussed them.
10   We went out and we viewed them.  So I don't know.
11       Q.  Has Mr. Valliere put together any reports in
12   connection with this valuation?
13       A.  No.
14       Q.  Do you know what appraisal credentials
15   Mr. Valliere has?
16       A.  I would only be, I wouldn't say guessing.  I
17   know he's an RA with the Massachusetts Board of Real
18   Estate Appraisers.  I believe he holds the IFA
19   designation with the -- I am not sure what that group
20   is.  I know it is the independent something of
21   appraisers.  I don't know.
22       Q.  Federation, I think?
23       A.  Could be.  Could be.  He's a certified

**53**

1  residential appraiser in the State of Massachusetts.
2      Q. Do you know what experience Mr. Valliere has
3  in valuing 40B developments?
4      A. I don't.
5      Q. Do you know what experience he has in
6  valuing beach club properties?
7      A. I don't.
8      Q. Did Mr. Valliere select the properties that
9  he felt were comparable to the subject property?
10     A. For which part of the assignment?
11     Q. Any part of it.
12     A. I indicated to him what type of sales I was
13 looking for. And he went out and searched for them
14 and brought back whatever he could find and then we
15 discussed them as to their relative merits.
16     Q. What type of comparable properties did you
17 tell him to look for?
18     A. Well in beach club facility I asked if he
19 could find beach club sales, any beach club sales. I
20 know that the plaintiff had provided a list of what
21 she thought were comparable properties so we started
22 with that list, and then expanded it because as it
23 turned out there were virtually no sales of beach

**54**

1  club properties available.
2      Q. Were there any sales of beach club
3  properties either by or to non-profit corporations?
4      A. We found none.
5      Q. What other types of comparable properties
6  did you ask him to perform?
7      A. Well we originally started out looking for
8  comparable land sales. Unimproved land sales.
9  Waterfront properties, things of that nature. When
10 that proved to be fruitless, we then began looking
11 for improved property sales that we could apply the
12 extraction process to. When the scope of work
13 changed from valuing the property as potentially
14 developable on a residential basis, we changed to a
15 40B scope and the beach club scope. And we went out
16 and sought the comparable sales for unimproved land
17 for either beach club or improved beach club sales.
18     And we sought out sales of 40B land which
19 we were not able to locate and we then started
20 looking for sales of land that had similar
21 development characteristics for multi-family
22 properties that could be developed.
23     Q. When Mr. Valliere was reviewing properties

**55**

1  to determine whether they were comparable or
2  dissimilar, did you rely on his judgment as to which
3  were comparable and which were dissimilar?
4      A. He initially brought whatever he could find
5  and then we went through them jointly and decided
6  which sales were most appropriate and comparable for
7  the various valuations.
8      Q. Do you recall when you did that?
9      A. We did that over a several month period
10 because the assignment changed.
11     Q. So what did Mr. Valliere contribute to any
12 of the three reports that we have been given?
13     A. Well he helped to conduct the research for
14 the comparable sales, and I utilized his input and
15 opinions on the various locations of properties, how
16 they stacked up versus the subject, things of that
17 nature.
18     MR. BOWEN: I want to take a one minute
19 break.
20     (A recess was taken.)
21     Q. On page 9. You write, "The property has
22 been appraised to USPAP principles."
23     A. Yes.

**56**

1      Q. Which USPAP principle do you believe apply
2  to that assignment?
3      A. All of them.
4      Q. In the next sentence you write, "The
5  marketing time is estimated to be less than one
6  year." How did you arrive at that estimate?
7      A. Based on the trends and based on the average
8  marketing time of all sales of all properties that we
9  get through Banker and Tradesmen on line and through
10 multiple listings, the market at that time was very
11 active and any type of property that had development
12 potential was selling at a very rapid rate.
13     Q. Did you in coming up with your estimate
14 distinguish between any of the three uses that were
15 proposed for the property or is this just a blanket
16 one year.
17     A. Well we did different appraisals for
18 different -- under different assumptions, but they
19 were all less than a year. So it applied to all of
20 them.
21     Q. How would the -- what data did you rely on
22 to apply one year marketing time for beach club
23 memberships?

**57**

1    A. Well, it wasn't a beach club membership so
2 much. It would be the sale of the property in bulk
3 to a developer.
4    Q. I see. What information did you rely on to
5 determine the one year marketing time for an in-bulk
6 sale to a non-profit developer?
7    A. That would be one in the same. In other
8 words the procedure would be, it would be sold for
9 development as a non-profit. An individual would
10 purchase that. And we looked at the sale as I said
11 vacant parcels of land of almost any ilk and the
12 demand was enormous for any type of developable land
13 for any type of property.
14    Q. So in your estimate of developing the
15 marketing time, you didn't take into account or you
16 didn't think it was appropriate to take into account
17 the potential character of the buyer?
18    A. I don't understand the question.
19    Q. Is there a market for non-profit developers
20 who were buying beach clubs.
21        MR. ANGLEY: I object to the form of
22 the question. I don't know whether there is such a
23 thing as a non-profit developer. There is a

**58**

1 developer that might develop for non-profit use. Are
2 you saying there is a thing called a non-profit
3 developer.
4    Q. That's fair. Tell me what you found in your
5 analysis for marketing time of properties to be
6 developed by anyone for operation as a non-profit
7 beach club?
8    A. We found none.
9    Q. Would that suggest to you one way or another
10 as to whether there is a market?
11    A. In view of no information, we opted for what
12 we thought was the next best information which was
13 the sale of vacant parcels of land for development
14 purposes.
15    Q. I see. So the fact that there is an absence
16 of those types of transactions doesn't suggest to you
17 that there isn't a market?
18    A. It did not.
19    Q. And when you come up with one year for
20 marketing time, did that apply to a 40B development
21 as well?
22    A. Yes. Yes.
23    Q. And what data did you rely on in coming up

**59**

1 with a one year for a 40B development?
2    A. Again we found no sales of 40B transfers, so
3 we went to the sale of properties that were capable
4 of supporting similar type projects in terms of
5 physical aspect. Multi unit condominium, adult over
6 55 communities, things of that nature. And we looked
7 at the length of time that those sales were on the
8 market. And again virtually no marketing time
9 associated with any of those.
10    Q. Let's see. In dropping down a couple
11 sentences. The following is a summary appraisal
12 report whereby the Departure Rule has not been
13 invoked. What was the date of this report, again?
14 Was it September 20?
15    A. Which one is this now?
16    Q. This is the most recent one, I think.
17        MR. ANGLEY: 20 of September, 2006.
18    A. But this again --
19        MR. ANGLEY: I'm sorry. The question
20 on the table was what was the date of the report. So
21 that would be.
22    A. Well, the date, it is a supplemental.
23 Conversations with --

