UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee )
of BD REALTY TRUST,                          )
                    Plaintiff                )
                                             )
v.                                           )
                                             )
THE TOWN OF WAREHAM acting by                )
and through the BOARD OF                     )
SELECTMEN OF THE TOWN OF                     )
WAREHAM, and the BOARD OF                    )
SELECTMEN OF THE TOWN OF                     )
WAREHAM,                                     )
                    Defendants               )

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
ANY AN ALL EVIDENCE AND TESTIMONY OF PLAINTIFF'S PROPOSED USE OF
THE PROPERTY AS A BEACH CLUB AND ANY ALLEGED COMPARABLE BEACH
CLUB PROPERTIES RELIED UPON BY THE PLAINTIFF</u>**

Now comes the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the

Trust"), and opposes Defendants' Motion in Limine to Exclude Any and All Evidence and

Testimony of Plaintiff's Proposed Use of the Property as a Beach Club and Any Alleged

Comparable Beach Club Properties Relied Upon by the Plaintiff.  For reasons, the Trust states as

follows.

**<u>ARGUMENT</u>**

I.      <u>The Comparable Sales Used By The Trust's Real Estate Appraiser Were
        Reasonable To Establish the Fair Market Value of a Beach Club Use</u>.

At trial, the Trust will introduce evidence that the highest and best use of the Premises

would be as a 250 member nonprofit recreational beach club, with on site parking and amenities

such as picnic tables, kayak/canoe racks and a 3,600 square foot wood framed club house facility

with bathroom facilities and locker storage. Considering that, *inter alia*, the property taken by eminent domain consists of 5.35 acres of beachfront property at the top of Buzzards Bay, and that the zoning in the district allows "nonprofit recreational uses"[1], this use is entirely plausible for the jury to consider as the highest and best use of the Premises. In order to establish the fair market value of such a beach club use, the Trust retained Steven G. Elliott ("Elliott"), a qualified real estate appraiser, who will testify about the value of this use. Elliot's approach was to first determine a per membership value for the proposed beach club. This value was established based upon comparable "of record" sales of three beach club condominium memberships at another nearby beach club (Bowerman's Beach Club) in Falmouth, Massachusetts occurring between August, 16, 2002 and December 10, 2003. After making adjustments for the difference in location, size of the land area of the club and available amenities, Elliot determined that the per ownership value of the beach club use was $18,000.00. Elliot then multiplied this value by the total number of available memberships (250) to produce a gross potential sellout figure of $4,500,000.00. Elliot then proceeded to adjust this gross value by applying a 10% discount ($450,000) for marketing, overhead and carrying costs and deducted another 15% ($675,000) for developer's return on investment.[2] An additional $250,000 was also deducted for the cost of constructing the club house structure. The remaining amount of the gross sellout value of $3,125,000 represents the value of the highest and best use of the premises that a hypothetical

---

[1] Because the Town disputes that the beach club would be an allowed use as a matter of law, the Trust has filed a Motion in Limine for a Legal Ruling That a Nonprofit Recreational Beach Club is an Allowed Use Within the R-30 Zoning District Under the Wareham Zoning Bylaw.

[2] The limitation on use in the Wareham Zoning Bylaw relates to the operation of the premises as a non profit recreational use. There is no limitation on the making of a profit from the sale of the property. A developer is fully entitled to purchase the property, develop it for a non-profit use and sell it to a non profit entity whether organized by the developer or an independent nonprofit entity for the operation of the actual club. See, e.g. Kiss v. Board of Appeals of Longmeadow, 371 Mass. 147, 155-156 (1976)(tennis club entity organized under G.L c. 180 qualified as not for profit where owners of land "received no profit on any count from the operation of the clubs other than payment of rent under leases…").

willing buyer would pay to a hypothetical willing seller for the premises.  See Elliot

Supplemental Report, pp. 19-28 (attached hereto as **Exhibit 1**).

The Town now seeks to bar the comparable sales data used by Elliott to arrive at the

valuation of the highest and best use of the Premises.  The Town argues that the comparable

sales were not reasonable because they were based on sales of only three memberships at a *for*-

profit beach club, and because there is a purported lack of a market for non-profit beach clubs.

The Town's argument is flawed for several reasons, and thus there is no legitimate basis for

excluding the beach club comparable sales at trial.

First, as a matter of law, the presentation of evidence as to the valuation of specialized

uses of property, such as the proposed beach club use, are allowed greater flexibility since they

often have a very inactive market and the exclusion of the somewhat limited available evidence

would have the effect of denying the owner the opportunity to establish the real value of the

property.   In eminent domain cases, "[t]he general rule is that the measure of damages is the fair

market value of the property actually taken at the time of the taking."  Newton Girl Scout

Council, Inc. v. Massachusetts Turnpike Auth., 335 Mass. 189, 193 (1956) (citations omitted).

"In determining fair market value, the effort is to determine 'the highest price which a

hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and

open market.'  [citation omitted] All the uses to which the property is reasonably adapted may be

considered."  Id. at 193-94 (citations omitted).  Specialized uses of property can be considered.

See id. at 194.  See also Tigar v. Mystic River Bridge Auth., 329 Mass. 514, 519 (1952) ("the

admissibility of testimony to show value for a special purpose may be to some extent a matter in

the discretion of the trial judge").

In cases where the Plaintiff argues that a property should be valued as adapted for a specialized use,

> It is not to be expected that the properties adapted for such a specialized use will have a very active market or that their market value can be shown by sales of nearby comparable property.  Once developed, such properties are rarely abandoned or sold.  To assist the trier of fact of value to reach a just result when such a property is taken by eminent domain, it frequently will be necessary to allow much greater flexibility in the presentation of the evidence that would be necessary in the case of properties having more conventional uses.

Newton Girl Scout Council, Inc., 335 Mass. at 194.  Although a judge has considerable discretion with respect to the admissibility of evidence of value of specialized uses, "the effect of . . . consistent exclusion of evidence bearing on the specialized value of the property [will be] 'to deny to the owner the power of proving the real value of that property.'"  Id. at 198.  While evidence of details of a particular unexecuted project may be excluded at trial, "evidence about the contribution to the then existing market value caused by the possibility of using the property in connection with [a beach]" would be admissible.  Southwick v. Massachusetts Turnpike Auth., 339 Mass. 666, 670 (1959).  Thus, if the reasons for an opinion of value "could be shown on cross-examination (a) to be unconvincing, or (b) to result in an over-estimate of the value of the property or of the feasibility of restoring [a degraded portion of the property],[3] or (c) to be based on faulty analysis or inadequate investigation, these matters would go only to the weight of the testimony.  They would not justify excluding the petitioner's testimony and reasons entirely." Southwick, 339 Mass. at 671. (emphasis added).

---

[3] In Southwick, the petitioner argued that the pond existing on the property taken by eminent domain could have been restored and used in conjunction with a fish and game association or some other club which could be valued. The petitioner also argued, in the alternative, that the property could have been developed into camp sites.  339 Mass. at 667-68.  The Massachusetts Supreme Judicial Court held that the petitioner was entitled to bring out the relevant facts if he "reasonably thought that a purchaser would pay more for the property because of the possibility of restoring the pond at low cost and because of the adaptability of it for camp sites [because] that was a question of judgment."  Id. at 670.

Secondly, as evidenced by Elliott's expert report, Elliott, did, in fact, locate three highly comparable sales for memberships that were sold at the Bowerman's Beach Club in Falmouth, Massachusetts. The property consists of 8.23 acres set with rolling sand dunes with good privacy with 157 storage units set within a wood framed single story building. Bowerman's Beach Club is located across on the easterly side of Buzzards Bay and consistent with the location of the proposed beach club site at the northerly end of Buzzards Bay. The Bowerman's Beach Club site is of a similar though slightly larger size, located on 8.23 acres as opposed to the 5.35 acre Wareham site. Three contemporaneous sales of membership units were described in the Elliot Report as follows:

*Recent Sales of Condominium Units from the*
*Bowerman's Beach Club in Falmouth, Massachusetts*

Location of Bowerman's Beach Club Condominium property:
140 Chapoquoit Road, Falmouth

| Condominium Unit No. | Date of Sale | Purchase Price |
|---|---|---|
| 125 | August 16, 2002 | $20,000.00 |
| 105 | October 9, 2002 | $22,000.00 |
| 55 | December 10, 2003 | $25,000.00 |

Based upon the larger land area, superior location and better facilities, Elliot made downward adjustments to a per membership value of $15,000 without a beach club building and $18,000 with a beach club building. The Town's attempt to create the illusion that Elliott did not find any comparable sales (see p. 2 of Town's motion) is misleading and relies on portions of the deposition transcript which are taken out of context.[4] This is further reflected in the testimony given by Elliott at his deposition:

---

[4] To the extent that the Town argues that the Plaintiff herself also stated that there were no exact comparables for beach club use, the Trust points out the obvious that the Plaintiff is not the expert who was retained by the Trust in this regard, and therefore her testimony on the issue of comparable sales is not to be given any unnecessary weight.

