UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee  )
of BD REALTY TRUST,              )
           Plaintiff   )
                               )
v.                               )
                               )
THE TOWN OF WAREHAM acting by     )
and through the BOARD OF         )
SELECTMEN OF THE TOWN OF         )
WAREHAM, and the BOARD OF        )
SELECTMEN OF THE TOWN OF         )
WAREHAM,                         )
           Defendants  )

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR LEGAL RULING RESTRICTING PLAINTIFF'S EVIDENCE OF WETLAND RESOURCE DELINEATION AT SUBJECT PROPERTY

Now comes the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), and opposes Defendants' Motion for Legal Ruling Restricting Plaintiff's Evidence of Wetland Resource Delineation at Subject Property. For reasons, the Trust states as follows.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The Trust purchased the real property located at 200 Swifts Beach Road in Wareham, Massachusetts ("the Premises") on August 31, 2000. On January 4, 2002, the Trust filed a Notice of Intent ("NOI") under the Massachusetts Wetlands Protection Act with the Wareham Conservation Commission for the purpose of obtaining regulatory environmental permits to construct a duplex dwelling on the site. The scope of the proposed work was stated as follows:

> Remove existing concrete slab and construct duplex dwelling on pilings in buffer zone to coastal dune. Pilings to be 12.5 x 13.3 feet on center, connected by concrete slab on grade and a paved drive will also be constructed in the buffer zone. Phragmites on site will be removed by hand in July followed by application of herbicide. Several existing

1

> pathways thru the dune will be removed and planted with beachgrass. Snow fencing will be installed along two pathways and around the construction site to protect the existing dunes. Rosa Rugosa will also be planted along a private path and beach to protect the existing dunes.

See Plaintiff's Proposed Exhibit I (Notice of Intent) attached hereto as **Exhibit 1** (Bates Stamp No. 00000257). As part of the NOI filing, the Trust informed the Wareham Conservation Commission that "for at least 50 years, a fairly large parking lot has been on the property serving a snack bar and bathhouse, [and that] No change is proposed in the use of this parking lot." See **Exhibit 1** (Bates Stamp No. 00000264). The NOI filing did not seek to permit any "work" in the parking area and more importantly, the Trust clearly stated its intention to continue that parking use.

The Trust was required to file the NOI for the Duplex use because some of the proposed "work" was to occur within coastal resource areas consisting of coastal dune (pilings for house), coastal beach (planting of beach grass) and salt marsh (restoration of degraded areas)[1] and because some work would occur within the 100 foot buffer zone of a bordering vegetated wetland ("BVW"). As part of an NOI, an applicant is typically required to delineate the boundary of the jurisdictional resource areas. Yet, in this case, a delineation of wetland resource areas on the Premises had already been made by the prior owner of the site based on a Final Order of Resource Area Delineation ("ORAD") issued by the Wareham Conservation Commission on October 18, 2000. The ORAD was issued based on a plan by the prior owner entitled "Plan Accompanying Abbreviated Notice of Resource Area Delineation on Land in Wareham, MA prepared for Glick Realty Corporation", drawn by Thompson Surveying & Engineering, Inc., dated May 4, 2000, and revised through June 19, 2000.[2] Under Massachusetts law, ORADs are in effect as an order that binds the land for three (3) years once approved by a

---

[1] The salt marsh referenced in the NOI is not within the layout of the parking lot area that is at issue.
[2] The ORAD was filed by the Trust's predecessor in interest.

conservation commission.  See 310 CMR 10.05(6)(a)(3).  See also Joint Statement of Stipulated Facts #10.  Thus, the ORAD for the Premises issued by the Wareham Conservation Commission on October 18, 2000 and expired on October 18, 2003.  See Joint Statement of Stipulated Facts #11.

In March 8, 2002, the Wareham Conservation Commission issued an Order of Conditions which denied the Trust's request to do work on the Premises requested in the NOI.  See Plaintiff's Proposed Exhibit J (attached hereto as **Exhibit 2**).  The Trust appealed the Order of Conditions to the Massachusetts Department of Environmental Protection ("DEP").  On August 12, 2003, the DEP issued a Superceding Order of Conditions to the Trust which authorized work to proceed on the Premises as shown on a plan entitled "Plan of Land in Wareham, Mass. Prepared for BD Realty Trust", drawn by Vautrinot Land Surveying, Inc., dated May 7, 2001 and revised through March 28, 2003 ("the Vautrinot Plan").  See Joint Statement of Stipulated Facts #13.  See also Agreed Exhibit 5 (attached hereto as **Exhibit 3**).  The SOC also determined that there was to be coastal dune restoration and salt marsh restoration,[3] and that no work was proposed to take place in a BVW.  See **Exhibit 3**.

On August 25, 2003, following the issuance of the SOC, the Wareham Conservation Commission, as authorized by the Board of Selectmen, appealed the SOC through a request for adjudicatory hearing with the Massachusetts Division of Administrative Law Appeals. Before the adjudicatory proceeding could start, the Town of Wareham voted in October, 2003 to take the Premises in by eminent domain. The Order of Taking was recorded on December 31, 2003. The Massachusetts Division of Administrative Law Appeals stayed the appeal of the SOC and thus no final administrative order was ever issued with respect to the NOI.

---

[3] The restoration was in an area that does not include the parking lot area at issue.

As part of the present eminent domain lawsuit, the Trust will introduce evidence at trial that the highest and best use of the Premises on the date of taking was either as a non-profit recreational beach club or as a 40-unit residential development pursuant to M.G.L. c.40B (affordable housing statute).  Under either of these development scenarios, the Trust identifies a portion of the Premises (the existing parking area on the property) as land available for use and development as either a parking area for the beach club use or as the site of one or more residential structures related to a Chapter 40B use.  The area in question was previously shown as salt marsh on the ORAD and Vautrinot Plan.

## ARGUMENT

I.    The Doctrine of Judicial Estoppel Does Not Apply In This Instance And Therefore Does Not Preclude the Testimony of the Trust's Wetlands Expert, Lenore White.

Judicial estoppel is a doctrine which "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Pegram v. Herdrich, 530 U.S. 211, 227, n.8 (2000)) (internal quotation marks omitted).  The purpose of the doctrine is to protect the integrity of the judicial process.  See id. at 750.  Though there is no bright-line test to determine whether judicial estoppel should apply, the Supreme Court has identified several factors which inform the decision whether to apply the doctrine, but also stressed these were neither "inflexible prerequisites" nor an "exhaustive formula."  Id. at 751.  These factors include:

(1)    Whether the party's later position is clearly inconsistent with its earlier position.

(2)    Whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception of inconsistent court determinations, suggesting that either the first or second court was misled.

(3)      Whether an unfair advantage or detriment would be created.

See id. at 750-51.

The First Circuit has limited the application of judicial estoppel, holding that estoppel may not be invoked unless:

(1)      the estopping position and the estopped position [are] directly inconsistent; and

(2)      the responsible party ... succeeded in persuading a court to have accepted its prior position.

Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004).   In the instant case, there are no facts supporting the application of judicial estoppel.

A.    The Trust Has Not Succeeded In Having A Court Accept Its Purportedly "Prior" Position On the Wetland Resource Delineations.

The Town is disingenuous when it suggests that the Trust adopted one position on the wetland resource area delineations (i.e. that the parking lot area contained salt marsh) and somehow secured a favorable decision based on that position.  There has simply never been any prior judicial determination of any kind regarding the Premises.  All that has ever been obtained is a Superceding Order of Conditions from the DEP that authorized particular and designated work for a proposed duplex use; a purely administrative and non-judicial order.  Even then, the SOC was never finalized because the Town appealed the SOC for an adjudicatory hearing that never took place because the Town made a taking of the Premises.  More importantly, the parking lot and any designation of that area as salt marsh was never adjudicated by any court or even addressed by the DEP because it was never even a part of the actual permitting process or proposed "work" of the Trust.  The reality of the procedural status of the Trust's permitting effort is that there has never been a final judgment or order issued in this case by any judicial authority.  To that end, there has not been any "judicial acceptance" of the Vautrinot Plan which

5

bars the Trust from now presenting evidence on the wetlands resource areas which may differ in some regards from those used to support the Vautrinot Plan.

      B.    <u>The Trust Has Not Taken Inconsistent Positions About The Wetland Resource Areas Existing on the Premises</u>.

Even assuming *arguendo* that there has been a prior judicial determination of the wetland resource areas on the Premises, the Trust has not adopted inconsistent positions about what wetland resource areas exist on the Premises.

      1.  *The Trust was bound by the ORAD delineations of the prior owner.*

The only plan submitted by the Trust during the administrative proceedings discussed *supra* was the Vautrinot Plan, as revised from time to time during the permitting process. However, attributing the resource area delineations as set forth in the Vautrinot Plan as the Trust's "position" on what resource areas existed on the Premises on the date of taking grossly misrepresents the facts. The resource area delineations shown in the Vautrinot Plan were taken directly from the ORAD Plan of May 17, 2000, as amended through June 19, 2000, which was prepared and filed by the previous owner. This filing was made well <u>before</u> the Trust purchased the Premises. Indeed, the Wareham Conservation Commission issued the ORAD on October 18, 2000, just 48 days after the Trust purchased the property. As a result of the Order, the Trust was legally bound by the resource area delineations set forth in the ORAD for three years, regardless of whether the delineations were correct, pursuant to 310 CMR 10.05(6)(a)(3). In short, the Trust did not adopt or ratify the resource area boundaries established by the ORAD by replicating them in the Vautrinot Plan; it simply had no choice but to be bound by the delineations established by the Wareham Conservation Commission for the three year term of the Order.

   2.   *The Trust has always implicitly contested the resource delineations that would affect the use of the existing parking lot.*

From the very first NOI filing, all the way through the SOC process, the Trust clearly

announced that it did <u>not</u> agree with the ORAD delineations as to the existing parking area on the

site.  Indeed, the NOI filing clearly disclosed that a large portion of what was shown as "salt

marsh" on the ORAD and the derivative Vautrinot Plans had been used as a parking lot for 50

years, and that the Trust intended to continue this use in conjunction with the duplex.  This

intention became even more clear when, during the SOC process, the DEP requested that

Vautrinot revise the permitting plan to add in the boundaries of the "existing parking area" on the

Premises.  This amended plan showing both salt marsh and a parking area in the middle of a salt

marsh area was the very plan ultimately approved by the DEP in the SOC.[4]

Of course, it was well known at the time, just as the experts of both parties in this

proceeding agree today, that the ORAD delineation of salt marsh was incorrect.[5]  A large portion

of the area shown as salt marsh was unvegetated hard packed sand and gravel, and a good potion

the area was above the elevation of the highest high tide and so did not meet the regulatory

---

[4] Under the Wetlands Protection Act and the implementing regulations at 310 CMR 10.00 et. seq. work within a salt marsh area is not permitted.  Thus the designation of the same area as "salt marsh" and as "existing parking area" are mutually exclusive and indicates both the Trust's position and the acceptance of that position by the DEP that this area was not salt marsh since the DEP undertook no enforcement action, asked for the parking area to be delineated on the Vautrinot Plan and approved that plan in the SOC.

[5] Additionally, there is a fundamental flaw in the Town's present motion to bar the testimony of the Trust's wetlands expert, which exposes the underlying weakness with relying on plans or ORADs which have been found to be incorrect.  When the Trust filed its NOI, the Premises were thought to exist within a Riverfront Area as that term is defined by the wetlands regulations.  The Wareham Conservation Commission did not dispute the Riverfront Area classification in its review of the NOI.  More importantly, the DEP issued the SOC and approved the work ratified thereby because of this Riverfront Area classification.  However, it was later determined by both the Trust's wetlands expert as well as the <u>Town's</u> wetlands expert during their investigation and study of the Premises as part of the ongoing litigation, that the Premises are <u>not</u> located within a Riverfront Area.  In essence, this means that the SOC issued by the DEP was based, in part, on a faulty premise.  Yet, under the Town's present theory, the Trust should be nonetheless bound by yet another inaccurate resource area classification despite the testimony of two experts (who are otherwise representing opposing parties).  Just as binding the Trust to the erroneous Riverfront Area classification would unfairly prejudice the Trust from presenting the more accurate evidence which supports the highest and best use of the Premises, similarly binding the Trust to fictional salt marsh classifications is equally prejudicial and will prevent the Trust from being fully compensated for the taking of its land by eminent domain.

definition of "salt marsh" under 310 CMR 10.32(2) ("Salt marsh means a coastal wetland that

extends landward up to the highest high tide line, that is, the highest spring tide of the year, and

is characterized by plants that are well adapted to or prefer living in, saline soils.).  This was

confirmed by the Trust's wetlands expert (Lenore White) during her investigation of the resource

areas existing on the Premises at the date of taking, which was undertaken in conjunction with

the present lawsuit and acknowledged by the Town's wetlands expert, Robert Daylor in his

deposition.  <u>See</u> Expert Report of Lenore White at p. 11-12 (attached hereto as **Exhibit 4**).  <u>See</u>

<u>also</u> Depo. Trans. of Robert Daylor at p. 55-57 (attached hereto as **Exhibit 5**).

> 3. *There is no inconsistency between the Trust's prior permitting efforts and the uses proposed in this action because the Trust never sought to permit the parking area use, only the duplex use.*

In this federal court action the Trust has determined that the part of the site labeled on the

Vautrinot Plan as "existing parking area" could have been used, as of the date of taking, as the

site of either a beach club parking area or 40B parking and building site.  There is nothing

inconsistent with either of these proposed highest and best uses and the prior permitting effort of

the Trust in 2002 and 2003.  Both the NOI application of 2002 and the SOC issued by the DEP

in August 2003 clearly define and limit the scope of both the "work" proposed by the Trust and

the "work" approved by the DEP as utterly and completely limited to the duplex use at the

northwesterly corner of the property, some salt marsh restoration and efforts to protect existing

dunes.  <u>See</u> **Exhibit 1**(NOI) and **Exhibit 3** (SOC).  Nowhere in this process did the Trust ever

seek to permit or obtain approval for work or use in the "existing parking area."   In this case, the

Trust has now, for the first time, turned its attention to the highest and best uses that might be

made of the entire parcel of land, including the parking lot area.  There is nothing inconsistent in

the Trust's assessment of uses at the site, and the Trust has every right to consider the parking

area as a potential site location, dependent only on the zoning and environmental regulations in effect at the date of taking.

4. *The ORAD expired on October 18, 2003 and the Trust is thereafter free to re-determine the location of resource areas on the Premises.*

The Town's effort to compel the Trust to be legally bound by the delineations on the Vautrinot Plan is a constraint unrecognized in the Massachusetts environmental permitting process and the DEP regulations clearly controvert any suggestion that judicial estoppel is appropriate in this context. Not only was the Trust forced to use those delineations and chaffed under them, but pursuant to DEP regulations, the ORAD expires after three years. 310 CMR 10.05(6)(a)(3). The reason for this is obvious. Wetland resource areas are dynamic and evolve and change over time. If a party's attempt to work within the confines of an ORAD gave rise to an estoppel, all ORADs would become perpetual. This is not the law found within the Massachusetts wetlands regulations. The Town's argument not only contradicts the clear terms of state regulations, but also the well the established principle that a waiver of a right must be knowing and intentional. Dunkin Donuts Incorporated v. Panagakos, 5 F.Supp.2d 57, 60 (D.Mass 1998). An equitable principle such as judicial estoppel may not be used to rewrite regulations or overturn well-established principals of common law.[6]

The simple truth of the matter is that as of the date of taking, the ORAD order had expired and no longer bound the landowner to the delineations shown on the plan. The ORAD

---

[6] First Circuit cases also hold that "judicial estoppel might be inappropriate when a party's prior position was based on inadvertence or mistake." Thore v. Howe, 466 F.3d 173, 181 (1st Cir. 2006) (citation omitted). "[A] later inconsistent assertion of fact will not necessarily give rise to judicial estoppel if a reasonable justification can be offered for a change in positions." Id. at 185 (citation omitted). In the present case, the Trust depicted the parking lot area as "salt marsh" on the Vautrinot Plan due to the fact that the ORAD plan was still in effect at the time. This is a reasonable justification for the position that the Trust was forced to take. Further, given that the Trust was not involved in the collection of information for compiling the ORAD (upon which the Vautrinot Plan was based), it was operating under a mistake as to the actual conditions existing on the Premises. Moreover, where the Trust was not seeking to use the parking area in a manner different from what had been already taking place, the correct information about the status of this area was not relevant to the limited scope of permitting for the duplex use. See id. These reasons further support the inappropriateness of judicial estoppel in this regard.

was never extended by the Trust or the Town.  The Town seems to forget that the taking

terminated the Trust's property interests in the Premises.  At that point, the Trust is entitled as a

matter of law to prove the highest and best use of the property.  The Trust is not bound by the

uses it made of the Premises before the taking and there is no reason why any purported position

that it took while it was still the owner should implicate the hypothetical process by which a

highest and best use valuation is made.  Based on the foregoing, judicial estoppel cannot bar or

limit Lenore White's testimony about the wetland resource areas that existed on the Premises on

the date of taking.  Therefore she must be permitted to testify at trial as set forth in her expert

report.

