UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11745RWZ

BARBARA DEIGHTON HAUPT, Trustee of
BD REALTY TRUST,

    Plaintiff

v.

TOWN OF WAREHAM acting by and
through the BOARD OF SELECTMEN OF
THE TOWN OF WAREHAM, and the
BOARD OF SELECTMEN OF THE TOWN
OF WAREHAM,

    Defendants

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION *IN LIMINE* TO
BAR EVIDENCE OF PLAINTIFF'S
PURCHASE PRICE FOR THE
PREMISES

    The issue in this eminent domain case is a determination of the fair market value of the Plaintiff's premises at the time of the taking on December 31, 2003. Approximately three and half years earlier, on August 31, 2000 Plaintiff had purchased the premises in a voluntary arms length transaction from an unrelated party for $225,000. See Deposition of Barbara Haupt, page 10 (Attached as Exhibit A). At the time of the purchase the premises was undeveloped land. Throughout the plaintiff's ownership the condition and use of the premises did not change and the premises remained undeveloped. See Deposition of Barbara Haupt, pages 51-52 (Attached as Exhibit B). Under Massachusetts law the original purchase price may be admitted in the discretion of the court if not too remote in time and if there has been no substantial intervening change in conditions. Brush Hill Development, Inc. v. Commonwealth, 338 Mass 359, 367, 155 N.E.2d 170 (1959). Because the time frame here is well within the range accepted by

courts as not being too remote, and because there have been no intervening changes in property conditions, the court should deny Plaintiff's motion.

In considering the admissibility of evidence to determine fair market value after a taking, the Massachusetts Supreme Judicial Court writes:

> "a noncompulsory sale between a willing seller and buyer is ordinarily regarded as a good test or criterion to aid the jury in determining the value of the land in controversy. The opinion of the buying public so expressed in a free market is what usually determines value." Suburban Land Co. v. Inhabitants of Town of Arlington, 219 Mass. 539, 541, 107 N.E. 432 (1914).

To be irrelevant, the purchase must be so remote in time to the government taking that it affords no indication of the value of the land at the time of the taking. See Lembo v. Town of Framingham, 330 Mass. 461, 463 115 N.E.2d 370, 371 (1953). In considering this length of time, many courts have admitted evidence of a purchase price more remote in time than the one at issue here. See e.g. Fitzgerald v. Boston Redevelopment Authority, 357 Mass. 766, 258 N.E. 2d 79 (1970)(six years); H.E. Fletcher Company v. Commonwealth, 350 Mass. 316, 214 N.E. 2d 721 (1966) (five years and six years); Brush Hill Development, Inc. v. Commonwealth, 338 Mass 359, 367, 155 N.E. 2d 170 (1959)(five years); Lembo v. Town of Framingham, 330 Mass. 461, 463 115 N.E. 2d 370, 371 (1953)(four years); Keating v. Duxbury Housing Authority, 11 Mass App. Ct. 934, 416 N.E. 2d 553 (1981) (five years).

There were no changes in conditions to the property during the time it was owned by Plaintiffs. At the time of purchase the property was undeveloped. At the time of the taking the property was in the same condition. In Fitzgerald v. Boston Redevelopment Authority, 357 Mass. 766, 258 N.E.2d 79 (1970), the court upheld the admission of the purchase price paid by landowners six years previously for a lot which

was used for parking both at time of such purchase and at time of taking. There is no merit to Plaintiff's argument that "substantial changes in market conditions" render the purchase price irrelevant. To support this argument Plaintiff seems to be relying on general upward market adjustments that occurred before the taking. However, increasing, even rapidly increasing, real estate values do not make a former purchase price irrelevant. In dismissing a similar argument that a "rapid rise in real estate values" over a four year period rendered a purchase price irrelevant the Massachusetts Supreme Judicial Court remarked, "The conditions during the four years in question were doubtless within the memories of the jurors, and they could make due allowance for them." Lembo v. Town of Framingham, 330 Mass. 461, 463, 115 N.E. 2d 370, 371 (1953). In any event, there can be no prejudice, as Plaintiff will have the opportunity at trial to introduce evidence and cross examine witnesses as to intervening "market conditions" during the time between the purchase and the taking.

