UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11745RWZ

| | |
|---|---|
| BARBARA DEIGHTON HAUPT, Trustee | ) |
| of BD REALTY TRUST, | ) |
|        Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| THE TOWN OF WAREHAM acting by | ) |
| and through the BOARD OF | ) |
| SELECTMEN OF THE TOWN OF | ) |
| WAREHAM, and the BOARD OF | ) |
| SELECTMEN OF THE TOWN OF | ) |
| WAREHAM, | ) |
|        Defendants | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY EXECUTION OF PLAINTIFF'S FIRST WRIT OF EXECUTION PENDING APPEAL AND WAIVE SUPERSEDEAS BOND REQUIREMENT**

Now comes the Plaintiff, Barbara Deighton Haupt, Trustee of BD Realty Trust ("the Trust"), and opposes Defendants' Motion to Stay Execution of Plaintiff's First Writ of Execution Pending Appeal and Waive Supersedeas Bond Requirement. For reasons, the Trust states as follows.

**ARGUMENT**

I.     The Town Has Failed To Advance Any Credible Rationale Which Would Warrant a Waiver of the Supersedeas Bond Requirement.

The Defendant-Appellant Town of Wareham ("the Town") presently requests a waiver from the supersedeas bond requirement found in Fed. R. Civ. P. 62 and Local Rule 62.2. As set forth below, there is no basis to grant a waiver in this instance, and therefore this Court should require the Town to post the supersedeas bond or else allow the Trust to proceed on its execution of the money judgment.

1

A.    <u>The Town Misrepresents Its Financial Ability to Pay the Judgment and Therefore a Bond Should Be Required</u>.

As a general matter, "[g]iven that the bond requirement is explicitly described in both the federal and local rules, an appellant should . . . be obliged to satisfy it." <u>Cipes v. Mikasa, Inc.</u>, 404 F.Supp.2d 367, 369 (D. Mass. 2005).  <u>See also</u> Fed. R. Civ. P. 62 and Local Rule 62.2. However, the <u>Cipes</u> court noted that, at least with respect to the district courts within the Seventh Circuit, there are criteria that should be used to determine whether a waiver of the bond requirement is warranted, including

> the degree of confidence that the district court has in the availability of funds to pay the judgment; [] whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and [] whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

<u>Id.</u> at 369-70 (citing <u>Dillon v. City of Chicago</u>, 866 F.2d 902, 904-05 (7th Cir. 1988)).  Using the Seventh Circuit framework, the <u>Cipes</u> court then went on to analyze whether the appellant in that case had demonstrated that it could clearly and plainly satisfy the judgment so as to waive the bond requirement.  The appellant pointed to financial statements indicating its net worth as support for its request for the waiver.  <u>See id.</u> at 370.  However, other documents in the record indicated to the court that the appellant's finances had been declining for several years and that future financial distress was likely.  <u>See id.</u>  Based on this evidence, the court found that the appellant's "ability to pay the judgment following appeal is not sufficiently guaranteed to warrant waiver of the supersedeas bond requirement" and thus denied the motion.  <u>Id.</u>  The court went on to point out that if the appellant "is as financially secure as it assures this Court it is, its ability to obtain the bond will not be difficult."  <u>Id.</u>

In its motion, the Town misleads this Court when it states that "the Town's ability to pay the judgment is so plain that the cost of the bond would be a waste of money" and that "[t]he

Town is a <u>stable and financially sound</u> judgment creditor . . . and a judgment of $1.3 million will not bankrupt the Town."  Town's Mot. at  p.2-3.   First, the foregoing assertions made by the Town are completely unsupported by any credible affidavit or other evidence regarding the true nature of the Town's financial status.  That is, the Town fails to include a detailed budget, much less any sworn statements from appropriate Town officials, presenting the state of financial affairs in Wareham.

More importantly, however, these bald and baseless assertions go against the great weight of recent publicity regarding the budget shortfall and financial predicament the Town is currently facing.  To wit, several recent newspaper articles more accurately set the financial scene for the Town of Wareham:

- In a twist of irony, an article published just two days before the Town filed its present motion notes that "<u>To close a $1.4 million projected deficit, the town approved a budget that included no money for lifeguards</u>", including Swifts Beach, the very beach taken by eminent domain by the Town of Wareham and serving as the underlying dispute in this case.  <u>See</u> **Exhibit A** – "Budget cuts take toll on beaches", New Bedford Standard-Times, June 24, 2007 (as reprinted at <u>www.southcoasttoday.com</u>) (emphasis added).

- During the May 1, 2007 Town Meeting debating which of two town boards' budgets should be considered at the Town Meeting, Wareham Selectwoman M. Jane Donahue stated that "[t]he town of Wareham is on the <u>brink of bankruptcy</u>."  <u>See</u> **Exhibit B** – "Wareham budget dispute boils over at Town Meeting, New Bedford Standard-Times, May 2, 2007 (as reprinted at <u>www.southcoasttoday.com</u>) (emphasis added).