**60**

1        MR. ANGLEY: You can't talk about
2 conversations with me.
3    A. It is a supplemental response to an
4 appraisal that was dated March 31, 2006.
5    Q. Which was why you were referencing the
6 Departure Rule?
7    A. Correct.
8    Q. Now dropping down to the next sentence. You
9 write, "We certify that we have personally inspected
10 the property. We have no present or future or
11 contemplated interests in the property, that our
12 compensation is not based on any stated or
13 preconceived value. As a result of our inspection
14 investigation analysis, we are of the opinion."
15        And I was just curious about when you use
16 the word "we" and "our" to whom are you were
17 referring?
18    A. Wayne Valliere. Because he had provided me
19 with the information. And we had inspected the
20 property jointly et cetera, et cetera.
21    Q. Does Mr. Valliere provide a certification?
22    A. No. And he didn't sign the report either.
23    Q. Over on Page 10. You write, "In order to

**61**

1  perform a complete appraisal process, the information
2  data collected and considered includes the
3  following." Then you have a list of bullet points.
4  Did you consider any other materials other than those
5  identified in this section?
6      A. No.
7      Q. Dropping down to the fourth bullet point
8  from the bottom. You write that you?
9      A. I'm sorry.
10     Q. We are on Page 10.
11     A. Yes.
12     Q. You write that the information data
13  collected considered and includes the following and
14  then the bullet point is. "Applicable information
15  regarding the subject area, general area, and all
16  relevant comparable data."
17         And I guess the issue I have with that is
18  above you are saying you consider the following
19  information and then in this bullet point you haven't
20  identified it. You just say the "applicable
21  information." So I was hoping you could tell me what
22  the applicable information was?
23     A. Applicable information regarding the

**62**

1  subject, well let me back up. I guess this bullet
2  would be sort of an umbrella statement regarding
3  whatever was not specifically itemized above. If
4  there was anything else that we didn't delineate
5  specifically. So any other plans or any other say
6  photographs, aerial photographs, topographical,
7  anything that wasn't included specifically above.
8  And then information applicable information regarding
9  the area, again market area analysis involves
10  describing the area and what is pertinent to it and
11  what it extends and what its reaches are.
12         And then the general area would be the
13  Town of Wareham, southeastern Massachusetts, and
14  whatever comparable data we deem to be appropriate
15  for the specific assignment.
16     Q. So, let's just work backwards. The
17  comparable -- all relevant comparable data is all
18  relevant comparable data included in this report?
19     A. Yes. Any other data we may have initially
20  viewed as possibly comparable then.
21     Q. Hold that thought for a second.
22         The any other data part of your answer,
23  is there a reference to that other data or

**63**

1  identification of that other data in your report?
2      A. No. I mean, when we start out, we don't
3  know what is going to prove to be relevant and what's
4  not going to be relevant. So once we discard it, it
5  is no longer relevant.
6      Q. What I am interested is the thought process
7  that goes into doing the sifting between what's
8  relevant in your opinion and what's not relevant.
9  And as part of my job is to examine what your sifting
10  process was and to do my job I need to be able to
11  look at the, call it the raw grain before it gets
12  ground and sifted.
13         So with that explanation, what I am
14  trying to get at here what was all the raw grain that
15  you looked at which I believe is what this bullet
16  point is referring to so I can then question you
17  about how you sifted?
18     A. Again this is the supplemental response so
19  it would be any and all data that we thought might
20  have applicability to either the 40B analysis or the
21  beach club analysis.
22     Q. Would that be in your file?
23     A. The raw data, yes, quite possibly.

**64**

1         (Pause.)
2         Well this scope of the appraisal
3  process means what did we go through in order to
4  arrive at our conclusions. So like anything else, we
5  start out with all this raw data, we discard that
6  that has no applicability and then we look at that if
7  we have an abundance of data, we ultimately weed out
8  that that is less comparable and come down to what we
9  feel is the strongest justification for whatever
10  point we develop.
11     Q. Of course, the interesting thing in looking
12  at appraisals is as I said the sifting process and
13  what the assumptions were as to why something wasn't
14  suitable. Of course, the difficulty I have is that
15  when the report relies strictly on file materials or
16  the alternative, there isn't an explanation of what
17  we looked at and why it was or wasn't comparable. It
18  becomes difficult for me to follow the process. I
19  guess with that editorial remark --
20         MR. ANGLEY: I thought he was going to
21  say since this was a supplemental report that we were
22  looking at, there was the original report that did
23  have market data that isn't repeated here. It did

65

1    have discussion of the subject area. If there is
2    other information, you might want to ask him about.
3        Q. Let me ask the question in a little
4    different fashion.
5            Was there anything that you relied upon
6    in any of the three reports that you prepared that
7    isn't specifically identified in the body of the
8    reports?
9        A. Nothing that I can think of offhand.
10       Q. So to put it differently, everything that
11   you relied upon and generated into the three reports
12   is identified in the bodies of the reports?
13       A. Yes.
14       Q. And what relationship do these umbrella
15   statements that you have in here have in relation to
16   your last answer. I'll try to make a better question
17   out of that.
18           If you have identified specifically
19   everything that you relied upon in these reports,
20   there isn't any need for these umbrella statements,
21   is there?
22       A. Well you have to understand that the scope
23   of the appraisal process comes before the specifics

66

1    of the report so that we put it under here and then
2    discuss it later in the report. This is laying out
3    the basic concept of what the scope is. So you know
4    what is coming.
5        Q. Oh yes. But of course what I am talking
6    about is your sentence in order to perform a complete
7    appraisal process, the information data collected and
8    considered includes the following?
9        A. Right.
10       Q. And I am trying to get at?
11       A. Right. We wouldn't in the scope refer to
12   each and every comparable sale that we used later in
13   the sales comparison approach.
14       Q. Of course not. That would be ridiculous.
15       A. So this would be the precursor to explain
16   what it is we did.
17       Q. And once you got into the full explanation
18   of what you did in the body of the report, everything
19   you relied upon in your analysis is specifically
20   identified in the body of the report, correct?
21       A. I believe so.
22       Q. This isn't a trick question. I am truly
23   seeking enlightenment here. On Page 11 after the