Q [Attorney Bowen]: Referring back to Page 6 of your report.  In the middle of the page, you write, as described in my original report, the alternative development concept for the premises would be as a non-profit recreational beach club for 250 available memberships valued at 15 thousand dollars per membership.  How did you come up with the number of 15 thousand?

A [Elliott]: Based on the comparable sales that we developed in our search of the market.  Placing primary weight on the sales at the facility in Falmouth

…

Q: What type of comparable properties did you tell [Wayne Valliere] to look for?

A:  Well in beach club facility I asked if he could find beach club sales, any beach club sales.  I know that the plaintiff had provided a list of what she thought were comparable properties so we started with that list, and then expanded it because as it turned out there were virtually no sales of beach club properties available.

Elliott Depo. Trans. at 42, 53-54 (attached hereto as **Exhibit 2**). <u>See</u> <u>also</u> Supp. Elliott Expert Report at 23 (indicating that "The reason that Bowerman's Beach Club is the only beach club that is viable as a comparable is that of those considered, Bowerman's Beach Club had the only transfers of record.").  Furthermore, Elliott did not testify that there was no comparable information that was available to analyze the feasibility of developing the Premises as a non-profit beach club.  A careful reading of Elliott's deposition testimony indicates that he stated that there simply were no sales of record to or by a non-profit entity:

Q [Attorney Bowen]: Were there any sales of beach club properties either by or to non-profit corporations?

A [Elliott]: We found none.

Elliott Depo. Trans. at 54.  While the low number of comparable sales of record may not be ideal, it is not a bar to admitting such testimony at trial, particularly where the use is a specialized one such as a beach club, and this Court should allow for flexibility in the types of comparables that are used at trial.  <u>See</u> <u>Newton Girl Scout Council</u>, 335 Mass. at 194.  To the extent that Elliott's comparables may be based on what the Town would assert to be faulty investigation or the result of an overestimate of value (which the Trust disputes), these types of

inquiries go to the weight and credibility of Elliott's testimony and are best left to scrutiny upon cross-examination at trial. See Southwick, 339 Mass. at 671.

Third, the Town's assertion that the for-profit sales at Bowerman's Beach Club are too dissimilar to warrant their admission at trial as evidence of the value of a non-profit membership at the Wareham site is utterly conclusory and unsupported by any evidence of any kind. In fact, whether there is any legitimate basis for not using for-profit beach club membership sales as an indicator of value for non-profit beach club memberships requires the expertise of those individuals—the real estate appraisers—who make these types of comparisons and render opinions of value on a regular basis. It should not be left the pure rhetoric and speculation of the Town's attorneys. Yet, as evidenced by the expert report and deposition testimony of the Town's real estate appraiser, Richard Dennis, Sr., the Town's expert has never stated there is no comparability between for-profit and non-profit beach clubs in this regard. In fact, Mr. Dennis has offered no opinion of any kind regarding the value of the beach club use, has not commented in any way regarding how such a use should be valued nor commented or criticized Elliot's approach to or valuation of the beach club use. In fact, it is not even clear what the Town means in calling Bowerman's Beach Club a for profit sale. The non-profit nature of the use in Wareham relates to profit from the operation of the club, not the sale of membership unit interests in real estate. In that regard, there is no difference between the properties.

The Town's real estate appraiser was well aware of Elliott's use of for-profit beach club comparable sales by the time he rendered his expert opinion and testified at deposition, yet he failed to ever opine—either through a supplemental expert report or an affidavit in support of the Town's present motion—that there is no basis for comparing for-profit and non-profit beach club membership sales. In fact, Dennis has only stated that the beach club use is not the highest and

7

best use of the Premises based on purported parking limitations as well and the cost to construct and operate a beach club.

Dennis has never stated that Elliott's use of for-profit comparable sales was inappropriate, nor has he ever stated that there is a meaningful difference between the value of land which may be used as a for-profit beach club instead of a non-profit beach club. Indeed, the physical features of the land itself as well as the improvements that could be located thereon are the only factors that have played into either real estate experts' opinion of value, no matter what the underlying use. Elliott testified in his deposition that the only differences between the Bowerman's Beach Club and the beach club proposed by the Trust are the "location, parking and the amenity package". See Elliott Depo. Trans. at 44. In that regard, Elliott made appropriate adjustments to the value of the Bowerman's Beach Club sales before assigning a value to the Trust's proposed use. See Elliott Depo. Trans. at 42-46. Thus, there is no basis for the Town's argument that these sales should be excluded on the basis that they are somehow too different to be an indicator of value.

II.    The Existence of a Market For Non-Profit Beach Clubs and the Likelihood That A Developer Would Purchase the Premises To Develop A Beach Club Are Matters To Be Considered By the Jury.

The Town argues that the Trust has failed to produce any evidence that there is either a market for non-profit beach clubs or evidence that a developer who would risk investing funds to develop such a beach club, and therefore the use of beach club comparable sales should be barred at trial. See Town's Motion, p. 3. Once again, Town misleads the Court with partial references to the record and baseless arguments. First, prior to the completion of the Elliot Report, the Trust retained Clarke Communications Group and Michael Mroz of Endeavor Associates of Boston to undertake a marketing study of the proposed beach club use entitled

Wankinco Beach Club Association Market Plan ("Market Plan").  See Elliott Expert Report

Exhibit E (Wankinco Beach Club Association Market Plan prepared by Clarke Communications

Group).[5]  This study was used by Elliot in developing and rendering his opinion of the fair

market value of the beach club use.  Indeed, Elliott's report clearly states that part of his basis for

considering the beach club use is that the Market Plan "indicates a strong demand for a beach

club facility in Wareham, given its location north of the Cape Cod Canal and the fact that users

would not be committed to having to go over the canal onto the Cape, which is becoming

saturated, on a capacity basis according to the study."  Elliott Supp. Expert Report at 22-23.

Elliott further states in his report that with the Premises being "[l]ocated on Buzzards Bay and

sharing the Bay with Cape communities such as Bourne and Falmouth, a beach club on Swifts

Beach would offer the attractions of a private beachfront property on warm water bay and Cape

Cod beaches without the crowding and demands of Cape Cod."  Elliott Expert Report at 23.

Thus, it is simply inconceivable how the Town can argue in its motion in limine that "there is no

evidence that there is a market for a non-profit beach club".  Notably, the Town's own real estate

expert failed to opine about the marketability of a beach club use on the Premises and the

Town's counsel could have, but did not, probe the expert witness during his deposition about the

relevance of the Market Plan.  At any rate, as the case law makes clear, even the lack of an active

market does not bar evidence of a proposed use.  Newton Girl Scout Council, Inc., 335 Mass. at

194.

      Second, the inducement or incentive that a third party developer would have to acquire

the Premises as the site for a non-profit beach club is documented in the Elliot Report by the

allocation of a 15% return on investment totaling $675,000 upon the sale of the property to the

---

[5] To the extent that the Court would like to review a copy, the Market Plan will be provided at the hearing on March 8, 2007.

non-profit entity that would operate the site.  As part of the appraisal process for these purely

hypothetical uses, Elliot opined that it is customary to allocate an entrepreneurial profit of

between 10 and 20 percent, depending on the absorption rate for units.  Given the strong demand

for beachfront property, and the large number of memberships, Elliot used a 15% figure since the

absorption rate was projected at 18 to 36 months.  See Elliot Supplemental Report, p. 26.

Furthermore, the Trust is not required to show that there is an actual buyer—in the form of a

non-profit developer or non-profit entity that would develop or operate a beach club—waiting in

the wings to purchase the Premises for the use proposed by the Trust.  Indeed, the test for fair

market value is the "'highest price which a <u>hypothetical</u> willing buyer would pay to a

<u>hypothetical</u> willing seller in an assumed free and open market.'"  <u>Newton Girl Scout Council</u>,

335 Mass. at 193 (citations omitted) (emphasis added).  In cases, such as this one, where the

property is to be valued with a specialized use that does not have an active market, there is

greater flexibility that is allowed in presentation of valuation evidence that is otherwise seen with

conventional uses.  See <u>id.</u> at 194.

> Where the property is not commonly bought or sold, to confine the owner to the
> testimony of witnesses who could testify as to its value by their knowledge of sales of
> similar property would deprive him of the right to show its true value. In such a case, 'it
> is proper to allow testimony to be given of its value for the specified purpose for which it
> is used…'

<u>Tigar v. Mystic River Bridge Auth.</u>, 329 Mass. 514, 518 (1952).  Provided that the highest and

best use is a lawful one, it is up to the jury (and not this Court) to consider whether there should

be discounts for the likelihood of a particular use being realized or the use's futurity.  See

<u>Skyline Homes, Inc. v. Commonwealth</u>, 362 Mass. 684, 686 (1972).