## **CONCLUSION**

Based on the foregoing, this Court should deny Defendants' Motion for Legal Ruling

Restricting Plaintiff's Evidence of Wetland Resource Delineation at Subject Property, and allow

the Trust's wetlands expert to testify at trial fully in accordance with her opinions as set forth in

her expert report.

|  |  |
|---|---|
|  | Plaintiff,<br>BARBARA DEIGHTON HAUPT, Trustee<br>of BD REALTY TRUST,<br>By her attorneys, |
| Date: 3/7/2007 |  |
|  | _/s/ Kristen M. Ploetz_____<br>Jeffrey T. Angley, Esq.<br>B.B.O. #543958<br>Kristen M. Ploetz, Esq.<br>B.B.O. #654549<br>Phillips & Angley<br>One Bowdoin Square<br>Boston, MA 02114<br>(617) 367-8787 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 7th day of March, 2007.

_____/S/ Kristen M. Ploetz_____
Kristen M. Ploetz, Esq.

L:\Ditn002\Motions in limine\opp.restricting.wetland.delineation.JTA.doc

**EXHIBIT 1**



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

Provided by DEP
Wareham
Town

## A. General Information

**Important:**
When filling out
forms on the
computer, use
only the tab
key to move
your cursor –
do not use the
return key.





**Note:**
Before
completing this
form consult
local
Conservation
Commission
regarding any
municipal bylaw
or ordinance.

1.  Applicant:

    BD Realty Trust
    Name                                          E-Mail Address
    P.O. Box 878
    Mailing Address
    Marion                              MA              02738
    City/Town                           State           Zip Code
    508-454-5342
    Phone Number                        Fax Number (if applicable)

2.  Representative (if any):

    Vautrinot Land Surveying, Inc.
    Firm
    Alan C. Vautrinot, Jr.              AlVaut@AOL.Com
    Contact Name                        E-Mail Address
    P.O. Box 144
    Mailing Address
    Plympton                            MA              02367
    City/Town                           State           Zip Code
    781-585-5505                        781-585-5520
    Phone Number                        Fax Number (if applicable)

3.  Property Owner (if different from applicant):

    Same
    Name

    Mailing Address

    City/Town                           State           Zip Code

4.  Total Fee:

    $250.00
    (from Appendix B: Wetland Fee Transmittal Form)

5.  Project Location:

    Swift's Beach                       Wareham
    Street Address                      City/Town
    Plat 50B-2, Lot B1
    Assessors Map/Plat Number           Parcel /Lot Number

6.  Registry of Deeds:

    Plymouth                   18845                224
    County                     Book                 Page
    90432
    Certificate (if Registered Land)



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

Provided by DEP
**Wareham**
Town

---

## A. General Information (cont.)

7. Summary of Project Impacts:

   a. Is any work being proposed in the Buffer Zone?

   ☒ Yes     If yes, how many square feet?

          16,600 including removal of phragmites
          Square Feet

   ☐ No

   b. List the impacts of proposed activities on each wetland resource areas (temporary and permanent impacts, prior to restoration and mitigation):

| Resource Area | Size of Impact (e.g., sq. ft.) |
|---|---|
| Coastal Dune, Plant Rosa Rugosa | 1250 |
| Coastal Dune, Plant American Beach Grass | 1895 |
| Coastal Dune and Saltmarsh, remove Phragmites | 6000 |
| Coastal Dune, install snow fencing to protect dune | 400 |
| Coastal Beach, plant Rosa Rugosa | 300 |
| Coastal Dune, remove existing concrete slab | 250 |

## B. Project Description

1. General Project Description:

   Remove existing concrete slab and construct duplex dwelling on pilings in buffer zone to coastal dune. Pilings to be 12.5 x 13.3 feet on center, connected by concrete slab on grade and a paved drive will also be constructed in the buffer zone. Phragmites on site will be removed by hand in July followed by application of herbacide. Several existing pathways thru the dune will be removed and planted with beachgrass. Snow fencing will be installed along two pathways and around the construction site to protect the existing dunes. Rosa Rugosa will also be planted along a private path and beach to protect the existing dunes.

2. Plan and/or Map References:

   A. Locus Map, USGS Sheet,
   Title            Date

   B. Plan of Swift's Beach prepared for BD Realty Trust.    5/5/01, rev thru
   Title            12/18/01



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

_____

Provided by DEP
Wareham
Town

---

## C. Activities Subject to Regulation

1. a. Check the applicable resource areas if work is to be conducted in an associated Buffer Zone:

   **Inland Resource Areas**

   ☐ Inland Bank

   ☒ Bordering Vegetated Wetland (BVW)

   **Coastal Resource Areas**

   ☒ Coastal Beach        ☒ Barrier Beach

   ☐ Rocky Intertidal Shore   ☒ Coastal Dune

   ☒ Salt Marsh          ☐ Coastal Bank

   b. Complete for all pkroposed activities located, in whole or in part, in Wetland Resource Area(s).

   **Inland Resource Areas:**

   Bordering Vegetated Wetlands:

   NA
   _____
   Square Feet altered

   _____
   Square Feet replaced

   Land Under Water Bodies:

   _____
   Square Feet altered

   _____
   Cubic Yards dredged

   Bank:

   _____
   Linear Feet altered

   Bordering Land Subject to Flooding:

   _____
   Volume of Flood Storage Lost (cubic feet)

   _____
   Volume of Flood Storage Compensation (cubic feet)

   Isolated Land Subject to Flooding:

   _____
   Volume of Flood Storage Lost (cubic feet)

   _____
   Volume of Flood Storage Compensation (cubic feet)

   **Coastal Resource Areas:**

   Coastal Dune:

   4545(fencing & plantings only)
   _____
   Square Feet altered
   NA
   _____
   Cubic Yards/Volume removed

   Salt Marsh:

   5250 (remove phragmites only)
   _____
   Square Feet altered

   Coastal Bank:

   _____
   Linear Feet  altered

   Land Under Salt Pond:

   _____
   Square Feet altered

   _____
   Cubic Yards dredged

   Rocky Intertidal Zone:

   _____
   Square Feet altered

   Designated Port Area:

   _____
   Square Feet altered

wpaform3.doc • rev. 1/3/02

000000253



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

_____

Provided by DEP
Wareham
. Town

---

## C. Activities Subject to Regulations (cont.)

Fish Run:

_____
Linear Feet altered

Land Subject to Coastal Storm Flowage:

NA
_____
Square Feet altered

Land Under Ocean:

_____
Square Feet altered

_____
Cubic Yards dredged

Land Containing Shellfish:

_____
Square Feet altered

Beach:

300(remove concrete slab)
_____
Square Feet altered

Riverfront Area:

a.   Name of Waterway (if available):

Wareham River_____

b.   Width of Riverfront Area (check one):

☐  25 ft. - Designated Densely Developed Areas only

☐  100 ft. - New agricultural projects only

☒  200 ft. - All other projects

c.   Describe how the Mean Annual High-Water Line was determined:

Tidal, actual observation

d.   Distance of proposed activity closest to the Mean Annual High-Water line:

15
_____
Feet

e.   Total area of Riverfront Area on the site of the proposed project:

120,000
_____
Square Feet

f.   Proposed alteration of the Riverfront Area:

| 4420 | NA | 4420 |
|---|---|---|
| Total Square Feet | Square Feet within 100 ft. | Square Feet between 100 ft. and 200 ft. |

000000259

**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

_____

Provided by DEP
Wareham
Town

## C. Activities Subject to Regulation (cont.)

2. Check all methods used to delineate the Bordering Vegetated Wetland (BVW) boundary:

   ☒ Final Order of Resource Area Delineation issued by Conservation Commission or DEP (attached)

   ☐ DEP BVW Field Data Form (attached)

   ☐ Final Determination of Applicability issued by Conservation Commission (attached)

   ☐ Other Methods for Determining the BVW boundary (attach documentation):

       ☐ 50% or more wetland indicator plants

       ☐ Saturated/inundated conditions exist

       ☐ Groundwater indicators

       ☐ Direct observation

       ☐ Hydric soil indicators

       ☐ Credible evidence of conditions prior to disturbance.

3. a. Is any portion of the proposed project located in estimated habitat as indicated on the most recent Estimated Habitat Map of State-Listed Rare Wetland Wildlife published by the Natural Heritage and Endangered Species Program?

       ☐ Yes    If yes, include proof of mailing or hand delivery of NOI to :

   > Natural Heritage and Endangered Species Program
   > Division of Fisheries and Wildlife
   > Route 135, North Drive
   > Westborough, MA 01581

   ☒ No

   2000-2001
   Date of Map

   b. Is any portion of the proposed project within an Area of Critical Environmental Concern (ACEC)?

       ☐ Yes    If yes, provide name of ACEC (see Appendix D for ACEC locations):

   _____
   ACEC

   ☒ No

   c. Is any portion of the site subject to a Wetlands Restriction Order under the Inland Wetlands Restriction Act (M.G.L. c. 131, § 40A) or the Coastal Wetlands Restriction Act (M.G.L. c. 130, § 105)?

   ☐ Yes

   ☒ No

000000260



Massachusetts Department of Environmental Protection
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

_____

Provided by DEP
Wareham
Town

## D. Performance Standards

1. Is any portion of the proposed activity eligible to be treated as a limited project subject to 310 CMR 10.24 or 310 CMR 10.53?

   ☐ Yes    If yes, describe which limited project applies to this project:

   _____
   Limited Project

   ☒ No

2. Is any activity within any Resource Area or Buffer Zone exempt from performance standards of the wetlands regulations, 310 CMR 10.00.

   ☐ Yes    If yes, describe which exemption applies to this project:

   _____
   Exemption

   ☒ No

3. a. Is the project located in the Riverfront Area?

   ☒ Yes    If yes, indicate the proposed project purpose:

   ☐ Single Family House          ☐ Industrial Development

   ☐ Residential Subdivision       ☐ Commercial Development

   ☐ Transportation                ☒ Other (describe)
                                     Redevelopment
                                     _____

   ☐ b. Was the lot where the activity is proposed created prior to August 1, 1996?

   ☒ Yes

   ☐ No

4. a. Describe how the project will meet all performance standards for each of the resource areas altered, including standards requiring consideration of alternative project design or location. Attach narrative and supporting documentation.

   b. Is this project exempt from the DEP Stormwater Policy?

   ☐ Yes    If yes, explain why the project is exempt::

   _____

   _____

   ☒ No    If no, stormwater management measures are required. Applicants are encouraged to complete Appendix C: Stormwater Management Form and submit it with this form.



Massachusetts Department of Environmental Protection
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent

Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

Provided by DEP
Wareham
Town

## E. Additional Information

Applicants must include the following with this Notice of Intent (NOI):

- USGS or other map of the area (along with a narrative description, if necessary), containing sufficient information for the Conservation Commission and the Department to locate the site.
- Plans identifying the location of proposed activities (including activities proposed to serve as a Bordering Vegetated Wetland (BVW) replication area or other mitigating measure) relative to the boundaries of each affected resource area.
- Other material identifying and explaining the determination of resource area boundaries shown on plans (e.g., a DEP BVW Field Data Form).
- List the titles and final revision dates for all plans and other materials submitted with this NOI.

## F. Fees

The fees for work proposed under each Notice of Intent must be calculated and submitted to the Conservation Commission and the Department (see Instructions and Appendix B, Wetland Fee Transmittal Form).

No fee shall be assessed for projects of the federal government, the Department, or cities and towns of the Commonwealth.

Applicants must submit the following information (in addition to pages 1 and 2 of Appendix B) to confirm fee payment:

_104/24_
Check Number

BD Realty Trust
Payor name on check

_1 / 4 / 02_
Check date

Same
Applicant name (if different from payor)

## G. Signatures and Submittal Requirements

I hereby certify under the penalties of perjury that the foregoing Notice of Intent and accompanying plans, documents, and supporting data are true and complete to the best of my knowledge. I understand that the Conservation Commission will place notification of this Notice in a local newspaper at the expense of the applicant in accordance with the wetlands regulations, 310 CMR 10.05(5)(a).

I further certify under penalties of perjury that all abutters were notified of this application, pursuant to the requirements of M.G.L. c. 131, § 40. Notice must be made in writing by hand delivery or certified mail (return receipt requested) to all abutters within 100 feet of the property line of the project location.

_Barbara DeJuter, TRUSTEE_
Signature of Applicant

_1/4/02_
Date

_BD REALTY TRUST_
Signature of Property Owner (if different)

Date

_John C. Whitet, Jr._
Signature of Representative (if any)

_1/4/02_
Date



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 3 – Notice of Intent
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

_____

Provided by DEP
Wareham
Town

---

## G. Signatures and Submittal Requirements (cont.)

**For Conservation Commission:**
Two copies of the completed Notice of Intent (Form 3), including supporting plans and documents; two copies of pages 1 and 2 of Appendix B; and the city/town fee payment must be sent to the Conservation Commission by certified mail or hand delivery.

**For DEP:**
Two copies of the completed Notice of Intent (Form 3), including supporting plans and documents; two copies of pages 1 and 2 of Appendix B; and a copy of the state fee payment must be sent to the DEP Regional Office (see Appendix A) by certified mail or hand delivery.

**Other:**
If the applicant has checked the "yes" box in any part of Section C, Item 3, above, refer to that section and the Instructions for additional submittal requirements.

The original and copies must be sent simultaneously. Failure by the applicant to send copies in a timely manner may result in dismissal of the Notice of Intent.

Wareham Conservation Commission
Town Hall
Wareham, Mass., 02571
Ref: Swift's Beach

December 19, 2001

Dear Commission;

This discussion is in connection with the above referenced project for BD Realty Trust at Swift's Beach. The proponent currently owns about 5 acres of land, Lots B-1 and E on Assessors Plat 50B-2. The property has been a separate parcel of land since prior to June 30, 1938. The Land Court decree plan shows that there were eleven structures including at least nine dwellings on the property in 1938. For at least 50 years, a fairly large parking lot has been on the property serving a snack bar and bathhouse. No change is proposed in the use of this parking lot. On the beach directly in front of the property are two parcels not owned by BD Realty Trust. One parcel belongs to the Town of Wareham and the adjacent parcel is under separate private ownership. Presumably, the owners of these parcels have rights to use the existing "Way". Currently the general public uses these two lots as a bathing beach, also trespassing on the adjacent subject property. The proposal includes fencing and plantings to prevent the public from trespassing and further degrading the dunes.

Appurtenant to the property is a municipal water service and a sewer connection, installed to serve the bathhouse and snack bar. The concrete slab foundation of the snack bar is about 40 feet wide and 65 feet long and will be removed. A corner of this slab is under the dune, and the dune will be restored to at least it's original location and elevation after the removal of the slab.

There are several resource areas on the property, the location of which were determined by the Wareham Conservation Commission by Order dated October 18, 2000.

Page One of Three

000000264

The proponent, B.D. Realty Trust proposes to erect a structure on pilings on the property. The entire project will develop about 6600 square feet of the 5 acres total area. The property includes about 120,000 square feet of riverfront area, and of the total project, only 4420 square feet or 0.4 % will be developed. The construction will occur only in what has been determined to be the 100 foot to 200 foot outer riparian zone. The only work proposed in the 0 foot to 100 foot inner riparian zone is fencing and plantings in the dune.

The proposed work includes removing the existing concrete slab as stated above and then constructing a structure on fourteen foot high pilings. Surrounding the structure will be decks supported by the main pilings by either cantilevering or the use of struts. To provide parking and access, a 50 foot by 37.5 foot concrete slab will be constructed under the easterly portion of the structure. It should be noted that the proposed slab is about 30% smaller than the slab being removed. A paved driveway will extend shoreward to Wankinco Avenue. This driveway is not within the riverfront area. The surface under the westerly and southerly portion of the proposed structure will be left natural and brought to grade by the use of compatible sand and shells brought from other sources. None of the proposed work will result in a decrease in elevation of any portion of the property.