Defendants,
By their attorneys,

_____
Richard Bowen (BBO# 552814)
Jeffrey T. Blake (BBO# 655773)
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA  02110-1109
(617) 556-0007

308775/3100/0224

# EXHIBIT A

```
 1   Rochester a long time ago.
 2       Q.  Do you know what sort of property it was?
 3       A.  It was acreage.
 4       Q.  Do you still own it today?
 5       A.  No.  No.
 6       Q.  Do you recall how you disposed of it?
 7       A.  I don't remember.  I was having a baby at
 8   the time, so I didn't keep good track of what was
 9   going on.  I know we had street lots that we sold.
10       Q.  Basically approval not required type lots?
11       A.  It was acreage that was not developable.  I
12   can't remember how that went.
13       Q.  Let me show you a document marked as
14   Exhibit 2.
15       A.  Yes, that's the deed.
16       Q.  And when did you buy the property that's the
17   subject of this litigation?
18       A.  August 31, 2000.
19       Q.  And what was the consideration paid for the
20   property?
21       A.  It is hard to say.  I think the
22   consideration on the deed was 225.
23       Q.  Was there any other consideration not
```

1 | expressed in the deed?
2 | A. I am trying to recall. I think there was
3 | four thousand dollar extension fee that went to the
4 | owner. Just regular expenses, closing expenses.
5 | Q. Were there any permitting or legal expenses
6 | I mean other than the usual sort of thing that you
7 | recall being part of the consideration?
8 | MR. ANGLEY: I am sorry. That she
9 | would have paid to Schwachman or have assumed?
10 | Q. Or have assumed.
11 | A. I think there was -- I can't remember now.
12 | Somewhere between 15 hundred, two thousand that went
13 | to the engineers.
14 | Q. And that was because of the permitting that
15 | was ongoing when you acquired the property?
16 | A. Right. Right.
17 | Q. When did you first learn that the property
18 | was for sale?
19 | A. Let me think. I think it was sometime in
20 | the early summer.
21 | Q. Of 2001?
22 | A. 2000.
23 | Q. Oh 2000, pardon me.

# EXHIBIT B

1    Q.   What other beach clubs did you look at?

2    A.   There is one in Falmouth.  Again I don't
3 remember the name of it.  There is another one next
4 to Horse Neck Beach.  That was just an annual.
5 People paying annual fees.  They couldn't own it.
6 And they did have lockers, but they were doubled or
7 tripled up.  The two or three people had used the
8 same little deal.  But they had a waiting list.

9    Q.   Did you think that the Horse Neck and
10 Falmouth ones were comparable to what you wanted to
11 do?

12   A.   Not really.  There really wasn't anything
13 exactly comparable because they aren't making anymore
14 water front.

15   Q.   Well global warming, you never know.

16   A.   Well this actually, this shore line hadn't
17 changed because we had to research for the DEP permit
18 where the high water mark was.  In 60 years what I
19 saw anyway.  I am not an expert.  I just concluded
20 that it really is not going anywhere.

21   Q.   Has the property changed much over the years
22 since you opened it?

23   A.   No.  Can you see from the pictures.  It is

1   pretty much the same.
2           MR. ANGLEY:  You are referring to the
3   time she observed it or since she doesn't own it any
4   longer.
5       Q.  Well during the time she owned it for
6   starters.
7       A.  No.
8       Q.  And has it changed since the town took it?
9       A.  I haven't seen any changes.
10      Q.  Getting back to the question of beach clubs.
11  Other than the ones you already described, are there
12  any others that you considered?
13      A.  I couldn't find any locally.  I am familiar
14  with Florida.  And I talked to a woman who did golf
15  courses and so forth.
16      Q.  Down in Florida or up here?
17      A.  Mostly Florida.  And I just didn't get to
18  that point because I got stopped at the pass, you
19  know.  So I wasn't able to do that.  But we have our
20  experts now, maybe we could do more.
21      Q.  When you came up with this range and you
22  were looking at these beach clubs, did you do any
23  cost of development analysis?