- As reported in April 2007, "The fiscal 2008 budget could prove daunting because, unlike recent years, <u>the town does not have so-called 'free cash' to close an estimated $1.4 million gap</u>. . . . <u>The town has been carrying what's described as a 'structural deficit' for years</u>.  The deficit is the portion of operating expenses funded through reserves, typically defined as 'free cash', rather than tax revenue . . . ."  <u>See</u> **Exhibit C** – "Wareham Town Meeting to tackle budget", New Bedford Standard-Times, April 18, 2007 (as reprinted at <u>www.southcoasttoday.com</u>) (emphasis added).  <u>See also</u> **Exhibit D** – 2007 Recruitment information for search for new Town Administrator (noting that "Wareham is facing a period of financial stringency", "structural deficit" and "financial difficulties" and that "the scale of this problem will not be known precisely until the state budget is finalized").

Based on the foregoing, it is an utter falsehood for the Town to represent to this Court that the Town's ability to pay the judgment is so plain that it does not warrant assuming the cost of a supersedeas bond. It is also pure folly for the Town to lead this Court to believe that "a judgment of $1.3 million will not bankrupt the Town" when the Town's own representatives have made contrary statements at public meetings. The Town has not put forth any credible facts which disputes the information submitted herewith by the Trust, and certainly none which warrants the waiver of the supersedeas bond required by Local Rule 62.2. Indeed, submission of at least some form of financial information or affidavit testimony about the Town's ability to pay judgment appears mandatory before this Court can even consider a waiver of the supersedeas bond. See, e.g., Cipes, 404 F.Supp.2d. at 370 (court considered financial statements, deposition testimony of former chief financial officer of corporation, balance sheet, and Dun & Bradstreet report); Bowers v. Baystate Techs., Inc., 2001 WL 640876 *1 (D. Mass. 2001) (court considered financial statements and affidavits). Moreover, using the more relevant criteria suggested by the Seventh Circuit in Dillon, and given the information known about the Town's present financial status, this Court should not have any "degree of confidence in the availability of funds" that the Town has to pay the judgment, and therefore should require the posting of a supersedeas bond forthwith.[1]

Furthermore, the Town contradicts itself when, on the one hand, it touts its purported ability to pay a $1.3 million judgment, yet complains that it cannot possibly pay the cost of posting a supersedeas bond, which is an out-of-pocket expense that is merely a fraction of the

---

[1] Although the Seventh Circuit also requires its district courts to consider whether the appellant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the appellant in an insecure position, this consideration should not be made by this Court because there is no evidence that the Town of Wareham has other creditors, much less is it clear about the severity of the Town's financial problems other than what has been reported in the local newspapers.

total judgment.[2]  As aptly stated by the <u>Cipes</u> court, if the Town of Wareham is as financially secure as it assures this Court it is, its ability to obtain the bond will not be difficult.  This Court should simply not be swayed by the notion that the Town merely prefers to use these minimal funds for "general municipal functions" rather than satisfy its legal obligation.

      B.    <u>The Ability of a Town to *Procedurally* Satisfy a Judgment Under M.G.L. c. 44, § 31, Does Not Mean That Town Has the *Actual* Ability to Pay a Money Judgment</u>.

In further support of its motion, the Town suggests that in the event that it is unsuccessful in its appeal, "the funds to satisfy the judgment will be immediately available without the need of a Town Meeting vote", and relies on M.G.L. c.44, § 31 in support of this argument.  This assertion is nothing more than a red herring.  A careful reading of M.G.L. c. 44, § 31, reveals that this statute only governs the <u>procedural</u> ability of a municipality to secure funds to satisfy a judgment, not the <u>actual</u> and <u>financial</u> ability to pay such funds:

> Payments of final judgments and awards . . . may, with the approval of the director of accounts if the amount of the judgment or award is over ten thousand dollars, be made from any <u>available</u> funds in the treasury.

M.G.L. c. 44, § 31 (emphasis added).

As noted above, it is clear that the Town of Wareham appears to be facing serious financial hardship.  Thus despite any authority that the Town's director of accounts may have to approve funds necessary to satisfy the judgment when the time comes, if there are no available funds in the treasury the Trust will be left unpaid.  This likely scenario is avoided by requiring the Town to post a supersedeas bond which secures the Trust's interests.

      II.    <u>The Town Has Failed to Set Forth Any Factual or Legal Basis for A Completely Unsecured Stay of the Execution</u>.

---

[2] The Town states that the cost for a supersedeas bond is two percent (2%) of the total judgment.  Although the Town calculated this amount to be $3,000, it appears to be incorrect—two percent (2%) of $1,100,000 (the amount of the $1,550,000 judgment, without interest or costs, to which the Trust is entitled) is $24,200.  Nonetheless, the Town is either able to pay the cost of the bond based on its purported plain financial ability to pay the judgment or else the Town misrepresents its true financial status to this Court.