67

1    last bullet point, you write, "The extent of the
2    scope is based on what is typical for the property
3    under appraisement as judged by the users of
4    appraisal services and the actions of other competent
5    appraisers performing the same assignment."
6            And I just wasn't sure what that meant.
7        A. Uniform standards talks about what the
8    requirements are for an appropriate scope of work.
9    And those are the two premises on which your scope of
10   work is judged. What would other appraisers who
11   perform similar appraisal services do in the same
12   case. And what would users of appraisal services
13   expect to receive. So it is basically a jury of your
14   peers and a jury of your clients that would determine
15   whether what you did was reasonable and appropriate.
16       Q. Dropping down to the footnote in the last
17   sentence. You write, "This report does contain the
18   complete data reasoning and analysis for the
19   determination of highest, best, and most profitable
20   uses of the property and the market value expressed
21   in this report." Did I read that correctly?
22       A. Yes.
23       Q. No typos there. No omission of words.

68

1        A. No.
2        Q. On Page 12 you write, "The most probable
3    price in terms of money which the property will bring
4    in a competitive and open market." And then you go
5    on and I was just hoping you could define for me what
6    you meant by a competitive and open market?
7        A. I mean that is part of the standard
8    definition. So I am not sure I am entirely competent
9    to describe what the definition means by a
10   competitive and open market. I know what we teach in
11   the course. And that means that the property has to
12   be made available to everyone under as it says all
13   terms requisite to a fair sale.
14           So it has to be an open market. No
15   restrictions or exclusions or anything of that
16   nature. The market has to be knowledgeable and I
17   think that's essentially what the definition revolves
18   around that you have fair and open offerings with no
19   restrictions to it.
20       Q. Dropping down to Number 3 about the middle
21   of the page. And you are identifying the various
22   conditions. Number 3 you have written, "A reasonable
23   time is allowed for exposure in the open market." Is

69

1  there a set of circumstances where what is reasonable
2  could vary according to the intended use of the
3  property?
4      A. Absolutely.
5      Q. What sort of occasions would warrant such a
6  discrimination between the intended uses of the
7  property?
8      A. Again, I am not sure I understand. First
9  let me clarify when you say I wrote. I am simply
10 copying the definition. So I didn't create this
11 definition.
12     Q. You are adopting it?
13     A. Exactly.
14     Q. By adopting it, it is yours?
15     A. That's fine. I am not afraid of taking the
16 definition of market value.
17     Q. That is a pretty easy one I think.
18     A. A reasonable time is allowed for exposure in
19 an open market.
20     Q. I think the question was is can what is
21 reasonable differ according to the intended use of
22 the property?
23     A. Absolutely.

70

1      Q. And can you give examples of that?
2      A. Depending on the property, well let's back
3  up and define what exposure time is. Exposure time,
4  again uniform standards talks about exposure time and
5  talks about marketing time. Exposure time takes
6  place prior to the date of the assignment. Marketing
7  time takes place after the date of assignment.
8          So they talk about reasonable exposure
9  time. How long is something put out on the market.
10 How long does it have to be exposed on the market
11 based on the type of property that it is assuming it
12 is exposed at a reasonable price. The example that
13 USPAP text gives is you could put a house on the
14 market for three million dollars and it sits on the
15 market for two years, you drop the price to a million
16 and a half, and it sells in two weeks.
17         So exposure time has to go hand in hand
18 with a reasonable price. So different property types
19 will have different exposure times based on the
20 market. If I am selling a house that has an expected
21 or reasonable exposure time based on all the other
22 transactions that are taking place. The market is
23 changing now so the exposure time it going to

71

1  increase dramatically.
2      Q. So it is not solely price sensitive, is it?
3      A. It is solely price sensitive. It is the
4  demand and supply. It is all of those things.
5  Scarcity, effective purchasing power, all of the
6  components of supply and demand. If I had a nuclear
7  power plant for sale, my exposure time could be ten
8  years. It could be fifteen years.
9      Q. These days I think it might be pretty short.
10     A. Again. It all depends which one. So that
11 exposure time is most definitely a moving target
12 depending on the type of property you are talking
13 about.
14     Q. On the fifth one, you write as one of the
15 conditions. "Financing, if any, is on the terms
16 generally available in the community and the
17 specified date, it is typical for the period and its
18 locale."
19         I was wondering if you could offer an
20 explanation as to how financing terms for 40B
21 projects would have affected your analysis?
22     A. I don't believe it would have any impact on
23 the analysis. I think from what projects that I have

72

1  been involved in, financing is not problematic. It
2  is not viewed as something that lenders would shy
3  away from. So it would not have any impact.
4      Q. And how would Number 5 apply to the
5  non-profit reactional beach club?
6      A. Again if it meets the criteria of a lender's
7  requirement, it is not going to have any problem at
8  all.
9      Q. Have your researches shown what lender's
10 market there is out there for financing that
11 particular type of use?
12     A. No.
13     Q. Have you examined the question?
14     A. We attempted to examine the question, but
15 since we were unable to find any non-profit beach
16 club land sales, we didn't really make any statement
17 regarding it.
18     Q. Over on Page 21. You do some highest and
19 best use analysis. Did anyone suggest to you a
20 potential highest and best use for the property?
21     A. I am not sure I understand the question.
22     Q. Did the engineer or Mrs. Haupt or the
23 wetlands specialist or anyone at all suggest to you

**73**

1  what might be a good highest and best use for the
2  property?
3      A. Well as I said our original assignment or
4  what we began to appraise was the property as though
5  it could be improved by a two family or two unit
6  residential building. And then based on discussions
7  with just about everyone different alternatives were
8  put forth. Beach club, 40B, any number of different
9  things. And my statement was that I couldn't, I was
10 not going to begin to assume what could be put there
11 if the expert said a non-profit beach club could be
12 put there. I could appraise there. If a 40B could
13 be put there, I could appraise that. So there are a
14 number of different alternatives presented and then
15 after looking at those various alternatives, it came
16 down to the non-profit beach club as being the most
17 profitable use under allowable zoning and the 40B as
18 a second highest and best use because of the fact
19 that the 40B regulations superceded city and town
20 regulations.
21     Q. You write in the middle of the page that you
22 were first retained, you were asked to value the
23 property as a duplex lot. Who asked you to value it