Where, unlike the Town, the Trust has gathered evidence that there is a market for a

nonprofit beach club use in Wareham, the Trust should be allowed to introduce evidence of the

comparable beach club sales at trial. The Town has not disputed Elliott's qualifications to value the beach club use proposed by the Trust. Instead, the Town merely relies on the argument that because the Trust has not shown past comparable sales involving a nonprofit entity, the comparable sales of Bowerman's Beach Club in Falmouth cannot be used by Elliott to determine the value of the beach club proposed as the highest and best use. As indicated by the cases above, this is not the proper test, particularly where specialized uses of property are at issue. The lack of comparable data[6] does not render the proposed highest and best use invalid. To that end, the Trust should be allowed to present all of its evidence on the comparable beach sales at trial, and the jury should be allowed to consider the weight of such evidence in light of any cross-examination that the Town may undertake.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendants' Motion in Limine Exclude Any and All Evidence and Testimony of Plaintiff's Proposed Use of the Property as a Beach Club and Any Alleged Comparable Beach Club Properties Relied Upon by the Plaintiff, and allow the Trust to introduce the comparable sales information used by Elliott as evidence at trial.

---

[6] As a general matter, the Trust disputes the Town's characterization that the data used by Elliott is not comparable. Based on the adjustments made by Elliott for location, amenities and size, the data is rendered comparable. That the underlying entity operating the Bowerman's Beach Club is a for-profit entity has not been adequately shown by the Town to be relevant when determining the credibility of comparable sales data.

<table>
<tr><td></td><td>Plaintiff,<br>BARBARA DEIGHTON HAUPT, Trustee<br>of BD REALTY TRUST,</td></tr>
<tr><td>Date:   3/6/2007</td><td>By her attorneys,</td></tr>
</table>

   _/s/ Kristen M. Ploetz_____

Jeffrey T. Angley, Esq.
B.B.O. #543958
Kristen M. Ploetz, Esq.
B.B.O. #654549
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
(617) 367-8787


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 6th day of March, 2007.

      /S/ Kristen M. Ploetz_____
Kristen M. Ploetz, Esq.


L:\Ditn002\Motions in limine\opp.beach.club.JTA.doc

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11745RWZ

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee<br>of BD Realty Trust,<br>　　　　　　　　Plaintiff<br>v.<br><br>THE TOWN OF WAREHAM acting by<br>And through the BOARD OF<br>SELECTMEN OF THE TOWN OF<br>WAREHAM, and the BOARD OF<br>SELECTMEN OF THE TOWN OF<br>WAREHAM,<br>　　　　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## SUPPLEMENTAL EXPERT REPORT OF STEVEN G. ELLIOTT, SRA, MRA REAL ESTATE APPRAISER

**I .**　　　**Witness**

Steven G. Elliott, SRA, MRA
Elliott, Gottschalk & Associates
78 Thomas Street
Ashland, MA 01721

**II.**　　　**Introduction**

This supplemental report and opinions expressed herein are submitted by Steven G.

Elliott of Elliott, Gottschalk & Associates, on behalf of the Plaintiff, Barbara Deighton Haupt,

Trustee of BD Realty Trust, in the above referenced matter.

This supplemental report is submitted in accordance with Fed. R. Civ. P. 26(a)(2) and

26(e), and is a supplement to the Expert Report of Steven G. Elliott, SRA,MRA Real Estate

1

Appraiser dated March 31, 2006 ("Original Report").  The basis for submitting this supplement report is the recently available information contained in the Supplement to Expert Report of Michael S. Giaimo, Esq. dated September 6, 2006 ("Supplemental Giaimo Report"), the Defendant Town of Wareham's Response to Plaintiff's Request for Admissions, and the Expert Report of Richard Dennis, all of which have been made available to and reviewed by me, indicating that a structure can be built on the Premises (as described herein) in accordance with the Wareham Zoning By-Law Floodplain District regulations.   Based on this information, it has been necessary for me to assess the impact of a beach club building as an additional amenity of the proposed beach club use to determine whether such an amenity would alter the valuation of the beach club use.  In my opinion, such an amenity does alter my valuation.  As a result, I have revised my opinion as to the highest and best uses of the Premises as of the date of taking.

All exhibits referenced herein have been previously submitted with the Original Report, with the exception of the McKenzie Engineering C-3 plan attached hereto.

## III.    Witness Qualifications

A.    General Background

**EDUCATION:**    Providence College, Providence, RI,
Graduated 1974, *magna cum laude*, with a B.S. in Business
Management
Babson College, Wellesley, MA
Graduated 1977, with Distinction MBA Program

Postgraduation coursework includes: a number of appraisal and
banking courses have been completed, including the 101, 201 and
202. Courses offered by the Society of Real Estate Appraisers.
The R-2 Workshop and several chapter seminars, including
Multiple Regression Analysis and the Valuation of Leases have
also been attended. Courses I and II of the Mortgage Banker's
Association of America, Mortgage Banker's school have been
attended and completed with the highest passing grade possible.

**EXPERIENCE:**    On July 1, 1974, began work as Appraisal Trainee, under tutelage
of John D. Hewitt, MAI, SRPA, at the Boston Five Cents Savings
Bank. Promoted to staff appraiser in 1975 and Assistant Appraisal
Officer in 1977.

In February 1980, resigned from the bank to form a partnership
known as Elliott, Gottschalk and Associates, Real Estate
Appraising and Consulting. In September 1980, received the SRA
designation from SREA. In 1981, was named an Eastern Mass.
Chapter #51 Director of SREA for a 3 year term. In 1984, received
the MRA designation from the Mass. Board of Real Estate
Appraisers. In 1984 began instructing courses for both the SREA
and MBREA. In 1989-90 served as Vice President and
Admissions Chairman for Eastern Mass. Chapter #51.

From 1999-2001 served as Education Chairman for MBREA.
President of MBREA in 2004. Nationally approved instructor for
Appraisal Institute Courses Basic Appraisal Principles, Basic
Appraisal Procedures, Residential Market Analysis and Highest
and Best Use and 410, 420/430. Appraisal Foundation Certified
USPAP Instructor.

In the 30+ years of appraising, over 18,000 appraisals, including

3

residential, commercial and industrial properties have been completed for over 500 clients, including lenders, attorneys, municipalities and individuals.  Is also qualified as an expert witness in various courts in Massachusetts, Connecticut and Vermont.

**LICENSES**    Massachusetts Certified General Real Estate Appraiser License #295

B.    List of Publications Authored by Witness Within Last Ten (10) Years

Articles appearing in the *New England Real Estate Journal* as follows:

- May 14, 2004, *Most Important Principle is the Principle of Change*

- June 11, 2004, *The Changing Face of the Appraisal Profession: A few Important Issues*

- September 10, 2004, *All Indicators Pointing to Stability for the Beginning of 2005*

- October 29, 2004, *Looking Forward to This year's Appraisers' Expo*

- February 11, 2005, *If Rates Remain Low, the RE Market Should Still Percolate*

- June 10, 2005, *HR 1295; Appraisers Should Contact Legislators in Support*

C.    Compensation to be Paid to Witness for Analysis and Testimony

I am being compensated for my services on an hourly basis.  My hourly rate is billed at $175.00 per hour.  To date, I have billed BD Realty Trust for approximately $3,000 for services rendered to date.  In addition, BD Realty Trust has also paid a $2,000 retainer (which is exclusive of the services billed to date).

D.    Listing of Other Cases in Which Witness Has Testified as an Expert or by Deposition Within the Last Four (4) Years.

Cordaville Rd., River St., Southville Rd.
Southborough, MA
ROUSSEAU v MBTA

4

February 2005

Gates St., Framingham
TOWN OF FRAMINGHAM v MA TURNPIKE AUTHORITY
February 2005

48 N St., South Boston
DONOVAN v CARROLL
June 2005

45 Putting Drive, Westwood, MA and 95 Longwood Drive,
Grantham, NH
NICHOLAS v NICHOLAS
December 2004

1186 Worcester Rd., Framingham
DHARA INC v TOWN OF FRAMINGHAM
September 2004

6 Mary Helen Way, Rockport
COOK v COOK
February 2004

59 Fountain St., Framingham
BANCROFT FOUNTAIN REALTY LLC v TOWN OF FRAMINGHAM
November 2003

720 Stevens St., Marlborough
FLYNN v FLYNN
October 2003

25 Forty-five West Street, Beverly
FRIEDMAN v FRIEDMAN
September 2003

29 Rice Road, Wayland
MAGLIONE v TOWN OF WAYLAND
September 2003

179 Sidney Street, Cambridge
SORKOW v GROSSMAN
August 2003

48 Maugus Avenue, Wellesley
O'CONNOR v O'CONNOR
February 2003

303 Grove St., Westwood
HENNESSEY v SARKIS
2001

## IV.    Statement of Opinions

### A.    Summary of Opinions

As a result of my inspection of the subject site, investigation, review of site and proposed development plans provided by others and analysis, it is my opinion that the Premises can be developed as a forty (40) unit residential condominium project developed pursuant to M.G.L. c. 40B. My opinion as to the value of the Premises with the 40B project is $3,000,000.00.

It is also my opinion that an alternative development scenario exists for the Premises which yields a measure of value similar but higher in value than the 40B project. As described in my Original Report, the alternative development concept for the Premises would be as a non-profit, recreational beach club with 250 available memberships valued at $15,000.00 per membership. At the time I rendered my Original Report it was my understanding that a clubhouse facility might not be lawfully constructed to support the beach club use. Taking into account all appropriate discounts and deductions as discussed herein, my opinion as to the value of the Premises with the beach club use without an amenities structure is $2,812,500.00, rounded to $2,800,000.00.