There are several coastal dune areas on the property. It is our opinion that these dunes have suffered degradation from lack of protection of the beach grass and other ground cover and an infestation of phragmites. For this reason, we propose to use accepted protective measures for dunes as recommended in the "Guidelines for Barrier Beach Management in Massachusetts" written by the Massachusetts Barrier Beach Task Force. The Task Force was sponsored by the DEP and the Guidelines are generally referenced in all Orders of Conditions for any beach projects.

These recommended measures include cutting down the phragmites in late July and the hand application of an off the shelf herbicide such as Roundup to the remaining stalks. It may be several years before the phragmites are finally brought under control. In addition, restorative work is proposed to close, fence off and revegetate all but two of the many paths which meander through the dune. The remaining two pathways will be reduced to a width of four feet by the use of snow fencing and plantings of Rosa Rugosa. It is hoped that in time the integrity of the dunes can be restored by these measures. None of this work will adversely impact the resource area, and will actually help restore the health of the dune.

The proposed dwelling itself and driveway are within the portion of the

Page Two of Three

000000265

property determined to be upland, and all construction work on the dwelling itself will be performed from inside the project perimeter to avoid impacts to the nearby dunes. It is our opinion that due to the nearly level topography, no siltation barriers are required. The project will be monitored closely and should it become evident that it becomes necessary, siltation barriers will be installed immediately in critical locations. These barriers will be maintained until the work is complete and all disturbed areas are stabilized.

In conclusion, BD Realty Trust is proposing restoration of degraded Riverfront Area at the site. By our calculations, there are approximately 120,000 square feet within the determined Riverfront Area, 68,000 in the inner (0-100') riparian zone and 52,000 within the outer(100'-200') riparian zone. Of the 120,000 square feet, we estimate that approximately 36,000 square feet(30%) are degraded in one way or another. If the proposal is approved, about 10,540 square feet of Riverfront Area will be restored. This includes 2630 square foot of concrete slab to be removed, 1200 square feet of phragmites to be removed, 1895 square feet of pathways to be closed and revegetated, 1215 square feet of beach to be revegetated and an additional 3600 square feet of beach to be closed and allowed to revegetate naturally. In addition, with the exception of the location of the supporting columns and the 1875 square foot slab, the dune will be allowed to migrate freely under the proposed structure.

The footprint of the proposed structure within the riverfront area is 4422 square feet, all within the outer riparian zone. This is 0.4% of the entire riverfront area and 0.9% of the outer riparian zone.

For this reason as well as the measures outlined  above and on the accompanying plan, it is our opinion that although there are several different resource areas on the property, no work is proposed which will *adversely* impact *any* resource area, meaning the project as proposed meets the requirements of 310 CMR 10.58 as well as the other sections of the Wetlands Protection Act and therefore we request approval of the project.

Should you have any questions regarding this matter, please feel free to contact me at the office.

Very Truly Yours;

VAUTRINOT LAND SURVEYING. INC.

Page Three of Three

000000266



Massachusetts Department of Environmental Protection
Bureau of Resource Protection - Wetlands

# WPA Appendix C – Stormwater Management Form
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

## A. Property Information

**Important:**
When filling out forms on the computer, use only the tab key to move your cursor - do not use the return key.

**Note:**
This November 2000 version of the Stormwater Management Form supersedes earlier versions including those contained in DEP's Stormwater Handbooks.

1.  The proposed project is:

New development  ☐ Yes
            ☒ No

Redevelopment  ☒ Yes
            ☐ No

Combination  ☐ Yes   (If yes, distinguish redevelopment components from new
                   development components on plans).
            ☐ No

2.  Stormwater runoff to be treated for water quality are based on which of the following calculations:

☐ 1 inch of runoff x total impervious area of post-development site for discharge to **critical areas** (Outstanding Resource Waters, recharge areas of public water supplies, shellfish growing areas, swimming beaches, cold water fisheries).

☒ 0.5 inches of runoff x total impervious area of post-development site for other resource areas.

3.  List all plans and documents (e.g. calculations and additional narratives) submitted with this form:

All roof drain leaders to be directed to drywells.

_____

_____

_____

_____

_____

## B. Stormwater Management Standards

DEP's Stormwater Management Policy (March 1997) includes nine standards that are listed on the following pages. Check the appropriate boxes for each standard and provide documentation and additional information when applicable.

### Standard #1: Untreated stormwater

☒ The project is designed so that new stormwater point discharges do not discharge untreated stormwater into, or cause erosion to, wetlands and waters.

000000267



Massachusetts Department of Environmental Protection
Bureau of Resource Protection - Wetlands

# WPA Appendix C – Stormwater Management Form
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

---

## B. Stormwater Management Standards (cont.)

**Standard #2: Post-development peak discharges rates**

☒ Not applicable – project site contains waters subject to tidal action.

Post-development peak discharge does not exceed pre-development rates on the site at the point of discharge or downgradient property boundary for the 2-yr, 10-yr, and 100-yr, 24-hr storm.

    ☐ without stormwater controls

    ☐ with stormwater controls designed for the 2-yr, and 10-yr storm, 24-hr storm.

    ☐ the project as designed will not increase off-site flooding impacts from the 100-yr, 24-hr storm.

**Standard #3: Recharge to groundwater**

Amount of impervious area (sq. ft.) to be infiltrated:  <u>6000</u>

Volume to be recharged is based on:

    ☐ The following Natural Resources Conservation Service hydrologic soils groups (e.g. A, B, C, D, or UA) or any combination of groups:

| (% of impervious area) | (Hydrologic soil group) | (% of impervious area) | (Hydrologic soil group) |
|---|---|---|---|
| (% of impervious area) | (Hydrologic soil group) | (% of impervious area) | (Hydrologic soil group) |

    ☒ Site specific pre-development conditions:  <u>8.3 inches/hour</u>    <u>3000 Cu. Ft.</u>
                                                         Recharge rate               Volume

Describe how there calculations were determined:

_____

_____

_____

List each BMP or nonstructural measure used to meet Standard #3. (e.g. dry well, infiltration trench).

<u>Drywells on all roof drain leaders.</u>

_____

_____

Does the annual groundwater recharge for the post-development site approximates the annual recharge from existing site conditions?

☒ Yes

☐ No

000000263



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands
# WPA Appendix C – Stormwater Management Form
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

---

## B. Stormwater Management Standards (cont.)

**Standard #4: 80% TSS Removal**

☒  The proposed stormwater management system will remove 80% of the post-development site's average annual Total Suspended Solids (TSS) load.

Identify the BMP's proposed for the project and describe how the 80% TSS removal will be achieved.

Roof runoff not contaminated.

_____

_____

_____

If the project is redevelopment, explain how much TSS will be removed and briefly explain why 80% removal cannot be achieved.

_____

_____

_____

**Standard #5: Higher potential pollutant loads**

See Stormwater Policy Handbook Vol. I, page I-23, for land uses of high pollutant loading

Does the project site contain land uses with higher potential pollutant loads

☐ Yes            If yes, describe land uses:

_____

☒ No

Identify the BMPs selected to treat stormwater runoff. If infiltration measures are proposed, describe the pretreatment. (Note: If the area of higher potential pollutant loading is upgradient of a critical area, infiltration is not allowed.)

_____

_____

**Standard #6: Protection of critical areas**

See Stormwater Policy Handbook . I, page I-25, for critical areas.

Will the project discharge to or affect a critical area?

☐ Yes            If yes, describe areas:

_____

☒ No



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Appendix C – Stormwater Management Form
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

---

## B. Stormwater Management Standards (cont.)

Identify the BMPs selected for stormwater discharges in these areas and describe how BMPs meet restrictions listed on pages I-27 and I-28 of the Stormwater Policy Handbook – Vol. I:

_____

_____

_____

Note: components of redevelopment projects which plan to develop previously undeveloped areas do not fall under the scope of Standard 7.

### Standard #7: Redevelopment projects

Is the proposed activity a redevelopment project?

☒ Yes    If yes, the following stormwater management standards have been met:

Standard 1, 3, 6 & 8 _____

_____

☐ No    _____

The following stormwater standards have not been met for the following reasons:

_____

_____

_____

☐ The proposed project will reduce the annual pollutant load on the site with new or improved stormwater control.

### Standard #8: Erosion/sediment control

☒ Erosion and sediment controls are incorporated into the project design to prevent erosion, control sediments, and stabilize exposed soils during construction or land disturbance.

### Standard #9: Operation/maintenance plan

☒ An operation and maintenance plan for the post-development stormwater controls have been developed. The plan includes ownership of the stormwater BMPs, parties responsible for operation and maintenance, schedule for inspection and maintenance, routine and long-term maintenance responsibilities, and provision for appropriate access and maintenance easements extending from a public right-of-way to the stormwater controls.

| | |
|---|---|
| Plan/Title | Date |
| Plan/Title | Date |



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Appendix C – Stormwater Management Form
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

## C. Submittal Requirements

DEP recommends that applicants submit this form, as well as, supporting documentation and plans, with the Notice of Intent to provide stormwater management information for Commission review consistent with the wetland regulations (310 CMR 10.05 (6)(b)) and DEP's Stormwater Management Policy (March 1997). If a particular stormwater management standard cannot be met, information should be provided to demonstrate how equivalent water quality and water quantity protection will be provided. DEP encourages engineers to use this form to certify that the project meets the stormwater management standards as well as acceptable engineering standards. For more information, consult the Stormwater Management Policy.

## D. Signatures

Barbara Deighton     *B.D. Romny Trust*          1/4/02
Applicant                                         Date

*Barbara Deighton*

Signature

Alan C. Vautrinot, Jr.                            1/4/02
Representative (if any)                           Date

*Ala C. Vahit, J.*

Signature

000000271

**Fleming & Ishihara, P.C.**
**PO Box 396**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                                Margaret A. Ishihara

11 January 2002

Town of Wareham
Conservation Commission
Memorial Town Hall
54 Marion Rd.
Wareham, MA. 02571


Re: BD Realty Trust, Swifts Beach, January 2002 NOI
DEP file no.: To be assigned

Dear Sir;   .

Enclosed please find for filing:

(a)    Notice of Appearance; and

(b)    Owner/Applicant's Memorandum of Law in Support of Notice of Intent.

Very truly yours,

Margaret A. Ishihara

Cc: Susan Bernstein, Esq.


000000272


Telephone: (508) 758-6981                          Fax: (508) 758-3406

TOWN OF WAREHAM CONSERVATION COMMISSION

RE:    BD REALTY TRUST, SWIFTS BEACH

DEP File No. : To be assigned.

OWNER/APPLICANT'S MEMORANDUM OF LAW IN SUPPORT OF NOTICE OF INTENT

INTRODUCTORY STATEMENT

This memorandum of law is being filed in support of the treatment of this project as a redevelopment project under 310 CMR 10.58(5), <u>Redevelopment Within Previously Developed Riverfront Areas: Restoration and Mitigation</u>.

PRIOR PROCEEDINGS

This project was originally proposed by the Owner/Applicant, BD Realty Trust, in a Notice of Intent filed on or about May 9, 2001. This project was denied by the Wareham Conservation Commission in their Order of Conditions dated September 26, 2001. The Owner/Applicant filed a Request for Superseding Order of Conditions from the Order denying the project. The Owner/Applicant has requested a stay of the Superseding Order of Conditions proceedings in order to proceed with the Notice of Intent filed in January 2002.

ARGUMENT

A project which is considered a redevelopment project does not have to meet the requirements of 310 CMR 10.58 (4) (c) (<u>Practicable and Substantially Equivalent Economic Alternatives</u>) or 310 CMR 10.58 (4) (d) (<u>No Significant Adverse Impact</u>). Instead the project must meet the requirements of 310 CMR 10.58 (5). See 310 CMR 10.58(5).

000000273

Redevelopment is defined as "replacement, rehabilitation or expansion of existing structures, improvement of existing roads, or reuse of degraded or previously developed area. A previously developed riverfront area contains areas degraded prior to August 7, 1996 by impervious surfaces from existing structures or pavement, absence of topsoil, junkyards, or abandoned dumping grounds". This project calls for the construction of a house and associated activities on a site which previously had a bathhouse, a snack bar and several dwellings located on it. Additionally, there has been foot traffic over the dune, which has worn footpaths in the dune, and phragmites, an invasive species, has established itself on the site. These activities took place prior to August 7, 1996.

The proposed project meets the criteria set forth in 310 CMR 10.58 (5).

Criteria:    "(a) At a minimum, proposed work shall result in an improvement over existing conditions of the capacity of the riverfront area to protect the interests identified in M.G.L.c. 131, § 40...."

How the project meets the criteria:    The proposed project will restore approximately 10,540 square feet of riverfront area. The footprint of the proposed structure within the riverfront area is 4422 square feet, all of which is located in the outer riparian zone. The net effect is an improvement over existing conditions.

Criteria:    " (b) Storm water management is provided according to standards established by the Department.

How the project meets the criteria:    See Stormwater Management Form, Appendix C to Notice of Intent.

Criteria:    "(c) Within 200 foot riverfront areas, proposed work shall not be located closer to the river than existing conditions or 100 feet, whichever is less, or not closer than existing conditions within 25 foot riverfront areas, except in accordance with 310 CMR 10.58 (5)(f) or (g)."

000000274

How the project meets the criteria:    The proposed work is located within the outer

riparian zone.

Criteria:    " (d) Proposed work, including expansion of existing structures,
shall be located outside the riverfront area or toward the riverfront area boundary and
away from the river, except in accordance with 310 CMR 10.58 (5)(f) or (g)."

How the project meets the criteria:    Part of the proposed work and the driveway are

located outside the riverfront area, and the rest of the house is located within the outer

riparian zone close to the outer boundary of the riverfront area.    The balance of the

project is restoration work.

Criteria:    "(e) The area of proposed work shall not exceed the amount of
degraded area, provided that the proposed work may alter up to
10% if the degraded area is less than 10% of the riverfront area,
except in accordance with 310 CMR 10.58 (5)(f) or (g)."

How the project meets the criteria:    The area of proposed work within the riverfront

area is 4420 square feet.  The degraded area is approximately 36,000 square feet, so the

area of proposed work is significantly less than the amount of degraded area.

Criteria:    "(f) When an applicant proposes restoration on-site of
degraded riverfront area, alteration may be allowed
notwithstanding the criteria of 310 CMR 10.58 (5)(c), (d), and
(e) at a ratio in square feet of at least 1:1 of restored area to
area of alteration not conforming to the criteria. Areas
immediately along the river shall be selected for restoration.
Alteration not conforming to the criteria shall begin at the
riverfront area boundary."

How the project meets the criteria:    The area of the proposed restoration is 10,540

square feet.  The area of proposed work within the riverfront is 4420 square feet, so a

better than 1:1 ratio is proposed.

Criteria: "Restoration shall include:
1. removal of all debris, but retaining any trees or other mature vegetation;
2. grading to a topography which reduces runoff and increases infiltration;
3. coverage by topsoil at a depth consistent with natural conditions at the site, and

4. seeding and planting with an erosion control seed mixture, followed by plantings of herbaceous and woody species appropriate to the site,..."

How the project meets the criteria:    This riverfront area has the characteristics of a coastal area rather than those of a river.  To the extent applicable the restoration will meet these requirements, and the restoration will result in an improvement of existing conditions.

000000276

CONCLUSION

For the reasons stated above the project should be approved as a redevelopment

project under 310 CMR 10.58(5).