The purpose of posting a supersedeas bond is to stay the execution of a money judgment, and appellant is generally required to satisfy this requirement if it wishes to forego the execution during the appeal process.  <u>See</u> <u>Cipes</u>, 404 F.Supp.2d at 369.  <u>See</u> <u>also</u> Local Rule 62.2.  There do not appear to be any reported cases within the First Circuit where the courts have allowed an <u>unsecured</u> stay of execution, and certainly the Town has not advanced any arguments or facts which would merit such relief in this instance.  <u>See</u> <u>id.</u> at 369.   At best, the Court can approve <u>alternate</u> security in lieu of a supersedeas bond, but this should only be done if and when the Town has properly demonstrated a substantial effort to comply with the $1.3 million bond requirement.  <u>See</u> <u>id.</u>  It would simply be unfair and unreasonable to burden the Trust with the prospect that it might not receive judgment monies from the Town in the likely event that the jury's verdict withstands appeal, particularly in light of the fact that the Town has not shown that it is solvent enough to pay the judgment.   To that end, this Court should not set an unreasonable and dangerous precedent by allowing a waiver of supersedeas bonds when there is no rational basis to do so.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should <u>deny</u> the Town's Motion to Stay Execution of Plaintiff's First Writ of Execution Pending Appeal and Waive Supersedeas Bond Requirement, and require the Town to post the supersedeas bond for the amount required by Local Rule 62.2 forthwith.

Plaintiff,
BARBARA DEIGHTON HAUPT, Trustee
of BD REALTY TRUST,
By her attorneys,

Date:   June 27, 2007

   /s/ Kristen M. Ploetz_____
Jeffrey T. Angley, Esq.
B.B.O. #543958
Kristen M. Ploetz, Esq.
B.B.O. #654549
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
(617) 367-8787

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 27th day of June, 2007.

_____/S/ Kristen M. Ploetz_____
Kristen M. Ploetz, Esq.

L:\Ditn002\opp.mot.stay.execution.doc

**EXHIBIT A**

# Budget cuts take toll on beaches

By Briand Boyd and Michelle Lee
Standard-Times
June 24, 2007 6:00 AM

Wareham's Little Harbor beach is buzzing with the signs of summer — children taking a dip in the water, people tanning on the beach and friends chatting under the sun.

The one sight missing from Little Harbor and Wareham's other two public beaches this summer is lifeguards. To close a $1.4 million projected deficit, the town approved a budget that included no money for lifeguards.

Although many SouthCoast park and recreation superintendents said they are ready for the season, there are challenges for some local beaches. Besides Wareham's lack of lifeguards, heavy April rains left damage and caused erosion in Westport and Dartmouth.

In Wareham, Onset, Little Harbor and Swifts beaches will remain open, and the Municipal Maintenance Department will clean up the beaches, selectmen Chairwoman Brenda Eckstrom said.

Local volunteers have pitched in to help with upkeep of the beaches.

"Thank God for our residents, to step up and do things like that," Mrs. Eckstrom said. "It's going to be a tough season."

Wareham has signs notifying visitors to swim at their own risk, and only one parking attendant will be monitoring Onset Beach for parking stickers.

Money for lifeguards was among the cuts approved by Town Meeting voters last month to keep the $58.2 million budget balanced.

The Harbormaster's Office may end up picking up some of the slack.

"We will probably have more calls regarding the beaches and situations the lifeguards would normally have handled," Harbormaster Michael L. Parola said.

Mr. Parola said his office also took a hit in the budget cuts; the number of seasonal staff members has been cut from eight to three and a half positions.

"I had a skeleton staff before," he said. "Now, I have half of a skeleton staff."

He recommended that without lifeguards, parents should be extra vigilant of their children at the beech.

At Little Harbor, beachgoers gave mixed reactions to the loss of lifeguards.

"It is disappointing," said Stephanie Barkas, 32, of Wareham, mother of four. She added, "As parents, we have to keep a close eye on our kids."

Audra Schiappa, 37, also of Wareham, said she does not rely on the lifeguards anyway, keeping a watchful eye on her four children, ages 2 to 7.

Mrs. Schiappa said it could make a difference when it comes to older children who are more likely to roam. "It would be nice to have backup support," she also said.

For her part, Carolyn Tutein, 43, a Belmont resident who summers in Wareham, said she does not think there is a strong need for lifeguards at Little Harbor, though they might be necessary at more crowded beaches, such as Onset Beach.

"This beach isn't really that dangerous," she said, referring to Little Harbor.

Meanwhile, New Bedford's East and West beaches will have lifeguards on duty this summer, as well as beaches in Mattapoisett and Westport.

In other towns, Mother Nature had a hand in changing the topography at two beaches.