**74**

1  as a duplex lot?
2      A. It was presented that that was what was
3  allowed and that was the basis on what Mrs. Haupt
4  would like the value developed.
5      Q. Who asked you to value the lot?
6      A. I think that was Attorney Angley that that
7  was permitted and should be valued in that manner.
8      Q. At that time did you complete the appraisal
9  assignment?
10     A. I believe we exchanged e-mails and
11 conversations saying this is what we think the final
12 value would be, but we didn't develop full appraisal
13 reports.
14     Q. And what did you conclude the final value
15 would be in that exchange?
16     A. As the duplex?
17     Q. Yes.
18     A. Well that's in the other reports, the 1.2
19 million dollars.
20     Q. Do you recollect what the date of that
21 exchange was?
22     A. Again, early to mid 2005, I think.
23     Q. We are on Page 22, on the second full

**75**

1  paragraph. You begin by writing, "The value of the
2  land was substantially increased by the prospect of
3  its development as a 40B project," and so forth.
4  From what starting point was the value of the land
5  substantially increased?
6      A. From that as a duplex, two family
7  residential lot.
8      Q. Over on Page 23. You offer an explanation
9  of the sales comparison approach. And in the second
10 sentence, "The principle states that a willing buyer
11 will substitute a like property, a lower price
12 provided there is similar utility and no unnecessary
13 time delays."
14     What do you mean by no unnecessary time
15 delays?
16     A. Well again this is a basic principle of the
17 sales comparison approach that if you could
18 theoretically construct a property at significantly
19 less than what you have to pay for the property and
20 that you could get it done in a timely fashion, you
21 would opt for that. But if it were going to take an
22 inordinately long period of time to put together the
23 pieces to have a like property, you might say it is

**76**

1  not worth it to me to do that. I want it now. So I
2  am going to pay the price.
3      Q. Dropping down to the section entitled "Beach
4  Club Development." And the second full sentence you
5  write, "The Wankinco Beach Club Association Market
6  Plan indicates a strong demand for a beach club
7  facility in Wareham." So you were relying on this
8  marketing plan for your conclusions about a strong
9  demand?
10     A. Yes.
11     Q. Did you do any independent analysis as to
12 market demand for this type of interest?
13     A. The information that we, we meaning myself
14 and Wayne, obtained regarding the lack of available
15 memberships that were sold that were marketed that
16 were offered for sale in the various beach club
17 facilities that we investigated indicated to us that
18 there appeared to be a very strong demand. And as I
19 recall Wayne's conversation with the people at the
20 Bowerman Group said any unit that ever comes on the
21 market is sold immediately and there is a waiting
22 list for people to acquire them. So that limited
23 amount of additional information with marketing study

The computer program refused to print in mini format. Sorry for any inconvenience.

1   indicated there was a strong demand.

2       Q.   Back down on the bottom of Page 23 in that

3   final bit there.  You write, "The appraisers have

4   studied the market for sales of condominium units."

5   You use the word appraisers, plural, to whom does

6   that refer?

7       A.   Mr. Valliere.

8       Q.   We are on Page 24.  There are five beach

9   clubs listed at the top.  Were those all of the ones

10  that you considered?

11      A.   No.

12      Q.   What other ones did you consider?

13      A.   I don't recall.

14      Q.   Do you recollect how many others there were?

15      A.   Specifically, no.

16      Q.   Do you recollect where they were located?

17      A.   We tried to keep them in the southern

18  Massachusetts Cape Cod area, yes.

19      Q.   Do you recollect what towns they were

20  located in?

21      A.   I don't know.  Wayne was heading up that

22  initial analysis to see if there were any other sales

23  that we could rely on.  So he looked at several

1    others and found no additional information that were

2    suitable for analysis.  But I can't tell you what

3    other specific ones he looked at.

4        Q.  So Wayne did that part of the analysis

5    rather than you?

6        A.  He did the research.

7        Q.  All right.

8            So Wayne brought you a list of beach

9    clubs that is longer than the five shown here and you

10   sifted through that list to determine which of the

11   five was appropriate to mention?

12       A.  No.  These five were provided by

13   Mrs. Haupt.  I said to Wayne, see, if you can find

14   any others.  He found several other beach clubs, and

15   then obviously the next question is, have there been

16   any sales.  And the answer was no.  They were mostly

17   privately held beach clubs.  The Bowerman was the

18   only one that was condominium aspect where individual

19   units were being sold.

20           From another, however, many he found, we

21   could glean no additional sales information.

22       Q.  What did you consider to be an appropriate

23   geographical range to look for beach club sales?

1      A.   Southern Massachusetts and upper Cape Cod
2  area.
3      Q.   So that would be approximately maybe a fifty
4  mile radius?
5      A.   Probably something like that.
6      Q.   Over on Page 25.  You write in the middle of
7  the page, "Each parking space can support two
8  ownership units resulting in a total of 250
9  ownerships."  How did you arrive at that conclusion?
10     A.   That was provided to me by the zoning
11  Attorney Giaimo.
12     Q.   But what did the market say about the number
13  of units that would be supportable by parking space?
14     A.   I don't understand the question.
15     Q.   Well, in the other clubs you looked at, what
16  was the ratio of parking space to membership units?
17     A.   The only one that had any sales, the
18  Bowerman Club was one to one.
19     Q.   In the other clubs did you look at what the
20  relationship of parking spaces to memberships was?
21     A.   I don't think that information was
22  available.
23     Q.   Do you think it is likely that membership

1    buyers would be carpooling to the club?

2        A.  No.

3        Q.  So do you think it is likely that as a

4    matter of marketing the two ownership units that each

5    parking space would support two ownership units?

6        A.  Yes. We thought it was likely.  We made an

7    adjustment for it, but we thought it was likely.

8        Q.  Over on Page 26.  You write as stated and

9    this isn't the full paragraph.  "As stated, this is

10   the gross potential, or retail saleout value.  From

11   retail sellout value, appropriate deductions must be

12   made in order to develop the market value of the

13   property."  Now what deductions were those?

14       A.  The ones below there.  Marketing, overhead,

15   carrying costs, and profit.

16       Q.  How did you arrive at the two to four

17   percent for marketing?

18       A.  This is based on experience with other sales

19   of developable subdivisions and things of that nature

20   that I have appraised hundreds of over the years.