However, in light of the information presently available to me as described in Section II above, it is my opinion that the beach club use described, if lawfully enhanced with a permanent two-story structure ("clubhouse") that contains amenities such as individual storage lockers,

6

changing facilities, bathrooms, showers, food storage and seating areas, increases the value of memberships by 20%, or $18,000.00 per membership. Taking into account all appropriate discounts and deductions as discussed herein, my opinion as to the value of the Premises with the beach club use with a clubhouse is $3,125,000.

Thus, as described herein, the highest and best use of the Premises as of the date of taking would be a 250 membership non-profit, recreational beach club with clubhouse facility.

B.      Complete Statement of Opinions and Basis and Reasons Therefor

1.      Background as to Why I Was Retained

In August 2005, I was retained by the law firm of Phillips & Angley on behalf of the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), to determine the value of the highest and best use of a 5.35 acre waterfront parcel of land located off of Swifts Beach Road in Wareham, Massachusetts ("the Premises"), and to render a report in accordance therewith. I was retained to provide a report expressing my opinions as to value of the highest and best use of the Premises at the time the Town of Wareham took it by eminent domain in December 2003.

Specifically, the scope of the services I was retained to provide included the following:

    1.      review existing background information about the Premises;

    2.      conduct a site inspection of the Premises;

    3.      render a written report of opinions regarding my findings; and

    4.      testify at trial.

2.      Data and Information Which Form the Basis of My Opinions

7

Upon being retained, I reviewed several documents in order to obtain background information about the Premises prior to my conducting a visual site inspection. Specifically, I reviewed the following documents:

- "Plan Accompanying Abbreviated Notice of Resource Area Delineation on Land in Wareham, MA prepared for Glick Realty Corporation", drawn by Thompson Surveying & Engineering, Inc., dated May 4, 2000 and revised through June 19, 2000 ("ANRAD Plan");

- "Plan of Land in Wareham, Mass. Prepared for BD Realty Trust", drawn by Vautrinot Land Surveying, Inc., dated May 7, 2001 and revised through March 28, 2003 ("Vautrinot Plan");

- Deed conveying title to the Premises to BD Realty Trust, See **Exhibit A** attached hereto;

- Order of Taking recorded by the Town of Wareham on December 31, 2003;

- Various historical photographs of the Premises, including an aerial photograph from the 1950s;

- Land Court Subdivision Plan 12124D, Sheet 1, dated June 30, 1938, See **Exhibit B** attached hereto ("1938 Land Court Plan");

- Superceding Order of Conditions issued by the Department of Environmental Protection for the Premises in Case No. SE 76-1380; and

- Architectural rendering of Wankinko Beach Club dated September 21, 2003, See **Exhibit C** attached hereto.

After reviewing the foregoing documents, Mr. Wayne Valliere and I conducted a site visit of the Premises on March 4, 2005. Subsequent to our site visit, additional research was also undertaken as described herein.

3.    Analysis and Conclusions

Based on my review of the above-noted materials and my site visit, I have formed an opinion as to the value of the highest and best uses of the Premises on or about December 31, 2003, the date that the taking occurred.

a.    Introduction

As stated above, on March 4, 2005, Wayne Valliere and I inspected the property known as Swift's Beach Road, Wareham, Plymouth County, Massachusetts, for the purpose of estimating the market value of the property as of December 31, 2003, which was the date of the taking of the land by the Town of Wareham. The property has been appraised according to USPAP principles. The marketing time is estimated to be less than one year, therefore, no estimate of Fair Value is necessary. The date of valuation is the date of the taking. The following is a Summary Appraisal Report, whereby the Departure Rule has not been invoked. We certify that we have personally inspected the property, that we have no present, future or contemplated interest in the property and that our compensation is not based on any stated or preconceived value. As a result of our inspection, investigation and analysis, we are of the opinion that the highest and best uses of the Premises is as follows: a 250-membership non-profit recreational beach club with clubhouse facility which would have a value of **$3,125,000.00**. An alternative use, of slightly lower value, would be a residential condominium project under Mass. Gen. L. c. 40B, which has a market value of **$3,000,000.00**. The following report includes the assumptions, investigation and analysis necessary to arrive at the final estimate of value.

b.    The Appraisal Process

9

i.    Scope of Appraisal Process

In order to perform a complete appraisal process, the information and data collected and

considered includes the following:

- identify and inspect the Premises;

- review the Expert Report of Lenore White, Wetlands Scientist, dated March 29, 2006, and the analysis and opinions set forth therein as to the wetland resource areas on the Premises;

- review the zoning regulations;

- review the Expert Report of Michael S. Giaimo, Esq., dated March 29, 2006, and the analysis and opinions set forth therein as to the zoning regulations applicable to the Premises;

- review the Expert Report of Bradley C. McKenzie, P.E., Civil Engineer, dated March 29, 2006, and the analysis and opinions set forth therein as to the permissible uses of the Premises;

- review the Supplement to Expert Report of Michael S. Giaimo, Esq. dated September 6, 2006, and the analysis and opinions set forth therein as to the zoning regulations applicable to the Premises;

- review the Expert Report of Richard J. Dennis, Sr., MAI, SRA, MRA dated June 29, 2006, and the analysis and opinions set forth therein;

- review of plan entitled "Alternative No. 2 Conceptual Beach "Clubhouse" Building" (drawing C-3), prepared by McKenzie Engineering Group, Inc.;

- review the Defendant Town of Wareham's Responses to Plaintiff's Request for Admissions;

- applicable information regarding the subject, area, general area and all relevant comparable data;

- current market conditions and trends affecting Premises;

- highest and best use analysis and opinion as to the highest and best use of the property;

- appropriate informational sources including municipal offices, Deed Registries, cost,

10

rental and sales data publications, as well as parties related to transactions considered to be applicable to the development of a value estimate; and

- the three approaches to value to the extent they are applicable, fully develop those approaches that are applicable and explain and justify the exclusion of any approaches.

The extent of the scope is based on what is typical for the property under appraisement as judged by users of appraisal services and the actions of other competent appraisers performing the same assignment.

ii.    Appraisal Development and Reporting Process

This is a Complete Summary Appraisal Report, which is intended to comply with the reporting requirements set forth under Standard Rule 2 of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it represents the discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of the value.[1] To develop the opinion of value, the appraiser performed a complete appraisal process, as defined by the Uniform Standards of Professional Appraisal Practice. This means that no departures from Standard 1 were invoked.

The appraiser is not responsible for the unauthorized use of this report.

iii.    Definition of Value and Interest Appraised

According to the text Real Estate Appraisal Terminology, published by the Appraisal

---

1 This report is not a Complete Self Contained Report under USPAP as this Report is premised, in part, on the Expert Reports of Lenore White of Wetland Strategies, Inc,. Michael Giaimo Esq. of Robinson & Cole, LLP and Bradley McKenzie of McKenzie Engineering Group, Inc., Supplement to Expert Report of Michael Giaimo, Esq., and Supplement to Expert Report of Lenore White of Wetland Strategies, Inc., Supplement to Expert Report of Bradley McKenzie of McKenzie Engineering and McKenzie Engineering C-3 drawings/plans titled "Alternative No. 2 Conceptual Beach "Clubhouse" Building" which are not attached to nor made part of this Report (except C-3 drawing). Nevertheless, each of those reports is a fundamental foundation for the opinions of value expressed herein, especially as to the physical possibility, legal permissibility, and financial feasibility of the uses so valued. This Report does contain the complete data, reasoning and analyses for the determination of highest, best and most profitable uses of the property and the market values expressed in this Report.

11

Institute, the applicable terms are defined as follows:

*Market Value*

The most probable price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  buyer and seller are typically motivated;

2.  both parties are well informed or well advised, and each acting in what he considers his own best interest;

3.  a reasonable time is allowed for exposure in the open market;

4.  payment is made in cash or its equivalent;

5.  financing, if any, is on terms generally available in the community at the specified date and typical for the property in its locale; and

6.  the price represents a normal consideration for the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or credits incurred in the transaction.

*Fee Simple Interest*

An absolute fee; a fee without limitations to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, police power, taxation and escheat. An inheritable estate.

c.  Description of the Premises and Town of Wareham

i.  Site Description - Summary

12

The subject property consists of a 5.35 acre parcel of land located at the corner of Swift's Beach Road, Wankinco Avenue and Atwood Avenue, in Wareham, Plymouth County, Massachusetts. The land is identified by the town on Map 50B, Block 2, Parcel B1 of the Wareham Assessors Maps.  Record title information is found in the Plymouth Registry of Deeds, Plymouth, Massachusetts, Book 18845, Page 224.

ii.     Site Description – Full

The subject site is located at 200 Swifts Beach Road, Wareham.  The lot has 233,046 square feet, or 5.35 acres of land.  There is 305 feet of linear road frontage on Swifts Beach Road running north and south. The property then runs east by northeast for several courses along Wankinco Avenue and an unnamed Way, 108.52' x 37.72' x 239.24' x 74.36' x 38.91'. The property then turns southeast along an existing drainage ditch for 466' +/- to the Wareham River. The property line then turns west and runs along the coastline to a lot of land now or formerly owned by George Papageorge and the Town of Wareham, turning north for 170', turning west for 100', and turning south for 172' back to the Wareham River where it turns west and follows the coast back to Swifts Beach Road.