OWNER/APPLICANT
BD REALTY TRUST
By their Attorney

Margaret A. Ishihara, BBO #247930
Fleming & Ishihara, P.C.
PO Box 396
86 Church St.
Mattapoisett, MA. 02739
Telephone: (508) 758-6981
Date: 11 Jun, 2002

000000277

CERTIFICATE OF SERVICE

I hereby certify that I have served the within document by mailing a copy to:

Commonwealth of Massachusetts
Department of Environmental Protection
20 Riverside Dr.
Lakeville, MA. 02347
Attn: Dorothy Blickens

With a courtesy copy to:

Susan A. Bernstein, Esq.
One Bowdoin Square, Suite 300
Boston, MA. 02114-2919

Date: _11 January 2007_

_Margaret A. Ishihara_

00000027

**EXHIBIT 2**



*Massachusetts Department of Environmental Protection*
*Bureau of Resource Protection – Wetlands* "DENIED"

# WPA Form 5 - Order of Conditions

*Massachusetts Wetlands Protection Act M.G.L. c. 131, §40*

DEP File Number

_____

*for DEP use only*

## **A** *Applicant Information* AND WAREHAM WETLAND PROTECTIVE BY-LAW, DIVISION VI

From:

Wareham
*Conservation Commission*

For:

SE76-1380
*Project File Number*

To:

BD Realty Trust
*Applicant Name*
P.O. Box 878
*Mailing Address*
Marion
*City/Town*
MA                02738
*State*          *Zip Code*

The project site is located at:

Wareham - Swifts Beach
*City/Town*
50B-2                    B1
*Assessors Map/Plat #*          *Parcel/Lot #*

and the property is recorded at the Registry of Deeds for:

Plymouth        18845        224
*County*          *Book*          *Page*

_____
*Certificate (if registered land)*

The Notice of Intent for this project was filed on:

January 2002
*Date*

The public hearing was closed on:

March 6, 2002
*Date*

Title and Date of final Plans and Other Documents:

Plan of Land for BD Realty Trust

by John Veracka Jr. R.P.E. dated May 7, 2001

Revised 02-10-02 & Foundation

Plan dated 02-19-02

## **B** *Findings*

Findings pursuant to the Massachusetts Wetlands
Protection Act:

Following the review of the above-referenced Notice of Intent
and based on the information provided in this application and
presented at the public hearing, this commission finds that the
area in which work is proposed is significant to the following
interests of the Wetlands Protection Act (check all that apply):

☐ Public Water Supply
☐ Private Water Supply
☐ Groundwater Supply
☒ Flood Control
☐ Land Containing Shellfish
☐ Fisheries
☒ Storm Damage Prevention
☒ Prevention of Pollution
☒ Protection of Wildlife Habitat

Furthermore, this Commission hereby finds that the project, as
proposed, is:
(check one of the following boxes)

Approved subject to:

☐ the following conditions which are necessary, in accordance
with the performance standards set forth in the wetlands
regulations, to protect those interests checked above. This
Commission orders that all the work shall be performed in
accordance with the Notice of Intent referenced above, the
following General Conditions, and any other special
conditions attached to this Order. To the extent that the
following conditions modify or differ from the plans,
specifications, or other proposals submitted with the Notice
of Intent, these conditions shall control.



000000279



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection – Wetlands

# WPA Form 5 - Order of Conditions

*Massachusetts Wetlands Protection Act M.G.L. c. 131, §40*

## B. Findings (cont.)

Denied because:

☑ the proposed work cannot be conditioned to meet the performance standards set forth in the wetlands regulations to protect those interests checked above. Therefore, work on this project may not go forward unless and until a new Notice of Intent is submitted which provides measures which are adequate to protect these interests, and a final Order of Conditions is issued.

☑ the information submitted by the applicant is not sufficient to describe the site, the work, or the effect of the work on the interests identified in the Wetlands Protection Act. Therefore, work on this project may not go forward unless and until a revised Notice of Intent is submitted which provides sufficient information and includes measures which are adequate to protect the Act's interests, and a final Order of Conditions is issued. A description of the specific information which is lacking and why it is necessary is attached to this Order as per 310 CMR 10.05(b)(c).

General Conditions

1. Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2. The Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state, or local statutes, ordinances, bylaws, or regulations.

4. The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
   (a) the work is a maintenance dredging project as provided for in the Act; or
   (b) the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance. If this Order is intended to be valid for more than three years, the extension date and the special circumstances warranting the extended time period are set forth as a special condition in this Order.

5. This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6. Any fill used in connection with this project shall be clean fill. Any fill shall contain no trash, refuse, rubbish, or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles, or parts of any of the foregoing.

7. This Order does not become final until all administrative appeal periods from this Order have elapsed, or if such an appeal has been taken, until all proceedings before the Department have been completed.

8. No work shall be undertaken until the Order has become final and then has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is done. The recording information shall be submitted to this Conservation Commission on the form at the end of this Order, which form must be stamped by the Registry of Deeds, prior to the commencement of the work.

9. A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words.
   "Massachusetts Department of Environmental Protection" [or, "MA DEP"] "File Number

   SE76-1380
   _____
   Project File Number

10. Where the Department of Environmental Protection is requested to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

11. Upon completion of the work described herein, the applicant shall submit a Request for Certificate of Compliance (WPA Form 8A) to the Conservation Commission.

12. The work shall conform to the following attached plans and special conditions:

    Final Approved Plans (attach additional plan references as needed) :

    Plan of Land for BD Realty Trust & Foundation Plan
    _____
    Title
    May 7, 2001 Rev. 02-10-02 & 02-19-02
    _____
    Dated
    John Veracka Jr. R.P.E.
    _____
    Signed and Stamped by
    Wareham Conservation Commission & D.E.P.
    _____
    On file with



*Massachusetts Department of Environmental Protection*
*Bureau of Resource Protection – Wetlands*

# WPA Form 5 - Order of Conditions

*Massachusetts Wetlands Protection Act M.G.L. c. 131, §40*

**B** *Findings (cont.)*

13. Any changes to the plans identified in Condition # 12 above shall require the applicant to inquire of the Conservation Commission in writing whether the change is significant enough to require the filing of a new Notice of Intent.

14. The Agent or members of the Conservation Commission and Department of Environmental Protection shall have the right to enter and inspect the area subject to this Order at reasonable hours to evaluate compliance with the conditions stated in this Order, and may require the submittal of any data deemed necessary by the Conservation Commission or Department for that evaluation.

15. This Order of Conditions shall apply to any successor in interest or successor in control of the property subject to this Order and to any contractor or other person performing work conditioned by this Order.

16. Prior to the start of work, and if the project involves work adjacent to a Bordering Vegetated Wetland, the boundary of the wetland in the vicinity of the proposed work area shall be marked by wooden stakes or flagging. Once in place, the wetland boundary markers shall serve as the limit of work (unless another limit of work line has been noted in the plans of record) and be maintained until a Certificate of Compliance has been issued by the Conservation Commission.

17. All sedimentation barriers shall be maintained in good repair until all disturbed areas have been fully stabilized with vegetation or other means. At no time shall sediments be deposited in a wetland or water body. During construction, the applicant or his/her designee shall inspect the erosion controls on a daily basis and shall remove accumulated sediments as needed. The applicant shall immediately control any erosion problems that occur at the site and shall also immediately notify the Conservation Commission, which reserves the right to require additional erosion and/or damage prevention controls it may deem necessary.

Special Conditions (Use additional paper if necessary)

See attached.

_____

_____

_____

_____

_____

_____

Findings as to municipal law, bylaw, or ordinance

Furthermore, the

_____
Conservation Commission

hereby finds (check one that applies):

☐ that the proposed work cannot be conditioned to meet the standards set forth in a municipal law, ordinance, or bylaw, specifically

_____
Name and citation of municipal law, bylaw, or ordinance

Therefore, work on this project may not go forward unless and until a revised Notice of Intent is submitted which provides measures which are adequate to meet these standards, and a final Order of Conditions is issued.

☐ that the following additional conditions are necessary to comply with a municipal law, bylaw, or ordinance, specifically

_____
Name and citation of municipal law, bylaw, or ordinance

The Commission orders that all the work shall be performed in accordance with the said additional conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans, specifications, or other proposals submitted with the Notice of Intent, the conditions shall control.

Additional conditions relating to municipal law, bylaw, or ordinance:

_____

_____

_____

_____

_____

_____

_____

_____



TOWN OF WAREHAM
CONSERVATION COMMISSION
MEMORIAL TOWN HALL
54 MARION ROAD
Wareham, Massachusetts 02571

BD Realty Trust
Decision  -  SE76-1380

The project is hereby denied for the following reasons:

The project does not meet the performance standards at 310 CMR 10.28(3), coastal dunes.  The project will hinder the landward or lateral migration of the coastal dune.

Also, the applicant was claiming that the project was a redevelopment project within previously degraded Riverfront Area and therefore did not require the Alternatives Analysis that is normally required for work within a Riverfront Area under 310 CMR 10.58.  The information submitted did not accurately reflect the previously degraded areas at the site and included areas in the square footage calculations that the Commission does not consider to be degraded, these being pathways through dunes and areas of Phragmite growth.   Therefore the Commission was not convinced through the information submitted that an Alternatives Analysis would not be required.   The information relative to the methodology of the proposed salt marsh restoration portion of the project was incomplete and untimely in terms of its submittal.

Because of this, the Commission also feels that the project should be denied due to lack of information under 310 CMR 10.05(6)(c).

000000503



**Massachusetts Department of Environmental Protection**
*Bureau of Resource Protection – Wetlands*

# WPA Form 5 - Order of Conditions

*Massachusetts Wetlands Protection Act M.G.L. c. 131, §40*

### B. *Findings (cont.)*

This Order is valid for three years, unless otherwise specified as a special condition pursuant to General Conditions #4, from the date of issuance.

March 26, 2002
*Date*

This Order must be signed by a majority of the conservation commission. The Order must be mailed by certified mail (return receipt requested) or hand delivered to the applicant. A copy also must be mailed or hand delivered at the same time to the appropriate regional office of the Department of Environmental Protection.

Signature(s):

On this ____8th____

day of ____MARCH____
*Month*

____2002____
*Year*

before me personally appeared

____DOUGLAS S. WESTGATE____

to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same as his/her free act and deed.

____Karen A. Forand____    Karen A. Forand
*Notary Public*
September 2, 2005
*My commission expires*

This Order is issued to the applicant as follows:

☐ by hand delivery on

_____
*Date*

X by certified mail, return receipt requested, on

March 26, 2002#70001670000327062513
*Date*

### C. *Appeals*

The applicant, the owner, any person aggrieved by this Order, any owner of land abutting the land subject to this Order, or any ten residents of the city or town in which such land is located, are hereby notified of their right to request the appropriate Department of Environmental Protection Regional Office to issue a Superseding Order of Conditions. The request must be made by certified mail or hand delivery to the Department, with the appropriate filing fee and a completed Appendix E: Request for Departmental Action Fee Transmittal Form, as provided in 310 CMR 10.03(7) within ten business days from the date of issuance of this Order. A copy of the request shall at the same time be sent by certified mail or hand delivery to the conservation commission and to the applicant, if he/she is not the appellant.

The request shall state clearly and concisely the objections to the Order which is being appealed and how the Order does not contribute to the protection of the interests identified in the Massachusetts Wetlands Protection Act (M.G.L. c. 131, §40 and is inconsistent with the wetlands regulations (310 CMR 10.00). To the extent that the Order is based on a municipal bylaw, and not on the Massachusetts Wetlands Protection Act or regulations, the Department of Environmental Protection has no appellate jurisdiction.

000000283



*Massachusetts Department of Environmental Protection*
*Bureau of Resource Protection – Wetlands*

# WPA Form 5 - Order of Conditions

*Massachusetts Wetlands Protection Act M.G.L. c. 131, §40*

**D.** *Recording Information*

This Order of Conditions must be recorded in the Registry of
Deeds or the Land Court for the district in which the land is
located, within the chain of title of the affected property. In the
case of recorded land, the Final Order shall also be noted in the
Registry's Grantor Index under the name of the owner of the
land subject to the Order. In the case of registered land, this
Order shall also be noted on the Land Court Certificate of Title
of the owner of the land subject to the Order of Conditions. The
recording information shall be submitted to the

Wareham
_____
*Conservation Commission*

on the form below, which must be stamped by the Registry of
Deeds.

Detach on dotted line and submit to the Conservation Commission.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To:
_____
*Conservation Commission*

Please be advised that the Order of Conditions for the project
at
_____
*Project Location*                              *DEP File Number*

has been recorded at the Registry of Deeds of

_____
*County*

and has been noted in the chain of title of the affected property
in
_____
*Book*

_____
*Page*

in accordance with the Order of Conditions issued on

_____
*Date*

If recorded land, the instrument number which identifies this
transaction is

_____
*Instrument Number*

If registered land, the document number which identifies this
transaction is

000000284

_____
*Document Number*

_____
*Signature of Applicant*

**EXHIBIT 3**



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
SOUTHEAST REGIONAL OFFICE
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347  508-946-2700

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

ELLEN ROY HERZFELDER
Secretary

ROBERT W. GOLLEDGE, Jr.
Commissioner

**1 2 AUG** 2003

Bob Deighton and Barbara Deighton, Trustees
BD Realty Trust
P.O. Box 878
Marion, Massachusetts 02738

RE:     WAREHAM -- Wetlands
DEP File No. SE 76-1380,
Superseding Order
of Conditions.

Dear Mr. & Mrs. Deighton:

Following an in-depth review of the above-referenced file and in accordance with Massachusetts General Laws, Chapter 131, Section 40 (the Act), and its Wetlands Regulations at 310 CMR 10.00, the Department of Environmental Protection has issued the enclosed Superseding Order of Conditions (SOC). This Order approves the proposed work including the removal of an existing concrete pad, and construction of a duplex home on piles, pervious driveway, connection to existing municipal sewerage line and public drinking water supply service located within the following wetland resource areas: Coastal Dune [10.28], Riverfront Area [10.58], and Land Subject to Coastal Storm Flowage (Zone VE (el. 20')) [10.04] as indicated on the Federal Emergency Management Agency (FEMA), Flood Insurance Rate Map (FIRM), revised June 15, 1992. The project also includes nuisance species control (*Phragmites australis*) [10.53(4)] and coastal dune restoration within Barrier Beach [10.29] and salt marsh restoration [10.32]. No work is proposed in Bordering Vegetated Wetland (BVW) [10.55]. Please be advised that the Wareham Conservation Commission established the wetland resource area boundaries through an Order of Resource Area Delineation, DEP File No. SE 76-1222, issued October 18, 2000.

In regard to Riverfront Area, the Department finds that the site qualifies as redevelopment and degraded conditions exist; and, the proponent has provided coastal dune and salt marsh restoration pursuant to 310 CMR 10.58(5).

Any future work not approved within this Superseding Order that is subject to jurisdiction of the Wetlands Protection Act will require the filing, at a minimum, of a Request of Determination of Applicability or a new Notice of Intent with the Conservation Commission and the Department. Prior to commencement of any such future work subject to jurisdiction receipt of a Negative Determination or valid Order of Conditions will be required.

It is the Department's opinion that, as conditioned herein, the permitted portions of the proposed project adequately protect the interest of the Act as cited in the SOC.  Please be advised that the Department reserves the right, should there be further proceedings in this matter, to raise additional issues and present further evidence as may be appropriate.

This information is available in alternate format. Call April McCabe, ADA Coordinator at 1-617-556-1171, TDD Service - 1-800-298-2207.

DEP on the World Wide Web: http://www.mass.gov/dep
♻ Printed on Recycled Paper

2

If you have any questions concerning this Superseding Order of Conditions, please contact **Dorothy Blickens** at **(508) 946-2781**.

Very truly yours,

Elizabeth A. Kouloheras,
Bureau of Resource Protection

K/DB/bh

Enclosure.