At East Beach in Westport, the sands are covered with cobblestones and rocks from a berm that broke during the heavy rainstorm in April, said Robert E. Carroll, chairman of the Westport Beach Committee. Mr. Carroll said the storm "wrecked havoc" on the beach and estimated that it could take millions of dollars to restore it. The committee is evaluating different options on how the beach could be repaired and how to obtain renovation funds.

In the meantime, East Beach is still open to the public. "It's not as nice," Mr. Carroll said. "You'd have to spread the blanket on the rocks."

The April storm also washed away a foot and a half of sand from Round Hill Beach in Dartmouth, said Park Superintendent Tim Lancaster. However, Mr. Lancaster said the erosion is a cyclical event at the beach and the sands should return as the summer and fall progresses. Erosion did not occur at Apponagansett and Jones beaches.

Mr. Lancaster said the town's beaches are prepared to open on Saturday and July 1 and will be fully staffed with 20 lifeguards and 60 part-time maintenance workers. He expects thousands of visitors this summer, with the Fourth of July the busiest time.

His only concern would be the Portuguese man-of-war colonies that invaded several Massachusetts and Rhode Island beaches last year. Beaches in New Bedford and Westport were temporarily closed to avoid encounters with the dangerous creatures with stinging tentacles. The tropical polyps were believed to have traveled north by the Gulf Stream and were blown to shore by local winds, according to marine biologists. "Hopefully they won't return," Mr. Lancaster said.

Mattapoisett Beach opened on Father's Day and is ready for the summer crowds, Gretchen MacDonald, the town recreation director, wrote in an e-mail. The beach has three full-time and two part-time lifeguards. She also noted the recreation department is preparing a volleyball tournament to honor the town's 150th birthday.

Westport's other beaches, Horseneck Beach State Reservation and Cherry & Webb Beach, are also in good condition for summer visitors.

Cherry & Webb Beach has eight lifeguards signed up for duty, and water quality tests will continue at Horseneck and Cherry & Webb, Mr. Carroll said. So far, there have been no sightings of Portuguese man-of-war, and Mr. Carroll said the water hasn't been warm enough to bring in any tropical critters.

Horseneck Beach State Reservation, which covers 600 acres, has 32 lifeguards on duty and 20 part-time workers for maintenance and selling tickets, said Isidore Mete, the recreation facility supervisor. Currently, the park is undergoing some boardwalk renovations and will build two new bathhouses as part of a $5 million upgrade.

Mr. Mete, who also manages Demarest Lloyd State Park in Dartmouth, said the beach is ready with five lifeguards and five summer workers. Renovation work to the bathhouse has also been completed and it will replace the portable toilets used for the past seven years, Mr. Mete said.

"We're prepared as we can be this summer for the season," Mr. Mete said.

The beach at Fort Phoenix State Reservation in Fairhaven also has a facility with showers that is currently under renovation and is expected to be completed by the third week of July, said Mark Cabral, a part-time assistant at the beach.

Contact Brian Boyd at bboyd@s-t.com

undefined

**EXHIBIT B**

# Wareham budget dispute boils over at Town Meeting

By Brian Boyd
Standard-Times staff writer
May 02, 2007 6:00 AM

WAREHAM — A dispute over which town board's budget would be considered at Town Meeting came to a head Tuesday night when five of six members of the Finance Committee abruptly resigned.

Finance Committee Chairman William Heaney and member Patrick Tropeano publicly announced their resignations during Town Meeting. The surprise announcements, which were met with a smattering of applause from Town Meeting floor, came after the town moderator sided with the selectmen, who had demanded that a budget proposed by the acting town administrator on March 21, and not the Finance Committee's plan, be used as the official budget offering.

The procedural dispute between the selectmen and Finance Committee fueled a heated debate Tuesday night. After it was clear that Town Moderator John Donahue would insist the March 21 budget be used as the main motion, Mr. Heaney and Mr. Tropeano announced they would resign at the close of Town Meeting.

A couple of hours later, voters rejected the selectmen's budget and approved the Finance Committee's $58.2 million version.

After Town Meeting adjourned, Mr. Tropeano said not only were he and Mr. Heaney resigning, but five of the six Finance Committee members had indicated they were stepping down.

Mr. Donahue said he attempted unsuccessfully to mediate the dispute before the meeting.

"It was a difficult question I was asked to rule on," Mr. Donahue said.

He also announced that he will establish a committee to resolve the matter before the special Town Meeting in the fall.

The Finance Committee had maintained it was following tradition in presenting a report that included acting Town Administrator John Foster's plan and its version.

While the Finance Committee report included Mr. Foster's proposals, selectmen were presenting a budget submitted by the administrator on March 21. Mrs. Eckstrom said earlier that that version was "the first and only version" presented to selectmen and therefore the official budget according to the town charter.

The dispute forced the town to delay Town Meeting, originally scheduled to begin April 23, until this week.

Selectmen Chairwoman Brenda Eckstrom moved Tuesday night that the March 21 budget be considered the proposed budget, and Mr. Heaney moved to amend Mrs. Eckstrom's motion to use the Finance Committee's version. Town Meeting went on to debate the Finance Committee version.