21   When a developer goes in and decides to acquire a raw

22   piece of land and then develop it, convert it to a

23   subdivision, these are the normal costs that they

81

1    impute when they are preparing their analysis of what
2    they can afford to pay for the land in its as is
3    condition.
4        Q. So does this two to four percent for
5    marketing apply to the marketing of the raw property
6    to the developer who's going to turn it into a
7    non-profit beach club or to the cost of marketing the
8    beach club memberships?
9        A. This has all got to do with the developer.
10   In other words they look at what the retail sellout
11   value could possibly be and then they make their
12   deductions from that in order to come up with what
13   they can afford to pay and make it worth their while.
14       Q. Explain how that process would work where
15   the property could only be developed as a non-profit
16   beach club. Take me from Mrs. Haupt selling the
17   property to the end use as a beach club?
18       A. Assuming that this is an allowable use.
19       Q. Yes. With that assumption?
20       A. Well, she would hire somebody like me to say
21   what this is worth to somebody. And I would go about
22   this process and say that this project has a retail
23   sellout value of $3,750,000.

82

1        Q. That is based on the 250 times 15 thousand.
2        A. Now she decides she does not want to take
3    this from point A to point C. So she is going to
4    sell it to somebody at point B. The question is what
5    would they be willing to pay in order to get to
6    point C. This involves point B. We take the retail
7    sellout and we subtract those costs associated with
8    getting it to point C, and that is what a developer
9    would be willing to pay Mrs. Haupt at point B.
10       She has got it approved and ready to go,
11   they then take it over and say I can make $3,750,000.
12   What would I be willing to pay to make $3,750,000.
13       Q. Let me back you up for a second. Mrs. Haupt
14   isn't a non-profit?
15       A. I'm sorry?
16       Q. Mrs. Haupt isn't non-profit?
17       A. No.
18       Q. So taking it from A to B as you described
19   it, she wouldn't be able to get it from A to B. You
20   know, it is ready to go, would she?
21       A. I don't know why she wouldn't.
22       Q. Because she is not a non-profit?
23       A. No. The ultimate goal is to sell it as a

83

1    non-profit beach club facility. So she would seek
2    the approvals for that. Once it is turned over to
3    the 250 unit owners, it is a non-profit. They own
4    this as a non-profit entity.
5        Q. I see what you are saying. You are saying
6    that she or a successor or interest could develop the
7    whole property, build out the beach club building,
8    and do whatever paving or parking was necessary for
9    the 125 parking spaces. And that she or this
10   developer would be able to do all that work. And
11   then at that point the non-profit corporation would
12   come along and buy the property once all that work is
13   done. Is that what you are saying?
14       A. No. I believe the individual unit owners
15   would make up that non-profit entity. Whatever that
16   is.
17       Q. So are they the ones that would build it?
18       A. No. The developer would build it.
19       Q. Would the developer have to get any
20   approvals before he could build it?
21       A. Absolutely.
22       Q. So he would have to follow zoning?
23       A. Yes.

84

1        Q. I think I understand, thank you.
2        And it was on that chain that A to B
3    to C that you just testified that those are the
4    predicate facts of your opinion of value based on
5    highest and best use of the property as a beach club?
6        A. Non-profit.
7        Q. Non-profit. Okay. Did I summarize that
8    accurately?
9        A. Yes.
10       Q. Over on Page 27. You write, "However, with
11   the advent of the information regarding the allowance
12   of a beach club facility that would provide similar
13   amenities to the Bowerman Beach Club, the appraiser's
14   opinion of value for the subject (as set forth above
15   and in the Original Report) has been amended and
16   increased by 20 percent to reflect the facility."
17       How did you calculate the 20 percent?
18       A. It was basically just in the first case, we
19   deducted and again as I said I don't recall my exact
20   percentages by approximately 10 percent or 15,
21   whatever it is, from the 25 thousand dollars bringing
22   it down. Well to go the other way in order to get
23   that same incremental amount of approximately three

**85**

1  thousand dollars, it was 20 percent of fifteen
2  thousand going back up.
3      Q. I see. Further down you write, "Assuming
4  modest quality construction, a cost of fifty dollars
5  per square foot has been assigned to this 3600 square
6  foot facility for a construction cost of $180,000."
7           Honestly I don't mean to sound like a
8  wise guy for saying this, it doesn't seem like you
9  can build a whole lot for $180,000 these days.
10 Perhaps that is why you say modest quality. I guess
11 I was wondering how you came up with the 50 dollars
12 per square feet.
13     A. We looked at what the Bowerman Beach Club
14 facility is. It is pretty basic and pretty rustic to
15 put it mildly. There is no heat. It is a big summer
16 shack. Because it can't be used in the off season.
17 It has a roof. It has siding and some plumbing and
18 you know.
19     Q. Further down you write, "Site costs
20 including footings, pilings, piers and utility
21 connections have been estimated at 70 thousand
22 dollars." I was wondering who estimated that?
23     A. Well in our report as the two family

**86**

1  dwelling which was a larger facility when we did our
2  cost approach, we developed a cost for approximately
3  one hundred thousand dollars so we scaled that back.
4  Those figures we developed in the two family
5  appraisal came from Marshall Swift and Marshall
6  Valuation Services and Cost Manuals.
7      Q. Could you explain the scaling back
8  methodology to me?
9           Tell you what, why don't we take our
10 lunch break now.
11         (A lunch recess.)
12         (The reporter read back the previous
13 question.)
14     A. Yes. As I said in the appraisal of the two
15 family, we had estimated through the various cost
16 manuals, a site cost of a hundred thousand dollars.
17 The original building size had a footprint, I
18 believe, of approximately 35 hundred square feet.
19 This is significantly smaller, approximately half the
20 size, but again there are certain costs that you
21 can't avoid. It wasn't a one for one decrease from
22 one hundred thousand to fifty thousand because of the
23 base you needed to develop and get all of utilities

**87**

1  to the site et cetera, et cetera.
2           From having to decrease from a 35 to 36
3  hundred square foot to 18 hundred, we looked at the
4  associated expenses, and it resulted in a thirty
5  percent decrease as opposed to a fifty percent
6  decrease.
7      Q. Were you pulling some of your expenses out
8  of Marshall and Swift.
9      A. Yes. I thought I said that.
10     Q. You may have. What was the date of the
11 Marshall and Swift Report that you were pulling them
12 out of?
13     A. It is manual. It is constantly updated.
14 They send out the quarterly updates, whatever the
15 current quarterly number was.
16     Q. Current as to when you did the report?
17     A. It was the same one that we used when we did
18 the original appraisal.
19     Q. Let's see. Turning over to Page 29. You
20 write in the second full paragraph. "The appraiser
21 has studied the market for comparable "adult housing"
22 and/or condominium projects. From the study, the
23 following had been selected as most comparable."