The site is mostly level and sandy with beach grass growing in places. Other sections are devoid of any plantings or vegetation.  Subsequent to my site inspection in March 2005, current resources areas under the Wetlands Protection Act have been delineated by Wetland Strategies, Inc. (WSI) and depicted on a plan entitled "Existing Conditions Plan", dated March 28, 2006, drawn by McKenzie Engineering Group, Inc. WSI has also rendered an opinion of the scope of the resource areas existing on the Premises as of the date of taking and the capacity of the site to

13

sustain the uses valued in this Report from an environmental permitting perspective. The site has an existing concrete pad in the northeast area. There is a utility pole near the pad with what appears to be water faucets. This area used to have some form of building on it and this pole and the water faucets were seemingly part of that building. The subject is located within a FEMA flood zone, which according to the surveyor, is Firm Community Panel 255223 0007D, Zone VE. This is common and typical for the area and surrounding newly constructed homes are elevated on concrete platforms.

There is an existing right of way serving the lots owned by the Town of Wareham and now or formerly owned by George Papageorge. This right of way acts as a driveway for both of these properties as well as the upper northwest area of the subject. The Premises historically has been used as a parking lot during the summer months for beach goers. The parking area appears to consist of hard packed sand with no growing vegetation.

    iii.    <u>History of the Premises</u>

The current property owner is the Town of Wareham, which acquired the property via a taking on December 31, 2003. Prior to the taking, the property was owned by Barbara Deighton Haupt, Trustee of BD Realty Trust under Declaration of Trust dated September 9, 1997and recorded with the Plymouth County Registry of Deeds, Book 15487, Page 245. The property was acquired from Swift's Beach Trust, Philip Shwachman, Trustee on August 31, 2000, with consideration shown of $225,000. The deed reference is Book 18845, Page 224 in the Plymouth County Registry of Deeds. The taking by the Town was for a reported $450,000.

    iv.    <u>Area Analysis</u>

The Town of Wareham is located in southeastern Massachusetts in the southeastern section of Plymouth County. During the decade 1990 to 2000 the population of Wareham increased by 1,103, or 5%.

**Census analysis 1990 to 2003:**

| 1990 | 2000 | 2003 |
|------|------|------|
| 19,232 | 20,335 | 21,090 |

The federal census is taken on even years. 2003 analysis is estimated.

Wareham is one of 27 incorporated communities located within the southeastern area of Plymouth County. Wareham has a land area of 36.68 square miles and a population of 20,335 per the 2000 census giving it a density of 554.39 people per square mile. It is bordered by the Towns of Middleborough, Carver, and Plymouth to the north, the Towns of Plymouth and Bourne to the East, the Town of Marion to the south, and the Towns of Rochester and Marion to the west. Wareham is approximately 20 miles east of New Bedford, 50 miles south of Boston, and 122 miles from New York City. Principle highways serving the town are Interstate Route 95 and 495. Local state highways include route 6, 25 and 28.

Public utilities are provided by NStar Electric and Gas Company, Inc., a privately owned corporation regulated by the Commonwealth of Massachusetts. The Town of Wareham provides sewer and water to the town from ground water sources. Rates for electric and gas services appear higher than average.

There are various routes of access both to and from the town of Wareham. While there is no passenger rail in the town itself, bus service to neighboring cities and towns are available. The MBTA is available in the neighboring city of Lakeville. Local roads and highways are considered

good, meeting the requirements of modern transportation. Commuter rail service is provided by the MBTA in adjacent Lakeville and long distance passenger service on AMTRAK is available in Boston.

Wareham has over 54 miles of coastline enhanced by beaches, estuaries, rivers, and ponds. From its beginnings Wareham was a mix of agricultural and industrial economies. Wareham has diversified into an industrial, commercial, and residential area with ample human and natural resources to support the growth. Current commercial growth continues on Route 6 and in the Industrial Park off of Interstate 195.

Wareham was originally a manufacturing town but also dabbled in shipbuilding and whaling. The town's swamplands were rich with iron ore, and manufacturing cut nails began in 1822 at the site of today's Tremont Nail Company, the oldest cut nail factory still in operation.

At the same time Wareham was establishing itself as a major grower of cranberries. Long before they were cultivated, cranberries grew wild in the area and were used as a food source, for medicinal purposes and as dyes. Since 1864, cranberry bogs have been commercially cultivated in Wareham.

Wareham's rural sections branch out from the town's center. The section known as Onset boasts vacation homes, shops, restaurants and beaches, all within walking distance of each other; there are also sailboats and fishing charters on its bay. In the summer the center of Onset offers outdoor concerts and events, and there are also tennis courts, a public park and golf nearby. Onset is a thriving summer retreat for both local residents and those from across the U.S. and has become more popular as visitors find they can enjoy the same beauty and cool waters as Onset's

more crowded neighbor, Cape Cod.

Wareham is growing commercially. One of the largest recent projects in Wareham is construction of a 56,000-square-foot Shaw's supermarket.   The only other full-service grocery stores operating between New Bedford and Cape Cod are in Fairhaven along Route 6 and on Cranberry Highway in East Wareham.   Additional commercial development is also proposed on 75 acres in West Wareham located just south of Route 28 and west of Interstate 195. The complex could comprise 30 to 40 retail stores and as many as four restaurants. In keeping with the aesthetics of Wareham, models of the plaza attempt to create a village environment, with sidewalks lined with park benches and trees.

Open space continues to be important to residents. The Wareham Fire District was recently awarded a state grant for $160,500 to help purchase and preserve 29 acres of undeveloped land off Charge Pond Road.

A popular pastime is watching the Wareham Gatemen, a local team of the Cape Cod Baseball League, at Spillane Field. Also popular is golf and tennis at the Bay Pointe Country Club or fishing on Blackmore Pond. Wareham also boasts several beaches and playgrounds.

Wareham remains one of the most affordable south shore communities in home prices, second only to New Bedford. Most recently, the Wareham Community & Economic Development Authority hopes to convert vacant, second-story units in Wareham center or Onset Village to affordable housing. The number of affordable apartments in town would increase under a program that provides funding for property owners to renovate structures for conversion to rental units.

v.    Market Area Analysis

The subject neighborhood is bordered to the north and west by Route 6, to the east by the Wareham River, and to the south by Buzzards Bay. Buzzards Bay is a warm water bay with maximum water temperatures during the summer of 71 . The shoreline is mostly smooth with sand and gravel beaches. There are a number of elongated bays and inlets. In 1998 Buzzards Bay was designated an Estuary of National Significance. The Bay is 28 miles long and averages 8 miles in width with an average depth of 36 feet and an area of approximately 228 square miles.

The Swifts Beach area was originally developed as a summer camp area in the late 1800s. Small cottages were built and used for summer homes in close proximity to beach recreation. In the 1960s the cottages started to undergo renovation and were made year round homes. To keep up with the influx of year round residents the Town of Wareham ran water and sewer lines to the area. The area continued to grow to become a year round neighborhood that saw new building in the 1970s through to the present. Today the neighborhood is 95% developed with primarily single family homes. Styles vary from the very small modest cottage to the larger more refined modern contemporaries. Neighborhood services include school buses provided by the Town for all schools. Shopping is located 1.5 miles northeast in downtown Wareham and 3.5 miles northeast on Route 6 in East Wareham. Local fire and police services are available within 1.5 miles from the subject neighborhood. Public transportation is 1.5 miles north on Route 6.

vi.    Zoning Data

The Premises are located in a residential district R-30 that requires 30,000 square feet of land with 150' of frontage for single family and 45,000 square feet and 200' frontage for duplex

structures/uses. Front, side and rear setbacks are 20', 10' and 5' and the maximum height is 35'.
The Premises has 305 feet of frontage on the road as well as 233,046 square feet of land area,
which conforms to current zoning. The Premises has approximately 660 feet of beach frontage.

     d.     Valuation of Highest and Best Use of the Premises

     i.     Highest and Best Use

From the text of Real Estate Appraisal Terminology, published by the Appraisal Institute,
the definition of Highest and Best Use is as follows:

> That reasonable and probable use that will support the highest present value, as defined,
> as of the effective date of the appraisal. Alternatively, that use from among reasonable,
> probable, legal alternative uses, found to be physically possible, appropriately supported,
> financially feasible, and which results in highest land value.[2]

Given the above definition, the appraiser has considered the property in terms of its
location, zoning, land use and improvements, if any. In addition, the area, neighborhood and
local market have also been considered. The highest and best use analysis calls for valuing the
property as though the land were vacant and also with the property improved if that is the case.

     ii.     Valuation Process

In estimating the value of the subject property, the appraiser has considered the three
approaches to value to the extent they are applicable. The style, type, age and availability of data
will determine which approaches to value can be applied in a given situation.