CERTIFIED MAIL  #7099 3220 0002 0275 3267

cc:     Wareham Conservation Commission

        Vautrinot Land Surveying
        P.O. Box 144
        Plympton, MA 02367

        Susan Blais
        c/o Attorney Susan A. Bernstein, Esq.
        One Bowdoin Square, Suite One
        Boston, MA 02114-2919

ecc:    DEP-SERO-BRP-ATTN: Mitch Ziencina



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands
## WPA Form 5 – Superseding Order of Conditions
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 76-1380
Provided by DEP

---

## A. General Information

From: Department of Environmental Protection
_____
Issuing Authority

This issuance is for (check one):

☒ Superseding Order of Conditions

☐ Amended Superseding Order of Conditions

To: Applicant:

Bob Deighton and Barbara Deighton, Trustees, BD Realty Trust
Name

P.O. Box 878
Mailing Address

Marion               MA        02738
City/Town          State    Zip Code

Property Owner (if different from applicant):

Same
Name

_____
Mailing Address

_____
City/Town          State    Zip Code

1. Project Location:

Off Swifts Beach Rd and Wankinco Ave
Street Address

Plat 50B-2
Assessors Map/Plat Number

Wareham
City/Town

Lot B-1
Parcel/Lot Number

2. Property recorded at the Registry of Deeds for:

Plymouth
County

90432
Certificate (if registered land)

18845
Book

224
Page

3. Dates:

January 14, 2002
Date Notice of Intent Filed

March 6, 2002
Date Public Hearing Closed

March 26, 2002
Date of Issuance of Local Order

4. Final Approved Plans and Other Documents (attach additional plan references as needed):

"Plan of Land in Wareham, Mass. Prepared For BD Realty Trust", 1 Sheet, hereinafter referenced as "Site Plan"
Title

Date
6/7/2001 revised thru 3/26/2003

"Foundation Plan, V-Zone Foundation, BD Realty Trust, Plat: 50B-2, Lot B1, 200 Swift Beach Road, Wareham, MA" , 3 Sheets, hereinafter referenced as "Foundation Plan"
Title

Date
4/2/2003 revised thru 4/9/2003

5. Final Plans and Documents Signed and Stamped by:

Plan 1: Alan C. Vautrinot, Jr., P.L.S.; and, Plan 2; Robert M. Field, P.E.
Name

6. Total Fee:

$370.00
(from Appendix B: Wetland Fee Transmittal Form)



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

**WPA Form 5 – Superseding Order of Conditions**
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 76-1380
Provided by DEP

---

## B. Findings

Findings pursuant to the Massachusetts Wetlands Protection Act:

Following the review of the above-referenced Notice of Intent and based on the information provided in this application and presented at the public hearing, the Department finds that the areas in which work is proposed is significant to the following interests of the Wetlands Protection Act. Check all that apply:

☒ Public Water Supply   ☐ Land Containing Shellfish   ☒ Prevention of Pollution

☒ Private Water Supply   ☒ Fisheries   ☒ Protection of Wildlife Habitat

☒ Groundwater Supply   ☒ Storm Damage Prevention   ☒ Flood Control

Furthermore, the Department hereby finds the project, as proposed, is: (check one of the following boxes)

**Approved** subject to:

☒ the following conditions which are necessary, in accordance with the performance standards set forth in the wetlands regulations, to protect those interests checked above. The Department orders that all work shall be performed in accordance with the Notice of Intent referenced above, the following General Conditions, and any other special conditions attached to this Order. To the extent that the following conditions modify or differ from the plans, specifications, or other proposals submitted with the Notice of Intent, these conditions shall control.

**Denied** because:

☐ the proposed work cannot be conditioned to meet the performance standards set forth in the wetland regulations to protect those interests checked above. Therefore, work on this project may not go forward unless and until a new Notice of Intent is submitted which provides measures which are adequate to protect these interests, and a final Order of Conditions is issued.

☐ the information submitted by the applicant is not sufficient to describe the site, the work, or the effect of the work on the interests identified in the Wetlands Protection Act. Therefore, work on this project may not go forward unless and until a revised Notice of Intent is submitted which provides sufficient information and includes measures which are adequate to protect the Act's interests, and a final Order of Conditions is issued. A description of the specific information which is lacking and why it is necessary is attached to this Order as per 310 CMR 10.05(6)(c).

**General Conditions** (only applicable to approved projects)

1. Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2. This Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state, or local statutes, ordinances, bylaws, or regulations.



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 5 – Superseding Order of Conditions
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 76-1380
Provided by DEP

---

## B. Findings (cont.)

4.  The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
    a.  the work is a maintenance dredging project as provided for in the Act; or
    b.  the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance. If this Order is intended to be valid for more than three years, the extension date and the special circumstances warranting the extended time period are set forth as a special condition in this Order.

5.  This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6.  Any fill used in connection with this project shall be clean fill. Any fill shall contain no trash, refuse, rubbish, or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles, or parts of any of the foregoing.

7.  This Order is not final until all administrative appeal periods from this Order have elapsed, or if such an appeal has been taken, until all proceedings before the Department have been completed.

8.  No work shall be undertaken until the Order has become final and then has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of the registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is done. The recording information shall be submitted to the Department on the form at the end of this Order, which form must be stamped by the Registry of Deeds, prior to the commencement of work.

9.  A sign shall be displayed at the site not less then two square feet or more than three square feet in size bearing the words,

    "Massachusetts Department of Environmental Protection" [or, "MA DEP"]

    "File Number SE 76-1380   "

10. Where the Department of Environmental Protection is requested to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before DEP.

11. Upon completion of the work described herein, the applicant shall submit a Request for Certificate of Compliance (WPA Form 8A) to the Department.

12. The work shall conform to the plans and special conditions referenced in this order.

13. Any change to the plans identified in Condition #12 above shall require the applicant to inquire of the Department in writing whether the change is significant enough to require the filing of a new Notice of Intent.

14. The Agent or members of the Conservation Commission and the Department of Environmental Protection shall have the right to enter and inspect the area subject to this Order at reasonable hours to evaluate compliance with the conditions stated in this Order, and may require the submittal of any data deemed necessary by the Department for that evaluation.



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

**WPA Form 5 – Superseding Order of Conditions**
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 75-1380
Provided by DEP

---

## B. Findings (cont.)

15. This Order of Conditions shall apply to any successor in interest or successor in control of the property subject to this Order and to any contractor or other person performing work conditioned by this Order.

16. Prior to the start of work, and if the project involves work adjacent to a Bordering Vegetated Wetland, the boundary of the wetland in the vicinity of the proposed work area shall be marked by wooden stakes or flagging. Once in place, the wetland boundary markers shall be maintained until a Certificate of Compliance has been issued by the Department.

17. All sedimentation barriers shall be maintained in good repair until all disturbed areas have been fully stabilized with vegetation or other means. At no time shall sediments be deposited in a wetland or water body. During construction, the applicant or his/her designee shall inspect the erosion controls on a daily basis and shall remove accumulated sediments as needed. The applicant shall immediately control any erosion problems that occur at the site and shall also immediately notify the Department, which reserves the right to require additional erosion and/or damage prevention controls it may deem necessary. Sedimentation barriers shall serve as the limit of work unless another limit of work line has been approved by this Order.

   Special Conditions:  See attached Special Conditions Nos. <u>1</u> through <u>23</u>.

This Order is valid for three years, unless otherwise specified as a special condition pursuant to General Conditions #4, from the date of issuance.

1 2 AUG 2003
_____
Date

Signatures:  *Elizabeth A. Kouloheras*
_____
Elizabeth A. Kouloheras, Bureau of Resource Protection

On __12th__          Of __August    2003__
     Day                 Month and Year

before me personally appeared <u>Elizabeth A. Kouloheras</u> to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same as his/her free act and deed.

_____          December 17, 2004
Notary Public                                My Commission Expires

This Order is issued to the applicant as follows:

☐ by hand delivery on                    ☒ by certified mail on

                                          1 2 AUG 2003
_____          _____
Date                                     Date      7099 3220 0002 0276 3267

---

**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

**WPA Form 5 – Superseding Order of Conditions**
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 76-1380
Provided by DEP

---

## C. Appeals

Notice of Appeal Rights:

**A)   Appeal Rights and Time Limits**

The applicant, the owner, any person aggrieved by the Superseding Order, any owner of land abutting the land upon which the proposed work is to be done, or any ten (10) persons pursuant to M.G.L. c.30A, §10A, are hereby notified of their right to request an adjudicatory hearing pursuant to M.G.L. c.30A, § 10, providing the request is made by certified mail or hand delivery to the Department, with the appropriate filing fee and a DEP Fee Transmittal Form within ten (10) business days from the date of issuance of this Superseding Order, and addressed to:

> Docket Clerk
> Office of Administrative Appeals
> Department of Environmental Protection
> One Winter Street, 3rd Floor
> Boston, MA 02108.

A copy of the request shall at the same time be sent by certified mail or hand delivery to the Conservation Commission, the applicant, and the issuing office of the DEP at:

> DEP Southeast Region
> 20 Riverside Drive
> Lakeville, MA 02347

**B)   Contents of Hearing Request**

A Notice of Claim for Adjudicatory Hearing shall comply with the Department's Rules for Adjudicatory Proceedings, 310 CMR 1.01(6), and shall contain the following information:

(a)   the DEP Wetlands File Number, name of the applicant and address of the project;
(b)   the complete name, address, and fax and telephone numbers of the party filing the request, and, if represented by consultant or counsel, the name, fax and telephone numbers, and address of the representative;
(c)   the names, telephone and fax numbers, and addresses of all other parties, if known;
(d)   a clear and concise statement of (1) the facts which are grounds for the proceedings, (2) the objections to this Superseding Order, including specifically the manner in which it is alleged to be inconsistent with the Department's Wetlands Regulations, 310 CMR 10.00, and does not contribute to the protection of the interests identified in the Act, and (3) the relief sought through the adjudicatory hearing, including specifically the changes desired in the Superseding Order;
(e)   a statement that a copy of the request has been sent by certified mail or hand delivery to the applicant and the conservation commission.

**C)   Filing Fee and Address**

A copy of the Notice of Claim along with a DEP Fee Transmittal Form and a valid check or money order payable to the Commonwealth of Massachusetts in the amount of one hundred dollars ($100) must be mailed to:

> Commonwealth of Massachusetts
> Department of Environmental Protection
> Commonwealth Master Lockbox
> P.O. Box 4062
> Boston, Massachusetts 02211

The request will be dismissed if the filing fee is not paid, unless the appellant is exempt or granted a waiver.  The filing fee is not required if the appellant is a city or town (or municipal agency), county, or district of the Commonwealth of Massachusetts, or a municipal housing authority.  The Department may waive the adjudicatory hearing filing fee pursuant to 310 CMR 4.06(2) for a person who shows that paying the fee will create an undue financial hardship.  A person seeking a waiver must file an affidavit setting forth the facts believed to support the claim of undue financial hardship together with the hearing request as provided above.

Failure to submit all necessary information may result in a dismissal by the Department of the Notice of Claim for an Adjudicatory Hearing.



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection - Wetlands

# WPA Form 5 – Superseding Order of Conditions
Massachusetts Wetlands Protection Act M.G.L. c. 131, §40

DEP File Number:

SE 76-1380
Provided by DEP

## D. Recording Information

This Order of Conditions must be recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land subject to the Order. In the case of registered land, this Order shall also be noted on the Land Court Certificate of Title of the owner of the land subject to the Order of Conditions. The recording information on Page 6 of Form 5 shall be submitted to the Department at the address listed below.

Department of Environmental Protection
Southeast Regional Office
20 Riverside Drive
Lakeville, Massachusetts 02347

Detach on dotted line, have stamped by the Registry of Deeds and submit to the Department.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To: Attn: Dorothy Blickens, Wetlands Section, Department of Environmental Protection, Southeast Regional Office, 20 Riverside Drive, Lakeville, MA 02347
Issuing Authority

Please be advised that the Superseding Order of Conditions for the Project at:

Off Swifts Beach Rd and Wankinco Ave          SE 76-1380
Project Location                                              DEP File Number

Has been recorded at the Registry of Deeds of:

Plymouth
County                                    Book                                    Page

for:

Property Owner

and has been noted in the chain of title of the affected property in:

Book                                    Page

In accordance with the Superseding Order of Conditions issued on:

Date

If recorded land, the instrument number identifying this transaction is:

Instrument Number

If registered land, the document number identifying this transaction is:

Document Number

Signature of Applicant

Wpaform5.doc • rev 6/12/03                                              Page 6 of 8

Superseding Order of Conditions for SE 76-1380
**Special Conditions:**

1. The Wareham Conservation Commission established the wetland resource area boundaries through an Order of Resource Area Delineation, DEP File No. SE 76-1222, issued October 18, 2000.

2. No work is proposed or permitted in Bordering Vegetated Wetland (BVW) [10.55].

3. *Prior to commencement of any construction*, and in an effort to protect existing vegetated dune areas, an erosion control barrier consisting of a row of hay bales staked end to end and a siltation fence firmly anchored with six (6) inches of soil shall be placed five feet outward from and parallel to the proposed duplex home *construction footprint*. This footprint includes the duplex building and deck(s), drywells and driveway. Access to the construction footprint can be achieved via the existing drive and directly adjacent degraded parking area. If the existing concrete pad cannot be removed within a 24-hour period, then anchored siltation fence shall be installed around this work area. The erosion control barrier shall serve as the limit of work. No equipment or vehicles are allowed beyond the limit or work for the duplex construction and concrete pad removal.

4. All areas disturbed during construction shall be immediately (within twenty-four hours) stabilized against erosion and revegetated with American Beach Grass [*Ammophila breviligulata*] within thirty (30) days of final on-site grading.

5. The applicant shall notify the Department and the Wareham Conservation Commission, in writing, after the installation of the erosion control barrier and 48 hours before any construction activity commences on the project site.

6. The proposed dwelling is to be constructed on a open pile foundation as shown on the plans of record and shall be in compliance with the structural and first floor elevation requirements of the Massachusetts Uniform Building Code (780 CMR 2102.0) and the Federal Emergency Management Agency as they relate to construction within the coastal high hazard area. The steel piles shall be driven into place and therefore dewatering is not necessary or permitted under this Superseding Order of Conditions.

7. Please refer to Special Condition #6 above. The only "slab" permitted to be constructed under this Superseding Order is a utility core slab with breakaway walls as proposed and shown on the plans of record. As proposed and shown on the "Site Plan" of record, the remainder of the area underneath the duplex shall be pervious consisting of natural sand and planted with American Beach Grass [*Ammophila breviligulata*]. This condition is ongoing and does not expire with the issuance of a Certificate of Compliance.

8. The applicant, owner and/or successor(s) shall provide written notification to the Department and the Wareham Conservation Commission upon installation of the proposed open pile foundation (prior to construction of the duplex dwelling). A statement from a registered Professional Engineer certifying that the proposed open pile foundation has been installed in compliance with the approved plans and conditions of this Superseding Order shall accompany the written notification.

9. As proposed, any driveway shall be constructed with pervious material, such as crushed shells, as shown on the "Site Plan" of record. This condition is ongoing and does not expire with the issuance of a Certificate of Compliance.

10. As proposed, all roof runoff shall be channeled into downspouts and directed into dry wells.

11. Water used to rinse concrete from equipment shall not be discharged to any wetland (i.e. coastal dune, beach, river and/or ocean...).

12. A qualified wetland scientist shall be present at the site during nuisance species control, coastal dune and salt marsh restoration [hereinafter "the restoration areas"] activities; shall supervise these activities; and shall monitor all wetland restoration activities.

13. As proposed the areas of nuisance species vegetation (*Phragmites australis*) adjacent to the existing concrete pad and along the line of boulders adjacent to the salt marsh shall be removed by hand and treated by application of an appropriate herbicide (such as RoundUp or similar product) that can be wiped (or brushed) directly on the

Superseding Order of Conditions for SE 76-1380
**Special Conditions Continued:**

the supervision of the previously noted wetland scientist. These areas shall be revegetated with American Beach Grass [*Ammophila breviligulata*].

14. As proposed and shown on the "Site Plan" of record, the four walking paths to coastal beach (2250 square feet), the concrete pad, and additional restoration area surrounding the proposed duplex (6371 square feet) shall be restored as coastal dune and planted with American Beach Grass [*Ammophila breviligulata*].

15. As proposed and shown on the "Site Plan" of record, the applicant shall allow approximately 525 square feet of degraded salt marsh to naturally re-vegetate. The salt marsh restoration area shall be protected from encroachment by the proposed post and rail fence. The split rail fence shall be installed by hand; the fence shall be installed so as to not impede the movement of any wildlife. The use of heavy equipment and/or installation of concrete footings or sono-tubes is prohibited.

16. All restoration activities shall take place in accordance with the Notice of Intent, additional information submitted under the "Notice of Project Change" to the Secretary of the Executive Office of Environmental Affairs pursuant to the Massachusetts Environmental Protection Act (MEPA), and plans of record except as conditioned within this Superseding Order.

17. No future activity, such as clearcutting, mowing or earth removal activities, that results in the alteration of the restoration areas is permitted. This condition is ongoing and shall not expire with the issuance of a Certificate of Compliance.

18. Any non-native invasive plant species (e.g. Phragmites, purple loosestrife, buckthorns, etc...) shall be removed by hand from the restoration areas under the supervision of the previously noted wetland scientist.

19. Should at least 75% of the surface area of the restoration areas fail to become re-established with greater than 50% salt marsh and dune species within two years of the restoration attempt, the Department reserves the right to require additional measures necessary to achieve compliance.

20. At the end of each growing season for a two-year period, a progress report on the relative success or failure of the restoration areas shall be submitted to the Department and the Wareham Conservation Commission. The inspection report shall include percent of vegetative cover, a list of the type of plants growing in the salt marsh and dune restoration areas, coverage of the vegetative species as a percentage of all plants, relative vigor of the plants, etc... The report shall also include the recommendations for improvement of poorly established salt marsh and dune areas.

21. It is the responsibility of the applicant, owner and/or successor(s) to ensure that all conditions of this Superseding Order are complied with. The project engineer and contractors are to be provided with a copy of this Superseding Order and referenced documents before commencement of work.