Town attorney Richard Bowen contended that the selectmen had the right to present their proposed budget. And he said the charter gave the Finance Committee the first opportunity to amend the proposed budget.

Mr. Bowen acknowledged that this interpretation "doesn't square up with your tradition."

Mr. Heaney charged that the procedural dispute that delayed Town Meeting one week was "a ruse" to allow the selectmen to bring back an earlier version of the budget.

As selectmen and the Finance Committee battled over which budget plan to present to voters, one area of difference was the library.

The budget plan that the selectmen contended was the official version cut library spending by 54 percent, from $677,001 in the current fiscal year to $312,905 in fiscal 2008. The Finance Committee report reduced the library budget by 17 percent to $558,712.

While considering the Finance Committee amendment, Town Meeting debated the impact of the two competing budgets on the library.

Resident Naomi Arenberg said the library is a social center and provides a range of educational services. "The library is much more than just a depository of books," she said.

Selectman M. Jane Donahue, in arguing against the Finance Committee amendment, said, "The town of Wareham is on the brink of bankruptcy."

The library is not the only department taking a hit as the town tries to close a $1.4 million gap between projected revenue and expenses. Both budget plans eliminate the Recreation Department.

The two versions had other differences: the March 21 plan fully funded a request by Upper Cape Cod Regional Technical School, while the Finance Committee proposed a lower amount, effectively rejecting the school's $1.74 million assessment to Wareham.

In other areas, they were the same. Both reduce Police Department spending by 9 percent compared to its current fiscal year budget.

Library officials said the smaller cut would allow them to maintain more services and attempt to keep its state certification.

The library has 16 full-time and part-time employees. The deeper cut would leave only four to five part-time employees, library director Mary Jane Pillsbury told The Standard-Times.

With the alternative, the library would lose a full-time librarian and a couple of pages. Hours for other part-time employees would be reduced, Mrs. Pillsbury said.

Under a 17 percent cut, the library still would be able to apply for a waiver from state certification requirements to avoid losing state aid and grants, she said.

undefined

**EXHIBIT C**

# Wareham Town Meeting to tackle budget

By Brian Boyd
Standard-Times staff writer
April 18, 2007 6:00 AM

WAREHAM — Voters who attend Town Meeting next week will have to make budget decisions at a time of fiscal uncertainty.

The annual Town Meeting starts Monday at 7 p.m. in the high school auditorium. Voters will have to decide 40 articles on the regular warrant.

The fiscal 2008 budget could prove daunting because, unlike recent years, the town does not have so-called "free cash" to close an estimated $1.4 million gap. Officials have to come to Town Meeting with a balanced budget and, this year, that won't be easy.

"The budget is going to take some time," Town Moderator John Donahue said.

The Finance Committee will present Town Meeting with a balanced budget, Chairman William Heaney said. Committee members will likely finalize the budget proposal when they meet tonight at 6:30 in the Multi-Service Center, Mr. Heaney said.

The town has been carrying what's described as a "structural deficit" for years. The deficit is the portion of operating expenses funded through reserves, typically defined as "free cash," rather than tax revenue, Mr. Heaney said.

The town must close the gap this year because it has run out of free cash, he said.

"There will be less town services provided than in fiscal 2007 in order to balance the budget," he said.

The proposed budget is not the same as the one submitted by former Town Administrator Michael Hartman. The plan does not eliminate spending for the Council on Aging and street lights, Mr. Heaney said.

However, the current proposal still closes the Recreation Department and provides no money for lifeguards or beach parking attendants, he said.

Other articles include the community events committee proposed by Selectman James Potter. In light of the cancellation and near cancellation of different events, Mr. Potter wants the town to create a committee to sponsor and encourage community events.

Various zoning proposals will also be on the agenda. One plan, known as "inclusionary zoning," would require residential developments with 10 units or more to designate at least 10 percent of them as low-cost housing. Another zoning proposal would add new standards and guidelines for commercial districts.

A proposal submitted by residents asks voters to allow an addition of approximately 800 square feet

onto the Oak Grove School for a Cape Verdean cultural center.

Voters will be asked to approve spending of Community Preservation Act money, including $500,000 toward the purchase of a conservation restriction on the 90-acre Sacred Hearts Seminary property. Preservation money is raised through a property tax surcharge.

The owners of the land would keep ownership but give up the right to develop it, said Nancy Miller, chairwoman of the Community Preservation Committee.

The restriction ensures the preservation of the land, and the Audubon Society, the Wareham Land Trust, and the town's Conservation Commission would manage the land, Ms. Miller said.

"It is a fabulous opportunity," she said.

The committee plans to request another $400,000 at the fall Town Meeting, and the balance of the $2.5 million restriction will be covered by private donations and federal funds, she said.

Also, there is a proposal to pay the difference between Officer Gary Lopes Jr.'s police pay and what he earned while serving in Iraq as a Marine. The proposal would require approval from the state.