**88**

1  Then you list five.
2           How many condominium projects or adult
3  housing projects did you review in order to come up
4  with these five.
5      A. I would say we looked at probably another
6  five to ten, at least another three or four on the
7  Cape, and then I was familiar with another half a
8  dozen or so that occurred in the Middlesex Norfolk
9  County area moving down towards the South Shore.
10     Q. Okay. Can you identify any of those?
11     A. I would have to refer to my notes. I don't
12 have them off the top of my head.
13     Q. Of the five sales of land that you have
14 identified here, how many of them are for 40B
15 projects?
16     A. None.
17     Q. I see. You distinguish between planned
18 residential communities and condominium projects.
19 What is the difference between the two?
20     A. You mean the adult housing? When you say
21 planned residential. I don't know.
22     Q. I will read from the report. "The above
23 five sales of land --

**89**

1  A. I am sorry. I was looking up at the top.
2  Q. Look right below the list of five.
3  A. Yes. Planned residential communities, I
4  meant by the adult over 55 as opposed to just a
5  straight condominium project.
6  Q. Thank you. And which of these were condo
7  and which were over 55?
8  A. Let's see. I believe the first three were
9  just strictly condominiums and the last two were
10  adult over 55.
11  Q. Did you speak to the buyers and sellers on
12  each of these?
13  A. Knew both the buyer and seller on four. Did
14  not speak to the buyer or seller, talked with the
15  loan officer on number 5. And I would have to check
16  but I believe that Wayne spoke to one or both of the
17  parties on the first three.
18  Q. Have the projects actually been built out
19  for the properties on 1 through 5.
20  A. Four and five were complete. 1, 2, and 3
21  were in the process.
22  Q. I would like to ask you about the
23  adjustments found in the table that begins on the

**90**

1  bottom of Page 30 and carries on to Page 31. And if
2  we could just go across the headers, so I understand
3  what each of them is. What is the first column?
4  A. The sale price per unit of approved, of the
5  approved number of units for the site.
6  Q. Is that adjusted or unadjusted?
7  A. That's unadjusted. In other words the sale
8  price divided by the number of units that was
9  approved.
10  Q. So for the properties identified as 1
11  through 5, some of the units have actually sold?
12  A. In other words what did they pay for the
13  land in relationship to how many units they could get
14  on the land.
15  Q. I see.
16  A. So if you divide 750 by 7, you get 107,142.
17  Q. And the description of the number of units
18  is found in the narrative on 29 through 30?
19  A. Yes.
20  Q. Then what's the next column going across?
21  A. The adjustment for the date of sale. In
22  other words when this is the adjustment for changing
23  market conditions. A.k.a the time adjustment. So,

**91**

1  that we adjusted each sale for its date of sale in
2  relationship to the date of valuation. For example,
3  Sale 1 that occurred January 13 of 2004 because that
4  was within 14 days of the date of value required no
5  adjustment for the change in market conditions.
6  The second sale which occurred in August
7  of '04 required a negative adjustment because values
8  were appreciating in order to get that back to the
9  date of valuation, we had to make a negative
10  adjustment. Again because prices were appreciating,
11  anything that occurred after our date of valuation
12  received a negative adjustment and sales four and
13  five which occurred in January of 2002 and November
14  of 2001, we made a positive time adjustment to make
15  it equivalent to the December 31, 2003, date of
16  valuation.
17  Q. Got you. And then the next category is
18  location.
19  A. This is the respected municipality. How the
20  municipalities compared to the subject locus of
21  Wareham in general terms. And that adjustment was
22  extracted based on our analysis of median sale prices
23  and the various communities and how they compared

**92**

1  with the subject's locus strictly in terms of
2  municipality to municipality.
3  Q. I am interested in the relationship to the
4  location adjustment and the waterfront adjustment. I
5  will tell you why because the median sale price that
6  you were using as a basis for adjustments in the
7  third column would in some measure take into account
8  waterfront property. I am throwing out Ashland and
9  Southboro. But in Chatham, Orleans and Harwich.
10  Did you attempt to make any adjustment
11  in the median other than the straight waterfront
12  adjustment that they used in the fourth column. Or
13  did you think it was necessary?
14  A. As compared to the location adjustment?
15  Q. Yes. Yes. Do you know what I am saying?
16  To a certain extent anything that is in a community
17  that has waterfront, the median is going to be higher
18  virtually to the fact that there is going to be
19  waterfront properties there already. If you feel
20  that the fourth column in making those adjustments
21  are, we are sort of multiplying something that is
22  already skewed because of the inclusion of waterfront
23  properties in the median?

93

1    A. I don't think we were because Wareham also
2 has waterfront properties.
3    Q. Okay that makes sense.
4       And what is the fifth column. The
5 final adjusted price per unit?
6    A. Once you apply the adjustments to the
7 initial price per unit. And the way you have to do
8 it first you apply the adjustments for the change in
9 market conditions and then you apply any subsequent
10 adjustments. You have got to get the initial
11 adjusted price to an equally adjusted number before
12 you then can apply the other adjustments.
13    Q. What I want to ask you about next is with
14 respect to each of the three columns that show
15 adjustments. I want to ask you about the actual data
16 that was used to calculate the adjustment
17 percentages. So for example, on sale date, just
18 using number 2 as an example. What data did you use
19 to generate the 4 percent?
20    A. We essentially were using a half a percent
21 per month average increase. Again based on median
22 sale prices and the appreciation of average sale
23 prices through Banker and Tradesmen. They put out

94

1 their monthly sale price, median sale price and we
2 looked at those averages and we looked at annual
3 averages for all of that. Various unit types. They
4 have aggregate and they break it down by price
5 increments, they break it down between single family
6 and condominiums. And that's what we looked at
7 there.
8    Q. You used condominium indices -- was it a
9 half percent for all of these adjustments or did it
10 vary?
11    A. No. We looked from two thousand, I forget,
12 November of 2001 up through 2005, the middle of 2005
13 when the last one occurred. And we looked at the
14 average increase in prices over that five year, six
15 year period of time. And they were all pretty close
16 to that half a percentage on average. Some maybe
17 went up eight to ten percent one year, or four or
18 five percent another.
19    Q. How about the location adjustment. And
20 again we will use Number 1. The 20 percent location
21 adjustment. Negative adjustment.
22    A. Right.
23    Q. How did you come up with the percentages