The value estimate, by the **cost approach**, relies on separate value estimates for the land

---

2 An alternative consistent  definition is found in the Real Estate Appraisal 4th Edition, of the Appraisal Institute of
Chicago Illinois: "The reasonably probable and legal use of vacant land or an improved property, which is
physically possible, appropriately supported, financially feasible, and that results in the highest value. The four
criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility and
maximum productivity."

and improvements. The land is valued as though it were vacant and the improvements are valued on the basis of the reproduction cost new. If the improvements are aged, then depreciation must be calculated and subtracted from the cost new of the improvements. Once the depreciated cost new has been calculated, it is then added to the land value estimate in order to arrive at an indicated value for the subject by the cost approach.

The **sales comparison approach** relies on a comparative analysis of sales of similar properties. The more similar the property is to the subject, the more valuable the property is as an indicator of value. Differences between the sale and the subject property are adjusted out so that an indication of value can be generated. Usually, the more data available, the better the indicated value is by this approach.

The **income approach** involves an analysis of a property's ability to generate income. The ability of the property to generate future income requires the appraiser to analyze the present worth of the property's future income stream. The income of the property is defined as the gross potential income a property can generate, less the expenses which are typical for a property of this type. The remaining net income before debt service is capitalized at an overall rate in order to arrive at an indicated value by this approach.

The final step in arriving at a final indication of value is to reconcile whatever approaches have been applied on the basis of the weight or strength each approach commands in the marketplace. This reconciliation does not mean a simple averaging of the approaches; it means a careful analysis of the strengths and weaknesses of each approach in view of the other approaches available.

In arriving at a final value estimate, the appraiser has applied the sales comparison approach to value. No weight has been placed on the income approach to value, given the site is non-income producing. No weight has been placed on the cost approach due to the fact there are no improvements on the site.

### iii.   Value of Opinion of Highest and Best Use of Premises.

At the time of taking, the property was used as a commercial pay-to-park beach open to the public during the summer season, which seasonal use dates back to the 1950's by report and supported by photographic and physical evidence at the site. The Trustee, Ms. Haupt had begun the design and development of a private beach club concept known as the Wankinko Beach Club and this appraiser has reviewed the architectural renderings prepared for that future planned use. Also, at the time of taking, the Trustee, Ms. Haupt, had obtained a permit from the Massachusetts Department of Environmental Protection to locate a 6000 square foot two story duplex building on the site, though the Town of Wareham had appealed the permit to an adjudicatory hearing at the DEP. When first retained, we were asked to value the property as a duplex lot and then to value the duplex use with an adjoining beach club use. As time progressed, different alternatives were proposed in terms of allowable uses to the site that would maximize its value in the marketplace and would better account for the legally permissible and physically possible prospects for the property. After many meetings and discussions it was determined that from among all of the various potential uses, there were two uses that appeared to be both allowable and capable of generating the highest return. The first use was a forty (40) unit residential condominium project developed as a 40B project. The second use was a 250-membership non-

21

profit, recreational beach club without a clubhouse facility. These are the two uses valued in the Original Report and are again described herein.

In light of recent information set forth in the Supplement to Expert Report of Michael S. Giaimo, Esq., the Expert Report of Richard J. Dennis, Sr. and the Town of Wareham's Responses to Plaintiff's Request for Admissions, it is now indicated that the Non-Profit Beach Club can be supported and enhanced in terms of appeal with the construction of a clubhouse facility on the Premises. The facility, based on the McKenzie Engineering drawing, is assumed to be a two story, 3,600 square foot facility with individual storage lockers, changing facilities, bathrooms, showers, food storage and seating areas.

The value of the land was substantially increased by the prospect of its development as a 40B project or as a private membership beach club. In particular, the environmental, zoning, civil engineering and land use professionals retained by the Trust analyzed these specific development proposals and how those proposals could be permitted and implemented. These proposals illustrate and support the enhanced value of the property based upon its development potential. According to two plans provided by McKenzie Engineering Group, which are dated March 28, 2006, the site has the capability of supporting a non-profit beach club with 125 parking spaces, or a two-building, 40 unit condominium complex, which would be allowed under Chapter 40B. The plan shows a 30 unit building and a 10 unit building. Based on the location of the property, its visibility, zoning and allowable uses, it is my opinion that the highest and best use of the Premises, as vacant, would be a 250-membership nonprofit recreational beach club with clubhouse facility.

*Sales Comparison Approach*

The underlying premise for the approach is the principle of substitution. The principle states that a willing buyer will substitute a like property at a lower price, providing there is similar utility and no unnecessary time delays in acquisition of said substitute. The method needed in applying this approach is for a study of the market to be conducted in order to locate sales of comparable properties. The sales must be verified and be on an arm's length transactional basis in order for them to be considered in the analysis. Once the sales have been located and verified, they are adjusted for any differences and then, specific units of comparison can be generated, i.e. price per square foot, price per acre, price per lot, etc.

*Beach Club Development*

Part of the reasoning and rationale for the beach club use is provided in a marketing study provided by Clarke Communication Group. See **Exhibit E** attached hereto. The Wankinco Beach Club Association Market Plan indicates a strong demand for a beach club facility in Wareham, given its location north of the Cape Cod Canal and the fact that users would not be committed to having to go over the canal onto the Cape, which is becoming saturated, on a capacity basis according to the study. Located on Buzzards Bay and sharing the Bay with Cape communities such as Bourne and Falmouth, a beach club on Swifts Beach would offer the attractions of a private beachfront property on warm water bay and Cape Cod beaches without the crowding and demands of Cape Cod.

The appraisers have studied the market for sales of condominium units or shares held in a beach club membership. The number of membership-only beach clubs in the area are limited.

During our initial research of the beach club market, Ms. Haupt indicated that she was aware of the following beach clubs in the area which might be used for comparability:

- Bowerman's Beach Club in Falmouth, Massachusetts

- Baker's Beach Club in Westport, Massachusetts

- Atlantic Avenue Beach Club in Westport, Massachusetts

- C K Beach Club, Inc. in Westport, Massachusetts

- Bonnet Shores Beach Club in Saunderstown, Rhode Island

Upon our review of the foregoing beach clubs, the Bowerman's Beach Club in Falmouth was the only comparable beach club to the one proposed for the Premises. The reason that Bowerman's Beach Club is the only beach club that is viable as a comparable is that of those considered, Bowerman's Beach Club had the only transfers of record.

Bowerman's Beach Club Condominium is located on Chapoquoit Road in West Falmouth on a peninsula that has Buzzards Bay on the west and West Falmouth Harbor on the east. It is on a long, slightly traveled dead end road with water frontage on Buzzards Bay. It consists of 8.23 acres, set within rolling sand dunes that affords very good privacy for the members, and boardwalks that allow members to walk through the dunes to the private beach area. There is one building which is one story in height which contains a total of 157 units that are numbered 1 through 157. The foundation is pine boards on cement block pilings. Exterior walls are of plywood covered with wood shingles. The roof is slightly pitched and covered with rolled asphalt. One parking space is assigned per unit. Across the road from the beach club is West Falmouth Harbor, a protected cove for boating, bathing, and fishing from the shore line.

Recent sales of condominium shares in the Bowerman's Beach Club are as follows:

### Recent Sales of Condominium Units from the
### Bowerman's Beach Club in Falmouth, Massachusetts

Location of Bowerman's Beach Club Condominium property:
140 Chapoquoit Road, Falmouth

| Condominium Unit No. | Date of Sale | Purchase Price |
| --- | --- | --- |
| 125 | August 16, 2002 | $20,000.00 |
| 105 | October 9, 2002 | $22,000.00 |
| 55 | December 10, 2003 | $25,000.00 |

See **Exhibit F** – Deeds of reference to sales.

The Original Report set forth a valuation of a beach club without a clubhouse facility as follows. Based on the site plan and zoning opinions, the Trust's Premises can support 125 parking spaces. Each parking space can support two ownership units resulting in a total of 250 ownerships. The site plans indicate that the other site amenities would include but not be limited to a comfort station, portable toilets, picnic tables and kayak/canoe racks. Based on the sales of comparable beach club condominium units at Bowerman's Beach in Falmouth, the value of the Premises as a non-profit beach club is based on a per ownership value of $15,000. To arrive at the "per membership" value for the Premises, the three (3) sales considered from the Bowerman's Beach Club were adjusted downward in accordance with the following features pertinent to the Bowerman's Beach Club:

- larger land area;

- superior location; and

- deeded changing rooms and bath facilities for members.

25

With three sales for the Bowerman's Beach Club ranging from $20,000 to $25,000, after adjusting for the above three items, a value estimated at $15,000 per beach club membership at the Swifts Beach Premises has been developed for a beach club use without a clubhouse facility.