22. This Superseding Order of Conditions (SOC) applies only to the removal of the concrete pad and construction of a duplex home on piles, pervious driveway, connection to existing municipal sewerage line and public drinking water supply service. The project under this SOC also includes nuisance species control (*Phragmites australis*), coastal dune and salt marsh restoration. Any future work not approved within this Superseding Order subject to jurisdiction of the Wetlands Protection Act will require the filing, at a minimum, of a Request of Determination of Applicability or a new Notice of Intent with the Conservation Commission and the Department. Prior to commencement of any such future work receipt of a Negative Determination or valid Order of Conditions will be required.

23. Upon completion of the project, a Certificate of Compliance shall be requested in accordance with General Condition No. 11, and under the provisions of 310 CMR 10.05(9)(d). Prior to issuance of the Certificate of Compliance, an "As-Built" plan and statement signed and stamped by a Registered Professional Engineer certifying compliance with the conditions of the Order shall be submitted to this Department with a copy to the Wareham Conservation Commission.

EK/db



**Massachusetts Department of Environmental Protection**
Bureau of Resource Protection – Wetlands and Waterways Program
## Fee Transmittal Form – Request for Adjudicatory Hearing

## A. Request Information

Important:
When filling out
forms on the
computer, use
only the tab
key to move
your cursor -
do not use the
return key.

1. Person/Party Making Request:
   (if appropriate, name the group representative)

   | | Applicant (if applicable): |
   |---|---|
   | Name | Name |
   | Street Address | Street Address |
   | City/Town          State     Zip Code | City/Town               State   Zip Code |
   | Phone Number       Fax Number (if applicable) | Phone Number            Fax Number (if applicable) |

2. Project Location

   Street Address

   City/Town                                     State                    Zip Code

3. DEP File Number:

## B.  Instructions

1. Send this form and check or money order for $100.00 payable to the *Commonwealth of Massachusetts* to the DEP Lockbox at:

   Department of Environmental Protection
   Commonwealth Master Lockbox
   Box 4062
   Boston, MA 02211

2. Send a copy of this form and a copy of the check or money order with the *Request for an Adjudicatory Hearing* to:

   Docket Clerk
   Office of Administrative Appeals
   Department of Environmental Protection
   One Winter Street
   Boston, MA 02108

**IMPORTANT**
This form is intended for fee transmittal only. The contents of a request for an adjudicatory hearing (Notice of Claim) are established at 310 CMR 1.01 (6) and the substantive statutes and regulations governing the Department's action.

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee )
of BD REALTY TRUST, )
      Plaintiff )
           )
v. )
           )
THE TOWN OF WAREHAM acting by )
and through the BOARD OF )
SELECTMEN OF THE TOWN OF )
WAREHAM, and the BOARD OF )
SELECTMEN OF THE TOWN OF )
WAREHAM, )
      Defendants )

## EXPERT REPORT OF LENORE WHITE, WETLANDS SCIENTIST

**I.**   **Witness**

Lenore White
Professional Wetland Scientist
Wetland Strategies, Inc.
5 Main Street Ext., Suite 303
Plymouth, MA  02360

**II.**   **Introduction**

This report and the opinions expressed herein are submitted by Lenore White of Wetland

Strategies, Inc. (WSI), on behalf of Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty

Trust, in the above-referenced matter.  This report is submitted in accordance with Fed. R. Civ.

P. 26(a)(2).

**III.**   **Witness Qualifications**

A.   General Background[1]

---

[1] A copy of my curriculum vitae is attached hereto as **Exhibit A**.

1

I am currently employed by Wetland Strategies, Inc. (WSI) of Plymouth, Massachusetts. I am also the president and owner of Wetland Strategies, Inc. Wetland Strategies, Inc. was incorporated in October of 2005. As the sole employee of WSI, I am responsible for all aspects of the operation of the company. My clients included a diverse group of individuals, developers, engineering firms, attorneys and municipalities. My services include providing clients with expert advice on all aspects of wetlands science and permitting needs including obtaining proper permits, providing regulatory interpretation, and assisting municipalities with implementation and enforcement of the State Wetlands Protection Act.

Prior to owning and working for WSI, I worked as an Environmental Analyst for the Massachusetts Department of Environmental Protection (MADEP) for approximately twenty-three (23) years. Specifically, I was employed by MADEP from October, 1981 through September, 2004. In 1985, I began working within the Wetlands and Waterways Program of MADEP. In this position, I was responsible for implementing and enforcing all aspects of the State Wetlands Protection Act and the regulations promulgated thereunder. My responsibilities while working for MADEP included, but were not limited to the following:

1.    preparing and issuing permits pursuant to the State Wetlands Protection Act regulations and the State Water Quality Standards;

2.    supervising subordinate wetland staff members;

3.    identifying wetland resource areas;

4.    conducting site inspections and public meetings;

5.    testifying as an expert witness; and

6.    preparing and presenting technical outreach sessions.

Since October, 1991 I have been certified as a Professional Wetland Scientist by the

National Society of Wetland Scientists.  See **Exhibit B** – Certification.

     B.     List of Publications Authored by Witness Within Last Ten (10)Years

  None in the last ten years.

     C.     Compensation to be Paid to Witness for Study and Testimony

My hourly rate is billed at $100.00 an hour.  Through the period ending February 28,

2006, I have billed BD Realty Trust a total of $4,422.06 for services rendered.  In addition, BD

Realty Trust paid a $500.00 retainer for my services.  For purposes of testifying as an expert

witness, my hourly rate is $150.00 an hour.

     D.     Listing of Other Cases in Which Witness Has Testified as an Expert at Trial or by
              Deposition Within Last Four (4) Years

I testified as an expert witness for the Department of Environmental Protection in the

matter of <u>David Armstrong v. Tom and Nancy Zotos</u> of Marshfield in a case tried before the

Department of Environmental Adjudicatory Law Judge.  I testified as to the accuracy of the

wetland resource areas and whether or not the erection of a stockade fence in the buffer zone was

a permissible activity.

     **IV.**     **Statement of Opinions**

     A.     Complete Statement of Opinions and Basis and Reasons Therefor

     1.     Background as to Why I Was Retained

In December, 2005, I was retained by the law firm of Phillips & Angley on behalf of the

Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), to determine the

wetlands resource area delineation, as defined by the Massachusetts Wetlands Protection Act

("WPA") and the regulations promulgated thereunder, on a 5.35 acre waterfront parcel of land

located off of Swifts Beach Road in Wareham, Massachusetts ("the Premises"), and to render a

report in accordance therewith.  I was retained to provide a report expressing my opinions as to

the wetlands resource areas existing on the Premises at the time the Town of Wareham took it by eminent domain in December 2003, which would, in turn, determine where work or activity (as defined by the WPA) could occur on the Premises and whether such work or activity would require permits under the WPA.

Specifically, the scope of the services I was retained to provide included the following:

1.    site inspection of the Premises;

2.    flagging of wetland resource areas on the Premises;

3.    review and analysis of publicly available information regarding the Premises;

4.    review and analysis of historical photographs and video of the Premises;

5.    render a written report of opinions regarding my findings; and

6.    testify at trial.

A determination of the wetland resource areas existing on the Premises at the time of the taking was needed because the classification or type of wetland resource areas on the Premises could affect what work or activity is allowed, the location and scope of such work and the criteria (performance standards) that would apply to such work. All of these concerns could affect the possible uses of the property. Specifically, the primary reason that I was retained was because there were existing plans of the Premises that indicated that there was salt marsh on an area of the Premises that was actively used as a parking lot, a use that is inconsistent with salt marsh performance standards found in the WPA Regulations. Due to the inconsistency between the resource delineation and the existing use of that area, it was imperative to determine whether this portion of the Premises was available for use, from a wetlands perspective, in determining the highest and best use of the Premises as a whole.

2.    <u>Data and Information Which Form the Basis of My Opinions</u>

Upon being retained, I reviewed several documents in order to obtain background information about the Premises prior to my conducting a visual site inspection. Specifically, I reviewed the following documents:

- "Plan Accompanying Abbreviated Notice of Resource Area Delineation on Land in Wareham, MA prepared for Glick Realty Corporation", drawn by Thompson Surveying & Engineering, Inc., dated May 4, 2000 and revised through June 19, 2000 ("ANRAD Plan");

- "Plan of Land in Wareham, Mass. Prepared for BD Realty Trust", drawn by Vautrinot Land Surveying, Inc., dated May 7, 2001 and revised through March 28, 2003 ("Vautrinot Plan");

- Second Notice of Intent filing by BD Realty Trust for the permitting of a duplex home on Swift's Beach property, together with attached letter from Alan C. Vautrinot, Jr., and supporting memorandum of Margaret Ishihara, Esq.;

- Letters dated January 31, 2002 and March 6, 2002 from Mario DiGregorio of Horsley & Whitten, Inc. to David Pichette, Wareham Conservation Administrator;

- Order of Conditions from the Wareham Conservation Commission denying the Second Notice of Intent application;

- BD Realty Trust's Request for Superseding Order of Conditions;

- Notice from the Department of Environmental Protection regarding Environmental Notification Form requirement;

- Environmental Notification Form filed by BD Realty Trust on July 29, 2002;

- Letter dated August 27, 2002 from Mario DiGregorio of Horsely & Whitten, Inc. to William T. Gage of the MEPA Unit at the Executive Office of Environmental Affairs;

- Notice of Project Change filed by BD Realty Trust;

- Certificate of the Secretary of Environmental Affairs on the Notice of Project Change dated June 6, 2003;

- Letter dated August 23, 2003 from the Army Corp of Engineers to BD Realty Trust regarding the retention of existing groins;

- Abutters Appeal of Superseding Order of Conditions;

- Town of Wareham Appeal of Superseding Order of Conditions; and

- Stay Order issued by Administrative Law Judge/Administrative Magistrate, Kristen M. Pallis.

See **Exhibit C** – attached hereto.

After reviewing the foregoing documents, I conducted two visual site inspections of the Premises to identify and delineate wetland resource areas. The site inspections occurred on December 12, 2005, and January 10, 2006. During the course of the site inspections, I noted the presence of wetland resource areas on the Premises. My identification and delineation of wetland resource areas on the Premises was based on my knowledge, experience and expertise in identifying and delineating wetland resource areas. The wetland resource areas, as defined by the WPA Regulations, which I identified on the Premises were as follows:

1.    salt marsh;

2.    bordering vegetated wetland ("BVW");

3.    coastal dunes;

4.    land subject to coastal storm flowage;

5.    barrier beach; and

6.    land under the ocean.

While on the Premises on January 10, 2006, I flagged the salt marsh and BVW wetland resource areas. These flags were later surveyed by McKenzie Engineering Group, Inc., and are shown on a plan entitled "Existing Conditions Plan" originally dated January 30, 2006 and revised through March 7, 2006, prepared by McKenzie Engineering Group, Inc. ("the Existing Conditions Plan"). I have reviewed the Existing Conditions Plan and state that it accurately

6

shows the areas of BVW and salt marsh that I identified and flagged on January 10, 2006. Since

there was no delineation plan that showed the location of resource areas on the actual date of

taking in December, 2003, the purpose of the January, 2006 effort was to determine the location

of resource areas at present and then compare these to the delineation information from 2000,

including the ANRAD plan, but also DEP and Wareham Conservation Commission files and

photographic and video evidence from 2003 in order to establish the location of resource areas as

of the date of taking on December 31, 2003.

After conducting the visual site inspections of the Premises, I then reviewed additional

historical information about the Premises, including publicly available information. On February

7, 2006, I conducted a review of the files maintained by the Wareham Conservation Commission

for the Premises. I reviewed the information available on the Massachusetts Geographical

Information System (MAGIS) network of information. In addition, I reviewed historical

photographs of the Premises taken in April 2003 through August 2004. Phillips & Angley on

behalf of the Trust provided these photographs to me. I also reviewed a video (DVD format) of

the Premises as filmed by the Trust on August 31, 2003. I also reviewed the contents of the

Department of Environmental Protection's file, number SE 76-1309, on February 21, 2006. In

sum, the foregoing documents that I reviewed after my visual site inspection are as follows:

1. Contents of the Department of Environmental Protection's File No. SE 76-
   1380, including:

   - Photographs of the site taken by Dorothy Blickens on November 14, 2001
   - Letter dated June 27, 2002 by Susan A. Bernstein, Esq. attorney for the
     abutters
   - Letter dated October 30, 2002 from Department of Environmental
     Protection to the Executive Office of Environmental Affairs regarding the
     ENF
   - On-site inspection report of Dorothy Blickens, dated November 14, 2001
   - Letter dated June 30, 2003 from Department of Environmental Protection
     regarding the Ch. 91 license application

- BRP- SERO Complaint intake form regarding an anonymous complaint of alleged illegal activity at the Premises

2. Contents of the Wareham Conservation Commission's files for the Premises, including:

- A plan of the Premises prepared by Thompson Surveying & Engineering, Inc. titled "Plan Accompanying Abbreviated Notice of Resource Area Delineation" dated May 2, 2000 (unrevised)
- Plans 2 and 3 of 5 accompanying the Ch. 91 license application, prepared by Vautrinot Land Surveying, Inc. (undated)
- Agent's Report, dated 2/6/02 and 3/6/02 of the Premises
- Memorandum from Tom Skinner, Director of Coastal Zone Management dated October 28, 2002 in response to ENF, EOEA # 12857
- Attachment A, Site Description, prepared by Andrew Walsh, ENSR submitted with the Notice of Intent

3. Existing Conditions Plan prepared by McKenzie Engineering Group, Inc. now dated March 28, 2006;

4. Video of the Premises taken by Barbara Deighton Haupt on or about August 31, 2003;

5. Photographs of the Premises provided to me on or about February 2, 2006 by the law firm of Phillips & Angley on behalf of BD Realty Trust showing portions of the Premises in April 2003, May 2003, September 2003 and August 2004; 1950's photo of beach use with snack bar, parking, beach use and undesignated structure and September, 2005 aerial photo of the premises;

6. Superceding Order of Conditions

7. Barrier Beach Inventory Project, Map Mr-5 produced by the Executive Office of Environmental Affairs, Massachusetts Coastal Zone Management, dated April, 1982;

8. Massachusetts Mouth of Coastal River Maps of the Town of Wareham;

9. "Foundation Plan" prepared by Field Engineering Co., Inc., sheets 1-3, dated April 2, 2003 and revised on April 9, 2003; and

10. Federal Emergency Management Agency flood map, panel 255223 0007D, dated July 15, 1992.

See **Exhibit D** attached hereto.

3.    Analysis and Conclusions

Based on my review of the above-noted materials and my site inspections, I have formed an opinion as to the wetland resource areas that existed on the Premises on or about December 31, 2003, the date that the taking occurred. Each of the types of wetland resource areas I identified on the Premises are discussed individually as follows.

a.    Presence of Coastal Dunes, Land Subject to Coastal Storm Flowage, Barrier Beach and Land Under the Ocean on the Premises

As stated above, I observed the presence of coastal dunes, land subject to coastal storm flowage, barrier beach and land under the ocean as these resource areas are defined by the WPA Regulations. Based upon my review of the ANRAD Plan, I determined that it was not necessary for me to independently delineate or flag these particular wetland resource areas because the delineation of these wetland resource areas on the ANRAD Plan was consistent with my inspections of the Premises in December 2005 and January 2006.

A coastal dune is a landform that is created by the movement of sand. The coastal dunes on the Premises are vegetated with a dense cover of beach grass (*Amophila breviligutata*), which has helped to maintain their presence. Thus, the location of coastal dune has not changed. The Federal Emergency Management Agency (FEMA) defines Land Subject to Coastal Storm Flowage. The map prepared by FEMA for the Premises is dated July 15, 1992 and has not been revised in the time between the taking and my site observations. Therefore, the delineation of this resource area has not changed. The delineation of the barrier beach has not changed, as barrier beaches are comprised of coastal dunes and coastal beaches. The beach has not changed, as the wrack line that I observed appears to coincide with the tidal limits as shown on the ANRAD plan. Land Under the Ocean is the land under the tidal creek that runs perpendicular to the shoreline on the east side of the Premises and I observed the creek to be at the same location as shown on the ANRAD plan. As a result, the delineation of coastal dunes, land subject to

coastal storm flowage, barrier beach and land under the ocean as shown on the ANRAD Plan could independently and accurately serve as the basis for depicting these areas on the Existing Conditions Plan.