The proposal appears both on the regular warrant and the warrant for the special Town Meeting, which will be held during the regular session, said R. Renee Fernandes-Abbott, former selectman and proponent of the article.

Contact Brian Boyd at bboyd@s-t.com

# WAREHAM "" The Onset Protective League will host a Town Meeting preview at 7 p.m. tomorrow at the Dudley Brown VFW off Onset Avenue in Onset. Town Meeting starts Monday.

Members of the Wareham Land Trust, the Finance Committee, Planning Board and Dr. Joe Costa of the Buzzards Bay National Estuary Program will be on hand to discuss warrant articles.

Dr. Costa will open the program by discussing nitrogen loading and introducing a warrant bylaw article drafted by the Buzzards Bay NEP that establishes nitrogen discharge limits for Wareham and requires new developments to install wastewater systems.

In addition to the proposed nitrogen loading bylaw, Wareham Land Trust members will discuss an article seeking $500,000 in Community Preservation Act funding for an effort to protect 90 acres of Sacred Hearts Seminary property from development.

Members of the Planning Board will be on hand to address zoning articles that propose a new zoning district as well as several "housekeeping" articles. The Finance Committee will introduce the proposed budget for fiscal 2008.

Refreshments will be served. The Wareham Land Trust will not hold a separate meeting tomorrow as first planned; its meeting has been combined with this event.

**EXHIBIT D**

# Town of Wareham, Massachusetts

# Town Administrator





Bennett Yarger Associates

# Introduction

Bennett Yarger Associates has been retained by the Wareham Board of Selectmen to recruit a new Town Administrator. This Profile and Challenge Statement draws upon our discussions with members of the Board of Selectmen, staff members, and community representatives. It describes our understanding of the organization, the challenges that lie ahead for the successful candidate, and the professional and personal characteristics an ideal candidate would possess. For more information about the Town of Wareham, including a copy of the charter, please consult its web site: http://www.wareham.ma.us

# Background on the Town of Wareham

Wareham is located on Buzzards Bay, a large bay that separates Southeastern Massachusetts from Cape Cod. The Town enjoys a great geographic location. It is within a seventy-five minute drive to Boston, which can also be reached by commuter rail from the Lakeville Station. The Town is less than an hour's drive from Providence. The most prominent geographic characteristic of Wareham is its long, irregular coastline providing the Town with ample waterfront property, which has long supported the tourist and second home industry. The landform is virtually identical to Cape Cod's. It is relatively flat, much of the waterfront is on estuaries, and the inland portions are characterized by relatively new growth forests and bogs. The latter are heavily used for cranberry cultivation, a mainstay of agricultural activity in Wareham. Because of its location, just before the Bourne Bridge, on the main road from New York, Connecticut and Rhode Island, the Town is known as the Gateway to the Cape. Wareham has the feel of a classic New England waterfront community that has not strayed far from its roots.

The Town of Wareham has a history that goes back to the early period of settlement by the English. The Town of Plymouth purchased most of the land that now forms the Town from the Indians in 1666. Wareham was incorporated in 1739. Its economy has always been closely connected to its natural resources. Early settlers used water to power the manufacturing mills for grain, cotton goods, paper, nails, rails, and other iron products. The Tremont Nail Company (founded in 1819), the nation's oldest nail manufacturer, was still in operation until two years ago. At that time the Town bought it for future development of a cultural / artisan center.

The 2000 US Census places the population at 20,335 and places median household income at approximately forty thousand dollars per year, about twenty percent below the state average. The land area of the Town is approximately thirty-five square miles.

# Organizational Design and Governance

Wareham's Charter, available through the Town's website, establishes the traditional New England Open Town Meeting as the legislative body of the Town and a Town Administrator/ Board of Selectmen structure as the Executive. The current structure is the result of a series of charter modifications and reforms

starting in the 1980s. The School Department while a part of Town Government operates under the jurisdiction of an elected School Committee. The Board of Selectmen consists of five members elected for three year staggered terms. All of the selectmen are elected at-large. The Town provides all of the services that are typically provided by Massachusetts's municipalities including sewer, police, land use regulation, public works and EMS services. However, two special Districts provide water supply and fire protection: the Onset Fire District and the Wareham Fire District. These Districts dating from the early 1900s were established to provide services to distinctive parts of the Town. The Districts are actively managed and provide two key municipal services. They are independent public bodies with their own governance structures, financing and legal base. They are not part of the Town budget nor is the Town Meeting the legislative body for these Districts.

At the Town election on April 3rd, three of the five seats on the Board will be filled. One long term Selectman recently resigned for personal reasons and another long serving Selectman has decided not to run for election. An additional Selectman's position is up for election in the normal rotation and the incumbent is running for re-election. All of the seats are contested. Other than the Selectmen the only Town Officials that are elected are the Town Clerk and the Moderator.