95

1 that were used on that column?
2    A. Again we looked at the median sale price for
3 condominiums in the given ranges that we were talking
4 about. When I say the given ranges, for a finished
5 product. And compared that to the subject's median
6 sale prices and came up with our numbers in that
7 manner.
8    Q. And how about under waterfront. How did you
9 come up with those adjustment percentages?
10    A. Well then that was more difficult to be
11 sure. We tried to obtain sort of average sale prices
12 of those various communities for waterfront versus
13 non waterfront because none of them were waterfront,
14 but some of them had better locations if you will.
15 Number 4 the Southboro one, for example, was one
16 street off of Route 9 so that got a significant
17 adjustment.
18       The same thing the Ashland one. That was
19 a side street off of 135. The comparable 3, West
20 Harwich, that is the one I believe that had the views
21 across, yes. If you look at the description there.
22 "30 year old facility on .60 acres of Herring River,
23 waterfront with access." So not quite as good as

96

1 direct waterfront but views and things of that
2 nature.
3    Q. Were any of the properties 1 through 5, did
4 any of them have walk right out to the beach kind of
5 access.
6    A. That's why they all received a positive
7 adjustment. As opposed all but one receiving a
8 negative adjustment for superior locations in terms
9 of their general location.
10    Q. So you ended up using a hundred thousand
11 dollars per unit multiplied by 30 proposed market
12 units for a value of 3 million?
13    A. Right.
14    Q. What was the rationale behind not using the,
15 what was the other ten?
16    A. Again based on my experience and I alluded
17 to that appraisal that I was performing at the time
18 in Westborough, Massachusetts, where the entities
19 that were assembling the land, their goal was to get
20 it approved and sell it. And they had already
21 received four or five bids on an unsolicited basis
22 simply because word had gotten out. All the bids
23 based their offer on were strictly the market units

97

1 and ignored the non market units because it was their
2 contention and having spoken to some of the people
3 who were bidding were major developers. They said we
4 make no money on the non market units.
5     Q. This was the Westborough property?
6     A. Did I say Northborough?
7     Q. I think earlier on we were referring to --
8 it might have been Northborough. You meant
9 Westborough.
10     A. I get my boroughs confused. So no value was
11 assigned to the ten affordable.
12     Q. Because there would be no profit made on
13 them?
14     A. Yes. And the way that they appear to be
15 bought is only on the basis of the market units.
16     Q. What profit were you assuming on the market
17 units?
18     A. I don't know what you mean by the market
19 units. The land or the buildings.
20     Q. Well the thirty units that you -- when you
21 were coming up with your opinion of value. You know
22 the thirty times one hundred thousand equals three
23 million. What profit margin, if any, did you

98

1 postulate when you were using the thirty times one
2 hundred thousand. That equation?
3     A. There is no profit margin. That's what the
4 market was willing to pay for units that they could
5 develop.
6     Q. Based on 1 through 5 above?
7     A. So the profit doesn't come until they build
8 the units. They factor that in on the final end sale
9 whatever that is going to be.
10     Q. Do you know what the profit margins were on
11 the properties listed as 1 through 5?
12     A. You mean what were the projected?
13     Q. Yes. Yes.
14     A. I don't. I don't.
15     Q. As far as you know were there any
16 restrictions on the amount of profit that could be
17 derived from the projects listed on 1 through 5?
18     A. No. Because they were all open market. It
19 is not restricted like the 40B which limits it.
20     Q. Well could you explain to me how you dealt
21 with adjustments for profit or lack thereof on the
22 40B proposal for the subject property?
23     A. There is no profit imputed to the value of

99

1 the land. That's what the developer would have to
2 pay in order to get the land and then build the
3 project and then make the profit on the entire
4 sellout.
5     Q. So your hundred thousand dollars per unit
6 assumes no profit at all?
7     A. To whom?
8     Q. Well let's back up because I probably am not
9 understanding this.
10        It is my understanding that you came up
11 with an opinion of value of three million dollars for
12 the property if it were done as a 40B condominium
13 project?
14     A. If you could build 40 units on that site.
15     Q. And that is based on an adjusted value of
16 one hundred thousand dollars per unit times the
17 thirty market rate units?
18     A. Correct.
19     Q. And that hundred thousand dollar figure is
20 based on the five properties that you have identified
21 on Page 29, 30, and 31 in your report, correct.
22     A. Correct.
23     Q. With appropriate adjustments?

100

1     A. Correct.
2     Q. And the figures and I am just looking at the
3 first column which was the amount per unit. Sales
4 dollar per unit column?
5     A. Yes.
6     Q. You derived at that figure from taking the
7 project land sale price and then dividing the number
8 of units that would come into the project as built?
9     A. Correct.
10     Q. Now I am understanding it. And so, any
11 profit that was reflected in these figures would be
12 simply the seller's profit on the land sale rather
13 than the anticipated developer's profit.
14     A. The developer was willing to pay this price
15 in order to build the project in anticipation of
16 making a profit on the sale of the units completed.
17        MR. ANGLEY: It is an opportunity cost.
18     A. In other words if they didn't think they
19 could make money, they would have paid fifty thousand
20 or twenty thousand. But they obviously felt they
21 could make money at 107,142 or 101,111 on that.
22     Q. Now on the bottom of 31, you write, "The
23 value per unit developed for the condominiums is a

101

1  $100,000. However, given that 25 percent, or 10, of
2  the 40 units must be affordable units, no value has
3  been assigned to the affordable units. This is due
4  to the fact that the developer makes little or no
5  profit." And so forth. But you conclude by saying,
6  "This fact is a born out by a recent appraisal
7  completed on a project in Westborough."
8          And then you say, "Since the sale has
9  not been consummated, exact specifics cannot be
10  disclosed."
11          What can you tell me about this
12  appraisal on the project in Westborough?
13      A. The reason I can't disclose it is because of
14  the confidentiality requirements of uniform
15  standards. If the sale had taken place, I can tell
16  you all about it. But if it hasn't taken place, I
17  still can't tell you about it.
18      Q. So we have two competing imperatives here.
19  One is plaintiff's requirement to make a full
20  disclosure on the bases of its opinion on one hand,
21  and the Federal Rules of Civil Procedure and your
22  USPAP confidentiality standards. Of course, I
23  suggest that it is probably the federal rules that