When $15,000 is multiplied by the 250 ownership entities, the gross potential sellout is $3,750,000. As stated, this is the gross potential, or retail sellout value. From retail sellout value, appropriate deductions must be made in order to develop the market value of the property. The standard deductions include marketing, carrying costs, overhead and profit. Based on my experience with several apartment projects that were acquired for redevelopment as condominiums, the average discounts taken are as follows:

- 2%-4% for marketing;

- 2%-4% for overhead; and

- 2%-4% for carrying costs.

Based on these ranges, an average of 10% was applied to the subject.

The last and largest item is entrepreneurial profit. Depending on the size and scope of a project, along with the expected project length, my experience with profit is in the 10% to 20% range. More difficult projects with long absorption periods are at the high end of the range and easier projects with rapid absorption are at the low end of the range. For the subject, the middle of the range was selected, or 15% based upon the strong demand for beachfront property and due to the large number of memberships (250) absorption rates would be lengthy (estimated at one and a

half to two and a half years). The total discount applied to the subject as a non-profit beach club

without clubhouse facility is 25%. When this percentage is applied to the retail, sellout value of

$3,750,000, the market value for the subject is $2,812,500, rounded to $2,800,000.

However, with the advent of the information regarding the allowance of a beach club

facility that would provide similar amenities to the Bowerman Beach Club, the appraiser's

opinion of value for the subject (as set forth above and in the Original Report) has been amended

and increased by 20% to reflect the facility. The revised membership value is now $18,000.

When $18,000 is multiplied by the 250 ownership entities, the gross potential sellout increases

from $3,750,000 to $4,500,000. Again, as was originally done, expenses must be deducted from

the retail sellout value in order to arrive as an 'as-is' value. The additional consideration is the

cost of the beach club facility. Assuming modest quality of construction, a cost of $50.00 per

square foot has been assigned to the 3,600 square foot facility for a construction cost of

$180,000.00. This type of facility is comparable to the facility at the Bowerman Beach Club.

Site costs, including footings pilings, piers and utility connections have been estimated at

$70,000, which is a lower figure than that used in the valuation of the property as a two family

facility due to its smaller size. The combined cost new for the facility and site improvements is

$250,000. In order to arrive at the 'as-is' value, this figure must be deducted from the retail

sellout figure along with the previously discussed figures for marketing, overhead, carrying costs

and profit. In the original value estimate of the beach club use as set forth above and in the

Original Report, a total of 25% was deducted from the retail sellout figure. This same figure has

been adopted for the beach club with a club house facility. Based on the above, the following

27

breakdown has been developed for the subject assuming the construction of the beach club facility:

| | | |
|---|---|---|
| Retail Sellout Value – 250 memberships x $18,000 - | | $4,500,000 |

Less:

| | | |
|---|---|---|
| Cost of Clubhouse - | $   250,000 | |
| Profit, Marketing, etc. expenses (25%) | $1,125,000 | |
| Total Expenses | $1,375,000 | $1,375,000 |
| Net, 'As-Is' Value | | $3,125,000 |

On the basis of the above, the inclusion of a beach club facility increases the original value estimate as a 250 membership private beach club by a gross amount of $750,000. After appropriate deductions for the cost of the facility, marketing, overhead, carrying costs and profit, the 'as-is' value is $3,125,000

*40B Project Development*

The appraisers have studied the market for sales of land sales that were acquired with approvals in place for condominium complexes. A number of sales throughout eastern and southern Massachusetts were identified and analyzed. From those, the sales discussed below were selected as being most comparable based on location, size and development potential. Once the sales were located, they were compared to the Premises on the basis of the number of potential condominium units.

28

In order to apply this approach, a study of the market is conducted in order to locate sales of comparable properties. As stated above, the sales must be verified and be on an arm's length transactional basis in order for them to be considered in the analysis. Once the sales have been located and verified, they are adjusted for any differences and then, specific units of comparison can be generated, i.e. price per acre, price per square foot, price per front foot, etc.

The appraiser has studied the market for comparable "adult housing" and/or condominium projects. From the study, the following have been selected as most comparable:

| ADDRESS | SALE DATE | SALE PRICE | PRICE/UNIT |
|---|---|---|---|
| 1. 37 Misty Meadows<br>Lane, Chatham | $ 750,000 | 01/13/04 | $107,142 |
| 2. 13 Beach Road<br>East Orleans | $ 910,000 | 08/16/04 | $101,111 |
| 3. 161 Route 28<br>West Harwich | $1,200,000 | 05/13/05 | $ 92,307 |
| 4. 26 Mt. Vickery<br>Rd., Southborough | $1,600,000<br>$3,000,000 | 01/29/02<br>01/29/02 | $ 40,000<br>$ 75,000 |
| 5. Off Olive Street<br>Ashland | $1,350,000<br>$4,510,000 | 11/09/01<br>11/09/01 | $ 24,545<br>$ 82,000 |

See **Exhibit D** attached hereto -- Deeds of reference to sales.

The above five sales are sales of land for planned residential communities or condominium projects on an unapproved or approved basis.

Following is a description of the sales and circumstances surrounding each sale.

1. This is a 1.59 acre parcel of land that was purchased pre-approval. The buyer obtained permits to construct seven, 2 bedroom condominiums that are being market in the $700,000 range. The deed reference is Book 18122, Page 322.

2. This is a 1.86 acre parcel of land that was improved by the 16 unit Sea Breeze Motel and a three bedroom raised ranch style dwelling. This is an interior lot that the developer demolished the motel, received approvals for eight, 2 bedroom condominiums and retained the existing dwelling as a ninth unit. This unit was sold and the new units are being marketed for $650,000 to $725,000 with two currently on the market for $699,900 and $739,000. The deed reference is Book 18940, Page 265.

3. This is the site of a 26 unit motel known as the West Harwich Motor Lodge. The 30+ year old facility is sited on .60 acres of Herring River waterfront, which access Nantucket Sound. The facility was demolished and the buyer replaced the wooden riverfront bulkhead. Approvals were granted for 13, 2 bedroom condominiums with marketing starting at $424,900 per unit. Completion is expected in early to mid 2006 and there are currently four units under agreement. The deed reference is Land Court Certificate 176688.

4. This is the sale of an adult community. The project is known as Vickery Hills and consists of a 17.57 acre parcel of land that was approved for 40 units. Pre-construction prices started at $439,000 and there were four models available. Michael and Alice Gulbankian sold the property to Vickery Hills LLC. The intervening transfer to John Sullivan was on an unapproved basis at $40,000 per unit. The transfer on an approved basis was $75,000 per unit with Norwood Co-Operative Bank providing a $3,750,000 mortgage. The transfer is recorded in Book 25863, Page 110. This is a superior project in terms of location, just off Route 85, approximately six miles from the subject.

5. This is a sale of an adult, 55+ condominium community known as Leah Estates. The above sales indicate the price paid for raw, unapproved acreage and an approved but unimproved site. The complex was approved for 55, detached dwellings of four model types. Units are of one and two story design and range from 1,700 to 2,100 square feet. Pricing started at $359,900 to $409,900. The parcel contains 20.6 acres and has a clubhouse facility as part of the amenity package. This is a desirable location near the Ashland Reservoir, which provides a number of recreational facilities. The first transfer was from Sabina Milman to Landmarc Development Group II, with a simultaneous transfer to JCJ Inc. The second transfer involved a $1,700,000 mortgage from Bay State Federal Savings and Loan.

The above sales require adjustments for date of sale, location, size and whether or not the

sale was on an approved or unapproved basis. Based on the above, the following adjustment grid

has been developed:

**SALE $/UNIT       SALE DATE       LOCATION   WATERFRONT     ADJ P/UT**

| | | | | |
|---|---|---|---|---|
| 1. $107,142 | 0- | -20% | 15% | $101,785 |
| 2. $101,111 | -04% | -10% | 10% | $97,067 |
| 3. $ 92,307 | -08% | 0% | 05% | $ 89,168 |
| 4. $ 75,000 | 12% | -15% | 25% | $ 92,400 |
| 5. $ 82,000 | 13% | -10% | 25% | $106,559 |

The appraiser has studied this adjusted price per unit range of $89,168 to $106,559. Sales 1 and 2 are most comparable in terms of date of sale. Sales 3-5 require a substantial adjustment for date of sale. After considering the above range, the estimated value of the subject by the sales comparison approach is $100,000 per approved unimproved unit. When the indicated value of $100,000 per unit is multiplied by the Premises' proposed 30 market units, the indicated value is $3,000,000.

The adjusted range of sales on a price per condominium unit and price per ownership basis was analyzed and from the range, a price per unit and price per ownership were developed. These values were multiplied by the subject site's number of condominium units that can be developed as well as the number of ownerships that can be sold. The second step as a 40B condominium project is to make appropriate deductions for the fact that the project requires 25% of the total number of units to be affordable. The value per unit developed for the condominiums is $100,000. However, given that 25%, or 10, of the 40 units must be affordable units, no value has been assigned to the affordable units. This is due to the fact that a developer makes little or no profit on the units and would not pay any additional monies to acquire the non-revenue generating units. This fact is born out by a recent appraisal completed on a project in

31

Westborough, Massachusetts. Since the sale has not been consummated exact specifics cannot

be disclosed. However, having personally analyzed three separate offers to purchase, none of the

offers included any monies for the affordable units that are part of the permitting process by the

town. As a result of the elimination of the 10 affordable units, the value of $100,000 per unit is

based on the 30 market units, which results in the indicated value of $3,000,000.