Pursuant to the Notice of Intent filings by the Plaintiff, the Wareham Conservation Commission and the subsequent Superceding Order of Conditions issued by the MADEP, the Trust sought to construct a duplex dwelling on the Premises, at the northwesterly corner of the site. The location of the proposed dwelling, as shown on the Vautrinot Plan, is not within coastal dune, salt marsh, barrier beach and land under the ocean as these resource areas are defined by the WPA Regulations. However, the structure is located within land subject to coastal storm flowage, so that a Notice of Intent filing for an order of conditions is required under 310 CMR 10.02(2).

The Massachusetts Wetlands Protection Act has developed performance standards for the different types of wetland resource area in the regulations found at 310 CMR 10.00 to limit adverse effects to such resource areas. The proposal to construct a structure meets the performance standards of the Wetlands Protection Act for the following reasons.  The structure is not proposed within or on a dune; it is proposed within 100 feet, or the buffer zone of the dune. It is to be constructed with the lowest horizontal member to be at elevation 21.0.  I visually estimated the elevation of the adjacent coastal dunes to be one to two feet above existing grade, or approximately at elevation 6, 7 or 8.  This means that the lowest horizontal component of the structure will be approximately 15 feet above the elevation of the dune. As such, the structure will not have an adverse effect on the coastal dune as it will not affect the ability of waves to remove sand nor will not interfere with the landward or lateral migration of the dune.   The Wetlands Protection Act does not include any performance standards for Land Subject to Coastal

Storm Flowage.   The practice of the Department of Environmental Protection has been to allow alteration to areas within Land Subject to Coastal Storm Flowage when the performance standards for other overlapping coastal resource areas have been met. In this case, there are no other resource areas at the location of the proposed duplex.  In addition, the Department has a practice of not allowing solid, vertical walls in a flood zone identified as a velocity zone or "V zone" and requires any structure to be placed on pilings above the elevation of the flood zone. The Proposal shows the structure to be located on pilings, above the elevation of the flood zone and does not include the construction of any vertical walls within the flood zone.  The proposed project thus meets the Department's standards in this regard and would be permitted.

      b.     Presence of Salt Marsh on the Premises.

      I observed the presence of salt marsh on the Premises on January 10, 2006.  My identification of the salt marsh was based on my visual site inspection and my knowledge of the definition of a salt marsh found in the WPA Regulations at 310 CMR 10.32(2).  The area of salt marsh that I delineated is accurately shown on the Existing Conditions Plan.

      Salt marsh is defined as

> a coastal wetland that extends landward up to the highest high tide line, that is, the highest spring tide of the year, and is characterized by plants that are well adapted to or prefer living in, saline soils.

My delineation of the salt marsh was established using the existing vegetation.  Specifically, I noted the presence of *Spartina alterniflora*, *Spartina patens*, *Distichlis spicata* and *Juncus gerardii,* and used these species as indicators of the edge of the salt marsh. Areas that did not contain these species were not identified as salt marsh.

      My visual site inspection indicated that as of January 10, 2006, the areas of salt marsh were inconsistent with the salt marsh depicted on the ANRAD Plan and the Vautrinot Plan.

Specifically, there were either 1) areas which I observed which did not contain any salt marsh on January 10, 2006 but were indicated as containing salt marsh on the ANRAD Plan; or 2) areas which contained salt marsh on January 10, 2006, but which were smaller than and did not extend as far northerly on the Premises as the area referenced as "salt marsh" on the ANRAD Plan.

The discrepancies between the salt marsh that I observed on January 10, 2006 and what was shown on the ANRAD Plan and Vautrinot Plan were inconsistent with my prior experience and knowledge about the existence or formation of salt marsh. This, together with my understanding that my visual site inspections occurred approximately two (2) years <u>after</u> the taking of the Premises, made me determine that it was necessary to also review additional historical information about the Premises in order to more accurately determine the location and extent of salt marsh on the Premises at the time of the taking. This additional research was necessary particularly in light of the fact that the Vautrinot Plan showed an existing parking lot in the same location as the area noted as "salt marsh" on the ANRAD Plan; yet under the WPA, there can be no work or activity in a salt marsh. Thus a designation of an area purportedly consisting of salt marsh but also shown as the location of existing parking are inconsistent concepts and did not make sense. Resolving this inconsistency is necessary to determine whether the area marked as "existing parking area" was available for use under the Wetlands Protection Act and the implementing regulations at 310 CMR 10.00 et. seq.

As discussed herein, it is my opinion that the reference to "salt marsh" as shown on the ANRAD Plan is not an accurate or reliable indicator of the presence and location of salt marsh at the time that the delineation was made in June 2000, or at the time of taking in December 2003. There are several bases for my conclusion.

     i.     <u>The ANRAD Plan Is Unreliable and Was Not Valid as of the Time of the Taking</u>

In June 2000, the Wareham Conservation Commission approved the ANRAD Plan. Generally, once approved, all plans depicting Abbreviated Notice of Resource Area Delineation, such as the ANRAD Plan for the Premises, are valid for three (3) years. The plans are generally not amended because the physical characteristics of wetland resource areas, such as the type and percentage of vegetative cover, site elevations, and subsurface soil conditions, do not change substantially over the course of three years. As a result, approved ANRAD plans typically serve as the basis for determining the presence and location of wetland resource areas on a site in relation to any proposed work or activity for a period of three years, even if those delineations were inaccurately surveyed or if conditions subsequently changed on the site.

In this case, there are several problems with relying on the delineation of salt marsh on the ANRAD Plan as approved. First, the precise location of the salt marsh is vague. The contour lines of the salt marsh delineations do not connect or are otherwise indeterminate as to the actual location of the boundary of the salt marsh. Moreover, the flagging done for salt marsh (depicted on the ANRAD Plan as a $\triangleright \triangleleft$ shape with an "SM" notation) does not appear to coincide with the illustration of grass tufts which usually denote salt marsh on such plans. Further, the notation of "salt marsh" with arrows on the ANRAD Plan does not coincide with the "SM" flagging on the ANRAD Plan.

However, even if I were to assume that the ANRAD Plan intended to show the salt marsh as the area shown as grass tufts—that is, the maximum possible extension of salt marsh on what is otherwise an indeterminate plan—based on my observations of the Premises on January 10, 2006, together with the historical visual evidence of the Premises, the ANRAD Plan is inaccurate as to what actually existed on the ground. Specifically, not only during my January 10, 2006 observations, but also in the photographs and video taken in 2003, I observed that the area drawn

with grass tufts on the ANRAD Plan is actually virtually devoid of the presence of the vegetation that is characteristic of salt marsh.

Moreover, based on my understanding that there has been virtually no activity or work done on the Premises since the taking in December 2003, the Premises are presently in a state of flux, such that salt marsh is becoming more extensive on the site, not less so. That is, given that the area of salt marsh which I observed is smaller and more easterly on the Premises than what is shown on the ANRAD Plan, and given that salt marsh and bordering vegetated wetlands are dynamic wetland resource areas that are subject to change in areas of inactivity, my opinion is that the Premises are becoming increasingly covered with salt marsh from a southerly and easterly direction, and that in December 2003 the Premises could not have possibly contained the extent of salt marsh as shown on the ANRAD Plan.

Finally, the ANRAD Plan, having been approved on October 18, 2000, expired on October 18, 2003 and therefore does not serve as the sole basis for determining the extent of salt marsh on the Premises when it was taken in December 2003.

ii.    Delineation of Salt Marsh under the WPA Regulations Must Take Into Account Site Elevation

As part of my review of additional information to determine the presence and location of salt marsh on the Premises at the time of the taking, I reviewed the Wareham Conservation Commission's records relative to the Premises. Specifically, I reviewed an undated document entitled "Attachment A Site Description", which was prepared by Andrew Walsh of ENSR, an environmental consulting firm. In that document, Mr. Walsh concludes that areas of the Premises, which are above the highest high tide line, do not meet the definition of a salt marsh. The basis for Mr. Walsh's conclusion is the definition of salt marsh found in the WPA Regulations at 310 CMR 10.32, which takes into account the elevation of a site when

14

determining whether salt marsh exists. I concur with Mr. Walsh to the extent that the elevation

of the site must be considered when defining the extent of the salt marsh. This is so because of

the definition of a salt marsh found in the Wetlands Protection Act regulations at 310 CMR

10.32. In part, the definition states that a salt marsh extends landward up to the highest high tide

line. If areas on the Premises are above the elevation of the highest high tide line, then those

areas do not meet the definition of a salt marsh. The ANRAD plan shows elevations on the

Premises, but I did not rely on the ANRAD plan as an accurate representation of the site

elevations. This is so because note number 4 on the ANRAD plan states that the Mean High

Water is at elevation 2.7. The ANRAD plan also shows the elevation of Mean High Water to

be at or near elevation 4. Because of the apparent inconsistency of the elevations on the

Premises as shown on the ANRAD plan, I did not rely on the ANRAD plan. Without having

confidence in the elevations shown on the ANRAD plan, and without any other information on

the elevations on the Premises, I relied on the lack of vegetation in determining the extent of the

salt marsh on the Premises.

     iii.    Historical Photographs and Video of the Premises Taken Around the Time of the
              Taking Refute the ANRAD Plan's Depiction of Salt Marsh

When I reviewed the historical photographs and video of the Premises, I looked for the

presence of salt marsh. From my review of the photographs and video, together with my

knowledge of the Premises, I made several conclusions about the presence and extent of the

wetland resource areas existing at the time the photographs and video were taken (approximately

four to nine months before the taking). Specifically, I concluded from the April, 2003

photograph that the portion of the Premises which is centrally located and just north of the row

of boulders did not meet the definition of a salt marsh pursuant to the definition found at 310

CMR 10.32. I have reached this conclusion because the visual evidence indicates that the area

did not contain any vegetation that is well adapted to or prefers living in saline soils. In fact, as shown in the photograph, the area did not contain any vegetation and is therefore not a coastal wetland. I arrived at the same conclusion that there was an absence of salt marsh in the central area of the Premises after viewing the DVD, because the video shows cars that are parked in the central area of the site, and there is no vegetation that can be seen. In order for this area to be defined as a salt marsh, it must be "characterized by plants that are well adapted to or prefer living in saline soils" 310 CMR 10.32. Whereas this area is not dominated by vegetation typical of that found in salt marsh, it does not meet the definition of a salt marsh.

Based on my observations of what existed in the 2003 photos and video, I conclude that at the time of the taking, the area noted as "Existing Parking Lot" on the Vautrinot Plan was not a salt marsh and did not contain salt marsh.

iv.    The Wareham Conservation Commission Has Not Enforced Previous Activity in the Area Noted as Salt Marsh on the ANRAD Plan or in the Area Noted as Existing Parking Lot on the Vautrinot Plan

The Wareham Conservation Commission has a duty to enforce the WPA and the WPA Regulations. In the event that the Commission determines that there is an activity in violation of the WPA or the WPA Regulations, it has the authority to issue an Enforcement Order for such violations. See 310 CMR 10.08.

If the area on the Premises which is shown as "salt marsh" on the ANRAD Plan was, in fact, salt marsh, the Commission had a duty to enforce the provisions of the WPA for the alteration of the salt marsh. However, during my review of the files retained by the Wareham Conservation Commission, I noted that during the time that the Trust owned the Premises, the Commission had not issued any Enforcement Orders regarding the use of the Premises for parking. The Vautrinot plan specifically identifies an area of "existing parking lot." It is clear

from the August 31, 2003 video that cars were parked on an area identified on the Vautrinot Plan as salt marsh, and such activity would be considered alteration of a salt marsh in violation of the WPA Regulations. At a minimum, based on the Commission's review of the Vautrinot Plan attached to the Trust's Notice of Intent to construct a duplex on the Premises, the Commission had constructive notice that there may have been activity consisting of the parking of vehicles on the Premises.   It is my opinion that the Commission's lack of enforcement action is due to the fact that the Commission either did not consider the parking of cars to be an alteration to the salt marsh or, alternatively, that it did not find salt marsh to exist on the Premises which would preclude such activity.   This opinion is consistent with writings in the file of the MADEP.   In the Department's file for this case, I reviewed a letter dated June 27, 2002 to Ms. Dorothy Blickens from an attorney for some parties opposing the NOI filing.  In that letter, the Department is advised that the applicant is operating a "commercial parking business on other portions of the Property, in which vehicles are being parked in wetland areas which are subject to protection."   The file further indicates that the Department contacted the Wareham Conservation Commission, which did not consider it to be an enforcement matter.

     v.    <u>Summary of the Presence of Salt Marsh on the Premises at the Time of the Taking</u>

     Based on the foregoing, it is my opinion that the area of the Vautrinot Plan which depicts "existing parking lot" did not consist of salt marsh, as defined by the WPA Regulations, at the time of the taking in December 2003 and therefore would not have been subject to the performance standards for salt marsh.  The parking of cars in this area, as evidenced by the long history of use of same, and historic photographs and videos documents establish that the area was used as a parking lot.  Use of a salt marsh as a parking lot is not a permissible activity pursuant to the State Wetlands Protection Act.  The performance standards for a salt marsh state

17

that a proposed project in a salt marsh or within 100 feet of a salt marsh or in a body of water

adjacent to a salt marsh shall not destroy any portion of the salt marsh or have an adverse effect

on the productivity of the salt marsh.   Parking vehicles on a salt marsh would result in

destroying the vegetation, and thus would not be permitted.   Parking vehicles in a buffer zone to

a salt marsh may be permitted and indeed was allowed, as evidenced by the historical

photographs and videos which document the practice.   The impacts of parking vehicles in a

buffer zone to a salt marsh may include the potential for automobile fluids to leak into the

substrate below the vehicle.   While this is not necessarily an advantage to the land within the

buffer zone, it is not likely to result in destroying the adjacent salt marsh as any fluids would

likely migrate downward due to the permeable nature of the soils in the buffer zone.  To the

extent that paved parking would be required for permitting purposes by the Town or DEP,

McKenzie Engineering has determined that a drainage system could be designed for the site to

handle automobile fluids or other run-off through catch basins and contaminant separation

devices. Furthermore, my observation revealed that the salt marsh was more extensive in

December of 2005 and January of 2006 than was shown on the Vautrinot Plan, which is dated

June, 2000.  I conclude that the historic use of the buffer zone for parking vehicles has not

resulted in any loss of salt marsh because the salt marsh has now spread out further into the

buffer zone.

       c.      Presence of Bordering Vegetated Wetland (BVW) on the Premises

While conducting my visual site observations of the Premises, I observed a bordering

vegetated wetland (BVW) on the Premises, and delineated the edge of the BVW by flagging it

on January 10, 2006.  The area of BVW that I flagged is accurately shown on the Existing

Conditions Plan.  My delineation of the BVW was based on my expertise and the definition of

18

BVW as found at 310 CMR 10.55.

Bordering vegetated wetland is defined as "freshwater wetlands that border on creeks, rivers, streams, ponds and lakes." 310 CMR 10.55(2). When I delineated the edge of the BVW on January 10, 2006, I noted the presence of several species of vegetation that are typical of freshwater wetlands including *Phragmites* spp, *Aster vimineus*, and *Panicum virgatum*. I used these species and visually estimated where 50% or more of these species occurred to determine the edge of the BVW. The performance standards for work in a BVW are found in the Wetlands Protection Act Regulations at 310 CMR 10.55 (4) (a). The standards state that any proposed work in a BVW shall not destroy or otherwise impair any portion of this area. Notwithstanding the provisions of paragraph 4(a), the issuing authority may allow the alteration of up to 5,000 square feet of BVW, provided the surface area of the lost area is replaced with an equal area of square footage. In addition, the regulations found at 310 CMR 10.53 (3) allow the alteration of more than 5,000 square feet of BVW, provided the activity qualifies as a "limited project". Limited projects are those activities as defined in 310 CMR 10.53 (3) and include, but are not limited to, the construction of a new roadway or driveway where reasonable means of access from a public way to an upland area is not available.

The ANRAD Plan depicts a somewhat different delineation of BVW than what I observed and flagged. Thus, similar to my analysis of salt marsh, I reviewed the historical photographs and video (both taken in 2003) of the Premises to determine whether the ANRAD Plan accurately depicted BVW on the Premises at the time of the taking. However, I could not determine where the edge of the BVW was in 2003 because neither the photographs nor the video showed the area of the BVW in sufficient detail to allow me to make a conclusion about either 1) the extent and location of the BVW at the time of the taking or 2) the accuracy of the

ANRAD Plan for such purposes.   While the ANRAD plan is confusing in defining the edge of

the BVW, and while BVW flags BVW B 1 through B5 do not make sense as there is no end flag

for this B series, there is simply not enough conclusive evidence for me to refute the ANRAD

plan.   Therefore, assuming the ANRAD plan to be the operative delineation of BVW at the time

of taking (and which plan was incorporated into the Vautrinot Plan), the access way into the

parking area shown on the Vautrinot Plan would pass through a small section of BVW.