The Board of Selectmen appoints the Town Administrator. The Charter requires four of the five Selectmen to vote affirmatively on the appointment. The Charter provides for a contract of up to three years for the Town Administrator. The Town Administrator is responsible for supervising, directing and controlling the operations of the Town except those functions headed by an elected official. The Town Administrator appoints department heads and staff with certain limited exceptions. The appointments made by the Town Administrator are effective after the Board of Selectmen has had fifteen days to reject an appointment or has sooner voted to affirm it. The charter gives responsibility for annual budget preparation to the Town Administrator.

The position of Town Administrator is firmly established in Wareham, which was one of the first towns in the region to incorporate a management professional in its governmental structure.

# Challenges for the Town Administrator

While Wareham appears to be a small to medium sized semi-rural town by some criteria it is a complex community. Its physical location on Buzzards Bay and its long history as a summer vacation destination means that its population close to doubles during the summer months. In this regard it is much like the Cape Cod towns. Like the Cape there is also very significant income disparity in the Town. Wareham despite its appearance has a significant element of urban problems.

Located at the junction of Routes 195 and 495 Wareham is easily accessible and this has both attracted some industry and placed pressure on the housing market. Both year-round and seasonal homes have spiked in price in recent years. These conditions have created the conditions to foster the development of the largest real estate development in Massachusetts. Approximately six thousand acres of land in the control of A.D. Makepeace are

planned for development for a variety of uses. While this project encompasses three towns, much of the development will be in Wareham. The first highly visible phase of this development is the six hundred thousand square foot mall adjacent to Exit 2 on Route 495 currently under construction. Very significant commercial, industrial and housing development is expected during the next twenty years as this very large property is developed.

Like many towns in Massachusetts Wareham is facing a period of financial stringency. There appears to be a structural deficit. Possibly offsetting this are discussions about enhancements to Local Aid in the state's FY 2008 budget, the possibility of an operating override under Proposition 2 1/2, the prospect of additional property tax revenue from the new mall and the reduction in debt service expected in two years when the High School is paid off.

Virtually all employees are members of collective bargaining units. The Town has a seasoned, experienced and motivated group of Department Heads but there appears little evidence that there is a management team at this time.

After an initial period of high turnover, the Town Administrator position has become well accepted. Only two people have held the post in the past thirteen years.

The composition of the Board of Selectmen is changing in a period when the Town is facing serious financial constraints. The new Town Administrator will arrive at a time when the political structure of the community may be shifting making the task of coordinating key opinion leaders a significant challenge. Specific challenges facing the new Town Administrator include

■ **Stability.** Wareham is fortunate to possess a core group of department leaders who possess considerable experience and skill. The new Town Administrator will need to draw on this talent pool to address the immediate issues of finance and the longer-term issues of structuring the Town to provide adequate services to citizens of a complex community. While meeting the immediate needs posed by the financial situation the Town Administrator will need to ensure that the Town is prepared for the consequences of the AD Makepeace development and the potential demand for services than will accompany the development.

Economic Development. Wareham will need physical development that produces net revenues for the Town. The Town's main local economic development vehicle is the Wareham Community Economic Development Authority (CEDA). This unique entity holds most of the powers typically vested in municipal development organizations. First created by a Special Act in 1977, that was substantially revised in 2004, it is governed by a seven member board on which the Selectmen have representation. The CEDA has 4 full-time employees. It is largely grant funded and has been involved in developing industrial parks, roads, sewer and water construction, streetscape improvements, construction and rehabilitation of buildings including a train station and social service programs.

The new Town Administrator will need to forge closer linkages between the Town's land use regulatory system, operations of line departments and the CEDA as the Town needs a comprehensive and unified approach to Economic Development.

■ **Employee Relations and Staff Development.** The organization is led by a group of experienced professionals, several recruited recently. There may be retirements in the next five years, and it will fall to the Town Administrator to recruit and retain qualified department managers. The general view is that Wareham's employees are fairly compensated and professional.

Like most Massachusetts municipalities virtually all employees are members of collective bargaining units. Managing the bargaining process in a fair but firm way during the current period of financial difficulty will be a challenge.

■ **Public Finance.** Like many Massachusetts towns Wareham is facing financial difficulties. The scale of this problem will not be known precisely until the state budget is finalized. Wareham's services will need to be tailored to available revenues, but in a way that maintains the core capacities required to provide services and to steadily improve services after the current period of financial exigency is past. Balancing fixed costs, state mandates, demands for service and collective bargaining requirements will be a delicate process, one that will require a significant degree of public discussion and debate.

# The Ideal Candidate

The Board of Selectmen seeks a Town Administrator willing to commit to a tenure long enough to address the current financial condition and set the stage for developing and implementing policies that will improve the organization and its ability to address service demand and growth issues. While current conditions are complex, Wareham needs a leader and problem solver who can address current concerns in a way that sets the stage for strengthening the organization.

The following attributes have been determined important in Wareham's next Town Administrator.