102

1  are going to apply to disclosure here.
2      A. Well, I mean I can't tell you the exact
3  specifics because I don't recall them off the top of
4  my head. As I said to you this was a multiple piece
5  parcel of land. That two gentlemen had acquired one
6  piece of it and then entered into negotiations to
7  acquire several other pieces to make it an assembled
8  size that made sense. The town as I indicated
9  changed the zoning, actually created a new specific
10  zoning for this piece along with the transferrable
11  development rights as I spoke of earlier. And that's
12  the overall description of it.
13          Even if I wanted to, I couldn't tell you
14  exactly how many units. It was in the hundreds of
15  units. The offering prices were in the tens of
16  millions of dollars. And as I said there were four
17  or five unsolicited offers from major national
18  developers. And each one of them paid nothing for
19  the affordable unit component.
20      Q. When you are on the witness stand at trial,
21  and I am questioning you about your appraisal, are
22  you going to have to -- I suppose it will depend on
23  the question, we will try it anyway. Are you going

103

1  to have to refer to materials that are in your file
2  to substantiate your opinion rather than materials
3  contained in your report?
4      A. I would assume I could stand on my reports
5  unless you ask some question that.
6      Q. Well I have been known to do that.
7      A. I will certainly will try to have --
8          MR. ANGLEY: Is that a question or a
9  statement. Are you asking for access to something we
10  haven't put into the report. I guess what you are
11  concerned about if he gets on the stand testifying on
12  what he has seen or heard about before. That's not
13  going to happen.
14          MR. BOWEN: Under USPAP as I know you
15  know it is an acceptable practice for an appraiser to
16  render an opinion and to be able to include form
17  opinions based on materials not in the report.
18          MR. ANGLEY: Dick Dennis could do the
19  same thing.
20          MR. BOWEN: It is absolutely standard.
21  My concern is I just want to be able to, I don't want
22  to be mouse trapped by something I should have seen.
23          MR. ANGLEY: You go through the

104

1  deposition transcript. If there are things that you
2  want, send me a letter and if he thinks it is
3  something he will rely upon, we will disclose it. If
4  he's not going to rely upon it, there is no point.
5  You have asked, there may be some notes he made about
6  some property he may have looked at. He may have
7  rejected it. Maybe comparable. It may be the
8  original list that is not relevant to me. I rejected
9  it. It is not comparable. Unless you want to get
10  into a discussion why he rejected. Then I don't know
11  where we are then. Or maybe something to talk about
12  at pretrial conference. I understand the issue. I
13  am not trying to be difficult.
14          MR. BOWEN: You are not being
15  difficult. I am trying to be up front. It is fairly
16  common for people to say I did thus and so. I can
17  back it up with reference to my file. For heaven's
18  sake. I don't know too many appraisers to bring in a
19  two wheeler loaded with stuff. I realize that is
20  something you have to do. I am not asking you to do
21  that. I want to understand how it is you approached
22  what it is you did.
23          THE WITNESS: I believe you have the

105

1 sum and substance of my abilities, whatever they may

2 be.

3          MR. BOWEN:  Well I am all set.

4          MR. ANGLEY:  I have one question.

5 CROSS-EXAMINATION.

6     Q.  (By Mr. Angley)  You have been asked to

7 comment on the appraisal report of Mr. Dennis?

8     A.  Yes.

9     Q.  And I think you were asked something to the

10 affect, what criticism did you have about his report?

11 And one question and I think you were then asked have

12 you told me everything that you can think that is a

13 criticism.  I have one question in that vein.

14          Which is are you aware that when

15 Mr. Dennis when he created his appraisal, he took the

16 5.35 acre parcel.  For now for purposes he made it

17 into two parcels.  One acre parcel and he treated it

18 as a buildable lot, and then there was another parcel

19 a little under four and a half acres which he valued

20 as a kind of a conservation kind of lot, do you

21 recall that?

22     A.  Yes.

23     Q.  Did you have an assessment or opinion about

106

1 whether or not there was an adjustment that

2 Mr. Dennis should have made to his valuation of that

3 one acre house lot that maybe was not made?

4     A.  Because of the 4.35 then being analyzed and

5 valued as conservation land?

6     Q.  Correct.

7     A.  Well that would be another adjustment

8 because then if the property now abuts 4.35 acres of

9 conservation land and could never be developed, et

10 cetera, that would enhance the value to the remaining

11 one acre because of the privacy factors and the

12 amenity of having 4.35 acres of conservation and non

13 developable land adjacent to it.

14          MR. ANGLEY:  I have no other questions.

15          MR. BOWEN:  We are all done.  Thank

16 you.

17          (The deposition concluded at 2:15 p.m.)

18

19

20

21

22

23

107

1                    WITNESS CERTIFICATE

2

3     I, Steven Elliott, the within named deponent

4 have read the transcript of my deposition taken on

5 October 11, 2006, and have listed any corrections to

6 my testimony on an attached errata sheet.

7

8

9                    Signed under the pains and

10                    penalties of perjury:

11

12

13     _____

14     STEVEN ELLIOTT

15

16

17     _____

18     DATE

19

20

21
22

23

108

               C E R T I F I C A T E

STATE OF MASSACHUSETTS  )
                        )  ss.
COUNTY OF NORFOLK       )

          I, CARMEN W. BRANSON, a Shorthand
Reporter and Notary Public in and for the County of
Norfolk and State of Massachusetts, do hereby certify
that:
          That the witness in the foregoing
deposition was present at the time and place therein
state;
          That the said proceeding was taken before
me as a Notary Public at the said time and place and
was taken down in machine shorthand writing by me;
          That I am a Court Reporter and Notary
Public of the State of Massachusetts, that the said
proceeding was thereafter under my direction
transcribed into computer-assisted transcription, and
that the foregoing transcript constitutes a full,
true, and correct report of the proceedings which
then and there took place;

          IN WITNESS WHEREOF, I have hereunto subscribed
my hand and affixed my official seal this October 19,
2006.

                    _____
                    CARMEN W. BRANSON
My Commission expires March 6, 2009

     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.