. vi.    Reconciliation and Final Value Estimate

The appraiser has developed an indication of value by the sales comparison approach to

value. The indicated value developed is as follows:

Cost Approach:                    N/A

Income Approach:                  N/A

Sales Comparison Approach:

*Beach Club Development - $3,125,000.00*

*40B Condominium Project - $3,000,000.00*

Since the only approach applicable is the sales comparison approach, the value of the highest and

best use of the Premises, as of the date of valuation, December 31, 2003, would be a 250

membership non-profit recreational beach club with clubhouse facility of

**Three Million One Hundred Twenty-Five Thousand ($3,125,000.00) Dollars**

D.    Exhibits to be Used as a Summary of or Support for the Opinions

A copy of the plan entitled "Alternative No. 2 Conceptual Beach "Clubhouse" Building"

(drawing C-3), prepared by McKenzie Engineering Group, Inc. is attached hereto as Exhibit 1.

The other exhibits which have been used in support of my opinions were attached to my Original

32

Report as **Exhibits A through F.**

Signed and submitted this ____20th____ day of September, 2006.

_____
Steven G. Elliott, SRA, MRA

L:\LITG\Dtm002\STEVEN ELLIOTT REPORTS\SElliott.supp.report.09.20.06.doc

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on ___September 20, 2006___
_____

and electronic mail

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS
CA No. 05-11745RWZ

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee | ) |
| of BD REALTY TRUST | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| THE TOWN OF WAREHAM acting by | ) |
| And through the BOARD OF | ) |
| SELECTMEN FOR THE TOWN OF | ) |
| WAREHAM and the BOARD OF | ) |
| SELECTMEN OF THE TOWN OF | ) |
| WAREHAM | ) |
| | ) |
| Defendant. | ) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The deposition of Steven Elliott, a witness called on behalf of the Defendant, provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, before Carmen Branson, Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Kopelman and Paige, P.C., 101 Arch Street, Boston, Massachusetts 02110 on Wednesday, October 11, 2006, commencing at 10 a.m.

APPEARANCES:
RICHARD BOWEN, ESQ.
KOPELMAN AND PAIGE, P.C.
101 Arch Street
Boston, MA  02110
(For the Defendant)

JEFFREY T. ANGLEY, ESQ.
KRISTEN M. PLOETZ, ESQ.
Phillips & Angley
One Bowdoin Square
Boston, MA  02114
(For the Plaintiff)

COPY

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1    Q.   Referring back to Page 6 of your report.   In

2    the middle of the page, you write, as described in my

3    original report, the alternative development concept

4    for the premises would be as a non-profit

5    recreational beach club for 250 available memberships

6    valued at 15 thousand dollars per membership.   How

7    did you come up with the number of 15 thousand.

8    A.   Based on the comparable sales that we

9    developed in our search of the market.   Placing

10   primary weight on the sales at the facility in

11   Falmouth.

12   Q.   And on the bottom of Page 6 and carrying

13   over to Page 7, you write, "However, in light of the

14   information presented available to me  -- presently

15   available to me as described in Section II above, it

16   is my opinion that the beach club use described, if

17   lawfully enhanced with a permanent two-story

18   structure (clubhouse) that contains amenities such as

19   individual storage lockers, changing facilities,

20   bathrooms, showers, food storage, and seating areas,

21   increases the value of memberships by 20 percent or

22   $18,000 per membership."

23        How did you derive the 20 percent?

1    A.   Again we had used the same comparables that

2    we used in the original appraisal had those sales

3    have that amenity which at the time we, the original

4    one we did not feel it would have that amenity.

5         So it was an adjustment of -- we

6    extracted, we attempted -- we extracted that value

7    from the sales that had taken place in relationship

8    to the locational differences which is now

9    essentially the only difference between the two

10   facilities.

11   Q.   Could you give me a full description of the

12   exact methodology that you used in coming up with the

13   20 percent.  And if you want to refer me to a

14   particular page in your report, that's fine.

15   A.   I might have to refer you to the original

16   report.  But I will need a minute to do that.

17        Okay.  So on the expert report,

18   Page 26.

19   Q.   Yes.  I have it.

20   A.   Okay.  Those were the most recent sales that

21   were identified at the Bowerman's Beach Club

22   condominium property in Falmouth.  As you can see we

23   have three sales from August of 2002, October of

1    2002, and the last one December of 2003.  With the

2    highest price being 25 thousand dollars.

3            We felt that the market value of sales at

4    Bowerman were 25 thousand dollars.  From that, we

5    deducted the value of the beach club facility that is

6    available there, which is described above.  And then

7    we also deducted for the superior location, and the

8    fact that Bowerman's has one parking space per unit

9    versus the fact that we would have two units per

10   space.

11       Q.   Were those the only differences that you saw

12   between the two clubs?

13       A.   Location, parking, and the amenity package,

14   yes.

15       Q.   And what percentage adjustment did you

16   assign to each of those three categories?

17       A.   Approximately 20 percent for location,

18   20 percent for the -- excuse me.  I am trying to

19   recall what the exact numbers were.

20       Q.   If it's explained in the reports, if you

21   direct me to the page.

22       A.   I don't believe we gave a full explanation

23   of it.  Yes.  On Page 27 we talk about the larger

1    area of the park.

2        Q.    Would this be in the original report?

3        A.    Yes.    On page 27.    Larger land area,

4    vis-a-vis the parking.    Superior location and the

5    deeded changing rooms and the bath facilities for

6    members.    So we did not specifically designate what

7    the adjustment percentages were.    And I would have to

8    go back and look at my notes, but I believe it was

9    approximately 25 to 30 percent for location, and

10   approximately 10 percent to 15 percent for the other

11   two items.

12       Q.    Each or?

13       A.    Each.

14       Q.    And with respect to the parking space, how

15   did you derive the 10 to 15 percent?

16       A.    I don't recall.

17       Q.    With respect to location, how did you derive

18   the 25 to 30 percent?

19       A.    When Wayne and I discussed the various

20   locations and I did defer to him since he has been an

21   appraiser in that general area for approximately 15

22   years, and we looked at comparative sales of other

23   properties in that area versus the Wareham area, we

1    felt that that was an appropriate adjustment.

2        Q.   What type of sales did you look at?

3        A.   I believe we just looked at residential

4    sales in general.

5        Q.   Was it your opinion that residential sales

6    were the most appropriate for determining the

7    locational differences between the Falmouth Beach

8    Club and the Wareham proposed beach club?

9        A.   Yes.  Because it was the only information we

10   had.  We had no beach club sales to compare.

11       Q.   And approximately how many sales did you

12   look at?

13       A.   I don't recall.

14       Q.   As to the beach club structure, how did you

15   come up with the 10 to 15 percent adjustment?

16       A.   We looked at it in terms of what we thought

17   the depreciated value of the improvements were at

18   Falmouth and then allocated that across the number of

19   memberships.

20       Q.   What was the depreciated value of the

21   improvements of Falmouth as to the date of taking?

22       A.   Again I would have to refer to my notes.  I

23   don't remember offhand.

1   residential appraiser in the State of Massachusetts.

2       Q.   Do you know what experience Mr. Valliere has

3   in valuing 40B developments?

4       A.   I don't.

5       Q.   Do you know what experience he has in

6   valuing beach club properties?

7       A.   I don't.

8       Q.   Did Mr. Valliere select the properties that

9   he felt were comparable to the subject property?

10      A.   For which part of the assignment?

11      Q.   Any part of it.

12      A.   I indicated to him what type of sales I was

13  looking for.  And he went out and searched for them

14  and brought back whatever he could find and then we

15  discussed them as to their relative merits.

16      Q.   What type of comparable properties did you

17  tell him to look for?

18      A.   Well in beach club facility I asked if he

19  could find beach club sales, any beach club sales.  I

20  know that the plaintiff had provided a list of what

21  she thought were comparable properties so we started

22  with that list, and then expanded it because as it

23  turned out there were virtually no sales of beach

1    club properties available.

2        Q.  Were there any sales of beach club

3    properties either by or to non-profit corporations?

4        A.  We found none.

5        Q.  What other types of comparable properties

6    did you ask him to perform?

7        A.  Well we originally started out looking for

8    comparable land sales.  Unimproved land sales.

9    Waterfront properties, things of that nature.  When

10   that proved to be fruitless, we then began looking

11   for improved property sales that we could apply the

12   extraction process to.  When the scope of work

13   changed from valuing the property as potentially

14   developable on a residential basis, we changed to a

15   40B scope and the beach club scope.  And we went out

16   and sought the comparable sales for unimproved land

17   for either beach club or improved beach club sales.

18        And we sought out sales of 40B land which

19   we were not able to locate and we then started

20   looking for sales of land that had similar

21   development characteristics for multi-family

22   properties that could be developed.

23       Q.  When Mr. Valliere was reviewing properties