   Nevertheless, the location of this access way is well known, as it is depicted in the

photographs and 2003 video.   The roadway is a clearly defined two track way worn down to hard

ground, caused by long time use of this area as the access area into the existing parking lot.   It is

my opinion that this access way would qualify as a limited crossing area and should and would

properly obtain a permit under the WPA and its regulations.   This is so because of the regulations

found at 310 CMR 10.53 (3) (e) which state that the construction and maintenance of a new

driveway or roadway is acceptable, where no other means of access from a public way to an

upland area is available.   The Vautrinot plan shows that there is no other access to the proposed

duplex.   Access from Swifts Beach Road is not possible due to the presence of the coastal dune

and there is no other public way from which to access the Premises.   The regulations found at

310 CMR 10.53 (3) (e) make clear that if there is no other means of access, the issuing authority

may issue an Order of Conditions that allows the work.  It has been my experience while

employed at the Department of Environmental Protection that these "limited project" access

roadways and driveways were routinely allowed.

   d.     Classification of the Premises as Riverfront Area

   I am aware that the MADEP has issued a Superceding Order of Conditions ("SOC")

allowing the Trust to construct a duplex structure on the Premises based upon the purported

location of the Premises in a Riverfront Area, as defined by the WPA Regulations.     I understand

that the appeal of the SOC is still active and has not been resolved.  Nevertheless, the ability to

use this Premises for a structure such as that proposed by the Trust in its second NOI is not

dependent on its qualification as Riverfront Area.

The definition of a Riverfront Area found at 310 CMR 10.58 (2) states, "When a river

flows into coastal waters or an embayment, the river ends where it no longer has primarily

riverine characteristics." Moreover, in accordance with the definition as found at 310 CMR

10.58, the Riverfront Area extends 200 feet from the Mean High Water elevation in coastal

settings.  At the time the ANRAD Plan was issued in June 2000, the Premises was found to exist

within a Riverfront Area as shown on the ANRAD Plan. The ANRAD Plan shows the Riverfront

Area as the Inner Riparian Zone and the Outer Riparian Zone associated with the Wareham

River.  These areas are shown as 100 and 200 feet, respectively, from Mean High Water.

Based on my observations of the site and my knowledge of the Wetlands Protection Act,

I do not agree that the Premises includes any Riverfront Area.  I have reached this conclusion

based on the characteristics of the site, which include the process of tidal action as evidenced by

the wrack line, the presence of coastal dunes and the salt marsh.   The presence of the wrack line

and coastal resource area is evidence that the Premises is within a coastal environment and not a

riverine one.   The definition of the Riverfront Area found at 310 CMR 10.58 (2) (a) states in

part that  "A river is a natural flowing body of water that empties to any ocean....".   The

Premises is an oceanfront parcel and therefore cannot border on a river.   Based on these

characteristics, I conclude that the site is primarily influenced by tidal dynamics and would not

be considered to be part of a riverine system. Moreover, in March 2005, MADEP published

maps of Riverfront Areas in coastal settings.  The MADEP maps definitively show that the

Premises do <u>not</u> contain a Riverfront Area as of 2005.

Based on the foregoing, I conclude that the Premises did not contain any Riverfront Area at the time the ANRAD Plan was approved in 2000, much less at the time of taking in December 2003. My conclusion is based on my knowledge and experience that general tidal characteristics of the Premises have not changed since the date of ANRAD Plan as evidenced by what I was able to observe in the August 2003 video of the Premises.

Although I do not agree with the ANRAD Plan's or the SOC's interpretation that the Premises contain Riverfront Area, my conclusions about the wetland resource areas on the Premises would not prohibit the permitting of the structure which was approved by the SOC. The proposed duplex is a permissible activity pursuant to the Wetlands Protection Act because the structure is to be located within an area of Land Subject to Coastal Storm Flowage, for which there are no performance standards. There are no vertical walls proposed, and thus the proposed activity would meet the Department's practice of not allowing any vertical walls in a velocity zone. In addition, the structure is proposed to be elevated on pilings above the flood zone elevation, determined by FEMA to be at elevation 20. This design also comports with the Department's practice of allowing structures in a V-zone, provided they are located on pilings above the elevation of the V-zone. There are no other resource areas that would be affected by the location of the duplex.

    e.    <u>The applicability of the Wetlands Protection Act to proposed plans titled "Conceptual Layout Plan Alternative 1 and Alternative 2.</u>

I have reviewed the Conceptual Layout Plans, Alternative 1 (Conceptual Comprehensive Permit Plan) and Alternative 2 (Conceptual Beach Club Plan) prepared by McKenzie Engineering Group, Inc. each dated March 28, 2006. <u>See</u> **Exhibit E** attached hereto. Each plan

depicts a conceptual proposal for using the Premises. Alternative 1 shows two separate buildings to be used as condominiums with attendant parking spaces. I understand Alternative 1 is a concept plan for a condominium to be built under the Massachusetts General Law, Chapter 40B, otherwise known as affordable housing. When reviewing Alternative 1, I assumed the structure is to be located on pilings with the lowest horizontal member to be at elevation 21.0 or higher. I also assumed that the condominiums would be located in areas that are within the buffer zones( within 100 feet) to a coastal dune and bordering vegetated wetland.[2] As such, it is my opinion that the structure would be approved under the State Wetlands Protection Act as it meets all of the conditions generally required for said activity. No such uses are located within resource areas under the WPA and its implementing regulations except for land subject to coastal storm flowage, which has no performance standards and a limited BVW crossing discussed before and again hereafter. The proposed structures would not interfere with the lateral or landward movement of the dunes, as they would be located above the elevation of the adjacent dunes. The other performance standards for coastal dunes are met as the proposed structures would not affect the ability of waves to remove sand from the dune, would not disturb vegetative cover, would not modify the dune form to effect storm or flood damage, and would not cause the removal of sand form the dunes. See 310 CMR 10.28(3). The performance standards for BVW would be met as well for the proposed use. There is no activity or work called for within the

---

[2] I also assume for the purposes of this Report, that Alternative Plan 1 and 2 might be located within the buffer zone to salt marsh, at least on the easterly side of the premises. Though such a delineation is not shown on these alternative plans, in that instance, the performance standard for activity within the buffer area to salt marsh can be satisfied, Nevertheless, I seriously question the delineation of salt marsh on the premises as shown on the ANRAD and Vautrinot Plans. The ANRAD Plan shows no salt marsh flags on the northerly, westerly or southerly side of the area denoted as "Salt Marsh." The only salt marsh flags appear on the easterly side of the premises. Yet as indicated previously, the contour lines of that salt marsh delineation do not connect or are otherwise indeterminate as to the actual location of the boundary of the salt marsh. I have previously determined that salt marsh did not exist west of the salt marsh delineation line as of the date of taking on December 31, 2003. Yet, there is no closure of the salt marsh line easterly of the flagged line. The Vautrinot Plan labels this area easterly of the flag line as "Area of Degraded Saltmarsh Restoration." In my opinion, there is insufficient reliable evidence to determine whether the

BVW, only within the buffer zone to the BVW. The performance standards for work in a BVW state that said work shall not destroy or otherwise impair any portion of said area. Whereas the work is proposed within the buffer zone only, there will be no destruction or impairment to the adjacent BVW. Locating the structures within the buffer zone of a salt marsh, if applicable, would also be permissible, as the structure would not destroy any portion of the salt marsh, or adversely affect the productivity of the salt marsh. Assuming also that the proposed parking areas are to be constructed without any structural features or impervious material, it too would be permissible pursuant to the State Wetlands Protection Act. This is so because there is nothing in the Wetlands Protection Act that specifically prohibits parking in Land Subject to Coastal Storm Flowage. In addition, I am not aware of any cases where the Department has not allowed parking within Land Subject to Coastal Storm Flowage.

Alternative number 2 shows the layout of a beach membership use with a parking area with planted islands in the central portion of the Premises within the confines of the parking area shown under the Vautrinot Plan, plus additional parking in the area where the duplex was previously sited, plus various amenities such as picnic tables, kayak racks and temporary toilet facilities. It is my opinion that the proposed parking areas and limited amenities would be approved under the State Wetlands Protection Act as it meets all of the conditions generally required for said activity. No such uses are located within resource areas under the WPA and its implementing regulations except for land subject to coastal storm flowage, which has no performance standards and a limited BVW crossing discussed before and again hereafter. The proposed uses are within the buffer area to BVW and coastal dune ( as to salt marsh, see footnote 2). The performance standards for coastal dunes are met as parking areas would not affect the

area easterly of the easterly side line of the "Existing Parking Lot" as shown on the Vautrinot Plan was salt marsh as of the date of taking or even at the time of the ANRAD Plan.

24

ability of waves to remove sand from the dune, would not disturb vegetative cover, would not

modify the dune form to effect storm or flood damage, would not interfere with the lateral or

landward movement of the dunes and would not cause the removal of sand form the dunes.  See

310 CMR 10.28(3).    Locating the parking use within the buffer zone of a salt marsh would also

be permissible, as such use  would not destroy any portion of the salt marsh, or adversely affect

the productivity of the salt marsh in compliance with the performance standard for salt marsh

under 310 CMR 10.32(3).  Nothing in the Wetlands Protection Act specifically prohibits parking

in Land Subject to Coastal Storm Flowage.   In addition, I am not aware of any cases where the

Department has not allowed parking within Land Subject to Coastal Storm Flowage.  The

proposed landscaped islands are permissible as they would not adversely affect the adjacent salt

marsh or bordering vegetated wetlands.   The planting of vegetation is permissible, as it does not

result in any loss or impairment of either the salt marsh or the bordering vegetated wetland.  The

performance standards for BVW would be met as well for the proposed use.   There is no activity

or work called for within the BVW, only within the buffer zone to the BVW.  The performance

standards for work in a BVW state that said work shall not destroy or otherwise impair any

portion of said area.  Whereas the work is proposed within the buffer zone only, there will be no

destruction or impairment to the adjacent BVW.

     In both Alternative 1 and 2, the proposed conceptual plan shows that access to the site

would be from Wankinko Avenue.    Assuming that the delineation of the bordering vegetated is

accurately shown on the ANRAD Plan, access to the site would require crossing an area of

bordering vegetated wetland.  I have estimated the area of BVW to be altered by the access to be

approximately 1,500 square feet, though much of this was significantly degraded.   The

regulations found at 310 CMR 10.55 (4) allow the issuing authority to permit the alteration of up

to 5,000 square feet of BVW so long as the area filled is replicated at a ratio of 1:1. Therefore, provided the proposal included a wetland replication area to be constructed in accordance with the standards found at 310 CMR 10.55 (4), the project is permissible.

As to all portions of the Premises, the site is not located in priority or estimated habitat for rare or endangered species nor is the Premises located within an Area of Critical Environmental Concern. Thus there are no enhanced or special performance standards or criteria that apply to the Premises.

D.    Exhibits to be Used as a Summary of or Support for the Opinions

The exhibits which have been used in support of my opinions are attached hereto as **Exhibits C, D and E**.

L:\LITG\Ditn002\LENORE WHITE REPORTS\LenoreWhite.Report.final.JTA.doc

Submitted under the pains and penalties of perjury this 29th day of March 2006.

Lenore White
Professional Wetland Scientist
Wetland Strategies, Inc.

**EXHIBIT 5**

# O'BRIEN & LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Barbara Deighton Haupt v. The Town of Wareham

Transcript of the Testimony of:

# Robert F. Daylor

# September 27, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Janet M. Hills   20831

Robert F. Daylor 9-27-2006
Barbara Deighton Haupt v. The Town of Wareham

|  | 54 |
|---|---|
| 1 | have actually have physically existed on the |
| 2 | site? |
| 3 A | It is -- it's not completely independent. |
| 4 | But, we also offered an opinion |
| 5 | about -- different from this, about what we |
| 6 | think the conditions were in 2003. |
| 7 Q | So, now -- and where does that opinion show up? |
| 8 | Is that one of your other attachments? |
| 9 A | Yes. And in our -- we have -- if you look at |
| 10 | Exhibits -- our Daylor Exhibit B and C, -- |
| 11 Q | Well, here are B and C. I don't know which one |
| 12 | it is that you wanted to look at. |
| 13 | Perhaps, I've gotten these out of the |
| 14 | order that you wanted to look at. |
| 15 A | Exhibit B is the -- this is our interpretation |
| 16 | of the Plaintiff's resource delineation in |
| 17 | 2006. So, this is shown on -- on the McKenzie |
| 18 | Plans, the E-1, E-2 and 3, that is, the concept |
| 19 | plans. |
| 20 | And our -- our plan C is -- Exhibit B |
| 21 | is what is -- what is before us from the |
| 22 | Plaintiff's position of the resource areas. |
| 23 | And our Exhibit C is our determination of the |
| 24 | resources as they exist today. |

|  | 55 |
|---|---|
| 1 | So that, -- so that in, -- on the |
| 2 | Plaintiff's opinion, are shown on Exhibit B and |
| 3 | our resource determinations are shown on |
| 4 | Exhibit C. |
| 5 | This is based upon our fieldwork and |
| 6 | observations in the summer of 2006. |
| 7 Q | Yes. Okay. So -- and I think I understood |
| 8 | that. |
| 9 | But, you had -- I thought you had said |
| 10 | that you had a plan that showed, as of the date |
| 11 | of taking, what you thought the resource area |
| 12 | delineations were on the ground? |
| 13 A | Physically, on the date of the taking? |
| 14 Q | Right. |
| 15 A | We have not prepared a plan that shows what |
| 16 | that would have been. |
| 17 | MR. ANGLEY: Now, -- Off the |
| 18 | record. |
| 19 | (Whereupon, a brief |
| 20 | discussion was held off |
| 21 | the record.) |
| 22 Q | (By Mr. Angley) So, if you were to look at the |
| 23 | Glick Plan, based upon, you know, what you know |
| 24 | about wetlands, you know, regulations, are |

|  | 56 |
|---|---|
| 1 | there aspects of this plan that -- and this is |
| 2 | the Glick Plan, the ORAD Plan, that seem |
| 3 | incorrect? Are there any aspects of this that |
| 4 | you think are incorrect? |
| 5 A | Yes. |
| 6 Q | And what aspects of this ORAD Plan would you |
| 7 | consider to be incorrect in some fashion or |
| 8 | other? |
| 9 A | From my review of photographs and GIS mapping |
| 10 | and my observations in the field and, I don't |
| 11 | believe the salt marsh area is as extensive as |
| 12 | shown on the Glick Plan. |
| 13 | So, I think -- I think there is no |
| 14 | question there -- there's no question in my |
| 15 | mind that, before the date of the taking, and |
| 16 | after the date of the taking, and most likely |
| 17 | on the date of the taking, that within the area |
| 18 | they identified as salt marsh, there were salt |
| 19 | marsh plants and they're evident today. And |
| 20 | they're evident in the Plaintiff's own |
| 21 | photographs. |
| 22 | But, I don't believe the entire area |
| 23 | was covered with salt marsh vegetation. |
| 24 | Also, I believe the coastal dune areas |

|  | 57 |
|---|---|
| 1 | are more extensive than shown on this plan. |
| 2 | So, I think, from at least those |
| 3 | perspectives, that the physical |
| 4 | characteristics, on the date of the taking, I |
| 5 | believe the coastal dunes were more extensive |
| 6 | and the salt marsh less extensive. |
| 7 Q | How about the reference to the inner and outer |
| 8 | riparian zones? |
| 9 A | When the superseding order was issued, they |
| 10 | actually had this portion (indicating) of the |
| 11 | Wareham River listed as a river. |
| 12 | That subsequently changed and I think |
| 13 | change is correct. |
| 14 | You know, the Wareham River in this |
| 15 | area is estuarian in nature. Estuarian means |
| 16 | not flowing like a river, flowing like a |
| 17 | portion of the ocean, that is, and sometimes, |
| 18 | when the tide is on the flood, the current is |
| 19 | towards the land. When the tide is on the ebb, |
| 20 | the current is flowing out to sea. That's a |
| 21 | predominant estuarian character. |
| 22 | And the river isn't flowing like the |
| 23 | Mississippi. That is, it's coming out of |
| 24 | Minnesota and flowing in one direction. |

15 (Pages 54 to 57)