*Personal*

■ Able to demonstrate unquestioned integrity in interactions with officials and citizens.
■ Able to deal with the ambiguity inherent with supporting a governance system for a complex community that is conflicted about the relationships between the value of local government services and their costs to citizens. The ideal candidate must lead and facilitate the improvement of government practices and assist in building consensus on critical issues.
■ Able to play a stabilizing role in a community in which political power may be shifting both on a generational and philosophical basis.
■ Able and willing to play a highly visible role in the community. The ideal candidate must participate broadly across the leadership structure of the community and region and be a champion of the community. The Town Administrator must be comfortable, engaging directly with citizens.
■ Able to delegate internal day-to day operational responsibility, holding the staff accountable for performance. The ideal candidate will have extensive experience in staff development and team leadership.
■ Able and willing to work openly with community groups and employees but not in a confrontational manner. A direct,

collegial, facilitative style that fosters joint problem solving is needed. The Town Administrator can have no agenda beyond being a professional.

■ Able to serve as a genuine team leader able to work with other town officials in a participative municipal environment that can easily divide into factions. The successful candidate will have experience in working in a community of comparable complexity.

■ Able to be a spokesperson and representative for the Town's agenda at Town Meeting, public forums and within the region. The successful candidate must be able to use the status inherent in the position to advance the Town's agenda.

■ Able to assume the strong managerial role specified in the charter, but without becoming a micro manager. The Town Administrator must be able to engage the organization on a personal as well as professional level. The successful candidate will be direct, facilitative, and clear.

■ Able to establish a goal-oriented environment. But do so by being a genuinely inclusive leader who is capable of exerting influence and direction in a manner that shares successes with the elected officials, professionals and volunteers. The successful candidate must lead by example and commitment.

### Professional

■ A mature leader of a comparable organization with extensive personal experience in finance, labor-management relationships, and staff development.

■ A professionally stable administrator with a record of tenure and consistent career growth. The Town does not seek a resume builder. They do seek a committed Administrator willing to stay, but also willing to take risks to improve the organization

■ A demonstrated background in guiding and participating in the redevelopment of communities and growing regions. The ideal candidate will be a coalition builder, equally at home with private sector and community leaders.

■ A demonstrated track record of positioning communities to engage in successful and sustained economic development. The ideal candidate will have experience in developing institutional economic development capacity including the formation of public-private partnerships, experience in deal structuring, rezoning, and advocacy. A record of developing effective relationships with municipal land use regulatory boards is important.

■ A proven track record of staff development with an emphasis on team building. The ideal candidate will have experience serving comparable communities aggressively restructuring services and priorities.

■ A proven municipal administrator with considerable leadership experience and appropriate education. The ideal candidate will have a bachelor's degree and the knowledge typically gained in a Masters program would be valuable. A minimum of five to ten years experience as a City or Town Administrator is preferred. A record of professional development and training is important as well as strong experience using IT to improve services.

■ The successful candidate must be a well-rounded administrator with a track record of managing complex customer service organizations within constrained financial resources. Financial management skills are vital to this position. Municipal planning, labor relations and grantsmanship skills are also strengths important to this position.

■ A balanced communicator with a proven track record of informing the elected leadership of critical policy and service initiatives. The new Town Administrator must be capable of keeping all officials comprehensively informed, while staying totally detached from the political process and ensuring that the members of the administration maintain a similar detachment.

■ A mature, experienced administrator with an understanding of how to lead a relatively small, complex community. This is not a position for a person seeking his or her first appointment as a Town Administrator unless that person has served a number of years as an assistant manager in a municipality of comparable complexity. Clearly, the successful candidate cannot be a politician in the classic sense, but must have a well-honed understanding of local political processes.

■ The Town Administrator must be both strategic and tactical. He or she must be experienced in working effectively in a political environment providing impartial guidance to elected officials to accomplish both the long-term strategic needs of the community as well as the short-term tactical steps necessary to deliver services.

■ Sense of realism; tell people how it is. A practical consensus builder, but willing to make decisions.

■ Not a caretaker. Someone who is creative and willing to advocate for issues that improve the community and who can effectively play the leadership role envisioned by the Charter.

## Salary and Schedule

The search begins in March, 2007 and will conclude in late May, 2007. The application deadline is April 19th, 2007. Compensation is anticipated to be in the $105,000 to $120,000 range, DOQ, plus benefits. . The Town will consider negotiating an incentive compensation system as a part of the Town Administrator's contract. Residency is not required. An employment contract is authorized by the charter.

## How to Apply

Electronic application is preferred using our website: www. bennettyarger.com. Please identify this recruitment on our homepage, combine cover letter and resume into a single file and complete the application form as directed.

Richard Kobayashi, President
Bennett Yarger Associates
P. O. Box 1360
Plymouth, MA 02362

Tel: 508/209-0055
Fax: 781/545-8565
Email: gconnors@bennettyarger.com

Electronic correspondence preferred.